UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

State of Minnesota,                          Case No. _____
by and through its Attorney General,
Keith Ellison,

          Plaintiff,

                              **COMPLAINT**

    v.

United States Department of Agriculture
and Brooke Rollins, Secretary of the
U.S. Department of Agriculture,

          Defendants.

**INTRODUCTION**

1.     Once again, the Trump Administration is threatening to let the needy go hungry.

2.     Just last month, the Trump Administration unlawfully withheld Supplemental Nutrition Assistance Program (SNAP) benefits nationwide and repeatedly attempted to score political points by blaming Democrats for its own actions.

3.     Now, in the midst of the holiday season, the Trump Administration has threatened to cut off Minnesota's SNAP funding and disqualify it from SNAP altogether unless Minnesota performs the impossible.

4.     On December 16, 2025, Agriculture Secretary Brooke Rollins sent a letter to Minnesota Governor Tim Walz purporting to require Minnesota to "recertify" the eligibility of over 100,000 SNAP households in Minnesota in just thirty days from the

receipt of the letter, which is January 15, 2026. She further demanded that Minnesota conduct in-person interviews with each of those households as part of the recertification process.

5.    Secretary Rollins threatened to take severe punitive actions against Minnesota if it failed to comply, including disqualifying all of Minnesota from SNAP.

6.    Defendants have no lawful authority to impose these demands on Minnesota or to punish it for failing to comply. Instead, the demand is part of an ongoing, misguided, and unlawful effort by the federal government to further the federal administration's personal and political grievances with Minnesota and its elected officials.

7.    Moreover, conducting in-person interviews and recertifications of over 100,000 households within 30 days would be utterly impossible even if Defendants had provided advance notice and Minnesota and its county partners redirected all available resources to the effort. Defendants surely know this.

8.    Minnesota seeks this Court's intervention to enjoin Defendants' unlawful actions.

## JURISDICTION AND VENUE

9.    This Court has jurisdiction over this Complaint under 28 U.S.C. §§ 1331 and 1346. Jurisdiction is also proper under the judicial review provisions of the Administrative Procedure Act. *See* 5 U.S.C. §§ 702, 704. The Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202.

10.    Venue is proper in this district under 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1). Defendants are United States agencies or officers sued in their official capacities. The State

of Minnesota is a resident of this judicial district, and a substantial part of the events or omissions giving rise to this Complaint occurred within this district.

## PARTIES

11.    Plaintiff State of Minnesota is a sovereign state of the United States of America. Minnesota is represented by and through its chief legal officer, Attorney General Keith Ellison, who is authorized to sue on the State's behalf, including on behalf of its public schools and its citizens. Minn. Stat. § 8.01.

12.    Defendant the United States Department of Agriculture (USDA) is a cabinet agency within the executive branch of the United States government. 28 U.S.C. § 501.

13.    Defendant Brooke Rollins is the Secretary of the USDA. She is charged with the supervision and management of all decisions and actions of that agency. She is sued in her official capacity. 28 U.S.C. § 503.

## FACTUAL ALLEGATIONS

### I.    SNAP PROVIDES LIFE-SAVING FOOD ASSISTANCE IN MINNESOTA AND THROUGHOUT THE UNITED STATES.

14.    Congress created SNAP to "safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households" by "permit[ting] low-income households to obtain a more nutritious diet through normal channels of trade by increasing food purchasing power for all eligible households who apply for participation." 7 U.S.C. § 2011. SNAP provides monthly electronic benefits that can be used like cash to purchase qualified food items.

15.    The federal government has long played a critical role in preventing hunger. SNAP's roots date to the first food stamp program in 1939. Congress enacted the Food Stamp Act in 1964.[1] *See generally* Food and Nutrition Service, *A Short History of SNAP*, https://www.fns.usda.gov/snap/history. The 2008 Farm Bill changed the name from the Food Stamp Program to SNAP and replaced the Food Stamp Act of 1977 with the Food and Nutrition Act of 2008 (FNA). *See* Pub. L. No. 110-234.

16.    To qualify, applicants must show their household[2] income is below threshold levels and that they meet other requirements.

17.    Nearly 24 million Americans received SNAP benefits in fiscal year 2024, including about 8.4 million children.

18.    SNAP benefits are "supplemental" for a reason: they help households stretch their food budgets but are not sufficient to fully meet expected food costs. A report showed that in 2024, the maximum per-meal SNAP benefit was insufficient to cover the cost of a modestly price meal in 99% of counties within the United States.[3] Compounding the issue, grocery prices have increased in 2025 at a rate higher than general inflation.

---

[1]    *See generally* Food and Nutrition Service, *A Short History of SNAP*, https://www.fns.usda.gov/snap/history.

[2]    "Household" is a defined term that includes an individual living alone, an individual living with others but who purchases food and prepares meals alone, or a group who lives together and purchase food and prepare meals together. 7 C.F.R. § 273.1(a).

[3]    Urban Institute, *Does SNAP Cover the Cost of a Meal in Your County?*, July 16, 2025, https://www.urban.org/data-tools/does-snap-cover-cost-meal-your-county.

II.    **IN MINNESOTA, THE DEPARTMENT OF CHILDREN, YOUTH, AND FAMILIES ADMINISTERS SNAP IN PARTNERSHIP WITH MINNESOTA'S COUNTIES AND TRIBAL NATIONS.**

19.    The USDA's Food and Nutrition Service (FNS) oversees SNAP, but SNAP is administered by the States. That is, States determine household eligibility and distribute benefits. *See* 7 U.S.C. §§ 2013, 2020.

20.    In Minnesota, the Department of Children, Youth, and Families (DCYF) administers SNAP. Minnesota uses a "State-supervised, county-administered" model. DCYF supervises 87 counties and 3 Tribal Nations that process and review SNAP applications.

21.    This model allows Minnesotans to work with their local county offices to apply for SNAP and to recertify ongoing eligibility. It also allows for higher responsiveness to emergency applications and allows county employees to evaluate eligibility for multiple county-run programs that may be implicated, creating higher efficiency and accuracy.

22.    Counties determine whether a household qualifies for SNAP by collecting information regarding the applicant, individuals who live with the applicant, income, expenses, and assets. Applicants may be asked to submit pay stubs, rent or mortgage documents, medical bills, and other paperwork to verify their eligibility.

23.    Once a county has determined a household is eligible for SNAP, the State, through DCYF, issues payments to participants' Electronic Benefit Transfer cards (EBT) using an EBT vendor. Participants can use their EBT cards just like debit cards to pay for food at grocers, farmers markets, and other retailers.

24.    In fiscal year 2024, DCYF issued benefits to an average of approximately 440,000 Minnesotans each month, including 181,980 children and 67,000 elderly individuals. DCYF currently issues about $75 million in benefits each month.

25.    A household is certified for a "certification period." To remain eligible, the household must "recertify" before the certification period expires. *See* 7 C.F.R. §§ 273.10(f), 273.14. Recertification periods cannot exceed twelve months except in limited circumstances. 7 C.F.R. § 273.10(f). In Minnesota, certification periods are either six, twelve, or twenty-four months, with twelve months being most common.

26.    During recertification, the administering county or Tribal Nation asks SNAP participants about changes to income, assets, household composition, or other circumstances that occurred during the certification period. Individuals are also required to notify the county sooner than the next scheduled certification when certain changes affecting eligibility occur.

27.    The applicable county or Tribal Nation also interviews a household member of the SNAP participant during recertification. USDA encourages State agencies to permit these interviews to take place by telephone and requires them to permit telephone interviews in case of "household hardship," including "illness, transportation difficulties, care of a household member, hardships due to residency in a rural area, prolonged severe weather, or work or training hours that prevent the household from participating in an in-office interview." 7 C.F.R. §§ 273.2(e)(2), 273.14(b)(iii), 273.14(b)(3).

28.    Minnesota permits all recertification interviews to take place either by telephone or in-person.

29.     While SNAP benefits are funded by the federal government, the costs of administering SNAP are split evenly between the federal government and Minnesota. *See* 7 U.S.C. § 2025(a). Minnesota spends approximately $160 million per year administering SNAP, $80 million of which is reimbursed by USDA. As discussed above, Minnesota distributes $75 million in benefits per month.

