UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

State of Minnesota,
by and through its Attorney General,
Keith Ellison,

                Plaintiff,

    v.

United States Department of Agriculture
and Brooke Rollins, as Secretary of the
Department of Agriculture,

              Defendants.

Case No. 25-CV-04767-LMP-JFD

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER OR EXPEDITED PRELIMINARY INJUNCTION OR STAY**

Once again, the Trump Administration is threatening to let the needy go hungry. Just last month, it unlawfully withheld Supplemental Nutrition Assistance Program (SNAP) benefits nationwide and attempted to score political points by blaming its political opponents for its own actions. Now, in the midst of the holiday season, the Trump Administration has threatened to cut off Minnesota's SNAP administrative funding and disqualify it from SNAP altogether unless Minnesota performs the impossible.

On December 16, 2025, Secretary of Agriculture Brooke Rollins sent a letter to Minnesota Governor Tim Walz purporting to require Minnesota to "recertify" the eligibility of approximately 100,000 SNAP households in Minnesota in just thirty days from the receipt of the letter (January 15, 2026). She further demanded that Minnesota conduct in-person interviews of those households. Interviewing and recertifying that number of

households within thirty days would be utterly impossible even if Defendants had provided advance notice (which they did not). Defendants surely know this.

Secretary Rollins and the U.S. Department of Agriculture (USDA) have no authority to impose these demands on Minnesota or to punish it for failing to comply. Instead, the demand is part of an ongoing, misguided, and unlawful effort by the federal government to further the federal administration's personal and political grievances with Minnesota and its elected officials.

Minnesota seeks emergency injunctive relief to enjoin Defendants' unlawful actions and ensure needy Minnesotans do not lose the benefits they need to feed their families.

## BACKGROUND

### I. SNAP PROVIDES LIFE-SAVING FOOD BENEFITS TO MINNESOTANS.

#### A. Overview Of SNAP In Minnesota.

SNAP is a federal benefits program that ensures low-income households avoid hunger and malnutrition "by increasing food purchasing power for all eligible households who apply for participation." 7 U.S.C. § 2011. SNAP is codified in the Food and Nutrition Act (FNA) at 7 U.S.C. §§ 2011 *et seq.* To qualify for SNAP benefits, an applicant must show that their household income is below a certain level and that other regulatory criteria are satisfied. *Id.* § 2014(a); 7 C.F.R. § 273.10(e)(2). If eligible, the applicant receives SNAP benefits on an Electronic Benefit Transfer (EBT) card. *See* 7 U.S.C. § 2016(a), (h). The EBT card works like a debit card, and SNAP participants can use it to purchase groceries at authorized retailers. *Id.* § 2016(b).

SNAP is overseen by USDA's Food and Nutrition Services (FNS), but states implement the program. 7 C.F.R. §§ 271.3(a), 271.4(a). In Minnesota, SNAP is supervised by the Department of Children, Youth, and Families (DCYF) and administered by 87 counties and three Tribal Nations. Minn. Stat. § 142F.05, subd. 1; Perry Decl. ¶ 5. DCYF's core responsibilities include maintaining "a continuing performance reporting system," which allows the state agency to monitor local administration of the program. Perry Decl. ¶ 8. DCYF also provides technical support to counties and Tribes; develops and conducts training; and performs "Management Evaluation" reviews of local agencies to confirm that they are complying with SNAP's requirements. *Id.* ¶¶ 9-10. The federal government recently reviewed Minnesota's processes and found that DCYF was fully discharging its SNAP responsibilities with no issues. *Id.* ¶ 10.

A significant number of Minnesotans benefit from SNAP. In fiscal year 2024, for example, roughly 440,000 people received SNAP benefits each month. *Id.* ¶ 6. Of those beneficiaries, approximately 182,000 were children and 67,000 were elderly. *Id.* The average monthly benefit is $314. *Id.*

DCYF currently issues about $75 million per month in SNAP benefits. *Id.* The federal government funds SNAP benefits but splits the administrative costs with Minnesota. *Id.* ¶ 7; *see also* 7 U.S.C. § 2025(a). Minnesota's annual administrative costs are approximately $160 million, about $80 million of which is reimbursed by the federal government. Perry Decl. ¶ 7.

**B. Counties Administer SNAP Applications And Recertifications.**

In Minnesota, counties[1] determine whether an applicant's household qualifies for SNAP. Perry Decl. ¶ 14. They collect information regarding the applicant, the applicant's household, income, expenses, and assets. *Id.*; *see also* Richie Decl. Ex. 1. The information may include pay stubs, rent or mortgage documents, medical bills, and other paperwork to verify eligibility. *Id.* If the household is eligible, the county certifies the household for a "certification period," which typically lasts 12 months 7 C.F.R. § 273.10(f); Perry Decl. ¶¶ 14, 29.

To remain eligible, the county must recertify the household before the certification period expires. 7 C.F.R. § 273.14(a). DCYF sends a notice of expiration (NOE) forty-five days before the certification period ends. *Id.* § 273.14(b); Perry Decl. ¶ 31; Wagner Decl. ¶ 8; Goodrum Decl. ¶ 8. The NOE explains the date by which the participant must apply for recertification, and the consequences of failure to apply for recertification. 7 C.F.R. § 273.14(b)(1)(ii). The county then schedules an interview with the household that must be completed at least ten days before the certification period ends. *Id.* § 273.14(b)(3); Perry Decl. ¶¶ 32-33. Most SNAP participants prefer phone interviews, which are allowed by federal law. *See* 7 C.F.R. § 273.2(e)(2); Perry Decl. ¶ 32; Wagner Decl. ¶ 9.

During recertification, the counties ask SNAP participants about changes to income, assets, household composition, or other circumstances that may affect eligibility and re-view supporting documentation. Richie Decl. Exs. 2–3. If the household remains eligible,

---

[1] Tribal Nations also administer SNAP, but this memorandum refers primarily to counties because the Recertification Letter targets only counties.

the county recertifies it for another certification period. 7 C.F.R. §§ 237.10(a)(2), 273.14(a); Perry Decl. ¶ 34.

### C. Minnesota Protects SNAP Program Integrity And Implements Anti-Fraud Measures.

Minnesota protects SNAP program integrity through several regulatory measures. For example, DCYF conducts regular quality control reviews of counties' SNAP decisions. Perry Decl. ¶ 8. DCYF reviews a statistically valid sample of cases to review decisions to deny, suspend, or terminate cases. *Id.*; *see also* 7 C.F.R. § 275.10(a). DCYF also performs regular management evaluations to assess counties' SNAP administration. Perry Decl. ¶ 8; *see also* 7 C.F.R. § 275.9(a). Federal data confirms these measures are effective. According to USDA, Minnesota's payment error rate[2] in 2024 was 8.98 percent—lower than the national average of 10.93 percent and lower than the error rates of 33 other states and territories. Perry Decl. ¶ 16; Richie Decl. Ex. 4.

