UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

State of Minnesota,
by and through its Attorney General
Keith Ellison,

Plaintiffs,

v.

United States Department of Agriculture,
and Brooke Rollins, as Secretary of the
Department of Agriculture,

Defendants.

Case No. 0:25-cv-04767

**DECLARATION OF JOVON PERRY**

---

I, Jovon Perry, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am a resident of the State of Minnesota, and I am over the age of 18. If called as a witness, I could and would testify competently to the matters set forth below.

**Professional Background and Qualifications**

2. I am currently employed by the Minnesota Department of Children, Youth, and Families (DCYF) as Director of the Economic Assistance and Employment Supports Division. My educational background includes a Bachelor of Science Legal Studies Degree and Master of Public Affairs Degree. I have been employed as Director of the Economic Assistance and Employment Supports Division since April 2014. As Director, I oversee economic assistance programs including the Temporary Assistance for Needy Families (TANF) program referred to as the Minnesota Family Investment Program, Diversionary Work Program, Supplemental Nutrition

Assistance Program (SNAP), SNAP Employment and Training, and Summer Electronic Benefits Transfer (EBT) referred to as the Minnesota Sun Bucks Program. My professional experience in this and similar capacities expands 20 years working for state government and the nonprofit sector.

3. I make this declaration based on personal knowledge and on my review of information and records gathered by agency staff.

**Agency Background**

4. The Minnesota Department of Children, Youth, and Families administers programs that keep children safe and provides families with supports to care for their children. Among the programs administered by DCYF is the Supplemental Nutrition Assistance Program (SNAP), which issues monthly electronic benefits that can be used to purchase food at authorized retail stores.

5. Pursuant to federal law, DCYF administers SNAP on behalf of the United States Department of Agriculture (USDA) and is responsible for the issuance, control, and accountability of SNAP benefits and Electronic Benefit Transaction (EBT) cards; ensuring program integrity; and supervising local transitional assistance offices' day-to-day administration of SNAP, including processing applications for SNAP benefits and certifying eligible applicant households. 7 U.S.C. § 2020(a)(1); 7 C.F.R. § 271.4; 7 C.F.R. § 274.2. Minnesota's SNAP program is state-supervised and administered by counties and Tribal Nations pursuant to Minnesota Statutes, Chapter 142F. USDA funds the entirety of SNAP benefits in Minnesota, though Minnesota and the federal government split administrative costs. 7 U.S.C. § 2025(a).

**SNAP in Minnesota**

6. SNAP is a key part of Minnesota's efforts to address hunger by supplementing the food budget of low-income families so they can purchase healthy food. In Federal Fiscal Year 2024, an average of 440,000 people received SNAP benefits in Minnesota each month, including 181,980 children and 67,000 elderly individuals. Households in Minnesota receive on average $314 per month in SNAP benefits to meet their basic subsistence and nutritional needs. Of those households, 33% of households are families with children, 29% are senior households without children, and 24% are households including non-senior adults with documented disabilities. During the federal fiscal year between October 1, 2024 and September 30, 2025, DCYF issued approximately $72 million per month in SNAP benefits in Minnesota. DCYF currently issues approximately $75 million per month in SNAP benefits.

7. Minnesota expends approximately $160 million in administrative costs to run its SNAP program each year, approximately $80 million of which is reimbursed by the federal government.

**DCYF's Role in Overseeing the SNAP Program in Minnesota**

8. DCYF oversees the 87 counties and 3 Tribal Nations administering SNAP in Minnesota. In accordance with federal policy, DCYF maintains a continuing performance reporting system to monitor program administration and program operations. 7 C.F.R. §275.2(a). The components of this system include data collection through management evaluation reviews and quality control reviews, analysis and evaluation of data from all sources, corrective action planning, corrective action implementation and monitoring, and reporting to FNS on program performance. 7 C.F.R. §275.2(a)(1).