### III.    MINNESOTA TAKES CARE TO ENSURE SNAP PROGRAM INTEGRITY, INCLUDING PREVENTING AND IDENTIFYING FRAUD.

30.     Minnesota conducts regular quality control reviews by reviewing a statistically valid sample of SNAP cases to determine whether decisions to deny, suspend, or terminate cases are correct. Federal law establishes standards for state quality control reviews and a process by which state error rates are compared to the national average error rates. 7 U.S.C. § 2025(c); 7 CFR 275.10(a).

31.     Minnesota also performs regular management evaluations to monitor and assess counties and Tribal Nations in their SNAP administration. As with quality control reviews, federal law sets requirements for management evaluations. 7 C.F.R. §§ 271.2, 275.9(a).

32.     According to the USDA data, Minnesota's payment error rate in 2024 (which includes both overpayments and underpayments) was 8.98%, lower than the national average of 10.93% and lower than the error rates of 33 other States or Territories. Alaska's error rate, by contrast, exceeds 24%.

33.    The Congressional Research Service acknowledged as recently as April 2025 that "SNAP fraud is rare, according to available data and reports" and that error rates generally reflect incorrect eligibility determinations, not fraud.[4]

34.    In addition to federally-mandated quality control review and management evaluations, Minnesota also has a State Fraud Prevention Investigation (FPI) program administered by counties and Tribal Nations to investigate possible recipient fraud in public assistance programs, including SNAP. This program actively pursues and investigates cases, with a focus on fraud prevention.

35.    Minnesota also accepts tips and referrals from all sources about potential fraud or abuse (providing a website, email, hotline, and mail reporting option).

## IV.    THE TRUMP ADMINISTRATION HAS REPEATEDLY USED SNAP AS A POLITICAL WEAPON.

36.    Throughout 2025, the federal government has used SNAP as a political weapon and repeatedly violated the FNA and its implementing regulations. Minnesota and dozens of other states have had to sue three times to stop the federal government's unlawful conduct.

### a.    The federal government unlawfully demands SNAP data.

37.    States collect highly sensitive data regarding SNAP applicants and recipients, including home addresses, Social Security numbers, and household income for millions of Americans.

---

[4] Congressional Research Service, *Supplemental Nutrition Assistance Program: Errors and Fraud*, Apr. 7 2025 (https://www.congress.gov/crs-product/IF10860).

38.     Because this data is sensitive—and federal and state privacy laws protect it—the federal government has always asked States to share limited data sets (*e.g.*, a statistically significant sample without personally identifying information) for quality control checks.

39.     But earlier this year USDA demanded that States turn over nearly all of their sensitive SNAP records since January 2020 and threatened States with noncompliance procedures—including cutting SNAP administrative funding—if they did not comply.

40.     Twenty-two states and the District of Columbia, including Minnesota, sued to stop USDA's unlawful demands. In October 2025, a federal district court granted a preliminary injunction, finding it likely that "the SNAP Act prohibits [States] from disclosing to USDA the information demanded in the formal warnings." *California v. USDA*, 2025 WL 2939227, at *10 (N.D. Cal. Oct. 15, 2025). The Court further noted that "USDA has announced its intent to use such information in ways well beyond those permitted under [the FNA]." *Id.* The Court enjoined USDA from disallowing SNAP funding based on the states' failure to comply with the unlawful demands. *Id.* at *14.

**b.  The federal government unlawfully withholds SNAP benefits during the government shutdown.**

41.     The federal government had never before tried to halt SNAP benefits during government shutdowns.

42.     But in October 2025, USDA announced it was suspending all SNAP benefits due to the then ongoing shutdown, despite having billions of dollars in contingency funding available to fund benefits. USDA posted a banner on its website blaming "Senate

Democrats" for the cessation of SNAP benefits, claiming they had done so "to hold out for healthcare for illegal aliens and gender mutilation procedures."

43.    President Trump posted on social media that "SNAP BENEFITS . . . will be given only when the Radical Left Democrats open up government, which they can easily do, and not before!"[5]

44.    Two federal district courts found that USDA's attempt to shut off SNAP benefits was likely unlawful. *See Massachusetts v. USDA*, __ F. Supp. 3d -__, 2025 WL 3040441, at *5–7 (D. Mass. Oct. 31, 2025) ("*Massachusetts I*"); *R.I. State Council of Churches v. Rollins*, 2025 WL 3050100, at *1–2 (D.R.I. Nov. 1, 2025).

45.    One federal district court further found it "clear that the administration is withholding full SNAP benefits for political purposes." *R.I. State Council of Churches v. Rollins*, __ F. Supp. 3d __, 2025 WL 3111213, at *11 (D.R.I. Nov. 6, 2025).

### c.    The federal government tries to unlawfully withhold SNAP benefits from non-citizens.

46.    On July 4, 2025, Congress passed the One Big Beautiful Bill Act (OBBB), which narrowed the categories of non-citizens eligible for SNAP. *See* Pub. L. No. 119-21, § 10108, 139 Stat. 72, 85 (2025).

47.    Four months later, on October 31, 2025, USDA issued guidance to the States that went beyond OBBB and said, for example, that refugees, those granted asylum, and others who entered the United States through humanitarian protection programs could

---

[5] Donald J. Trump (@realDonaldTrump), Truth Social (Nov. 4, 2025, at 11:06 AM), https://perma.cc/6QAN-54YU.

never be eligible for SNAP. It also said that many categories of immigrants were no longer exempt from a five-year waiting period imposed on some lawful permanent residents before they can access SNAP.

48.    Twenty-one states and the District of Columbia sued to stop USDA from implementing this unlawful guidance and moved for a preliminary injunction. On December 15, 2025, a federal district court entered a preliminary injunction barring USDA from enforcing its unlawful guidance. *See New York v. Rollins*, Case No. 6:25-cv-02186-MTK (D. Or. Dec. 15, 2025) (Dkt. 64).

## V.    THE TRUMP ADMINISTRATION TARGETS MINNESOTA AND ITS POLITICAL LEADERS.

49.    The Trump Administration has unlawfully targeted Minnesota because of personal animosity toward Minnesotan politicians, disagreements with policy choices made by the Minnesota legislature, and bias against Minnesota residents of Somali descent. Indeed, in the context of litigation with Saint Paul, the Trump Administration has admitted to targeting states led by Democrats.[6]

50.    Trump has repeatedly demonstrated personal animosity toward Minnesota Governor Tim Walz, the Democratic vice-presidential nominee in the 2024 election.

---

[6] Meryl Kornfield, *Trump administration admits to targeting blue states for energy grant cuts*, The Washington Post, Dec. 17, 2025, https://www.washingtonpost.com/politics/2025/12/17/blue-state-cuts-trump-grants.

51.    For example, in the wake of the assassination of former State Speaker of the House Melissa Hortman and her husband Mark Hortman, President Trump said that Governor Walz is "so whacked out, I'm not calling him."[7]

52.    President Trump has referred to Governor Walz by a crude nickname, called him a "dangerously liberal extremist," and just last month used a slur to call him "the seriously re----ed Governor of Minnesota, Tim Walz."[8] On December 1, 2025, the Trump Administration published a highly partisan missive titled, "Yes, There's Something Wrong With Walz—and it cost Taxpayers $1 Billion" on the official White House website. In that posting, the White House called Governor Walz "deeply disturbed" and falsely claimed that "the massive [Feeding our Future] scandal unfolded on Walz' watch—and he did absolutely nothing about it."[9]

53.    President Trump has also repeatedly disparaged Minnesota Congresswoman Ilhan Omar. [10]

---

[7] Cheyanne M. Daniels, *Trump won't call 'whacked out' Walz after Minnesota shooter charged*, Politico, June 17, 2025, https://www.politico.com/news/2025/06/17/trump-walz-phone-call-00410141.

[8] Zak Failla, *Trump Uses Slur Against Gov. Tim Walz in Thanksgiving Truth Social Tirade; Walz Fires Back*, Msn.com, Nov. 28, 2025, https://www.msn.com/en-us/news/politics/trump-uses-slur-against-gov-tim-walz-in-thanksgiving-truth-social-tirade-walz-fires-back/ar-AA1RllEY.