DCYF also monitors the SNAP program for fraud. *See* Minn. Stat. § 142A.03, subd. 2(q) (vesting DCYF commissioner with responsibility to detect and prevent fraud); Perry Decl. ¶¶ 12-15. SNAP fraud can take several forms, such as retail fraud, where retailers submit phony transactions, and EBT skimming, where criminals use devices attached to card readers to steal EBT card data from recipients. Perry Decl. ¶ 17. SNAP recipient fraud occurs where a person lies to obtain benefits they are not entitled to or sells benefits for

---

[2] Payment error rates are different from fraud and measure the accuracy of a state's SNAP payments. Perry Decl. ¶ 16. Payment errors are usually unintentional and arise from incorrect eligibility determinations. *See id.* Fraud is different because it involves an intentional act to obtain unauthorized SNAP benefits. *Id.* ¶ 17.

cash. It would be difficult to obtain significant amounts through SNAP recipient fraud, as the monthly benefits average only $314. *Id.* ¶ 27.

Minnesota has strong fraud controls, and SNAP fraud is relatively rare. Perry Decl. ¶ 16-17; Congressional Research Service, *Supplemental Nutrition Assistance Program: Errors and* Fraud (Apr. 7, 2025), https://www.congress.gov/crs-product/IF10860 (noting that "SNAP fraud is rare, according to available data and reports"). DCYF participates in Minnesota's Fraud Prevention Investigation program. Perry Decl. ¶¶ 12–15. Through this program, DCYF works with counties to investigate potential recipient fraud in public assistance programs, including SNAP. *Id.* Minnesota has also worked with its EBT card vendor to prevent fraud through use of the card. *Id.* And Minnesota accepts tips and referrals from all sources about potential fraud or abuse via a website portal, email, hotline, and U.S. mail. *Id.* DCYF has no reason to believe that SNAP recipient fraud—or any type of SNAP fraud—is more prevalent in Minnesota than other states. *Id.* ¶ 18.

## II. DEFENDANTS THREATEN TO DISQUALIFY MINNESOTA FROM SNAP UNLESS IT PERFORMS IMPOSSIBLE TASKS WITHIN THIRTY DAYS.

### A. Defendants demand that Minnesota recertify and conduct in-person interviews of approximately 100,000 households in thirty days.

On December 16, 2025, Secretary of Agriculture Brooke Rollins sent a letter (the "Recertification Letter") to Minnesota Governor Tim Walz claiming that there is "highly publicized and ongoing fraud affecting federally funded benefits in the State of Minnesota." Perry Decl. Ex. 1. The only support for this claim was the "Feeding Our Future" fraud, which occurred years ago during the COVID-19 pandemic and did not involve SNAP. *Id.*

Secretary Rollins then stated that "USDA is hereby requiring Minnesota to participate in a Supplemental Nutrition Assistance Program (SNAP) pilot project, conducted pursuant to 7 U.S.C. § 2026(b)(1)(A), to increase the efficiency of SNAP and improve the delivery of SNAP benefits to eligible households." *Id.* Secretary Rollins asserted that "[m]ore accurate certifications of eligibility of SNAP benefits will ensure that those in need receive assistance, raising levels nutrition among low-income individuals." *Id.*

Secretary Rollins stated the pilot project requires Minnesota to take several actions, including recertifying all SNAP households in Hennepin, Ramsey, Washington, and Wright counties (the "Recertification Counties") within thirty days of receipt of the letter (*i.e.*, by January 15, 2026) and to conduct in-person interviews for those recertifications. The Recertification Letter asserted that "[f]ailure to participate . . . will trigger noncompliance procedures in 7 U.S.C. 2020(g)," and may "affect Minnesota's continued participation in SNAP." *Id.*

### B.  It is impossible to comply with the Recertification Letter.

The Recertification Counties contain approximately 100,000 SNAP households.[3] Perry Decl. ¶ 24; Wagner Decl. ¶ 13; Becker Decl. ¶ 5; Castillo Decl. ¶ 4; Goodrum Decl. ¶ 12. It is impossible for Minnesota and the Recertification Counties to conduct in-person interviews and recertify these households in just thirty days with no advance notice. Perry Decl. ¶¶ 25, 38–46; Wagner Decl. ¶¶ 12–24; Becker Decl. ¶¶ 6–13; Castillo Decl. ¶¶ 8–10;

---

[3] There are minor discrepancies between DCYF's estimate of the number of affected households (approximately 106,000) and the sum of the counties' estimates (approximately 96,000). The exact number always fluctuates, so estimates can differ based on the reference date used.

Goodrum Decl. ¶¶ 11–20. Defendants are demanding that the Recertification Counties complete recertifications at roughly 10 times their normal rate. *See, e.g.*, Wagner Decl. ¶ 14; Goodrum Decl. ¶ 13. It is not feasible to accomplish this daunting task in just thirty days with existing resources.

DCYF and the Recertification Counties do not have enough full-time, trained staff to process this volume of recertifications in thirty days, and any available staff would be forced to work significant overtime. Perry Decl. ¶ 37; Becker Decl. ¶¶ 7–9; Castillo Decl. ¶ 8; Goodrum Decl. ¶¶ 16–19; Wagner Decl. ¶¶ 17–22. Given that USDA provided no notice or funding, the State and Counties will not be able to hire and train staff to assist. Castillo Decl. ¶ 9; Goodrum Decl. Ex. A. The State and Counties are also not able to divert staff to work exclusively on SNAP recertifications without causing significant delays in the processing of SNAP benefits applications and hindering work on other critical benefits programs. Perry Decl. ¶ 53–54; Wagner Decl. ¶ 22; Becker Decl. ¶ 9.

And there are several complicating factors beyond staffing. Recertifications cannot begin immediately: it takes time to provide notice to staff and recipients, to schedule additional work hours and interviews, and to take other administrative steps. Perry Decl. ¶ 39. Moreover, interviews would need to be complete by January 5 to give recipients ten days to submit verification documents after their interviews, as regulations require. *See* 7 C.F.R. § 273.14(b)(3). USDA did not allow adequate time to provide notice to affected households: Minnesota typically provides forty-five days' notice, and USDA requires at least one month's notice. *Id.* § 273.14(b)(1)(i); Perry Decl. ¶ 36. Recipients are likely to be confused about the need to recertify out of schedule and to interview in person, particularly

among those who just recently recertified. Perry Decl. ¶ 51; Becker Decl. ¶ 10; Castillo Decl. ¶ 9. Many recipients receive notice via General Delivery, which can impose significant delays between mailing and receipt. Becker Decl. ¶ 12; *see also* Goodrum Decl. Ex. A.