9. DCYF is responsible for preparing and maintaining policy and system procedure manuals, providing monthly updates to reflect SNAP changes, and provides a mechanism for asking policy questions to provide timely answers to eligibility questions. 7 C.F.R. §272.3(a). DCYF develops and conducts trainings and requires county and Tribal Nation agency participation in training and technical assistance programs to promote compliance with statutes, rules, federal laws, regulations and policies governing human services. Minn. Stat. 142A.03, subd. 2(e)(1).

10. DCYF conducts Management Evaluation reviews which are reviews conducted by the State to determine if the counties and Tribes who administer SNAP are administering and operating SNAP in accordance with program requirements. The review process follows the procedures established by 7 C.F.R. §275.9. USDA conducted a State Systems Management Evaluation (ME) review in July 2025. The Food and Nutrition Service (FNS) review of the State's Management Evaluation (ME) Review System assessed the adequacy of the State's ME review processes, procedures, methodology, and corrective action for the project area reviews. The purpose of conducting the State ME Process Review is to determine if the State performance reporting system is adequately evaluating its own SNAP operations for compliance with the requirements outlined in FNS regulations, handbooks, and policy. The report stated that FNS found that the State Agency is fulfilling its responsibilities for the administration of the program and is following applicable regulations and policies with no findings and no observations.

11. In addition to ME evaluations, DCYF conducts quality control reviews pursuant to 7 C.F.R. §275.10. Quality control reviews are a review of a statistically valid sample of active and negative cases to determine the extent to which households are receiving the SNAP

allotments to which they are entitled and to determine the extent to which county and Tribal agency decisions to deny, suspend, or terminate cases are correct.

12. DCYF "is responsible for ensuring the detection, prevention, investigation, and resolution of fraudulent activities or behavior by applicants, recipients, and other participants in the programs administered by the department." Minn. Stat. § 142A.03, subd. 2(q). To ensure fraud prevention and program integrity, Minnesota has a Fraud Prevention Investigation (FPI) program administered by counties and Tribal Nations to investigate possible recipient fraud in public assistance programs, including SNAP. This program actively pursues and investigates cases with a focus on fraud prevention. Minnesota accepts tips and referrals from all sources about potential fraud or abuse and offers several ways to report to Program Integrity Oversight, including submitting an online form, calling a toll-free hotline number, submitting a report via email, or sending a letter via US mail.

13. Minnesota has worked with EBT vendor, FIS, to implement protections to EBT cards to prevent fraud including allowing clients to free cards, blocking common use PIN numbers, blocking cards from being used out of state or for online purchasing. Minnesota is in the planning stages to add client alerts by text or email to know if a PIN has changed or a card is cancelled and not allowing the same PIN number to carry over to replacement cards. Minnesota contracted with an EBT consultant to provide a roadmap for implementing chip card technology.

14. Eligibility determinations that happen at the time of application and recertification ensure that program recipients are eligible for SNAP. This process includes client application, an interview conducted by an eligibility worker, submission and review of documents to verify information, completion of any data matches, and a new determination of eligibility. Eligibility workers follow up with any inconsistent information. This eligibility process is administered by

counties and Tribal Nations. All SNAP participants in Minnesota are required to recertify their eligibility for SNAP either every 6, 12, or 24 months based on their household circumstances, and must report certain changes during their certification period to maintain SNAP eligibility.

15. Eligibility workers ensure that a recipient is still eligible for the program, and they can refer anything that is suspicious that they are unable to resolve to the fraud prevention investigation program for further investigation. Diverting resources to complete recertifications en masse will reduce eligibility workers' accuracy and ability to identify suspicious circumstances due to the time pressures associated with this proposed project.

**Payment Error Rates and Fraud in SNAP**

16. State payment error rates are tied to SNAP's quality control system. Payment error rates are not the same as fraud. Payment error rates are largely unintentional and can occur from both overpayment of benefits and underpayment of benefits. Payment error rates measure a state's accuracy in administering SNAP benefits. In Federal Fiscal Year 2024, Minnesota's payment error rate was 8.98%. Nationwide the Payment Error Rate was 10.93%. In Federal Fiscal Year 2024, Minnesota's payment error rate was lower than the national average.