[9] The White House, *Yes, "There's Something Wrong with Walz"—and it Cost Taxpayers $1 Billion*, Dec. 1, 2025, https://www.whitehouse.gov/articles/2025/12/yes-theres-something-wrong-with-walz-and-it-cost-taxpayers-1-billion/.

[10] Dareh Gregorian, *Trump calls Ilhan Omar 'garbage' and says Somalis should 'go back to where they came from'*, NBC News, Dec. 2, 2025, https://www.nbcnews.com/politics/donald-trump/trump-calls-ilhan-omar-garbage-somalis-go-back-came-from-rcna247041.

54.     President Trump has also recently defamed Minnesota's Somali community. In November 2025, President Trump falsely claimed that Somalis were "completely taking over the once great state of Minnesota" and forming violent gangs.[11] He said they should "go back to where they came from" and "I don't want them in our country."[12]

55.     The Trump Administration has increasingly targeted Minnesota not just with words but actions.

56.     In November 2025, President Trump posted on social media that he would terminate Temporary Protected Status (TPS) for Somalis in Minnesota and shortly thereafter ordered that green cards for Somalis be reexamined, falsely claiming "[h]undreds of thousands of Somalians [sic] are ripping off our country and ripping apart that once great state."[13]

57.     In December 2025, the Trump administration launched an "intensive immigration enforcement operation primarily targeting hundreds of undocumented Somali immigrants in the Minneapolis-St. Paul region" that is still ongoing.[14]

58.     Federal agencies have also demanded data and begun new investigations of Minnesota programs at an unprecedented volume:

---

[11] *Id.*

[12] *Id.*

[13] Conor Wight, *President Trump orders green cards from Somalia, other countries of 'concern' be reexamined*, CBS Minnesota, Nov. 30, 2025, https://www.cbsnews.com/minnesota/news/trump-orders-green-cards-somalia-countries-concern-reexamined/.

[14] Hameed Aleaziz, et al., *New ICE Operation Is Said to Target Somali Migrants in Twin Cities*, N.Y. Times, Dec. 2, 2025, https://www.nytimes.com/2025/12/02/us/politics/ice-somali-migrants-minneapolis-st-paul.html.

a. On December 1, 2025, the U.S. Department of Justice notified the Minnesota Department of Health that one of its grant programs related to health disparities was under investigation.

b. That same day, U.S. Transportation Secretary Sean Duffy purported to give Minnesota 30 days to revoke commercial driver's licenses that the U.S. Department of Transportation characterized as unlawful.

c. Also that same day, the U.S. Treasury Secretary Scott Bessent announced (via social media) that the Treasury Department would investigate claims that Minnesota tax dollars may have been diverted to terrorist organizations.

d. On or around December 2, 2025, the administrator of the U.S. Small Business Administration announced (via social media) that she was ordering an investigation based on the Feeding our Future scheme.

e. On December 4, 2025, the Administration for Children and Families division of the U.S. Department of Health and Human Services used the Feeding our Future fraud scheme as an excuse to demand Minnesota provide "the complete universe of TANF administrative data for all recipients from 2019 through 2025."

f. On December 9, 2025, the U.S. Department of Justice filed a lawsuit against Minneapolis Public Schools over the schools' collective bargaining agreement.

g. Also on December 9, 2025, the U.S. Department of Education and U.S. Department of Health and Human Services demanded the State of Minnesota enter into an agreement by December 15, 2025 related to transgender student athletes. That communication was followed by a letter dated December 22, 2025 threatening enforcement action against the State.

h. On December 12, 2025, the federal government sent six separate letters to the State of Minnesota demanding a large volume of data (including names, dates of birth, SSNs, and addresses) related to the following separate programs: Refugee Cash Assistance, Refugee Medical Assistance, Child Care and Development Fund program, Community Services Block Grant program, Social Services Block Grant program, Low Income Energy Assistance Program, Parents in Community Action program, Head Start, and Title IV-E funding. That same day the federal government sent two more letters to other Minnesota recipients, including Minneapolis Mayor Jacob Frey.

i. On December 15, 2025, the U.S. Department of Labor sent a letter to the Minnesota Department of Employment and Economic Development stating it would conduct an onsite visit in January 2026 to investigate alleged fraud.

## VI.    THE TRUMP ADMINISTRATION THREATENS TO TERMINATE SNAP IN MINNESOTA UNLESS MINNESOTA COMPLIES WITH UNLAWFUL, IMPOSSIBLE DEMANDS.

59.    Continuing that flurry of federal demands directed at Minnesota, on December 16, 2025, Secretary Rollins sent a letter (the "Recertification Letter") to Governor Walz asserting there is "highly publicized and ongoing fraud affecting federally funded benefits in the State of Minnesota[.]" (Ex. 1.) The only support for this assertion was the "Feeding Our Future" fraud, which occurred in approximately 2020–21 during the COVID-19 pandemic and did not involve SNAP. (*Id.*)

60.    Secretary Rollins stated that "USDA is hereby requiring Minnesota to participate in a Supplemental Nutrition Assistance Program (SNAP) pilot project, conducted pursuant to 7 U.S.C. § 2026(b)(1)(A), to increase the efficiency of SNAP and improve the delivery of SNAP benefits to eligible households." (*Id.*) She claimed that "[m]ore accurate certifications of eligibility for SNAP benefits will ensure that those in need receive assistance, raising levels of nutrition among low-income individuals." (*Id.*)

61.    Secretary Rollins stated the "pilot project" required Minnesota to take various actions, including recertifying all SNAP households in Hennepin, Ramsey, Washington, and Wright counties (the "Recertification Counties") within 30 days of receipt of the letter (i.e. by January 15, 2026). (*Id.*)

62.    The Recertification Letter imposes new requirements for this recertification process that go beyond what is required by USDA's regulations during the typical recertifications every household must complete at regular intervals.

15

63.     It states that Minnesota must "account[] for the income and resources of any excluded household members, conduct[] in-person interviews, and us[e] federal eligibility tools like the improved, cost-free Systematic Alien Verification for Entitlements (SAVE) Program database." (*Id.*)

64.     The Recertification Letter threatens that "[f]ailure to participate in this pilot project as specified by USDA will trigger noncompliance procedures codified in 7 U.S.C. § 2020(g). It may also affect Minnesota's continued participation in SNAP." (*Id.*)

**a. The stated reasons for imposing the "pilot project" are unreasoned and unsupported.**

65.     The Recertification Letter cites the Feeding Our Future fraud as the reason for singling out Minnesota for this "pilot project." (Ex. 1.) That pandemic-era scheme targeted a different food relief program that allowed organizations to receive reimbursement for large-scale distribution of prepared meals they claimed to be providing to school children.

66.     The Feeding Our Future perpetrators exploited the COVID-19 pandemic to enrich themselves between 2020 and January 2022, with some individuals stealing tens of millions of dollars to enrich themselves. That was possible because the Federal Child Nutrition Program, as designed by the federal government, permitted large reimbursements based on claimed headcounts and tally sheets, and relied on the veracity of sponsoring organizations rather than individual identifying information.

67.     But it would be exceedingly difficult to perpetrate a similar scheme via SNAP recipient fraud. Although there have been instances nationwide of significant SNAP

16

frauds, these schemes have involved retailer fraud or wrongdoers skimming or stealing SNAP recipient's card numbers and draining the accounts.[15] Here, the proposed "pilot project" does nothing to discover these types of fraud. The "pilot project" targets only SNAP recipient fraud. Recipient fraud occurs when people, for example, lie about their income or identity or sell benefits for cash. The amount of information gathered at the time of application and recertification reduces the opportunities for wide-scale fraud, and the relatively modest amounts available make such schemes less lucrative, requiring far more work to steal less money. SNAP households in Minnesota receive, on average, $314 in benefits per month.

68.    The large-scale Feeding Our Future fraud, which ended years ago and involved non-profits and shell companies lying about the number of children they were feeding to reap hundreds of millions of dollars, simply provides no reason to believe individuals in Minnesota are committing SNAP recipient fraud at greater rates than the rest of the nation in order to obtain an average of $314 in food benefits per month.