Minnesota has no way to compel in-person interviews: USDA specifically prohibits States from "requir[ing] households to report en masse for an in-office interview during their certification period," specifically noting they "may not require households to report en masse for an in-office interview[.]" 7 C.F.R. § 273.2(e)(1). Even if they could, the Recertification Counties lack the required physical space for so many interviews. Wagner Decl. ¶ 16; Castillo Decl. ¶ 9; Goodrum Decl. ¶ 15. In-home interviews are not an option either. Not only are they impractical on this scale, USDA prohibits them unless a household meets specified "hardship criteria" *and* requests an in-home interview. 7 C.F.R. § 273.2(e)(2).

The Recertification Letter requires all this to happen over the course of several major holidays, when both staff and recipients often have planned time away from work, travel plans, or family commitments that further limit their ability to complete this process. Perry Decl. ¶ 40; Wagner Decl. ¶ 21; Becker Decl. ¶ 7. There is frequently severe weather in Minnesota in December and January, limiting ability to travel to interviews. Perry Decl. ¶ 42. The Twin Cities are also in the midst of significant immigration enforcement action by the federal government.[4] It has been widely reported that ICE is engaging in racial

---

[4] *See, e.g.,* Perry Decl. ¶¶ 43–46; Hameed Aleaziz, et al., *New ICE Operation Is Said to Target Somali Migrants in Twin Cities*, N.Y. Times, Dec. 2, 2025, https://www.ny-times.com/2025/12/02/us/politics/ice-somali-migrants-minneapolis-st-paul.html.

profiling and other unlawful behavior.[5] There is significant reason to believe those reports will affect beneficiaries' willingness to meet with government officials.[6]

And this process is likely to *lessen* Minnesota's ability to fight fraud. Rushed recertifications are less accurate and will reduce ability to identify suspicious circumstances. Perry Decl. ¶ 15; Goodrum Decl. Ex. A. Redirecting staff toward recertifications would undermine the quality control and fraud protections Minnesota has in place. Perry Decl. ¶ 37.

For all of these reasons, the Recertification Letter would result in untold numbers of households losing SNAP benefits not because they are ineligible but because they were unable to complete recertifications and in-person interviews on the ridiculous timeline Defendants have imposed.

## III. THE TRUMP ADMINISTRATION HAS USED SNAP AS A POLITICAL WEAPON AND IS TARGETING MINNESOTA FOR PARTISAN REASONS.

The Trump Administration has already made clear that it is willing to use SNAP, and to withhold food from the hungry, for partisan purposes.[7] Just two months ago, a federal court determined that the Trump Administration is "explicitly directing agencies…to

---

[5] *See, e.g.,* Emmy Martin et al., *Racial profiling concerns grow as ICE expands presence in Twin Cities*, Minn. Star Tribune, Dec. 18, 2025, https://www.startribune.com/racial-profiling-concerns-grow-as-ice-expands-presence-in-twin-cities/601545116.

[6] Perry Decl. ¶ 46; Becker Decl. ¶ 10; *see also* Compl. ¶ 82 n.17 (collecting reporting regarding people afraid to leave their homes).

[7] Minnesota has already sued Defendants three times this year in SNAP-related cases and obtained preliminary injunctive relief in all three. *See Massachusetts v. USDA*, ___ F. Supp. 3d ___, 2025 WL 3040441, at *5–7 (D. Mass. Oct. 31, 2025); *Massachusetts v. USDA*, ___ F. Supp. 3d ___, 2025 WL 3155810 (D. Mass. Nov. 12, 2025; *California v. USDA*, 2025 WL 2939227, at *1 (N.D. Cal. Oct. 15, 2025); *New York v. Rollins*, Case No. 6:25-cv-02186-MTK (D. Or. Dec. 15, 2025), Dkt. 64.

punish Democrats by targeting programs perceived as having a certain political affiliation." *AFSCME, AFL-CIO V. United States OMB*, ___ F. Supp. 3d ___, 2025 WL 3018250, at *18 (N.D. Cal. Oct. 28, 2025) (emphasis removed).

Last month, the Trump Administration unlawfully cutoff SNAP benefits nationwide even though billions of dollars in appropriations remained. *See Massachusetts v. USDA*, ___ F. Supp. 3d ___, 2025 WL 3040441, at *5–7 (D. Mass. Oct. 31, 2025) ("*Massachusetts I*"); *R.I. State Council v. Rollins*, 2025 WL 3050100, at *1–2 (D.R.I. Nov. 1, 2025) ("*Rhode Island I*"). USDA posted a banner on its website blaming "Senate Democrats" for the shutoff. Richie Decl. Ex. 5. And after two federal courts ordered USDA to pay SNAP benefits, President Trump posted on social media that "SNAP BENEFITS…will be given only when the Radical Left Democrats open up the government, which they can easily do, and not before!" *Id.* Ex. 6. Given this, a federal district court found it "clear that the administration is withholding full SNAP benefits for political purposes." *Rhode Island II*, 2025 WL 3111213, at *11.

President Trump has repeatedly demonstrated personal animosity against Minnesota and its elected leaders in recent weeks. He has called Minnesota Governor Tim Walz

"whacked out,"[8] "seriously retarded,"[9] and "deeply disturbed."[10] President Trump has also repeatedly defamed Minnesota's Somali community, calling Minnesota Congresswoman Ilhan Omar "garbage," and saying that Somalis should "go back from where they came from," and "I don't want them in our country."[11]

As President Trump's verbal attacks on Minnesota and its leaders have escalated, the federal government has targeted Minnesota with an unprecedented bevy of actions. In December 2025, the President stated that he would terminate Temporary Protected Status for Somalis in Minnesota.[12] Federal law enforcement then launched an intensive immigration enforcement operation in Minnesota targeting Somali immigrants.[13] And over the past month, federal agencies have initiated over a dozen investigations, lawsuits, and enforcements actions against Minnesota and other public entities. Richie Decl. Exs. 7–16.

---

[8] Cheyanne M. Daniels, *Trump won't call 'whacked out' Walz after Minnesota shooter charged*, Politico, June 17, 2025, https://www.politico.com/news/2025/06/17/trump-walz-phone-call-00410141.

[9] Zak Failla, *Trump Uses Slur Against Gov. Tim Walz in Thanksgiving Truth Social Tirade; Walz Fires Back*, Msn.com, Nov. 28, 2025, https://www.msn.com/en-us/news/politics/trump-uses-slur-against-gov-tim-walz-in-thanksgiving-truth-social-tirade-walz-fires-back/ar-AA1RllEY.