17. Fraud is different from an error rate. Fraud is an intentional act and can occur a number of ways in the SNAP program: recipient fraud, retailer fraud, and through SNAP scams such as EBT skimming. USDA is responsible for overseeing and certifying SNAP retailers. EBT skimming is a common form of fraud in the SNAP program and occurs when EBT card numbers and PINs are used to steal SNAP benefits from SNAP recipients using skimming devices attached to ATMs. Minnesota receives information from FIS, Minnesota's EBT vendor, listing cases that may be vulnerable to benefit skimming. The state works with FIS to reset EBT card

PINs and notifies the SNAP household to create a new PIN to protect their benefits. Recipient fraud in the SNAP program is low.

18. DCYF is not aware of any reason to believe SNAP recipient fraud, or any other type of SNAP fraud, is more common in Minnesota than elsewhere in the United States.

19. As detailed above, DCYF and its county and Tribal Nation partners invest significant resources in ensuring SNAP's program integrity.

**USDA's Recertification Demand**

20. On December 16, 2025, U.S. Department of Agriculture/Food and Nutrition Service ("USDA-FNS") Secretary Brooke Rollins sent Minnesota's Governor Tim Walz a letter stating that USDA is "requiring Minnesota to participate in a Supplemental Nutrition Assistance Program (SNAP) pilot project, conducted pursuant to 7 U.S.C. 2026(b)(1)(A), to increase the efficiency of SNAP and improve the delivery of SNAP benefits to eligible households." The letter further stated that "more accurate certifications of eligibility for SNAP benefits will ensure that those in need receive assistance, raising levels of nutrition among low-income individuals." USDA went on to detail the pilot project which requires DCYF and four counties in Minnesota (Hennepin, Ramsey, Washington, and Wright) to conduct recertifications within 30 days of receipt of the letter. Among other things, the letter requires in-person interviews for the recertification process. The letter concludes with a warning that "failure to participate in this pilot project as specified by USDA will trigger noncompliance procedures codified in 7 U.S.C. 2020(g). It may also affect Minnesota's continued participation in SNAP." A true and correct copy of that letter is attached as Exhibit 1.

21. The USDA's actions are unprecedented. To my knowledge, USDA has never before required a state to participate in a mandatory pilot project. DCYF has always understood

that pilot project participation is optional. States typically apply to USDA for permission to participate in pilot projects.

22. Until now, USDA's actions reflected that it shared this understanding. For instance, under the first Trump Administration, the Food and Nutrition service (FNS) distributed a memo announcing a demonstration project under section 17(b)(1) of the Food and Nutrition Act (7 U.S.C. § 2026(b)(1)) and stated "FNS is offering this to states at their option. States that would like to participate in this demonstration project must submit a letter to their regional office requesting a waiver by March 29, 2019." A true and correct copy of this memo is attached as Exhibit 2.

23. The project described above was enacted under the same statutory authority that USDA purports to be enacting this "pilot project" under (7 U.S.C. § 2026(b)(1)).

24. Hennepin, Ramsey, Washington, and Wright counties (the "Recertification Counties") collectively contain approximately 106,000 SNAP households, totaling approximately 191,000 individuals. The four counties selected by USDA to participate in its mandatory pilot project represent 45% of the households receiving SNAP in Minnesota. The SNAP participants in these counties are less likely to be white (24%) than the statewide SNAP population (43%).

25. It would not be possible to recertify these households in a thirty-day period under any circumstances.

26. In its letter, USDA stated that the purpose of the project was a response to "highly publicized and ongoing fraud affecting federally funded benefits in the State of Minnesota, including the multi-million-dollar Feeding Our Future fraud scheme." (Ex. 1) DCYF is not aware of any connection between Feeding Our Future and SNAP. I understand that the Feeding Our

Future fraud ended approximately four years ago. I further understand that is involved large-scale fraud by many individuals resulting in the theft of hundreds of millions of dollars.

27. It would be exceedingly difficult to perpetrate a similar scheme via SNAP recipient fraud. In Minnesota, the average SNAP recipient receives about $314 per month in food benefits.