---

[15] *See, e.g.,* U.S. Government Accountability Office, *Stolen SNAP Benefits Cost Beneficiaries Millions*, Dec. 2, 2025, https://www.gao.gov/blog/stolen-snap-benefits-cost-beneficiaries-millions; Neal Riley, *2 Massachusetts store owners charged in $7 million SNAP fraud case*, CBS News, Dec. 17, 2025, https://www.cbsnews.com/boston/news/snap-massachusetts-fraud-boston/; Madeline Bartos, *7 charged in Pennsylvania SNAP trafficking operation that stole $775k*, CBS Pittsburgh, Dec. 18, 2025, https://www.cbsnews.com/pittsburgh/news/pennsylvania-snap-trafficking-operation/?intcid=CNR-01-0623.

### b. The "pilot project's" demands are impossible to comply with.

69.     Approximately 106,000 households and 191,000 individuals receive SNAP benefits in the Recertification Counties, constituting 45% of SNAP households statewide. It is impossible to recertify them within 30 days of receipt of the Recertification Letter even using the normal recertification process required by 7 C.F.R. § 273.14.

70.     But that process is made significantly more onerous by requiring in-person interviews. USDA's regulations recognize that in-person interviews often impose unnecessary burdens. *See* 7 C.F.R. § 273.2(e)(2). The USDA therefore encourages State agencies to permit telephone interviews, *see id.* § 273.14(b)(1)(iii), and it requires State agencies to permit telephone interviews in cases of "household hardship," which must include, at a minimum, "illness, transportation difficulties, care of a household member, hardships due to residency in a rural area, prolonged severe weather, or work or training hours that prevent the household from participating in an in-office interview." *Id.* §§ 273.14(b)(3), 273.2(e)(2).

71.     The Recertification Counties lack adequate physical space for the number of in-person interviews required by the Recertification Letter. Privacy and confidentiality would both be compromised. *See* 7 C.F.R. § 273.2(3)(1) ("Facilities must be adequate to preserve the privacy and confidentiality of the interview.").

72.     Even if adequate office space existed, Minnesota and the Recertification Counties cannot compel households to appear for interviews. USDA's regulations provide that "State agencies may not require households to report for an in-office interview during their certification period[.]" 7 C.F.R. § 273.2(e)(1). "For example, State agencies may not

require households to report en masse for an in-office interview during their certification periods simply to review their case files, or for any other reason." *Id.*

73.    Home visits are not viable either. In addition to requiring significantly more resources, USDA's regulations prohibit home-based interviews unless a household meets specified hardship criteria and requests an in-home interview. 7 C.F.R. §§ 273.2(e)(2), 273.14(b)(3).

74.    The USDA requires Minnesota to provide at least one month's notice before recertifications, 7 C.F.R. § 273.14(B)(1)(I), and Minnesota's practice is to provide 45 days' notice. Neither is possible here.

75.    Simply notifying recipients of the need for unexpected recertifications and scheduling in-person interviews involves significant work. DCYF does not have enough copies of the required notice forms in stock to send to all households in the Recertification Counties at once. Even if it did, printing and sending them and scheduling over 100,000 in-person interviews would take significant time.

76.    And it is difficult to communicate with many recipients. For example, many recipients are homeless and receive mail via General Delivery, which often involves a significant delay between when mail is sent and when it is received.

77.    USDA regulations require Minnesota to schedule interviews so that a household has at least 10 days following the interview to provide verification documents for the recertification. 7 C.F.R. § 273.14(B)(3)(iii). So to complete recertifications by January 15, 2026, the latest an interview could occur is January 5.

78.     Conducting over 100,000 in-person interviews is made even more difficult by the fact that USDA is requiring this to happen in the heart of the Minnesota winter, a time with frequent severe weather and inability to travel.

79.     Moreover, the thirty-day period from December 16, 2025 to January 15, 2026 includes three major holidays (Christmas, Hannukah, and New Year's Day). Indeed, that period includes some of the most important holidays of the year for many Minnesotans, often involving travel, planned time away from work, and important family obligations, limiting the availability of both employees and recipients to complete the recertifications.

80.     So in reality, the time for completing over 100,000 interviews is significantly shorter than thirty days because interviews cannot begin immediately upon receipt of the letter on December 16 but can only be scheduled over time with significant effort by county staff and cooperation by recipients. The interviews would need to be completed within twenty days after receipt of the letter to provide households with sufficient time to provide verification documents, and the timeframe is further reduced by the holiday season.

81.     The mandated recertifications and in-person interviews are further complicated by the fact that the USDA is ordering this to occur while the U.S. Department of Homeland Security and U.S. Immigration and Customs Enforcement (ICE) are engaging in "Operation Metro Surge" in the Twin Cities.

82.    It has been widely reported that ICE is engaging in racial profiling by stopping and detaining people of color regardless of citizenship or immigration status.[16] Predictably, many residents are afraid to leave their homes, including citizens and others with lawful status.[17] The Recertification Counties include the Twin Cities and the metropolitan area that ICE is targeting. In-person interviews are made more difficult by the fact that individuals in many qualifying households—including people of color or those in mixed-status households[18]—are already fearful of leaving their homes and will be particularly fearful of meeting with a government official during ongoing ICE activity.

---

[16] *See, e.g.,* Emmy Martin et al., *Racial profiling concerns grow as ICE expands presence in Twin Cities*, Minn. Star Tribune, Dec. 18, 2025, https://www.startribune.com/racial-profiling-concerns-grow-as-ice-expands-presence-in-twin-cities/601545116.

[17] *See, e.g.,* Jason Rantala, *Trump's immigration policies are hurting Minneapolis small businesses, owners say*, CBS Minnesota, Dec. 16, 2025, https://www.cbsnews.com/minnesota/news/trump-immigration-minneapolis-small-business-impact/ ("The Trump administration's increased immigration enforcement has made many Twin Cities residents afraid to leave their homes"); Nina Moini & Aleesa Kuznetsov, *'People seek our food to feel close to home': Minneapolis chef says ICE fears hurt business*, Dec. 17, 2025, https://www.mprnews.org/episode/2025/12/17/people-seek-our-food-to-feel-close-to-home-minneapolis-chef-says-ice-fears-hurt-business ("[P]eople that look like us…are afraid to go out because they're going to be racially profiled. They might get kidnapped with no reason."); Tesfaye Negussie & Sabina Ghebremedhin, *Somalis in Minnesota say ICE agents already targeting their community*, ABC News, Dec. 8, 2025, https://abcnews.go.com/US/somalis-minnesota-ice-agents-targeting-community/story?id=128080449 ("[Minneapolis City Council member Jamal Osman] said that people are afraid to leave their houses, and he is advising those of Somali descent to carry passports everywhere they go.").

[18] "Mixed-status households" are those where at least one member is not eligible for SNAP because of his or her immigration status. These often include one or more parents without lawful presence who have U.S. citizen children. Mixed-status households are still eligible for SNAP. *See* 273.11(c)(3).

83.    Indeed, one ICE tactic is to arrest Minnesota residents at county courthouses when they appear for hearings.[19] Even if Minnesota and the Recertification Counties could assure recipients that state and county employees presented no risk of unlawful immigration enforcement, they could not assure them that ICE will not target recipients appearing for mandatory interviews.

84.    Attempting to complete this mammoth process in the timeframe provided would require the Recertification Counties to redirect all available staff to working exclusively on SNAP recertifications, causing harm to county residents who need assistance with other programs or services.

85.    The Recertification Counties would also experience significant human resources and labor relations issues by attempting to demand that their staffs complete this impossible task.

86.    Further, recertifications must occur on a regular cadence. *See* 7 C.F.R. §§ 273.10(f), 273.14(a). Recertifying all existing households in a thirty-day period creates a recurring glut of recertifications at regular intervals for years to come. The Recertifying Counties would likely need to hire additional staff to repeat those recertifications despite the fact those additional staff would be unnecessary most of the year.

---

[19] *See, e.g.,* Katrina Pross, *ICE arrests target immigrants at Hennepin County courthouse, causing 'immense' anxiety*, Sahan Journal, January 28, 2025 https://sahanjournal.com/public-safety/ice-arrests-minneapolis-hennepin-county-courthouse/

### i. *Hennepin County*

87.    As of November 2025, Hennepin County has 54,316 active SNAP households, including 86,987 individuals.

88.    Hennepin County typically processes about 4,500 to 5,500 recertifications each month. The Recertification Letter would require it to process roughly ten times that normal volume.