[10] The White House, *Yes, "There's Something Wrong with Walz"—and it Cost Taxpayers $1 Billion*, Dec. 1, 2025, https://www.whitehouse.gov/articles/2025/12/yes-theres-something-wrong-with-walz-and-it-cost-taxpayers-1-billion/.

[11] Dareh Gregorian, *Trump calls Ilhan Omar 'garbage' and says Somalis should 'go back to where they came from'*, NBC News, Dec. 2, 2025, https://www.nbcnews.com/politics/donald-trump/trump-calls-ilhan-omar-garbage-somalis-go-back-came-from-rcna247041.

[12] Conor Wight, *President Trump orders green cards from Somalia, other countries of 'concern' be reexamined*, CBS Minnesota, Nov. 30, 2025, https://www.cbsnews.com/minnesota/news/trump-orders-green-cards-somalia-countries-concern-reexamined/.

[13] *See* Aleaziz , *supra* note 4.

The Trump Administration has admitted in court that it is targeting Minnesota for partisan reasons. The City of St. Paul recently alleged that the Energy Department had terminated grants in Minnesota and other "Blue States" for partisan reasons. Richie Decl. Ex. 17. Just two weeks ago, the Justice Department admitted the terminations were "influenced by whether a grantee's address was located in a State that tends to elect and/or has recently elected Democratic candidates in state and national elections (so-called 'Blue States')." *Id.* Ex. 18.

## ARGUMENT

In deciding whether to issue a preliminary injunction,[14] the Court must consider four factors: "'(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.'" *Hotchkiss v. Cedar Rapids Cmty. Sch. Dist.*, 115 F.4th 889, 893 (8th Cir. 2024) (quoting *Dataphase Sys., Inc. v. C.L. Sys, Inc.*, 640 F.2d 109, 114 (8th Cir. 1981)).[15]

While no factor is determinative, the probability of success is the most significant. *Home Instead, Inc. v. Florance*, 72 1 F.3d 494, 497 (8th Cir. 2013) (citation modified).

---

[14] Minnesota seeks either expedited handling of its preliminary injunction motion or a temporary restraining order. *See* L.R. 7.1(d). "[T]he standard for analyzing a motion for a temporary restraining order is the same as a motion for a preliminary injunction," but the duration of the order is generally limited to 14 days. *Tumey v. Mycroft AI, Inc.*, 27 F.45h 657, 665 (8th Cir. 2022) (citing Fed. R. Civ. P. 65).

[15] The Administrative Procedure Act authorizes courts "to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. There is "substantial overlap" between the factors for a § 705 stay and a preliminary injunction. *Nken v. Holder*, 566 U.S. 418, 434 (2009).

Generally, courts require a movant to show it has a "fair chance of prevailing" on the merits of a claim. *Planned Parenthood Minn. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008). A movant "need not show that it has a greater than fifty per cent likelihood of success." *Sleep No. Corp. v. Young*, 33 F.4th 1012, 1017 (8th Cir. 2022) (citation modified).

## I.    MINNESOTA HAS A FAIR CHANCE OF PREVAILING ON ITS APA CLAIMS.

### A.    The Recertification Letter is final agency action.

Two conditions must be satisfied for a challenged agency action to be "final." "First, the action must mark the consummation of the agency's decision-making process and not be merely tentative or interlocutory in nature." *Union Pac. R.R. Co. v. U.S. R.R. Ret. Bd.*, ___ F.4th ___, 2025 WL 3639277, at *5 (8th Cir. Dec. 16, 2025). "Second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)). "To satisfy this second condition, the agency action 'must inflict some legal injury upon the party seeking judicial review,' either compelling affirmative action or prohibiting otherwise lawful action." *Id.* (quoting *Sisseton-Wahpeton Oyate of Lake Traverse Rsrv. v. U.S. Corps of Eng'rs*, 888 F.3d 906, 915 (8th Cir. 2018)).

Both are satisfied. First, the Recertification Letter is not "merely tentative or interlocutory in nature." *Union Pac.*, 2025 WL 3639277, at *5. Rather it "mark[s] the consummation of [USDA's] decision-making process" and orders Minnesota to take specified actions or face specified consequences. *Id.*

Second, the Recertification Letter determines legal rights and consequences. It "compel[s] affirmative action" by Minnesota, namely interviewing and recertifying SNAP

households. *Id.* It also states failure to comply "will trigger noncompliance procedures cod-ified in 7 U.S.C. § 2020(g)" and "may also affect Minnesota's continued participation in SNAP." Perry Decl. Ex. 1.

A federal court recently determined a similar letter from USDA was final agency action. *See California v. USDA*, ___ F. Supp. 3d ___, 2025 WL 2678567, at *4–5 (N.D. Cal. Sept. 18, 2025) ("*California I*") (granting TRO); *California v. USDA*, 2025 WL 2939227, at *4–5 (N.D. Cal. Oct. 15, 2025) ("*California II*") (granting PI). The letter there demanded actions and stated "failure to comply 'may trigger noncompliance procedures'" under 7 U.S.C. § 2020(g). *California I*, 2025 WL 2678567, at *4 (emphasis in original). The Recertification Letter is stronger, stating noncompliance "*will* trigger non-compliance procedures[.]"Perry Decl. Ex. 1 (emphasis added). But even that weaker lan-guage "determine[d] Plaintiff States' obligations and the consequences flowing from a fail-ure to comply," making it final agency action. *California I*, 2025 WL 2678567, at *5; *see also California II*, 2025 WL 2939227, at *5. The same is true here.

### B.     The Recertification Letter violates the APA's procedural requirements.

SNAP regulations must be promulgated via the notice and comment procedures of the Administrative Procedure Act (APA). *See* 7 U.S.C. § 2013(c). Those procedures apply to "legislative" rules but not "interpretive" rules. *See Iowa League of Cities v. E.P.A.*, 711 F.3d 844, 855 (8th Cir. 2013). "The critical distinction between legislative and interpretive rules is that, whereas interpretive rules 'simply state what the administrative agency thinks the statute means, and only 'remind' affected parties of existing duties,' a legislative rule

'imposes new rights or duties.'" *Id.* at 873 (quoting *Nw. Nat'l Bank v. U.S. Dep't of the Treasury*, 917 F.2d 1111, 1117 (8th Cir. 1990)).

An agency cannot evade the APA's procedures by disguising legislative rules as letters. In *Iowa League of Cities*, the plaintiff alleged that the EPA had sent a Senator two that contradicted the Clean Water Act and the EPA's own regulations. *Id.* at 854. The Eighth Circuit agreed and found that the letters announced "new legal norm[s]" such that "the EPA violated the APA when it bypassed notice and comment procedures." *Id.* at 875; *see also id.* at 876 ("Because the September 2011 letter had the effect of announcing a legislative rule…the EPA violated the APA's procedural requirements by not using notice and comment procedures.").