28. USDA has not offered any data to support its assertion that there is fraud in Minnesota's SNAP program that is higher than in other states such that Minnesota was selected for this project. Even if USDA were relying on payment error rates, which are not a measure of fraud, to support selecting Minnesota for this project, Minnesota's payment error rates have historically been lower than the nationwide average. USDA's proposed pilot does not address retailer fraud in SNAP and would not address EBT skimming. The pilot focuses exclusively on recipients.

**<u>Minnesota Regularly Conducts SNAP Recertifications as Required by Federal Law</u>**

29. DCYF and its county and Tribal Nation partners regularly recertify all SNAP households in Minnesota, as required by USDA regulations. *See* 7 C.F.R. § 273.14. Recertification periods are either six, twelve, or twenty-four months. *Id.* § 273.10(f). In Minnesota, the most common recertification period is twelve months.

30. During the recertification, DCYF and its county and Tribal Nation partners confirm that the SNAP household remains eligible for SNAP.

31. DCYF sends a household a Notice of Expiration (NOE) 45 days before the end of its certification period. *See* 7 C.F.R.§ 273.14(b)(1).

32. The administering county or Tribal Nation schedules an interview with the household. Minnesota permits telephone interviews for recertifications, as permitted by the

USDA. *See* 7 C.F.R. §§ 273.2(e), 273.14. The USDA in fact requires telephone interviews in certain circumstances. *Id.*

33. The USDA also requires that the interviews be scheduled at least 10 days before the household's certification ends. *See* 7 C.F.R. § 273.14(b)(3)(iii).

34. After receiving information from the household and conducting the interview, the administering county or Tribal Nation determines if the household remains eligible for SNAP.

**Implementing the Pilot at DCYF**

35. SNAP recipients already recertify at regular intervals every six, twelve, or twenty-four months depending on their household circumstances as well as a requirement that they report certain changes throughout their certification period. To recertify all SNAP recipients in the pilot project counties, DCYF would need to create a systems override to force new recertification dates for all recipients not otherwise scheduled for recertification during this timeframe. This will permanently change the schedule for future recertification dates and create a mass recertification process for the pilot counties on an ongoing basis.

36. The pilot project is unclear about the notice owed to recipients for their recertifications. Minnesota typically provides 45-days' notice prior to the recertification process which gives recipients time to gather their verification documents and schedule an interview. The timeframe for USDA's pilot does not take into account notice requirements. Failure to provide adequate notice to recipients who are then unable to complete the recertification process could lead to additional appeals and taxes on our administrative hearing system.

37. DCYF will need additional staffing to adequately support county eligibility workers throughout the pilot, including policy guidance, training and technical assistance, and call center support. DCYF does not have the ability to hire new staff to support this process and

would not be able to lend staff to counties to support this effort in 30 days. If DCYF were to designate staff to help with the process, we would need to identify functions to stop – i.e. training new workers, answering policy and system questions, updating manuals, monitoring issuance, making other system changes in our IT systems, etc. Redirecting staff to support the proposed pilot would undermine the quality control and program integrity systems already in place as staff would need to focus exclusively on supporting the counties' recertification efforts.

38. Implementing this pilot project as demanded by the Recertification Letter is even more difficult for several reasons.

39. For one, USDA provided no advanced notice. Recertifications cannot begin immediately upon receipt of the letter but would require providing significant notice to both staff and recipients, scheduling of working hours and interviews, and other administrative steps.

40. USDA also selected a thirty-day period containing major holidays including Christmas, Hannukah, and New Year's Day. Many employees have planned time off from work or travel plans during the holiday season that limit their availability to conduct recertifications. Similarly, many SNAP beneficiaries will similarly be unavailable.

41. USDA also demanded in-person interviews. But the USDA prohibits DCYF from requiring households to report for in-office interviews during their certification periods and also prohibits DCYF from conducting in-home interviews unless the household meets specified hardship criteria and requests an in-home interview. *See* 7 C.F.R. § 273.2(e).