89.    Hennepin County officials have determined it is not possible for them to comply. Hennepin County does not have enough available staff members with the necessary expertise to perform 54,316 recertifications in 30 days.

90.    Redirecting all available staff members to SNAP recertifications would require Hennepin County to halt other critical work, including:

  a.  Staffing telephone lines for SNAP and cash assistance recipients (which receive approximately 80,000 calls per month);

  b.  Processing new applications, changes, or updates for SNAP and cash assistance programs;

  c.  Regular work in Quality, Training, Appeals, Technology, Emergency Assistance and Emergency General Assistance, and Housing Support; and

  d.  All onsite services other than SNAP recertification (Hennepin County sees about 10,000 residents onsite per month).

### ii. *Ramsey County*

91.    As of November 2025, Ramsey County has approximately 34,000 active SNAP households, including 58,131 individuals.

92.     Ramsey County typically processes about 2,800 recertifications each month. The Recertification Letter would require it to process over twelve times that normal volume.

93.     Ramsey County officials have determined it is not possible for them to comply. Ramsey County does not have enough available staff members with the necessary expertise to perform 34,000 recertifications in 30 days.

94.     Redirecting all available staff members to SNAP recertifications would require Ramsey County to halt other work, including for other critical services, such as:

   a.  Staffing telephone lines for SNAP and cash assistance recipients (which receive approximately 10,000 calls per month);

   b.  Processing new applications, changes, or updates for SNAP and cash assistance programs;

   c.  Regular work in Quality, Training, Appeals, Technology, Emergency Assistance and Emergency General Assistance, and Housing Support; and

   d.  All onsite services other than SNAP recertification (Ramsey County sees about 5,000 residents onsite per month).

### iii.  *Washington County*

95.     As of December 2025, Washington County has 5,447 active SNAP households, including 10,394 individuals.

96.     Washington County typically processes about 600 recertifications each month. The Recertification Letter would require it to process approximately nine times that normal volume. Washington County officials have determined it is not possible for them to comply.

97.     Washington County has determined that attempting to comply would overwhelm its staff capacity, increase processing errors, undermine its ongoing efforts to identify SNAP fraud, and cause eligible households to lose SNAP benefits.

### iv.  *Wright County*

98.     As of December 2025, Wright County has 2,861 active SNAP households, including 5,522 individuals.

99. Wright County typically processes about 300 recertifications each month. The Recertification Letter would require it to process nearly ten times that normal volume. Wright County officials have determined it is not possible for them to comply.

100.     Wright County has determined that attempting to comply would overwhelm its staff capacity, increase processing errors, undermine its ongoing efforts to identify SNAP fraud, and cause eligible households to lose SNAP benefits.

### c.  The proposed "pilot project" would undermine Minnesota's efforts to identify SNAP fraud.

101.     There is no reason to believe that the proposed "pilot project" would be successful in discovering SNAP fraud. USDA offers no evidence of any fraud among Minnesota's SNAP beneficiaries.

102.     In addition, SNAP households are already recertified at regular intervals. There is no reason to believe that this process will discover fraud that would not be discovered at a household's next scheduled recertification.

103.      Nor has USDA provided any reason to believe that in-person interviews are more effective at detecting fraud than the telephone interviews that are typically used.

104.     In fact, conducting recertifications at the frantic pace USDA has demanded would be *less* effective at detecting fraud than conducting recertifications as they come due, when employees have the time and resources necessary to complete them thoroughly.

105.     The "pilot project" would require the Recertification Counties to recertify even those households that were recently recertified. For instance, a household that was recertified on December 15 would need to be recertified *again* sometime between December 16 and January 15. Repeating that same process is exceedingly unlikely to detect fraud and is a poor use of resources.

106.     In fact, the "pilot project" is likely to *harm* Minnesota's ability to detect SNAP beneficiary fraud. DCYF and the Recertification Counties would be forced to divert all available resources to recertification efforts at the expense of the Fraud Prevention Investigation program and other tools more useful for discovering fraud than recertifications.

### d.  Minnesota would be irreparably harmed by attempting to comply with the Recertification Letter.

#### i.  Attempting to comply with the Recertification Letter will cause Minnesota to incur significant costs that cannot be recouped by damages.

107.     As discussed above, attempting to recertify over one hundred thousand households in just 30 days, including performing in-person interviews for all of them, would be massively burdensome and expensive, and would generate ongoing costs as a massive glut of households would continue to need to be recertified at regular intervals for years.

108.     Those costs would not be recoverable against Defendants. *See United States v. Testan*, 424 U.S. 392, 400 (1976) (no damages claims against United States without waiver of sovereign immunity). Economic injuries for which damages are not available due to sovereign immunity are irreparable injuries. *See Missouri v. Trump*, 128 F.4th 979, 996 (8th Cir. 2025).

> **ii. Attempting to comply with the Recertification Letter will undermine the trust that Minnesota has built with those in need of food assistance.**

109.     Those that need food assistance are often reluctant to enroll in SNAP. USDA found that in fiscal year 2020, only 78% of eligible people received SNAP benefits.

110.     Minnesota has worked for years and expended significant resources to build trust with residents in need of food assistance to encourage SNAP participation.

111.     Imposing arbitrary rules on short notice erodes the trust between SNAP recipients and Minnesota. Requiring households to recertify—even if they just recently did so—will cause confusion and distrust. All SNAP households in Minnesota, not just those in the Recertification Counties, will be left to question what new conditions might be imposed on them without notice or whether USDA will penalize Minnesota in ways that makes it impossible to provide them with SNAP benefits.

112.     And although these requirements are being imposed by Defendants, it will be State employees or its county partners who will need to explain these things to SNAP recipients, creating the impression that it is Minnesota imposing these onerous, arbitrary requirements and undermining the trust that Minnesota has worked to build.

### iii. Attempting to comply with the Recertification Letter will irreparably harm Minnesota because needy families will lose SNAP benefits.

113.   Attempting to comply with the Recertification Letter will predictably result in households losing SNAP benefits not because they are ineligible but because they were not able to complete the recertification process and in-person interviews.

114.   Removing those needy households from SNAP will transfer costs to Minnesota and its local governments and community organizations, as those families will increasingly rely on emergency services and safety net programs like local food banks, or will go hungry.

115.   Food banks are already strained because USDA cut $500 million in food deliveries this year.[20]

116.   Booting needy families off SNAP will harm public health and wellbeing. Loss of SNAP causes hunger and malnutrition, which are associated with many poor health outcomes in children including poor concentration, decreased cognitive function, fatigue, depression, and behavioral problems.

117.   These outcomes in turn harm Minnesota's education system. Children without nutritious food struggle to learn, while access to nutritious food is associated with better educational outcomes, including improved attendance, behavior, grades, and test scores.[21]

---

[20] *See* Tami Luhy, *Food banks scramble after USDA halts $500 million in deliveries*, CNN (Mar. 22, 2025), https://www.cnn.com/2025/03/22/politics/food-banks-usda-delivery-halt.
[21] *See* Sehrish Naveed et al., *An Overview on the Associations between Health Behaviors and Brain Health in Children and Adolescents with Special Reference to Diet Quality*,

118.     Minnesota will need to devote additional resources to address these health and education problems.

119.     SNAP is also critical to adults' health. Low-income adults who participate in SNAP incur about $1,400 less in medical care costs per year than low-income non-participants. Food insecurity generally is associated with higher healthcare costs, including emergency room visits, hospitalizations, and related costs.

120.     Loss of SNAP benefits will harm state healthcare systems and programs that partially depend on state funds, like MinnesotaCare.

121.     Cutting SNAP benefits for eligible households also has downstream effects. It harms merchants who accept SNAP benefits, including grocers and farmers markets, and has ripple effects for all of Minnesota's economy.

### iv. Attempting to comply with the Recertification Letter will irreparably harm Minnesota by increasing its payment error rate, leading to severe financial consequences.

122.     The OBBB creates penalties for States whose SNAP payment error rates exceed specified thresholds, requiring those States to shoulder a portion of the costs of their SNAP benefits. *See* 7 U.S.C. § 2013(a)(1)–(2). Errors made during the current fiscal year bear on the assessed penalties. *See id.* § 2013(a)(2)(B)(ii)(I).