As discussed below, the Recertification Letter announces a plethora of new legal norms that contradict the FNA and USDA's regulations. Among other things, USDA claims the power, contrary to the APA, to compel participation in SNAP pilot projects and that pilot projects permit USDA to impose obligations on States that are not otherwise found in statutes or regulations. The Recertification Letter is also contrary to USDA's regulations by, for example, requiring recertifications in the middle of beneficiaries' certification periods and requiring in-person interviews.

Because the Recertification Letter "ha[s] the effect of announcing a legislative rule," it was subject to notice and comment procedures. *Id.* at 876. There is no question that USDA did not comply with these procedures. USDA did not, for example, publish notice in the Federal Register or give interested persons an opportunity to submit comments. *See*

5 U.S.C. § 553(b)–(c). The Recertification Letter must therefore be vacated. *See Iowa League of Cities*, 711 F.3d at 875–76.

**C.    The Recertification Letter is contrary to law.**

**1.    Defendants cannot require Minnesota to participate in a SNAP pilot project.**

Defendants cannot mandate pilot project participation by an unwilling State. The statutory provision they rely on states:

> The Secretary may conduct on a trial basis, in one or more areas of the United States, pilot or experimental projects designed to test program changes that might increase the efficiency of the supplemental nutrition assistance program and improve the delivery of supplemental nutrition assistance program benefits to eligible households, and may waive any requirement of this chapter to the extent necessary for the project to be conducted.

7 U.S.C. § 2026(b)(1)(A). Nothing in that language authorizes compulsory projects. Other subsections confirm projects can only be entered at a State's request. § 2026(b)(1)(D) includes deadlines for the Secretary to respond to "a request for a waiver under subparagraph (A)," indicating that § 2026(b)(1)(A) projects can only be entered by request.

Other sections of the FNA that authorize "pilot projects" make clear that participants must opt-in. *See Id.* §§ 2017(f)(2) (authorizing pilot projects "at the request of 1 or more State agencies"); 2036d(a) (authorizing pilot projects "on application of eligible entities"); 2025(h)(1)(F)(i)(I) (authorizing pilot projects via "cooperative agreements" with State agencies); 2021(h)(3)(i) (authorizing pilot projects "to test innovative Federal-State partnerships"). Given this, it would be remarkable to conclude that Congress used "pilot project" in § 2026(b)(1)(A) to refer to compulsory projects. *See, e.g., Azar v. Allina Health*

*Servs.*, 587 U.S. 566, 574 (2019) (courts "do[] not lightly assume that Congress silently attaches different meanings to the same term in the same or related statutes").

And Congress gave Defendants specific tools for bringing States into compliance when they maladminister SNAP. *See* 7 U.S.C. § 2020(g)–(h), (l). The existence of these tools further demonstrates Congress did not intend for Defendants to use compulsory pilot projects as remedial tools. *Cf. Watt v. GMAC Mortg. Corp.*, 457 F.3d 781, 783 (8th Cir. 2006) ("the expression of one thing excludes others not expressed").

USDA shared this view until recently. DCYF is not aware of any prior instance in which USDA or FNS claimed the power to compel pilot project participation. (Perry Decl. ¶¶ 21–23.) For example, during the first Trump Administration, USDA proposed a "demonstration project" under § 2026(b)(1). (*Id.* Ex. 2.) The memo announcing the project stated "FNS is offering this to States at their option." (*Id.*) That is because § 2026(b)(1) projects can *only* be entered at a State's option.

### 2. Pilot projects do not permit Defendants to impose new obligations on States.

Even if Defendants could dragoon Minnesota into a pilot project, they still could not impose new obligations on it. § 2026(b)(1)(A) permits the Secretary only to "waive any requirement" of the FNA for a pilot project. Nothing gives Defendants the authority to unilaterally impose new requirements on states , like demanding *en masse* recertifications with in-person interviews.

### 3. This "pilot project" is prohibited by the FNA.

Several provisions of the FNA prohibit this particular "pilot project." Projects must be "designed to test program changes that might increase the efficiency of the supplemental nutrition assistance program and improve the delivery of supplemental nutrition assistance program benefits to eligible households[.]" 7 U.S.C. § 2026(b)(1)(A). As discussed above, this project's draconian requirements would decrease efficiency and hinder delivery of benefits to eligible households.

Congress prohibited projects not "consistent with the goal…of providing food assistance to raise levels of nutrition among low-income individuals[.]" 7 U.S.C. § 2026(b)(1)(B)(i)(I). The Recertification Letter claims "[m]ore accurate certifications of eligibility for SNAP benefits will ensure that those in need receive assistance, raising levels of nutrition among low-income individuals." (Perry Decl. Ex. 1.) But recertifying existing households or removing ineligible households does not raise nutrition levels for anyone. As discussed above, this project will decrease nutrition levels by disqualifying eligible households who are not able to recertify in thirty days.

Congress also prohibited § 2026(b)(1)(A) projects unless they "include[] an evaluation to determine the effects of the project." *Id.* 2026(b)(1)(B)(i)(I). The Recertification Letter makes no provision for an evaluation.

Congress restricted "[p]ermissible projects" to those intended to "improve program administration," "increase the self-sufficiency of [SNAP] recipients," "test innovative welfare reform strategies," or "allow greater conformity with the rules of other programs than would be allowed but for this paragraph." *Id.* § 2026(b)(1)(B)(ii). This does none of these.

Diverting all available resources from other SNAP work (e.g. processing new applications) will greatly harm program administration.

"Impermissible projects" include those that "den[y] assistance to an otherwise eligible household or individual" who has complied with SNAP's requirements. *Id.* § 2026(b)(1)(B)(iv)(III)(bb). This project would deny assistance to eligible households or individuals who cannot be interviewed in person and recertified in thirty days.

"Impermissible projects" also include those "inconsistent" with the requirement that State agencies "provide timely, accurate, and fair service to SNAP applicants and recipients. *Id.* §§ 2026(b)(1)(B)(iv)(III)(ff), § 2020(e)(2)(B)(i). It is the antithesis of fairness to impose new burdens on recipients without notice and to retroactively change the rules of the life-sustaining benefits they have already qualified for.

### 4. The Recertification Letter would require Minnesota to violate the FNA and its regulations.

The Recertification Letter is also contrary to law because Minnesota could not comply without violating several provisions of the FNA and its regulations. For one, the Recertification Letter effectively adjusts the current certification periods for households in the Recertification Counties such that they all terminate on January 15, 2026. But regulations provide that Minnesota "may not end a household's certification period earlier than its assigned termination date" except under circumstances not met here. 7 C.F.R. § 273.10(f)(4).