42. The thirty-day period that USDA selected is in the middle of winter. Severe weather frequently limits the ability of both staff and beneficiaries to travel to in-person interviews.

43. The Twin Cities area is also in the midst of aggressive immigration enforcement actions by U.S. Immigration and Customs Enforcement (ICE). It has been widely reported that ICE is engaging in racial profiling and stopping and detaining even lawful residents and U.S. citizens. *See, e.g.,* Emmy Martin et al., *Racial profiling concerns grow as ICE expands presence in Twin Cities*, Minn. Star Tribune, Dec. 18, 2025, https://www.startribune.com/racial-profiling-concerns-grow-as-ice-expands-presence-in-twin-cities/601545116.

44. It has also been widely reported that people are afraid to leave their homes because of this ongoing ICE activity. *See, e.g.,* Jason Rantala, *Trump's immigration policies are hurting Minneapolis small businesses, owners say*, CBS Minnesota, Dec. 16, 2025, https://www.cbsnews.com/minnesota/news/trump-immigration-minneapolis-small-business-impact/ ("The Trump administration's increased immigration enforcement has made many Twin Cities residents afraid to leave their homes"); Nina Moini & Aleesa Kuznetsov, *'People seek our food to feel close to home': Minneapolis chef says ICE fears hurt business*, Dec. 17, 2025, https://www.mprnews.org/episode/2025/12/17/people-seek-our-food-to-feel-close-to-home-minneapolis-chef-says-ice-fears-hurt-business ("[P]eople that look like us…are afraid to go out because they're going to be racially profiled. They might get kidnapped with no reason."); Tesfaye Negussie & Sabina Ghebremedhin, *Somalis in Minnesota say ICE agents already targeting their community*, ABC News, Dec. 8, 2025, https://abcnews.go.com/US/somalis-minnesota-ice-agents-targeting-community/story?id=128080449 ("[Minneapolis City Council member Jamal Osman] said that people are afraid to leave their houses, and he is advising those of Somali descent to carry passports everywhere they go.").

45. The Recertification Counties include the Twin Cities metro area, where ICE has focused its enforcement efforts.

46. In DCYF's experience, some beneficiaries will be reluctant to meet with DCYF or county officials to recertify their SNAP eligibility because they will be fearful of immigration enforcement. And DCYF staff cannot assure them that ICE will not attempt to question or detain beneficiaries as they travel to and from recertification interviews.

**Irreparable Harm**

47. Minnesota and DCYF will be irreparably harmed if the federal government withholds the SNAP administrative funds which total $80 million dollars a year. DCYF would likely have to cut staff and programs that are critical to supporting the SNAP program or divert resources from other important services, which would impact service delivery at the county and Tribal Nation level.

48. The Recertification Letter also threatens to disqualify Minnesota from continued participation in SNAP.

49. Either of these threatened actions could result in a total loss of SNAP for Minnesota and the approximately 440,000 households who depend on it to put food on the table.

50. Minnesota would not be able to replace federally funded SNAP benefits with state funds.

51. The recertification process demanded by the Recertification Letter would significantly erode the trust DCYF has built with Minnesotans over many years. DCYF is the representative of the broader SNAP framework to Minnesota residents. The process required by the Recertification Letter conflicts with what households have previously been informed and imposes significant burdens on them. Requiring them to submit to unscheduled recertifications and in-person interviews with very little notice, in the middle of the holiday season no less, is likely to create confusion and distrust. These households are likely to feel that DCYF has failed

or engaged in wrongdoing. DCYF has fostered trust with Minnesota residents and stakeholders by representing to them that SNAP eligibility and compliance with programmatic requirements will lead to timely benefits issuance. SNAP benefits directly fund one of the most crucial basic human needs: access to food. Failure to deliver on that basic need as promised is a deep violation of residents' trust.

52. Loss of trust among Minnesota residents will likely lead to decreased SNAP enrollments, which in turn will cause irreparable long-term harm and costs to the State in the form of increased healthcare and safety net costs, and expending of resources to rebuild trust in the public agency as described below.