123.     The diversion of resources for a rushed recertification process will inevitably lead to errors in eligibility determinations and payment calculations, increasing Minnesota's payment error rate and triggering potentially massive financial consequences.

---

17(3) Int'l J. Env't Res. Pub. Health. (Feb. 4, 2020), https://doi.org/10.3390/ijerph17030953.

Economic injuries for which damages are not available due to sovereign immunity are irreparable injuries. *See Missouri*, 128 F.4th at 996.

> **e. Minnesota would be irreparably harmed by the punitive actions Defendants have threatened in the Recertification Letter.**

124.    As discussed above, Minnesota cannot possibly comply with the Recertification Letter. It would therefore be subject to the sanctions Defendants have threatened, which include loss of SNAP administrative funding (via the provisions of 7 U.S.C. § 2020(g)) and "Minnesota's continued participation in SNAP." (Ex. 1.)

125.    Being disqualified from SNAP—something not authorized anywhere by law—would be devastating to Minnesota. It would drastically magnify each of the harms discussed above.

126.    Indeed, a statewide loss of SNAP benefits "creates a substantial risk that SNAP recipients will need to rely on, and potentially overwhelm, existing state resources and services," causing "imminent fiscal injury" to Minnesota. *Massachusetts I*, 2025 WL 3040441, at *3; *see also id.* at *7 (loss of SNAP benefits "undoubtedly result[s] in substantial harm" to States). A statewide loss of SNAP benefits would further "result in major operational disruptions and administrative burdens across [State] agencies and fiscal and operational harm to state programs that will be overwhelmed by residents lacking essential SNAP benefits." *Massachusetts v. USDA*, __ F. Supp. 3d __, 2025 WL 3155810, at *2 (D. Mass. Nov. 12, 2025) ("*Massachusetts II*").

127.    The loss of SNAP administrative funds would also irreparably harm Minnesota. *See Massachusetts II*, 2025 WL 3155810, at *10 (describing lost of SNAP

30

administrative funding as "dire consequences"); *California*, 2025 WL 2939227, at *12–13 (finding threatened loss of SNAP administrative funding constitutes irreparable harm); *California v. USDA*, __ F. Supp. 3d __, 2025 WL 2678567, at *8–9 (N.D. Cal. Sept. 28, 2025) (same).

128.    Minnesota relies on and plans for significant federal funds to administer SNAP. As discussed above, Minnesota receives approximately $80 million per year from the federal government for administrative costs. Minnesota and the counties and Tribal Nations that administer SNAP would be unlikely to be able to take on those costs themselves, effectively causing a shutdown of SNAP in Minnesota (and its concomitant harms).

**COUNT I**
**Administrative Procedure Act—Procedural Violation (5 U.S.C. § 706(2)(D))**
**(Against all Defendants)**

129.    Plaintiff realleges and incorporates by reference the allegations set forth above.

130.    USDA is an "agency" as defined by the Administrative Procedure Act (APA). See 5 U.S.C. § 551(1).

131.    The FNA provides that all regulations for the SNAP program must be promulgated "in accordance with the procedures set forth in section 553 of title 5." 7 U.S.C. § 2013(c).

132.    The Recertification Letter is a final agency action because it marks the consummation of USDA's decision-making process and determines rights or obligations

from which legal consequences will flow. *See Bennett v. Spear*, 520 U.S. 157, 177–78 (1997).

133.     The Recertification Letter is a legislative rule because it "substantively amends or adds to, versus simply interpreting the contours of, a preexisting rule." *Iowa League of Cities, v. E.P.A.*, 711 F.3d 844, 873 (8th Cir. 2013); *see also N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018) (a legislative rule "assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself"); *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251–52 (D.C. Cir. 2014) (legislative rules "purport[] to impose legally binding obligations or prohibitions"). As discussed in more detail below, the Recertification Letter is directly contrary to existing law and regulation.

134.     The APA's notice-and-comment procedures apply to legislative rules. *See* 5 U.S.C. § 553. Those procedures require advanced notice of proposed rulemaking followed by an opportunity to participate by interested persons. *Id.* § 553(b)–(c).

135.     When an agency promulgates a final rule, it must include "a concise general statement of [its] basis and purpose." 5 U.S.C. § 553(c).

136.     Unless an exception applies, a substantive rule must be published or served at least 30 days before its effective date. 5 U.S.C. § 553(d).

137.     Defendants failed to follow any of these requirements. Defendants did not provide notice of proposed rulemaking to Minnesota, the Recertification Counties, or any interested person. Defendants did not provide any opportunity to participate or comment. Defendants did not provide a concise statement of the rule's basis and purpose. And

Defendants made the rule effective immediately, without waiting 30 days after providing final notice.

138.     Minnesota is entitled to a stay of the effective date of the Recertification Letter pending judicial review, to vacatur of the Recertification Letter, and to preliminary and permanent injunctions barring its implementation. *See* 7 U.S.C. §§ 705–06.

## COUNT II
### Administrative Procedure Act—Contrary to Law and in Excess of Statutory Authority (5 U.S.C. § 706(2)(A) & (C))
### (Against all Defendants)

139.     Plaintiff realleges and incorporates by reference the allegations set forth above.

140.     USDA is an "agency" as defined by the APA. *See* 5 U.S.C. § 551(1).

141.     The Recertification Letter is a final agency action because it marks the consummation of USDA's decision-making process and determines rights or obligations from which legal consequences will flow. *See Bennett v. Spear*, 520 U.S. 157, 177–78 (1997).

142.     The APA requires the Court to "hold unlawful and set aside" agency actions, findings, and conclusions that are "not in accordance with law" or "in excess of statutory . . . authority." 5 U.S.C. § 706(2)(A) & (C).

143.     The Recertification Letter is not in accordance with law and in excess of Defendants' statutory authority for several reasons.

144.     *First*, Defendants cannot mandate pilot project participation by an unwilling state. The FNA only permits pilot projects agreed to by both USDA and the participating

33

State agencies or other eligible entities. *See, e.g.,* 7 U.S.C. § 2017(f)(2) (authorizing pilot projects "at the request of 1 or more State agencies"); § 2036d(a) (authorizing pilot projects "on application of eligible entities"); § 2025(h)(1)(F)(i)(I) (authorizing pilot projects via "cooperative agreements" with State agencies); § 2021(h)(3)(i) (authorizing pilot projects "to test innovative Federal-State partnerships"). Nothing in the FNA gives Defendants authority to mandate participation in a pilot project by an unwilling participant. Indeed, Congress gave Defendants tools for taking actions against States it believes are maladministering SNAP. *See* 7 U.S.C. § 2020(g)–(l). But forced participation in pilot projects was not among them.

145.    *Second*, Defendants cannot unilaterally impose new duties and obligations upon participants in pilot projects. Congress gave the Secretary the authority only to "waive any requirement" of the FNA in connection with a pilot project. 7 U.S.C. § 2026(b)(1)(A). Congress did not give her authority to invent new obligations, like requiring recertifications that have not yet come due or requiring States to perform in-person interviews. And Defendants have not in fact waived any requirement as part of this purported pilot project.

146.    *Third*, this particular "pilot project" is prohibited by statute for the reasons in paragraphs 148–152:

147.    Congress provided that "[t]he Secretary may not conduct" a pilot project under 7 U.S.C. § 2026(b)(1)(A) unless "the project is consistent with the goal … of providing food assistance to raise levels of nutrition among low-income individuals[.]" 7 U.S.C. § 2026(b)(1)(B)(i)(I). The Recertification Letter asserts that "[m]ore accurate certifications of eligibility for SNAP benefits will ensure that those in need receive

34

assistance, raising levels of nutrition among low-income individuals." (Ex. 1.) Disqualifying existing beneficiaries due to an arbitrary deadline does nothing to help those in need of assistance. And by redirecting all available resources to recertification, this program would affirmatively harm those in need. For example, staff resources would be diverted from processing new applications to recertifying existing beneficiaries.

148.    Congress also prohibited the Secretary from conducting a pilot project under 7 U.S.C. § 2026(b)(1)(A) unless "the project includes an evaluation to determine the effects of the project." 7 U.S.C. § 2026(b)(1)(B)(i)(I). The Recertification Letter contains no provision for an evaluation.