The Recertification Letter requires in-person interviews, but USDA regulations provide that "State agencies may not require households to report for an in-office interview

during their certification period[.]" 7 C.F.R. § 273.2(e)(1). "For example, State agencies may not require households to report en masse for an in-office interview during their certification periods simply to review their case files, or for any other reason." *Id.* Nor can Minnesota compel in-home interviews, which are only permitted when a household meets specified hardship criteria and requests one. *Id.* § 273.2(e)(2).

Regulations also require Minnesota to offer telephone interviews for recertifications in certain circumstances. *Id.* But here Defendants are requiring *all* interviews be in-person.

USDA also requires Minnesota to send notices to recipients as the first step in the recertification process. *Id.* § 273.14(b)(1). Notices must be sent one to two months before the certification period ends. *Id.* But here Defendants made it impossible for Minnesota to provide adequate notice by requiring the process be complete within thirty days of the receipt of the Recertification Letter.

And as discussed above, the FNA requires Minnesota to "provide timely, accurate and fair service to SNAP applicants and recipients." *Id.* § 2020(e)(2)(B)(i). This project would require Minnesota to treat them unfairly and untimely, including by providing inadequate notice of arbitrary, burdensome requirements being imposed upon recipients to keep the benefits they have already qualified for.

**5. Defendants lack authority to take the remedial measures threatened in the Recertification Letter.**

The Recertification Letter states "[f]ailure to participate in this pilot project as specified by USDA will trigger noncompliance procedures codified in 7 U.S.C. § 2020(g). It may also affect Minnesota's continued participation in SNAP." Perry Decl. Ex. 1. But

21

Defendants do not have authority to take these actions for "failure to participate" in a pilot project.

§ 2020(g) permits the Secretary to seek injunctive relief against a State agency or to withhold SNAP administrative funds under certain circumstances, but "failure to partici-pate" in pilot project is not among them. Instead, it permits the Secretary to take action only if a State agency fails without good cause "to comply with any of the provisions of this chapter, the regulations issued pursuant to this chapter, the State plan of operation submitted pursuant to subsection (d) of this section, the State plan for automated data pro-cessing submitted pursuant to subsection (o)(2) of this section, or the requirements estab-lished pursuant to section 2032 of this title[.]" 7 U.S.C. § 2020(g). And nothing in the FNA or elsewhere authorizes Defendants to bar Minnesota from participating in SNAP as a re-medial action. *Cf. id.* § 2013(a)(1) (States may participate in SNAP unless they collect taxes on food purchased with SNAP benefits).

### C. The Recertification Letter is arbitrary and capricious.

"The APA's arbitrary-and-capricious standard requires that agency action be rea-sonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423, (2021). "It is a foundational principle of administrative law that judicial review of agency action is limited to the grounds that the agency invoked when it took the action." *DHS v. Regents of the Univ. of Calif.*, 591 U.S. 1, 20 (2020) (internal quotation omitted).

"An agency decision is arbitrary or capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the

evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Missouri ex rel. Bailey v. U.S. Dep't of Interior, Bureau of Reclamation*, 73 F.4th 570, 576–77 (8th Cir. 2023) (quotation omitted). "The scope of review is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must explain the rational connection between the facts found and the choice made." *Anderson v. U.S. DOT, Fed. Highway Admin.*, 213 F.3d 422, 423 (8th Cir. 2000) (quotations and citations omitted).

### 1. Defendants' stated reason for this "pilot project" is unsupported.

The only reason given for this project is the Feeding Our Future fraud. That scheme ended years ago, did not involve SNAP, and exploited the pandemic to steal hundreds of millions of dollars. Perry Decl. ¶ 26. Recertification and interviews could only detect SNAP recipient fraud and not, for example, retailer fraud. The Recertification Letter provides no reason to believe SNAP recipient fraud is rampant in Minnesota. It would be exceedingly difficult to obtain large sums using recipient fraud, where average monthly benefits are just $314. (*Id.* ¶ 27.) DCYF is not aware of any information suggesting SNAP fraud is more common in Minnesota than elsewhere. (*Id.* ¶ 18.) And Defendants offered *no* explanation for why they selected Hennepin, Ramsey, Washington, and Wright Counties for recertifications.

### 2. Fraud is not a factor Congress intended for Defendants to consider in taking remedial actions with States.

Fraud, moreover, is not a factor Congress directed Defendants to consider in taking remedial actions with State agencies. Congress instead gave Defendants tools for States

that, for example, fail to comply with the FNA or its regulations, *see* 7 U.S.C. § 2020(g), or have poor quality control systems and unacceptable payment error rates, *see id.* §§ 2013(a)(2), 2025(c)–(d), (i). By these measures, Minnesota excels. Perry Decl. ¶¶ 10, 16.

### 3. Defendants have not explained a rational connection between purported SNAP fraud and *en masse* recertification.

Defendants have further not "explain[ed] the rational connection between the facts found and the choice made." *Anderson*, 213 F.3d at 423. Even if Defendants had a basis to believe there is SNAP fraud in Minnesota, they have not explained why they chose to require *en masse* recertification. There is no reason to believe this would catch fraud not caught at a household's last recertification or that would not be caught at its next one. It is a waste of resources to recertify households that recertified as recently as a few weeks ago. And as discussed above, by forcing rushed recertifications that divert efforts from *actual* fraud detection programs, this "pilot project" is likely to significantly *harm* Minnesota's ability to identify SNAP fraud.

### 4. Defendants acted arbitrarily by requiring Minnesota to perform the impossible.

Defendants also failed to consider the massive burdens the Recertification Letter would impose on Minnesota and the Recertification Counties. *See City & Cnty. of S.F. v. U.S.C.I.S.*, 408 F. Supp. 3d 1057, 1108 (N.D. Cal. 2019), *aff'd*, 981 F.3d 742 (9th Cir. 2020) (action arbitrary and capricious where it "entirely fails to discuss costs being borne by the states"). Indeed, compliance is impossible. An agency action is arbitrary and capricious "when compliance is impossible." *Messina v. USCIS*, 2006 WL 3745664, at *6 (E.D. Mich. Feb. 16, 2006); *see also Salas v. Pfeiffer*, 2025 WL 2503204, at *3 (E.D. Cal. Sept.

2, 2025) ("It is clearly established that using the powers of government to require impossible tasks is arbitrary and unconstitutional.").