53. Diverting resources for a mass recertification process will harm other public assistance programs in Minnesota as eligibility workers often determine eligibility for multiple programs not just SNAP. Diverting all resources to this effort will result in significant delays in processing and access to other benefits. Processing a year's worth of recertifications in 30 days will inevitably lead to errors in eligibility determinations and payment calculations, increasing Minnesota's SNAP payment error rate. New federal law imposes significant penalties on states whose payment error rates exceed certain thresholds. *See* 7 U.S.C. 2013(a)(1)-(2). Errors made during the current fiscal year bear on the assessed penalties. *See id.* § 2013(a)(2)(B)(ii)(I).

54. Implementing this pilot would cause a significant decrease in Minnesota's Application Processing Timeliness rates as resources would be diverted away from new applications (for expedited and regular SNAP). Minnesota is currently under a corrective action for this measure, and this pilot would undermine Minnesota's ability to comply with its corrective action.

55. SNAP recipients in Minnesota will be harmed if their benefits are terminated due to their failure to complete the recertification process. Some recipients recently recertified and to ask them to do so again would lead to confusion and distrust of the State of Minnesota and the SNAP program. Recipients may not be able to complete the recertification process without adequate notice. The lack of notice of a new recertification timeline will impact recipient's ability to plan ahead and gather verification documents. In 2024, 16.5% of SNAP cases that closed (for any reason) re-opened in less than 3 months. This indicates that the SNAP household likely remained interested and eligible for SNAP but was unable to demonstrate their eligibility in a timely manner to maintain or immediately restore benefits. This pilot project will create an administrative burden for recipient households, some of whom may have already recertified in the preceding months.

56. Loss of SNAP benefits causes economic harm to Minnesota. More than 3,600 merchants in Minnesota accept SNAP benefits for food purchases. Every $1 in SNAP benefits generates up to $1.50 in local economic activity, boosting grocery stores, farmers markets and food retailers across the state. If significant numbers of Minnesota residents are forced to cut back on food spending at once, this will immediately and drastically affect the economic well-being of vendors, farmers, and stores across Minnesota.

57. Loss of SNAP benefits will also strain Minnesota's food banks, which are already overwhelmed.

58. Requiring county eligibility workers to complete a years' worth of work in 30 days will likely result in households who remain eligible for SNAP being removed from the program due to their inability to complete the process in 30 days. If SNAP enrollment declines, there will be additional health care expenditures in Minnesota. SNAP enrollment is correlated

with other health outcomes in Minnesota. A Minnesota study found that when adult SNAP recipients were able to retain their SNAP benefits, annual Medicaid health care spending was $98.8 lower per person for each month of SNAP receipt.[1]

59. A process with the potential to remove eligible households from SNAP solely because of their inability to comply with a burdensome administrative process outside their normal timelines for recertification will impact Minnesota's children and their nutrition. Through a federal option called "direct certification" for its school lunch program, Minnesota currently certifies an estimate of 250,000 children for federally funded free or reduced-price meals for state fiscal year 2024 due to their households' participation in SNAP. This process is crucial for improving access to the school lunch program without any unnecessary delays and reduces the administrative burden on schools. Any reduction in SNAP enrollment for families with schoolchildren therefore has a negative impact on federal eligibility for free or reduced-price meals.

60. A complete loss of SNAP would potentially overwhelm existing state resources and cause severe fiscal, public health, and educational harms to Minnesota.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 26th day of December, 2025, in Brooklyn Park, Minnesota.

Jovon Perry
Director of Economic Assistance and Employment Supports Division
Family Wellbeing Administration
MN Department of Children, Youth, and Families

[1] Kollannoor-Samuel, G., Boelcke-Stennes, K.A., Nelson, J., Martin, E., Fertig, A.R., & Schiff, J. (2022). Supplemental Nutrition Assistance Program Participation is Associated with Lower Health Care Spending among Working Age Adults without Dependents. *Journal of Health Care for the Poor and Underserved 33*(2), 737-750. https://dx.doi.org/10.1353/hpu.2022.0060