149.    Congress further restricted "[p]ermissible projects" to those intended to "improve program administration," "increase the self-sufficiency of [SNAP] recipients;" "test innovative welfare reform strategies," or "allow greater conformity with the rules of other programs than would be allowed but for this paragraph." 7 U.S.C. § 2026(b)(1)(B)(ii). This "project" is none of these. Forcing the Recertification Counties to abandon all other SNAP-related work (e.g. processing applications, changes, and appeals) and do a year's worth of recertification work in just 30 days with no reason to believe it will catch more fraud than performing recertifications on their usual timeline does not "improve program administration," it harms it tremendously.

150.    Congress provided that "[i]mpermissible projects" include those that "den[y] assistance to an otherwise eligible household or individual" who has complied with SNAP's requirements. 7 U.S.C. § 2026(b)(1)(B)(iv)(III)(bb). But this project would deny assistance to eligible households or individuals who cannot be interviewed in person and

recertified in thirty days—requirements Defendants are attempting to impose beyond what is required by statute and regulation.

151.    Congress provided that "[i]mpermissible projects" also include those "inconsistent" with the requirement that each State agency "provide timely, accurate, and fair service" to SNAP applicants and recipients. 7 U.S.C. § 2026(b)(1)(B)(iv)(III)(ff), § 2020(e)(2)(B)(i). It is the antithesis of fairness to impose significant burdens on recipients that are not provided for by statute or regulation without notice and to retroactively change the rules of the life-sustaining benefits they have already qualified for.

152.    *Fourth*, the "pilot project" would require Minnesota to violate several provisions of the FNA and its implementing regulations.

153.    As discussed above, the "pilot project" would require Minnesota to violate the FNA's requirement that it "provide timely, accurate, and fair service" to SNAP applicants and recipients. 7 U.S.C. § 2020(e)(2)(B)(i).

154.    USDA's regulations provide that "State agencies may not require households to report for an in-office interview during their certification period[.]" 7 C.F.R. § 273.2(e)(1). "For example, State agencies may not require households to report en masse for an in-office interview during their certification periods simply to review their case files, or for any other reason." *Id.* But that is exactly what the USDA is purporting to require Minnesota to do.

155.    Because Minnesota cannot compel in-office interviews, home-based interviews would be another potential method of conducting in-person interviews (albeit one requiring significantly more resources). But USDA regulations prohibit home-based

interviews unless a household meets specified hardship criteria and requests an in-home interview. 7 C.F.R. § 273.2(e)(2).

156.     Regulations permit and encourage State agencies to conduct all recertification interviews by telephone, and State agencies must use telephone interviews in cases of "household hardship," which must include, at a minimum, "illness, transportation difficulties, care of a household member, hardships due to residency in a rural area, prolonged severe weather, or work or training hours that prevent the household from participating in an in-office interview." 7 C.F.R. § 273.2(e)(2). But here Defendants are purporting to require face-to-face interviews for *all* households, regardless of hardship.

157.     The USDA generally prohibits Minnesota from "end[ing] a household's certification period earlier than its assigned termination date." 7 C.F.R. § 273.10(f)(4). But the "pilot project" would require Minnesota to end certification periods for households who are unable to complete the recertification process and in-person interviews, even if Minnesota did not receive any information suggesting the household had become ineligible.

158.     The "pilot project" would also require Minnesota to violate notice requirements. USDA regulations provide that the first step in the recertification process is providing a notice of expiration (NOE). *See* 7 C.F.R. § 273.14(B)(1)(I). The earliest that State agencies can provide the NOE is "the first day of the next-to-the-last month" in the household's certification period. *Id.* For the vast majority of households in the Recertification Counties, performing the recertification process in the thirty-day window

mandated by USDA would require sending NOEs before the date permitted by § 273.14(B)(1)(I).

159.     On the other hand, State agencies must provide an NOE "before the first day of the last month of the certification period[.]" 7 C.F.R. § 273.14(B)(1)(I). That is, State agencies are required to give more than one month's notice. That is not possible here, where USDA informed Minnesota of this "pilot project" on December 16, 2025 and required the recertifications to be complete by January 15, 2025.

160.     And the "pilot project" would require Minnesota to violate its FNS-approved State Plan of operation, in violation of statute and regulation. *See* 7 U.S.C. § 2020(g); 7 C.F.R. § 276.1.

161.     *Fifth*, Defendants lack authority to take the remedial measures threatened in the Recertification Letter if Minnesota fails to comply with their demands.

162.     The letter threatens "[f]ailure to participate in this pilot project as specified by USDA will trigger noncompliance procedures codified in 7 U.S.C. § 2020(g). It may also affect Minnesota's continued participation in SNAP." (Ex. 1.)

163.     7 U.S.C. § 2020(g) provides that if "there is a failure by a State agency without good cause to comply with any of the provisions of this chapter, the regulations issued pursuant to this chapter, the State plan of operation submitted pursuant to subsection (d) of this section, the State plan for automated data processing submitted pursuant to subsection (o)(2) of this section, or the requirements established pursuant to section 2032 of this title," then the Secretary "shall immediately inform such State agency of such failure" and provide "a specified period of time for the correction of such failure." *Id.* If

the State agency does not correct the failure within the specified period, the Secretary may seek injunctive relief and "shall proceed to withhold" administrative funds "as the Secretary determines to be appropriate, subject to administrative and judicial review[.]" *Id.*

164.    7 U.S.C. § 2020(g) does not authorize the Secretary to take any action against Minnesota for failure to comply with the Recertification Letter. The Recertification Letter is not part of the provisions of the FNA or the regulations promulgated under it, the State plan of operation, the State plan for automated data processing, or the requirements established under 7 U.S.C. § 2023.

165.    Minnesota is entitled to a stay of the effective date of the Recertification Letter pending judicial review, to vacatur of the Recertification Letter, and to preliminary and permanent injunctions barring its implementation. *See* 7 U.S.C. §§ 705–06.

**COUNT III**
**Administrative Procedure Act—Arbitrary and Capricious (5 U.S.C. § 706(2)(A))**
**(Against all Defendants)**

166.    Plaintiff realleges and incorporates by reference the allegations set forth above.

167.    USDA is an "agency" as defined by the APA. *See* 5 U.S.C. § 551(1).

168.    The Recertification Letter is a final agency action because it marks the consummation of USDA's decision-making process and determines rights or obligations from which legal consequences will flow. *See Bennett v. Spear*, 520 U.S. 157, 177–78 (1997).

169.    The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

An agency is action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

170.    The Recertification Letter is arbitrary and capricious because the reasons for imposing the "pilot project" upon Minnesota are unsupported and irrational; because the stated reasons for the "pilot project" rely on factors that Congress has not intended for USDA to consider; because the proposed "pilot project" would not remedy the recipient fraud it supposedly targets; because it fails to consider the hardships it would impose on Minnesota, the Recertification Counties, SNAP recipients and applicants, and those who depend on other services from DCYF and/or the Recertification Counties that would be harmed while all resources are redirected toward recertification; because it fails to consider the significant reliance interests of those same groups, and because the stated reasons are pretextual and Defendants are in fact imposing this "pilot project" on Minnesota to further the Trump Administration's political and personal feuds with Minnesota and its political leaders.

171.    The stated reason for imposing the "pilot project" on Minnesota is unreasoned and unsupported. As discussed above, the large-scale Feeding Our Future fraud that occurred years ago and exploited the pandemic to steal hundreds of millions of dollars provides no reason to believe individuals in Minnesota commit SNAP recipient fraud at

any greater rates than the rest of the country in order to receive an average benefit of $314 per month.

172.    Congress, moreover, provided that in ensuring SNAP program integrity, USDA should focus on State agencies' payment error rates. *See* 7 U.S.C. § 2025(i). The Secretary "may require a State agency to carry out new or modified procedures for the certification of households" in areas with "payment error rates…that impair the integrity of [SNAP]." *Id.* Here Defendants have purportedly targeted Minnesota for new procedures not because of payment error rates but because of recipient fraud. That decision is arbitrary and capricious because it is not based on the factors that Congress specified. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). Minnesota's error rate is below the national average.

173.    And as discussed above, the proposed "pilot project" would not be successful in discovering SNAP recipient fraud. There is no reason to believe that it would discover any fraud that would not already be discovered during the normal recertification process, and in fact would require rushed recertifications and a diversion of resources from fraud detection and investigation. The mismatch between the supposed problem (recipient fraud) and the prescribed remedy (en masse recertifications) makes the action arbitrary and capricious.