### 5. Defendants ignored serious reliance interests.

It is arbitrary and capricious for agencies to "ignore" that "longstanding policies may have engendered serious reliance interests that must be taken into account." *DHS*, 591 U.S. at 30 (quotation omitted); *see also F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (agency must "provide a more detailed justification…when its prior policy has engendered serious reliance interests"). Defendants failed to account for several reliance interests. For one, Minnesota and the Recertification Counties do not have adequate resources or employees to complete an *en masse* certification because they budget, hire staff, and plan with the reasonable belief that SNAP will be administered as provided by law. Having done so, they cannot immediately begin performing recertifications at ten times their normal rate or more.

Defendants also failed to consider the serious reliance interests of eligible SNAP beneficiaries in the Recertification Counties, who risk losing their benefits because they did not have adequate notice or time to comply with these new hurdles.

And Defendants failed to consider the serious reliance interests of all SNAP beneficiaries in Minnesota. All beneficiaries risk losing benefits if Defendants withhold SNAP administrative funds or disqualify Minnesota from SNAP. SNAP keeps families from going hungry—there could be no more serious reliance interest. It is arbitrary and capricious to threaten to take it away without so much as considering the effects of doing so. *See, e.g., R.I. State Council of Churches v. Rollins*, ___ F. Supp. 3d ___, 2025 WL 3111213, at *8

(D.R.I. Nov. 6, 2025) (*"Rhode Island II"*) (USDA acted arbitrary and capriciously in cutting SNAP benefits without considering "the increased harm that will befall these recipients if they are forced to go without food"); *New York v. Trump*, 769 F. Supp. 3d 119, 142 (D.R.I. 2025) (USDA and others acted arbitrarily and capriciously by failing to consider "the catastrophic consequences that flowed" from their actions); *City & Cnty. of S.F.*, 408 F. Supp. 3d at 1111–12 (action was arbitrary and capricious where agency "made no attempt…to investigate the type or magnitude of harm" to public health it would cause).

### 6.  Defendants have acted arbitrarily by targeting Minnesota for partisan purposes.

Finally, an agency action is arbitrary and capricious when the agency offers a "pretextual" reason "that is incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019). Agency decisions are arbitrary and capricious where they "feature[e] unjustifiable bias or partisanship[.]" *Level the Playing Field v. FEC*, 961 F.3d 462, 464 (D.C. Cir. 2020).

As discussed above, a federal court determined that the Trump Administration is "explicitly directing agencies…to punish Democrats by targeting programs perceived as having a certain political affiliation." *AFSCME*, 2025 WL 3018250, at *18 (emphasis removed). Soon thereafter, the Trump Administration unlawfully terminated SNAP benefits nationwide and repeatedly tried to blame Democrats, leading a federal court to find it "clear that the administration is withholding full SNAP benefits for political purposes." *Rhode Island II*, 2025 WL 3111213, at *11.

And as discussed above, President Trump has attacked Minnesota and its elected leaders in recent weeks, coinciding exactly with an unprecedented flurry of federal actions against Minnesota, including overt and aggressive immigration enforcement, a threat to cancel Temporary Protected Status only for Somali immigrants in Minnesota, and over a dozen investigations, lawsuits, and enforcement actions. Most recently, the Justice Department conceded in court filings that the federal government had targeted Minnesota for grant cancellations because it "tends to elect" Democrats. Richie Decl. Ex. 18.

Here, Defendants singled out Minnesota, offering reasons that make no sense. They required Minnesota to take impossible actions that would do nothing to fight fraud. Knowing those tasks are impossible, they threatened to disqualify Minnesota from SNAP once they are not accomplished. These are not the actions of an agency concerned with minimizing fraud or fostering cooperation with States. Add to that the political games the Administration is already playing with SNAP and its own admissions that it has targeted Minnesota for partisan purposes. This Court is "not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Commerce*, 588 U.S. at 785. The Recertification Letter threatens to end SNAP in Minnesota for partisan reasons. Threatening to take food from the needy to advance President Trump's personal and political grievances is the epitome of arbitrary and capricious.

## III.    MINNESOTA IS LIKELY TO PREVAIL ON ITS SPENDING CLAUSE CLAIM.

Congress may impose conditions on states' acceptance of federal funds, but "the conditions must be set out 'unambiguously[.]'" *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*,

451 U.S. 1, 17 (1981)). States must accept those conditions "voluntarily and knowingly." *Id.*

Minnesota established a SNAP program and accepted SNAP funds without any notice it would be subjected to the preposterous demands of the Recertification Letter. As discussed above, nothing in the FNA, its regulations, or elsewhere authorizes these actions, let alone provides "unambiguous" notice of their possibility. Imposing these retroactive, post-acceptance conditions on Minnesota violates the Spending Clause. *See Arlington*, 548 U.S. at 296; *Pennhurst*, 451 U.S at 17.

## IV.   PLAINTIFF WILL SUFFER IRREPARABLE HARM ABSENT EMERGENCY RELIEF.

Irreparable harm exists "when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). Absent interim relief, Minnesota will suffer irreparable harm for myriad reasons.

### 1.   Attempting to complete the recertifications and in-person interviews would cause irreparable harm.

Even attempting to comply with the Recertification Letter would cause irreparable harm. To begin with, it would have significant economic costs. *See, e.g.,* Perry Decl. ¶ 37; Wagner Decl. ¶ 21; Goodrum Decl. ¶ 19. Economic injuries for which damages are unavailable constitute irreparable injuries. *See Missouri v. Trump*, 128 F.4th 979, 996 (8th Cir. 2025).

Minnesota has worked for years to build trust with Minnesotans. Perry Decl. ¶ 51. In particular, Minnesota has assured them that complying with existing SNAP

requirements will lead to timely benefits. *Id.* Imposing entirely new conditions on those benefits and requiring beneficiaries to submit to unscheduled recertifications and in-person interviews with little notice during the holiday season will damage the trust Minnesota has built. *Id.* This will be particularly true of recipients who just recently were approved for the first time or recertified. Loss of trust leads to decreased SNAP enrollments, causing the harms discussed below, such as increased healthcare costs. *Id.* ¶ 52.

Minnesota and the Recertification Counties would be forced to divert every available employee to recertifications. This hinders other important work, including processing new SNAP applications and changes, staffing telephone assistance lines, and work on other critical benefits programs. Perry Decl. ¶ 53–54; Wagner Decl. ¶ 22; Becker Decl. ¶ 9. It would cause "significant" delays in processing applications for both SNAP and other benefits. Perry Decl. ¶ 53–54. Courts have recognized that impairing States' "ability to comply with their obligations under the SNAP Act to administer benefits, including…the speed with which applications can be reviewed and required reports can be prepared" constitutes irreparable harm. *California I*, 2025 WL 2678567, at *8; *see also E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 678 (9th Cir. 2021) ("divert[ing] significant resources" constitutes irreparable injury).