174.    The "pilot project" is also arbitrary and capricious because Defendants provided no reasons for selecting Hennepin, Ramsey, Washington, and Wright counties. Together, those four counties contain about 45% of all SNAP households in Minnesota. Defendants have not explained why these counties were selected.

175.    USDA further failed to consider the hardships the proposed "pilot project" imposes on Minnesota and the Recertification Counties. Namely, that it is impossible to complete the project with the available resources as is discussed above. Requiring an impossible task is arbitrary and capricious. USDA further failed to consider that it would be immensely costly to even attempt to perform this work, and that it would harm all other critical operations performed by DCYF and the Recertification Counties as they reallocate all resources to SNAP recertifications.

176.    USDA failed to consider the hardships the proposed "pilot project" imposes on SNAP recipients and applicants. This project would require over one hundred thousand SNAP households to appear for in-person interviews, which USDA's own regulations acknowledge imposes hardship. *See* 7 C.F.R. § 273.2(e)(2). It requires those households to complete an additional recertification, no matter how recently they first qualified or last recertified, in order to keep their benefits and does not provide them with the notice otherwise required before a recertification. And people needing anything but a recertification—for example those filing a new application or seeking a change in benefits—will be harmed by the diversion of program resources to recertifications.

177.    USDA failed to consider the hardships the proposed "pilot project" imposes on beneficiaries of other programs administered by DCYF and the Recertification Counties, like the Food Distribution Program on Indian Reservations, the Food Shelves and Meal Programs, the Minnesota Food Assistance Program, the Diversionary Work Program, Emergency Assistance, or the Minnesota Family Investment Program. The

massive diversion of resources to SNAP recertifications will leave these programs understaffed, harming those who rely on them.

178.     USDA failed to consider the reliance interests of Minnesota and the Recertification Counties, who hire staff and make budgets and plans on the assumption that USDA will not entirely rewrite the rules of the game without notice and without legal authority.

179.     USDA failed to consider the reliance interests of SNAP recipients and applicants, who similarly rely on the fact that SNAP will be administered in accordance with the FNA and its promulgating regulations and as they were previously informed, and that they will not be subject to unscheduled recertifications and mandatory in-person interviews to keep the benefits they rely on.

180.     USDA failed to consider the reliance interests of beneficiaries of other programs administered by DCYF and the Recertification Counties, who rely on DCYF and the Recertification Counties allocating adequate staff and resources to those programs.

181.     As discussed above, the stated reasons for imposing this "pilot project" on Minnesota make no sense. But President Trump's animosity for Minnesota and its elected officials is undeniable. As he has grown more vocal in recent months regarding his hostility for Minnesota and its leaders, the federal government has increasingly targeted Minnesota as described above. Now this.

182.     Indeed, the Recertification Counties include the counties with Minnesota's largest Somali populations, which is the same area ICE is also currently targeting. It also includes the district of Rep. Ilhan Omar, one of President Trump's favorite targets.

183.    USDA has provided "an explanation for agency action that is incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019). This Court "cannot ignore the disconnect between the decision made and the explanation given" and is "not required to exhibit a naiveté from which ordinary citizens are free." *Id.* (quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977)).

184.    USDA has targeted Minnesota to further President Trump's feud with Minnesota and its leaders. USDA's pretextual reason for imposing the project makes it arbitrary and capricious, *see Dep't of Commerce*, 588 U.S. at 785, as does taking agency action to punish political enemies, *see Simmons v. Smith*, 888 F.3d 994, 1001 (8th Cir. 2018) ("Agencies may act arbitrarily and capriciously if they treat similarly-situated parties differently or if they act with bad faith.").

185.    Minnesota is entitled to a stay of the effective date of the Recertification Letter pending judicial review, to vacatur of the Recertification Letter, and to preliminary and permanent injunctions barring its implementation. *See* 7 U.S.C. §§ 705–06.

**COUNT IV**
**Spending Clause Violation**
**(Against all Defendants)**

186.    Plaintiff realleges and incorporates by reference the allegations set forth above.

187.    "Congress may attach conditions on the receipt of federal funds." *South Dakota v. Dole*, 483 U.S. 203, 206 (1987). However, any conditions must be imposed "unambiguously" to enable "States to exercise their choice knowingly, cognizant of the

consequences of their participation." *Id.* at 207 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)).

188. Defendants are threatening to withhold Minnesota's SNAP administrative funding and to disallow its participation in SNAP altogether unless Minnesota completes the impossibly onerous tasks they have demanded. This violates the constitutional limitations on the federal government's spending power because Minnesota did not have "clear notice" of this condition when it elected to participate in SNAP. *See Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006).

189. "Though Congress' power to legislate under the spending power is broad, it does not include surprising participating States with post acceptance or 'retroactive' conditions." *Pennhurst*, 451 U.S. at 25. That is, not even Congress could impose these new conditions upon Minnesota, and certainly not Defendants acting without—and in fact contrary to—congressional authority.

190. Minnesota is entitled to preliminary and permanent injunctions barring implementation of the Recertification Letter and, pursuant to 28 U.S.C. § 2201, to a declaration that the Recertification Letter and its implementation violates the Spending Clause of the U.S. Constitution.

## COUNT V
## Ultra Vires
## (Against all Defendants)

191. Plaintiff realleges and incorporates by reference the allegations set forth above.

192.    Defendants cannot take actions that exceed the scope of their constitutional or statutory authority.

193.    Federal courts may grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015); *see also Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689 (1949) (ultra vires actions "may be made the object of specific relief").

194.    Defendants' actions challenged here are contrary to law and beyond their authority because they lack constitutional or statutory authority to impose the conditions of the Recertification Letter upon Minnesota or to punish Minnesota as threatened in the Recertification Letter.

195.    Minnesota is entitled to preliminary and permanent injunctions barring implementation of the Recertification Letter and, pursuant to 28 U.S.C. § 2201, to a declaration that the Recertification Letter and its implementation is outside Defendants' constitutional and statutory authority.

## PRAYER FOR RELIEF

WHEREFORE, Minnesota respectfully requests that this Court enter judgment in its favor and grant the following relief:

1.    Pursuant to 5 U.S.C. § 705, an order staying the Recertification Letter and its implementation;

2.    Pursuant to 5 U.S.C. § 706, an order vacating the Recertification Letter and its implementation;

3.    A temporary restraining order and/or preliminary injunction enjoining Defendants from implementing the Recertification Letter or taking any actions against Minnesota for failure to comply with the Recertification Letter, including but not

limited to withholding SNAP administrative funds or disallowing Minnesota's continued participation in SNAP;

4.    A permanent injunction enjoining Defendants from implementing the Recertification Letter or taking any actions against Minnesota for failure to comply with the Recertification Letter, including but not limited to withholding SNAP administrative funds or disallowing Minnesota's continued participation in SNAP;

5.    A declaration that Defendants' actions are unlawful;

6.    Award Minnesota its fees, costs, and expenses, including attorney's fees, to the extent permitted by law; and

7.    Grant other such relief as this Court finds appropriate.

Dated:  December 23, 2025

KEITH ELLISON
Attorney General
State of Minnesota

**s/ Joseph Richie**
JOSEPH RICHIE
Special Counsel
Atty. Reg. No. 0400615

LIZ KRAMER
Solicitor General
Atty. Reg. No. 0325089

PETER J. FARRELL
Deputy Solicitor General
Atty. Reg. No. 0393071

KATHERINE BIES
Special Counsel
Atty. Reg. No. 0401675

BRIAN CARTER
Special Counsel
Atty. Reg. No. 0390613

LINDSEY MIDDLECAMP
Special Counsel
Atty. Reg. No. 0392589

445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2125
(651) 300-0921 (Voice)
(651) 282-5832 (Fax)
Joseph.Richie@ag.state.mn.us
liz.kramer@ag.state.mn.us
peter.farrell@ag.state.mn.us
Katherine.Bies@ag.state.mn.us
Brian.Carter@ag.state.mn.us
Lindsey.Middlecamp@ag.state.mn.us

*Attorneys For the State of Minnesota*

|#6258165-v1