Further, the rushed recertification process will "inevitably" lead to errors that increase Minnesota's SNAP payment error rate. Perry Decl. ¶ 53; *see also* Goodrum Decl. Ex. A.; Castillo Decl. ¶ 10. New federal law imposes significant penalties on states whose payment error rates exceed certain thresholds. *See* 7 U.S.C. § 2013(a)(1)–(2).

And this process will cause households to lose SNAP benefits not because they are ineligible but because they were unable to complete the recertification by January 15, resulting in State and local governments providing food or other support to vulnerable residents. Wagner Decl. ¶ 23; Perry Decl. ¶¶ 52, 57. SNAP participation is correlated with lower Medicaid healthcare costs, causing healthcare costs to increase. Perry Decl. ¶ 58. A reduction in SNAP enrollment for families with schoolchildren also negatively impacts eligibility for federally free or reduced-price meals. *Id.* ¶ 59. A loss of SNAP benefits "creates a substantial risk that SNAP recipients will need to rely on, and potentially overwhelm, existing state resources and services," causing "imminent fiscal injury" to Minnesota. *Massachusetts I*, 2025 WL 3040441, at *3; *see also Massachusetts v. USDA*, __ F. Supp. 3d __, 2025 WL 3155810, at *2 (D. Mass. Nov. 12, 2025) ("*Massachusetts II*") (describing "fiscal and operational harm to state programs that will be overwhelmed by residents lacking essential SNAP benefits").

**2. The punitive actions threatened by the Recertification Letter would cause irreparable harm.**

If Minnesota does not comply, Defendants threaten to take actions that could result in loss of SNAP administrative funding or ending Minnesota's participation in SNAP. Perry Decl. Ex. 1. Minnesota receives approximately $80 million dollars annually in SNAP administrative funding. Perry Decl. ¶ 47. The loss of these federal funds could not be fully replaced by the State and Minnesota would likely have to cut staff and programs that are critical to supporting the SNAP program or divert resources from other important services. *Id.* Courts have recognized that loss of SNAP administrative funding constitutes irreparable

harm. *See Massachusetts II*, 2025 WL 3155810, at *10 (describing lost of SNAP administrative funding as "dire consequences"); *California II*, 2025 WL 2939227, at *12–13 (finding threatened loss of SNAP administrative funding constitutes irreparable harm); *California I*, 2025 WL 2678567, at *8–9 (same); *see also E. Bay Sanctuary*, 993 F.3d at 677 (loss of funding is irreparable injury).

Disqualifying Minnesota from SNAP would wreak massive harms, "result in major operational disruptions and administrative burdens across [State] agencies and fiscal and operational harm to state programs that will be overwhelmed by residents lacking essential SNAP benefits." *Massachusetts II*, 2025 WL 3155810, at *2 (quotation omitted); *see also Massachusetts I*, 2025 WL 3040441, at *3 (loss of SNAP "creates a substantial risk that SNAP recipients will need to rely on, and potentially overwhelm, state resources and services"); *id.* at *7 (loss of SNAP "undoubtedly result[s] in substantial harm" to States).

## VI. THE BALANCE OF HARMS AND PUBLIC INTEREST SUPPORT EMERGENCY RELIEF.

The third and fourth factors—harm to the opposing party and the public interest—merge when the government opposes preliminary relief. *Morehouse Enters., LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 78 F.4th 1011, 1018 (8th Cir. 2023).

The public faces imminent, irreparable harms from the Recertification Letter. To begin with, SNAP recipients in the Recertification Counties will be forced to submit to arbitrary, burdensome, and unlawful demands to keep benefits they have already qualified for. Recipients of both SNAP and other programs will be harmed from damage to those

programs caused by diverting all available resources to SNAP recertifications. Perry Decl. ¶ 53–54; Wagner Decl. ¶ 22; Becker Decl. ¶ 9.

And Minnesotans will lose SNAP benefits, either because they cannot recertify within thirty days or because Defendants will cut Minnesota's SNAP administrative funding or disqualify it from SNAP. People rely on SNAP to feed their families. Taking that from them massively harms the public interest. *R.I. State Council of Churches v. Rollins*, 158 F.4th 304, 316 (1st Cir. 2025) (recognizing "overwhelming evidence of the harms that even a short suspension of [SNAP] benefits would cause"); *Rhode Island II*, 2025 WL 3111213, at *2 ("irreparable harm would occur if millions of people were forced to go without funds for food"), *Massachusetts I*, 2025 WL 3040441, at *7 ("absence of SNAP payments will undoubtedly result in substantial harm" to recipients).

Defendants face no hardship from a stay. To begin with, "there is substantial public interest in a federal agency following its own regulations . . . and in Americans trusting their own government to follow the rule of law." *Shaik v. Noem*, 2025 WL 1170447, at *3 (D. Minn. Apr. 22, 2025). To the extent Defendants are actually concerned about fraud, the rushed recertifications they have demanded will divert resources from program integrity efforts and do little to detect fraud. Perry Decl. ¶ 37. Indeed, recertifications are more likely to detect fraud when employees have the time necessary to carefully review an applicant's eligibility. *Id.* ¶ 15; Goodrum Decl. Ex. A.

For these reasons, the balance of equities and public interest weigh in favor of emergency injunctive relief.

**CONCLUSION**

Defendants have unlawfully and arbitrarily imposed impossible requirements on Minnesota and are threatening to terminate food benefits for hundreds of thousands of needy Minnesotans as soon as January 15, 2026. This Court should grant emergency injunctive relief to avoid the irreparable and completely avoidable harm that would be inflicted on the State of Minnesota if Defendants permit hundreds of thousands of Minnesotans to go hungry.

Dated:  December 29, 2025       Respectfully submitted,

KEITH ELLISON
Attorney General
State of Minnesota

**<u>s/ Joseph Richie</u>**
JOSEPH RICHIE
Special Counsel
Atty. Reg. No. 0400615

LIZ KRAMER
Solicitor General
Atty. Reg. No. 0325089

PETER J. FARRELL
Deputy Solicitor General
Atty. Reg. No. 0393071

KATHERINE BIES
Special Counsel
Atty. Reg. No. 0401675

BRIAN CARTER
Special Counsel
Atty. Reg. No. 0390613

LINDSEY MIDDLECAMP
Special Counsel
Atty. Reg. No. 0392589

445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2125
(651) 300-0921 (Voice)
(651) 282-5832 (Fax)
joseph.richie@ag.state.mn.us
liz.kramer@ag.state.mn.us
peter.farrell@ag.state.mn.us
katherine.bies@ag.state.mn.us
brian.carter@ag.state.mn.us
lindsey.middlecamp@ag.state.mn.us

*Attorneys For Plaintiff State of Minnesota*

|#6260772-v1