UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 0:25-cv-04767-LMP-JFD

STATE OF MINNESOTA, *by and through its*
*Attorney General, Keith Ellison*,

Plaintiff,

v.

UNITED STATES DEPARTMENT OF
AGRICULTURE and BROOKE ROLLINS,
*Secretary of the U.S. Department of Agriculture*,

Defendants.

OPPOSITION TO STATE'S MOTION FOR A TEMPORARY RESTRAINING ORDER
OR EXPEDITED PRELIMINARY INJUNCTION OR STAY

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................ 5

    A.    Overview of SNAP and Recertification............................................ 5

    B.    The Secretary of Agriculture Has Authority to Increase Efficiency of SNAP, Improve Delivery of SNAP Benefits to Eligible Households, and Ensure State Compliance. .................................................................................... 7

    C.    Minnesota Has Failed to Safeguard American Taxpayer Dollars. ................ 8

    D.    USDA Established the Minnesota Pilot Project to Ensure Federal Dollars Go Only to Those Who Are Eligible. ....................................................... 13

LEGAL STANDARD ........................................................................................ 14

ARGUMENT ..................................................................................................... 15

    I.    MINNESOTA IS UNLIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS............................................................................................... 15

        A.    The Secretary's December 16 Pilot Is Not Contrary to Law. ..................... 15

        B.    The Secretary's December 16 Letter Is Not Subject to Any Prior Notice and Comment Rulemaking Requirement................................................... 18

        C.    The Secretary's Recertification Pilot Is Not Arbitrary and Capricious. ...... 20

**D.   Plaintiff's Claims of Political Targeting Are an Irrelevant Attempt to Distract from the Merits.** ........................................................................ **21**

**E.   Minnesota is Unlikely to Prevail on Its Spending Clause Claim.** .............. **21**

**II.      MINNESOTA HAS NOT DEMONSTRATED IRREPARABLE HARM** ... **21**

**III.     THE BALANCE OF THE EQUITIES—HARMS AND PUBLIC INTEREST— FAVORS DEFENDANTS.** .................................................... **25**

**IV.     PLAINTIFF SHOULD BE ORDERED TO POST SECURITY IN CONNECTION WITH ANY INJUNCTIVE RELIEF AND THE COURT SHOULD STAY ANY RELIEF.** ...................................................................... **26**

**CONCLUSION** ..................................................................................... **27**

# TABLE OF AUTHORITIES

Page(s)

Cases

*All. for Ret. Ams.*,

    2025 WL 740401 ................................................................................................ 23

*Am. Pub. Health Ass'n*,

    606 U.S. __,145 S. Ct. 2658 (2025) ................................................................. 26

B & D Land & Livestock Co. v. Conner,

    534 F. Supp. 2d 891 (N.D. Iowa 2008) ...................................................... 4, 15

*Chaplaincy of Full Gospel Churches*,

    454 F.3d ........................................................................................................... 23

*Clapper v. Amnesty Int'l USA*,

    568 U.S. 398 (2013) ....................................................................................... 23

*Dep't of Educ. v. California*,

    No. 24A910, 604 U.S. 650 (2025) ................................................................. 26

*Food Mktg. Inst. v. Argus Leader Media*,

    588 U.S. 427 (2019) ....................................................................................... 15

*Mazurek v. Armstrong*,

    520 U.S. 968 (1997) .................................................................................... 3, 14

Morehouse Enterprises, LLC v. Bureau of Alcohol, Tobacco, Firearms and Explosives,

    78 F.4th 1011 (8th Cir. 2023) .................................................................... 4, 14

Nken v. Holder,

    556 U.S. 418 (2009) ........................................................................................ 4, 15

Winter v. Nat. Res. Def. Council, Inc.,

    555 U.S. 7 (2008) .......................................................................................... 4, 14

Statutes

7 U.S.C. 2026(b)(1)(A) ..................................................................................... passim

7 U.S.C. 2026(b)(2)(A) ............................................................................................ 19

7 U.S.C. § 2011 ........................................................................................................ 5

7 U.S.C. § 2013(a) ................................................................................................... 5

7 U.S.C. § 2013(c) ............................................................................................. 18, 19

7 U.S.C. § 2020(d) .............................................................................................. 5, 6

7 U.S.C. § 2020(e)(8)(A) ........................................................................................ 23

7 U.S.C. § 2020(g) ......................................................................................... 7, 13, 17

7 U.S.C. § 2021(h)(3)(i) ......................................................................................... 17

7 U.S.C. § 2021(i) ................................................................................................... 17

7 U.S.C. § 2025(c)(1)(G) .................................................................................. 12, 13

7 U.S.C. § 2026(b)(1)(C) .................................................................................. 16, 19

7 U.S.C. § 2036d(a) ................................................................................................ 17

7 U.S.C. §§ 2017(f)(2) ............................................................................................ 17

Rules

Fed. R. Civ. P. 65(c) ................................................................................................ 26

Regulations

7 C.F.R. Part 273 ..................................................................................................... 6

7 C.F.R. § 271.3 ....................................................................................................... 5

7 C.F.R. § 271.4 ....................................................................................................... 6

7 C.F.R. § 272.1(c)(1) ............................................................................................ 23

7 C.F.R. § 276.4 ....................................................................................................... 8

7 C.F.R. § 276.4(b) ................................................................................................... 8

7 C.F.R. § 276.7 ....................................................................................................... 8

7 CFR § 273.10(g)(1)(i) ........................................................................................... 6

7 CFR § 273.12(a)(1) ............................................................................................... 6

7 CFR § 273.14(a) .................................................................................................... 6

7 CFR § 273.16(c)(1) ........................................................................................... 9, 10

7 CFR § 273.2(c)(1)(i) .............................................................................................. 6

Other Authorities

90 Fed. Reg. ........................................................................................................... 11

Defendants United States Department of Agriculture and Brooke Rollins, as Secretary of the Department of Agriculture (collectively, the "USDA" or "Defendants"), by and through counsel, hereby submits the following memorandum in opposition to Plaintiff's Motion for a Temporary Restraining Order or Expedited Preliminary Injunction or Stay (the "Motion") [ECF. No. 5] by the State of Minnesota ("Minnesota," "State," or "Plaintiff").

## INTRODUCTION

"I came into this field to help. Um, fraud has never been a big focus for me. And I'm not saying it doesn't exist. Of course, of course it does. It exists in government from top to bottom. Um, I just went on record of saying that, didn't I?"

- Minnesota SNAP Program Manager[1]

This matter arises amidst a public record of the State failing to detect and prevent massive fraud, waste, and abuse in its administration of Federal taxpayer funds. Minnesota is notorious for its inability to properly administer the payment of Federally funded assistance, including Supplemental Nutrition Assistance Program (SNAP) benefits, commonly known as "food stamps."[2] Worse than laxity or incompetence, it appears the State may have been complicit in intentionally encouraging the under-reporting of erroneous or fraudulent payments.

---

[1] Corley Decl., Ex. A at 41:27-42:09.
[2]   E.g.,   https://kstp.com/kstp-news/top-news/minnesota-repeatedly-reported-inaccurate-data-on-snap-to-the-federal-government/

Minnesota's SNAP agency, in a recording of its program manager training SNAP eligibility workers, admitted that "fraud has never been a big focus for me" while also acknowledging that fraud "[e]xists in government from top to bottom."[3] Minnesota's SNAP training instructs State officials responsible for SNAP eligibility determinations and fraud referrals to "stop"[4] and first consider their own "bias,"[5] "equity,"[6] and racial and ethnic disparities;[7] the relative proportion by race of people disqualified for fraud;[8] the adverse consequences if they are disqualified from receiving food stamps;[9] and "why" someone has violated SNAP, suggesting stress and memory issues could excuse violations.[10]

Minnesota urged its SNAP eligibility workers to be "trusting" because "suspicious" "cynical" mindsets can "hinder" their impact,[11] and "dig" for ways to avoid adverse outcomes,[12] fraud investigation referrals, and disqualifications from SNAP,[13] disparaging as "punishment" income limits on eligibility for receiving public assistance.[14] Since last summer, USDA has requested that States produce the data they collect, with Federal funding assistance, and use, to determine households' eligibility to receive SNAP and the

---

[3]Corley Decl., Ex. A.
[4] *Id.* at 37:00-38:00.
[5] *Id.* at 16:18-24:00; 37:00:39:30.
[6] *Id.* at 10:53-12:00.
[7] *Id.* at 30:18-33:30.
[8] *Id.* at 30:18-34:00, 1:04-1:05.
[9] *Id.* at 15:22-16:18; 39:30-41:30.
[10] *Id.* at 37.00-38.00.
[11] *Id.* at 26:30-30:18.
[12] *Id.* at 15:00-16:00.
[13] *Id.* at 1:11-1:13.
[14] *Id.* at 51:00-51:30.

amount of SNAP benefits to be paid—100 percent of which is Federally Funded. Unlike the majority of States, Minnesota refuses to produce this data to USDA.

In view of Minnesota's record, on December 16, 2025, the Secretary of Agriculture wrote to the Governor of Minnesota, citing highly publicized and ongoing fraud and requiring the State to participate in a pilot project, run on a trial basis "pursuant to 7 U.S.C. 2026(b)(1)(A) to . . . improve the delivery of SNAP benefits to eligible households" and noting that "[m]ore accurate certifications of eligibility for SNAP benefits will ensure that those in need receive assistance."[15] Plaintiff already is obligated to perform recertifications of households on a rolling basis to avoid unlawfully paying out Federal funds to ineligible recipients. The Secretary's pilot involves no change other than to perform, once, an accelerated re-certification of eligibility. The recertification could be done using the same procedures Minnesota already should be following.

Minnesota never responded to the Secretary or USDA to ask for more time, or to propose any alternatives to the pilot schedule or methods that would lead Minnesota to comply with the pilot.[16] Instead, Minnesota remained silent until it filed its Complaint two days before Christmas and then moved to enjoin the Secretary's pilot. Minnesota's conduct reveals that it has no intention of complying with the Secretary's eligibility recertification requirement. In so doing, Minnesota caused the alleged impossibility of timely compliance and potential consequences that it begs the Court to now enjoin.

---

[15] Corley Decl., Ex. C.
[16] Corley Decl. ¶¶ 34-37.

Minnesota is seeking the "extraordinary and drastic"[17] remedy of a temporary restraining order or preliminary injunction or stay. The State is not entitled to this relief because it has not met, and as a result of its own choices cannot meet, any of the factors[18] it must establish for such relief. Critically, Minnesota has not demonstrated, and cannot demonstrate, a likelihood of success on the merits of any of its claims. The State is likely not to prevail on the merits because the pilot it is challenging is squarely within the United States Secretary of Agriculture's statutory authority providing that:

> The Secretary *may* conduct on a trial basis, *in one or more areas* of the United States, pilot or experimental projects designed to test *program changes* that *might* increase the efficiency of the supplemental nutrition assistance pro-gram and improve the delivery of supplemental nutrition assistance program benefits to eligible households, and *may waive any requirement of this chapter to the extent necessary for the project to be conducted*.

7 U.S.C. § 2026(b)(1)(A) (emphasis added). None of Plaintiff's claims are likely to prevail on the merits because they cannot override the express statutory authority of the Secretary to conduct the pilot and to waive any requirement "to the extent necessary for the project to be conducted." *Id*. As we demonstrate, plaintiff cannot show irreparable harm from

---

[17] *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quotation omitted).

[18] To obtain the "extraordinary remedy" of a preliminary injunction, *Morehouse Enterprises, LLC v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 78 F.4th 1011, 1016 (8th Cir. 2023). Plaintiffs must establish that (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [their] favor," and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The third and fourth factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The standard to postpone agency action pursuant to APA Section 705 is "the same" as the standard to obtain a preliminary injunction, *B & D Land & Livestock Co. v. Conner*, 534 F. Supp. 2d 891, 905 (N.D. Iowa 2008), but presupposes the applicability of the APA to plaintiffs' claims.

4

Federal action, and the balance of the equities and public interest weigh in favor of not enjoining the Secretary's ability to help ensure that SNAP is administered and enforced in accordance with law.

## BACKGROUND

### A.    Overview of SNAP and Recertification.

The Supplemental Nutrition Assistance Program, also known as "SNAP," is the successor to the Food Stamp Program and is the nation's largest nutrition assistance program.[19] Through SNAP, Congress sought to "alleviate . . . hunger and malnutrition," and to "permit low-income households to obtain a more nutritious diet." 7 U.S.C. § 2011. Once enrolled in the program, eligible individuals and households receive monthly benefits on an electronic benefit transfer ("EBT") card, which can be used like a debit card at authorized retail food stores to purchase food.[20]

USDA's Food and Nutrition Service ("FNS") is responsible for administering SNAP for retail food stores and issuing administrative rules. *See* 7 U.S.C. § 2013(a), (c); 7 C.F.R. § 271.3. FNS also oversees the States' administration of SNAP, including reviewing the States' Plans of Operations and their payment accuracy. 7 U.S.C. § 2020(d).[21] States, on the other hand, administer day-to-day operation of the program through their designated agencies. *See id.* § 2020(a). This includes determining eligibility and benefit amounts,

---

[19] *See* Food and Nutrition Act of 2008, 7 U.S.C. § 2011, *et seq.* ("FNA"); *see also* Supplemental Nutrition Assistance Program ("SNAP"), U.S. Dep't of Agric., Putting Healthy Food within Reach for Those in Need (updated May 27, 2025), https://perma.cc/5KYW-MJ56.
[20] Corley Decl. ¶ 5.
[21] Corley Decl. ¶ 6.

issuing benefits to eligible households, and ensuring program integrity with respect to SNAP recipients. *Id.* § 2020(a)(1); 7 C.F.R. § 271.4.

To participate in SNAP, households must apply and meet all applicable eligibility requirements, including limits on income and resources. 7 CFR § 273.2(c)(1)(i).[22] Once the State has confirmed eligibility for SNAP participation, including conducting any required verifications, the household is certified to participate in SNAP. *See* 7 CFR § 273.10(g)(1)(i). Once a household is certified to participate, it must comply with reporting requirements to maintain its eligibility throughout the certification period.[23] The reporting requirements can vary by household and State option, but the reporting requirements include monthly reporting, quarterly reporting, simplified reporting (periodic reporting), and change reporting.[24] *See* 7 CFR § 273.12(a)(1). In addition to reporting requirements, households must also timely apply for recertification prior to the end of their certification period to ensure there is no disruption in benefits.[25] *See* 7 § CFR 273.14(c). For recertification, the State Agency "must establish procedures for notifying households of expiration dates, providing application forms, scheduling interviews, and recertifying eligible households prior to the expiration of certification periods," and "[h]ouseholds must apply for recertification and comply with interview and verification requirements."[26] 7 CFR § 273.14(a).

---

[22] *See generally* 7 § U.S.C. 2014; 7 C.F.R. Part 273.
[23] Corley Decl. ¶ 7.
[24] *Id.*
[25] Corley Decl. ¶ 12.
[26] *Id.*

**B.**     **The Secretary of Agriculture Has Authority to Increase Efficiency of SNAP, Improve Delivery of SNAP Benefits to Eligible Households, and Ensure State Compliance.**

To test program changes that might increase the efficiency of SNAP and improve the delivery of SNAP benefits to eligible households, the Secretary "may conduct on a trial basis, in one or more areas of the United States, pilot or experimental projects. . . ." 7 U.S.C. § 2026(b)(1)(A). Any project conducted by the Secretary must be consistent with SNAP's goal of providing food assistance among low-income individuals and must include an evaluation to determine the effects of the projects. 7 U.S.C. § 2026(b)(1)(B)(i). Further, the Secretary may conduct a project that is designed, in relevant part, to improve SNAP administration. 7 U.S.C. § 2026(b)(1)(B)(ii). While the Secretary is permitted to waive any requirement of the FNA "to the extent necessary for the project to be conducted," the FNA provides a list of restrictions on permissible projects that outline certain provisions which cannot be waived. 7 U.S.C. § 2026(b)(1)(A). *See* 7 U.S.C. § 2026(b)(1)(A)(iii).

The FNA also provides USDA authority to ensure state compliance. 7 U.S.C. § 2020(g). Before taking action, USDA must provide States with notice of noncompliance and must provide State Agencies "a specified period of time for the correction of such failure." *Id.* If the state does not come into compliance, USDA may refer the matter to the Attorney General to act and/or (regardless of referral to the Attorney General), USDA "shall proceed to withhold from the State such funds authorized" by the FNA.[27] *Id.*

---

[27] *See also* Corley Decl. ¶ 30.

The relevant regulations permit USDA to either suspend or disallow funds, the difference being that suspension is a temporary withholding of all or a portion of the federal funds of a State's budget to administer SNAP. Disallowance, on the other hand, is a denial by USDA of otherwise reimbursable administrative costs. *See* 7 C.F.R. § 276.4(b), (c). The administrative process for withholding funds is established by 7 C.F.R. § 276.4 and 7 C.F.R. § 276.7.[28]

## C.  Minnesota Has Failed to Safeguard American Taxpayer Dollars.

For years now, Minnesota and its operation of FNS programs have been a point of concern for USDA.[29] In September 2022, the Justice Department announced criminal charges against 47 defendants for their alleged roles in a $250 million fraud scheme in Minnesota that exploited a Federally-funded child nutrition program administered by USDA FNS.[30] Over the next three years, the extent of the perpetrated fraud became more apparent. In September 2025, the Justice Department announced that it had charged the 75th defendant in this scheme.[31] Throughout this entire scheme, Federal funds provided to

---

[28] *See also* Corley Decl. ¶¶ 5-15.

[29] *See* Corley Decl. ¶¶ 16–24.

[30] Department of Justice, *U.S. Attorney Announces Federal Charges Against 47 Defendants in $250 Million Feeding Our Future Fraud Scheme* (Sept. 20, 2022), https://www.justice.gov/archives/opa/pr/us-attorney-announces-federal-charges-against-47-defendants-250-million-feeding-our-future; Federal Bureau of Investigations, *Dozens Charged in $250 Million COVID Fraud Scheme* (Sept. 21, 2022), https://www.fbi.gov/news/stories/dozens-charged-in-250-million-covid-fraud-scheme-092122. *See* Corley Decl. ¶ 17.

[31] Department of Justice, *75th Defendant Charged in Feeding Our Future Fraud Scheme* (Sept. 4, 2025), https://www.justice.gov/usao-mn/pr/75th-defendant-charged-feeding-our-future-fraud-scheme.

Minnesota by USDA FNS that were intended as reimbursements for the cost of serving meals to children were instead misappropriated and laundered to enrich the defendants.[32]

In late 2023, staff at USDA learned of a SNAP training by Minnesota Department of Human Services ("MDHS"), the precursor to the Minnesota Department of Children, Youth, and Families ("MDCYF")—the agency within Minnesota that administered SNAP.[33] The video of the training, entitled, "Fraud Prevention and Investigations: The Impact On Children Living In Poverty," contained numerous assertions that alarmed FNS staff.[34] Perhaps most concerning was a statement made by the Minnesota SNAP Program Manager, who said, "I came into this field to help. Um, fraud has never been a big focus for me. And I'm not saying it doesn't exist. Of course, of course it does. It exists in government from top to bottom. Um, I just went on record of saying that, didn't I?"[35]

This sentiment of the SNAP Program Manager was borne out in the advice she provided throughout the training, where on multiple occasions she described clear instances of intentional Program violations as defined at 7 CFR § 273.16(c)(1) and encouraged training participants to find ways around reporting a violation.[36] For example, one participant asked, "But how do you avoid disqualification?" for an individual who lied about having a second income that was subsequently discovered. The SNAP Program Manager replied:

---

[32] *See* Corley Decl. ¶ 18.
[33] *See* Corley Decl. ¶ 19.
[34] *See* Corley Decl. ¶; *id.*, Ex. A.
[35] See Corley Decl., Ex. A at 41:50–42:08.
[36] *See* Corley Decl., Ex. A.

Boy, dig and I think . . . just keep engaging in conversation. And I might say
"I don't want to send someone. I want to resolve this together with—between
you and I—so that we can move forward. I don't want to send somebody." .
. . You don't want them to be disqualified and it's okay to say that.[37]

This training video and the programmatic inaccuracies it contained concerned
USDA staff so much that they placed Minnesota on the next Management Evaluation cycle,
flagging them as "at risk."[38] Minnesota's predisposition to mismanaging and wasting
Federal dollars despite law to the contrary has seemingly continued, regardless, as is
evidenced by State policy memos that violate federal rules.[39]

Then, in December 2025, a Minnesota news agency reported that Minnesota
"repeatedly reported incorrect information about [SNAP] to the federal government."[40]
According to the report, MDCYF, which took over SNAP administration in 2024, then
continued to rely on the flawed data to respond to questions about SNAP.[41] According to
the MDCYF Commissioner, the agency "just learned about that fairly recently, when folks
started reaching out to us."[42] In an interview with the news agency, Minnesota's SNAP
Commissioner answered questions about the prevalence of fraud in SNAP in Minnesota.[43]

---

[37] Corley Decl., Ex. A at 1:12:01–1:12:58.
[38] Corley Decl. ¶¶ 20-21.
[39] Corley Decl. ¶¶ 20-21. *See also* MNDHS, "Who is exempt from the SNAP general
work rules?" (Nov. 2025),
https://www.dhs.state.mn.us/main/idcplg?IdcService=GET_DYNAMIC_CONVERSION
&RevisionSelectionMethod=LatestReleased&dDocName=cm_00280612
(listing "homelessness" as an exemption to general work requirements).
[40] Kristen Swanson, *Minnesota Repeatedly Reported Inaccurate data on SNAP to the
Federal Government*, KTSP.COM (Dec. 15, 2025), https://kstp.com/kstp-news/top-
news/minnesota-repeatedly-reported-inaccurate-data-on-snap-to-the-federal-government/.
[41] *Id.*
[42] *Id.*
[43] *Id.*

She responded that less than 1% of SNAP recipients are found to have committed fraud, with only 143 intentional program violations committed.[44] However, "[t]he department later confirmed that the SNAP issuance data and fraud numbers in the last three USDA State Activity Reports were incorrect."[45]

The latest revelations concerning the inaccuracy of Minnesota's reported data, including its fraud numbers, were all the more troubling in light of Minnesota's repeated refusal to provide participant data to the SNAP Information Database.[46] Without access to Minnesota's participant data, USDA is in the position of paying Federal dollars to Minnesota to operate a program that Minnesota's staff acknowledges contains fraud that it does not know the extent of and did not recognize inaccurate data without the public's assistance.[47] Further, FNS's review of the data it has gathered in the SNAP Information Database from complying States has shown that States with a county-administered program, like Minnesota, are more likely to have higher rates of fraud, waste, and abuse than States that do not delegate administration of SNAP to the county level.[48]

Minnesota's claims that it protects SNAP program integrity and implements anti-fraud measures are misleading. Minnesota states that "Federal data confirms" its Quality Control and Management Evaluation measures are "effective" at protecting SNAP program integrity because of its FFY 2024 Payment Error Rate of 8.98 percent.[49] Although it is true

---

[44] *Id.*

[45] *Id.*

[46] *See* Privacy Act of 1974; System of Records, 90 Fed. Reg. 26,521 (Sept. 23, 2025).

[47] *See* Corley Decl., Ex. A at 41:50–42:08; Swanson, *supra* note 40.

[48] Corley Decl. ¶ 16.

[49] *See* Pl.'s Mem. at 5.

that Minnesota's data indicates an error rate was 8.98 percent, that rate was so high that the State was required, by statute, to develop and implement a Corrective Action Plan for its payment errors.[50] Being required to take corrective action as a result of payment errors certainly cannot constitute Federal confirmation of program integrity or effective management.

Minnesota also contends that USDA "recently reviewed Minnesota's processes and found that [M]DCYF was fully discharging its SNAP responsibilities with no issues."[51] Again, this is misleading. Management Evaluations are conducted only on discrete portions of a State's SNAP operations at a given time, and the various "functional areas" examined by the Management Evaluations are on timed review cycles.[52] For example, there can be Management Evaluations conducted on State Management Evaluation Systems, PAR (local and state), ABAWD, E&T, QC Statistics, QC Integrity, Recipient Claims, Recipient Integrity, SNAP-Ed, and EBT, anywhere from every 2 years to every 6 years.[53] The Management Evaluation that Minnesota cites in support of its contention was focused on the State Management Evaluation System—not its compliance with ABAWD requirements, its handling of recipient claims, or crucially, its handling of recipient integrity.[54]

---

[50] Corley Decl. ¶ 22. *See also* 7 U.S.C. § 2025(c)(1)(G) (requiring a Corrective Action Plan to reduce payment errors for State Agencies with a payment error rate of 6% or greater).
[51] Pl.'s Mem. at 3 (citing Perry Decl. ¶ 10).
[52] Corley Decl. ¶ 24.
[53] *Id.*
[54] *Id.*

Further, Minnesota is relying on figures based on the data that it collected under the direction of program management that, as previously stated, trained State workers to strive to avoid finding and referring fraud for investigation.[55] Those figures cannot be relied upon.

**D.    USDA Established the Minnesota Pilot Project to Ensure Federal Dollars Go Only to Those Who Are Eligible.**

As a result of the information obtained by USDA concerning Minnesota's administration of SNAP and FNS programs, generally—the Feeding Our Future fraud scheme, the MDHS SNAP Fraud Training Video, the reporting of inaccurate SNAP issuance and fraud information to USDA over a period of years, the repeated subsequent failure to discover errors and fraud on its  own, a PER necessitating formal corrective actions, and its refusal to provide to USDA the underlying participant data that would enable USDA to ascertain accurately Minnesota's ability to administer SNAP—the Secretary decided to exercise her statutory authority and create the pilot outlined in her December 16 Letter.[56]

Minnesota argues that the establishment of this pilot project is a remedial action to force it into compliance for the maladministration of SNAP.[57] In support of this contention, Minnesota cites to 7 U.S.C. § 2020(g)–(h), (l) and contends that because Congress provided specific tools for bringing States into compliance with the FNA, a pilot project cannot be used in support of this purpose.[58] However, this mischaracterizes the action at hand. The

---

[55]  Corley Decl. ¶¶ 19-21.
[56] Corley Decl. ¶¶ 25-29; *see id.*, Ex. C.
[57] *See* Pl.'s Mem. at 18.
[58] *Id.*

purpose behind USDA's pilot project is to test whether such recertification actions are effective in detecting known but undetected fraud in a State's SNAP program and effectively "re-setting" the State's SNAP administration to one of full compliance when remedial actions such as management evaluations and corrective action plans have previously fallen short.[59] And, contrary to Minnesota's assertion that this pilot project "could only detect SNAP recipient fraud," which USDA is dedicated to eliminating, this pilot project would also illuminate instances of MDCYF employee fraud.[60]

**LEGAL STANDARD**

Injunctive relief "is an extraordinary and drastic remedy." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quotation omitted). To warrant preliminary relief, the movant must satisfy a four-prong test, establishing "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

To obtain the "extraordinary remedy" of a preliminary injunction, *Morehouse Enterprises, LLC v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 78 F.4th 1011, 1016 (8th Cir. 2023). Movants must establish that (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [their] favor," and (4) "an injunction is in the public interest." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  The third and

---

[59] Corley Decl. ¶¶ 25-29.
[60] Corley Decl. ¶ 28.

fourth factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The standard to postpone agency action pursuant to APA Section 705 is "the same" as the standard to obtain a preliminary injunction, *B & D Land & Livestock Co. v. Conner*, 534 F. Supp. 2d 891, 905 (N.D. Iowa 2008), but presupposes the applicability of the APA to the State's claims.

## ARGUMENT

## I.    MINNESOTA IS UNLIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS.

### A.    The Secretary's December 16 Pilot Is Not Contrary to Law.

Minnesota's principal contention is that USDA cannot *require* the state to engage in a pilot project.[61] Specifically, Minnesota argues that pilot projects under 7 U.S.C. § 2026(b)(1)(A) must permit States to "opt-in."[62] That argument finds no support in the statutory text.

"In statutory interpretation disputes, a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself. Where … that examination yields a clear answer, judges must stop." *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 436 (2019). Here, the FNA explicitly provides the Secretary discretion to establish a pilot project as she deems necessary. The relevant text, as Minnesota agrees, is the following:

> The Secretary *may* conduct on a trial basis, in one or more areas of the United States, pilot or experimental projects designed to test program changes that might increase the efficiency of the supplemental

---

[61] Pl.'s Mem. at 17.
[62] Pl.'s Mem. at 17–18.

> nutrition assistance pro-gram and improve the delivery of
> supplemental nutrition assistance program benefits to eligible
> households, and *may* waive any requirement of this chapter to the
> extent necessary for the project to be conducted.

7 U.S.C. § 2026(b)(1)(A).

Minnesota's argument, however, contravenes the plain language of 7 U.S.C. § 2026(b)(1)(A). Congress broadly conferred upon the Secretary authority to conduct pilot projects "in one or more areas" and to waive other requirements, as needed. *Id.* Nowhere does the text reference anything limiting the Secretary's discretion to allow pilot projects only where States "opt-in" to such projects. In fact, the statute does not purport to limit the Secretary's discretion at all; rather, it grants broad, discretionary authority to the Secretary (the Secretary "may") to conduct pilot or experimental projects to increase the "efficiency" of SNAP. The breadth of this authority is further supported by the last clause of the statute, which grants the Secretary discretion to "waive any requirement of this chapter to the extent necessary for the project to be conducted." Minnesota's arguments would render the Secretary's pilot authority meaningless if States can simply refuse to participate in the Secretary's discretionary pilots. Additionally, the FNA uses language in 7 U.S.C. § 2026(b)(1)(A) and (B) to discuss pilots the Secretary "may conduct" which differs from language in 7 U.S.C. § 2026(b)(1)(C) that discusses projects that are, in contrast, requested by the State. The text of 7 U.S.C. § 2026(b)(1)(C) provides, in relevant part, "[n]o waiver or demonstration program shall be approved …unless… *the State agency conducting the demonstration project* pays the cost of any increased allotments." (emphasis added).

16

This reading is supported by the pilot project language Minnesota relies on in its brief.[63] Minnesota cites to 7 U.S.C. §§ 2017(f)(2), 2036d(a), 2025(h)(1)(F)(i)(I), and 2021(i)[64] to argue that State participation must be voluntary.[65] However, the language at 7 U.S.C. §§ 2017(f)(2), 2025(h)(1)(F)(i)(I), and 2021(i) actually *requires* the Secretary to conduct a particular pilot, and the language at 7 U.S.C. § 2036d(a) permits the Secretary to approve a pilot requested by an entity *other than* a State. Therefore, the correct construction of Congress' statutory scheme is that it provides the Secretary with the discretion and authority to conduct pilot projects she decides to initiate, but also provides that she may approve project requests initiated by States and other entities, and in some circumstances, has been required by Congress to use that authority to conduct a specific project.

Because 7 U.S.C. § 2026(b)(1)(A) authorizes the Secretary to require State participation, Minnesota's failure to participate in a pilot project required by the Secretary would mean the State has violated the Food and Nutrition Act. Violations of the Food and Nutrition Act are subject to noncompliance procedures, such as the withholding of State administrative funds. *See* 7 U.S.C. § 2020(g).

Lastly, because the Secretary's authority at 7 U.S.C. § 2026(b)(1)(A) permits her to waive any FNA provision, as needed, for the pilot project, the December 16 pilot does not, as Minnesota contends, require it to violate Federal law. In any event, USDA did not, as

---

[63] *See* Pl.'s Mem. at 17.
[64] In its brief, Minnesota cites to 7 U.S.C. § 2021(h)(3)(i), which does not exist. USDA believes Minnesota intended to cite to 7 U.S.C. § 2021(i), which requires the Secretary to carry out pilot projects "to test innovative Federal-State partnerships to identify, investigate, and reduce fraud by retail food stores and wholesale food concerns."
[65] *Id.*

Minnesota claims, require Minnesota to comply with "entirely new conditions"[66] upon SNAP eligibility. The Secretary simply called for a one-time acceleration, in a sample subset of counties, of the work that Minnesota is in all events obligated to perform to ensure SNAP program integrity. Minnesota was only asked to promptly complete responsibilities it already had.[67] Some of the households at issue in the pilot would be up for recertification without the pilot project, and others would have periodic or change reports due that Minnesota staff would have to verify.[68] Accordingly, the pilot will accelerate some work, while eliminating other work that Minnesota otherwise was obligated to perform.

### B.    The Secretary's December 16 Letter Is Not Subject to Any Prior Notice and Comment Rulemaking Requirement.

Minnesota contends that it is likely to prevail because the Secretary's pilot allegedly violates the FNA for failure to promulgate notice and comment rulemaking for the pilot.[69]; 7 U.S.C. § 2013(c). Specifically, it alleges USDA is in violation of the following provision:

> The Secretary shall issue such regulations consistent with this Act as the Secretary deems necessary or appropriate for the effective and efficient administration of the supplemental nutrition assistance program and shall promulgate all such regulations in accordance with the procedures set forth in section 553 of title 5 of the United States Code. In addition, prior to issuing any regulation, the Secretary shall provide the Committee on Agriculture of the House of Representatives and the Committee on Agriculture, Nutrition, and Forestry of the Senate a copy of the regulation with a detailed statement justifying it.

7 U.S.C. § 2013(c).[70]

---

[66] Pl.'s Mem. at 29.
[67] *See* Corley Decl., Ex. C.
[68] *See* Corley Decl. ¶ 12.
[69] *See* Pl.'s Mem. at 15
[70] *See* Pl.'s Mem. at 15.

Notably, this language applies only to "regulations," not pilot or demonstration projects, and is required for regulations only to the extent "the Secretary deems it necessary or appropriate for the effective and efficient administration of SNAP." 7 U.S.C. § 2013(c). The authority for the Secretary's pilot is explicit that it is to "test" changes that "might increase the efficiency" of SNAP and "improve the delivery of" SNAP to eligible households. 7 U.S.C. § 2026(b)(1)(A). It is at most a potential precursor to a Secretarial determination that the piloted test shall more broadly and permanently be deemed necessary or appropriate for the effective and efficient administration of SNAP.

In any event, Congress expressly provided the Secretary's authority to conduct a pilot under 7 U.S.C. § 2026(b)(1)(A) includes the authority to "waive any requirement of this chapter to the extent necessary for the project to be conducted." *Id.* As such, for the limited time, scope, and purpose of a pilot project, any statutory requirements asserted by Minnesota as a bar to the pilot are not, because the Secretary may waive them for the pilot, regardless of whether they remain in full force and effect outside of the pilot project.

Further, 7 U.S.C. 2026(b)(2)(A) is the only pilot provision of the FNA that requires a publication in the Federal Register, and even then, it does not require notice and comment rulemaking. It provides that for "demonstration projects to test improved consistency or coordination between [SNAP] and the Job Opportunities and Basic Skills program" a notice of final approval must be published at least 60 days prior to its start.

19

### C.    The Secretary's Recertification Pilot Is Not Arbitrary and Capricious.

USDA has a rational basis for establishing the pilot in Minnesota. Contrary to Minnesota's assertions, the pilot established by the December 16 Letter was not justified solely by the Feeding Our Future fraud scheme—as is evidenced by the letter stating the basis as "highly publicized and ongoing fraud… *including* the multi-million-dollar feeding Our future fraud scheme."[71] (emphasis added) The decision took into consideration MDCYF performance, public reporting, and concerns over the State's administration of SNAP over the course of multiple years.[72] This, in and of itself, demonstrates that this action was not taken for partisan purposes, but for legitimate, programmatic purposes.

Further, while Minnesota asserts this pilot is impossible to comply with and did not factor in reliance interests, both are incorrect assertions. First, Minnesota cites to many of its State-elected options as hurdles to compliance—options the State is at liberty to alter. Second, it ignores the Secretary's authority to waive statutory requirements as needed to conduct the pilot—meaning all hurdles that would truly render the pilot impossible can be removed. Third, Minnesota assumes that USDA failed to consider the reliance interests of SNAP participants in Minnesota, however, that is not the case. USDA weighed its options and decided the greater risk to SNAP was the billion+ taxpayer dollars sent to Minnesota each year and the benefits being spent by fraudsters instead of families who were actually eligible.

---

[71] *See* Corley Decl., Ex. C.
[72] *See* Corley Decl. ¶ 16-24; *see id.*, Ex. D.

**D.      Plaintiff's Claims of Political Targeting Are an Irrelevant Attempt to Distract from the Merits.**

Much of the State's Motion is taken up with political rhetoric and claims that the pilot is arbitrary and capricious because of partisan targeting.[73] Minnesota's invocation of partisanship is an irrelevant attempt to distract from the questions of whether the Secretary's pilot is within her authority to prescribe, and whether the Secretary's pilot was supported by any rational basis. As we demonstrated, Minnesota is not likely to prevail on either of these questions.

**E.      Minnesota is Unlikely to Prevail on Its Spending Clause Claim.**

Plaintiff briefly asserts that the Secretary's request for recertification imposes conditions on Minnesota's receipt of Federal funds that Minnesota does not accept and so violates the Constitution's Spending Clause.[74] Because, as discussed above, Congress provided "the Secretary may to conduct on a trial basis . . . a pilot to test program changes that might increase the efficiency of the supplemental nutrition assistance program . . . and improve the delivery of . . . to eligible households, and may waive any requirement of [the FNA] to the extent necessary for the project to be conducted," 7 U.S.C. § 2026(b)(1)(A) , the Secretary has not violated the Spending Clause.

**II.      MINNESOTA HAS NOT DEMONSTRATED IRREPARABLE HARM.**

The State has not demonstrated irreparable harm, a fact that is underscored by its choice to not respond to the Secretary's letter in any way other than by filing this very

---

[73] *See* Pl.'s Mem. at 10–13; 26–27.
[74] Pl.'s Mem. at 27–28.

lawsuit. In contrast, a county in a different State that was requested to undertake a similar pilot, contacted FNS to advise that "[i]In our efforts to become compliant with the SNAP recertification pilot project, as is the practice in other USDA pilot programs, we would like a written waiver of the federal regulations necessary to perform the county's functions in the pilot project." This other State (which like Minnesota is nonetheless suing USDA to withhold SNAP data), also requested an extension of time "to complete the recertification process in conformance with the pilot program."[75] In contrast, by remaining silent after December 16 and doing nothing to engage with the Secretary about her recertification pilot, other than to sue her two days before Christmas,[76] Minnesota elected to ensure its noncompliance and any alleged harm about which it now complains.[77] To illustrate, Minnesota has confirmed that it has done no work to comply with the December 16 pilot.[78] Minnesota thus ensured that it would not increase the pace of its recertifications "during the holiday season that will damage the trust that Minnesota has built."[79]

Minnesota contends that "[a]ttempting to complete recertifications and "in-person interviews would cause irreparable harm," citing the potential damage to the "trust" Minnesota claims it has instilled in its citizens that they will continue receiving SNAP, if they were required if they were required to undergo recertification ahead of Minnesota's

---

[75] *See* Corley Decl., Ex. E.
[76] Corley Decl. ¶¶ 34-37.
[77] Minnesota misplaces its reliance on any finding of likely irreparable harm in cases relating to the recent lapse in appropriations. *See* Pl.'s Mem. at 29–32. The State of Minnesota refusing to participate in a test pursuant to 7 U.S.C. § 2026(b)(1)(A) authorized pilot is not the same thing as Congress failing to appropriate funds for SNAP.
[78] Corley Decl. ¶¶ 34-37.
[79] Pl.'s Mem. at 29.

normal schedule and during the "holiday season."[80] Even assuming, for argument purposes Minnesota's allegation that it has assured residents that they can "trust" they will timely receive SNAP benefits if they comply with "existing SNAP requirements,"[81] re-certification *is* without dispute an existing requirement. The pilot simply asks that a subset of counties within the State complete those recertifications sooner than the 12 months the State typically waits to recertify eligibility. Minnesota is supposed to be performing recertifications on a rolling basis anyway. That a subset of Minnesota's counties were asked to accelerate this work is not, as Minnesota exclaimed, imposition of "entirely new conditions."

Minnesota's claim that its compliance with the pilot would cause some to lose "trust" in Minnesota and then not seek SNAP benefits, and then seek other State benefits instead, is conjecture about the potential actions and feelings of third-parties that is the height of speculation and does not constitute irreparable harm. *See Chaplaincy of Full Gospel Churches*, 454 F.3d at 297; *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013) (Article III standing cannot be establish based on the unfettered choices made by independent actors not before the court); *All. for Ret. Ams.*, 2025 WL 740401, at *23. Finally, even if Minnesota were to undertake the acceleration of the existing requirement to be recertified, and that did cause applicants to mistrust SNAP, that mistrust would itself be irrational.  USDA has always had the authority to conduct pilots, and to require recertification.  Further, the State and applicants have always been on notice that

---

[80] Pl.'s Mem. at 29–30.
[81] Pl.'s Mem. at 29–30

USDA can monitor payment data to prevent fraud and to protect the integrity of SNAP, and so should not rely otherwise. *See* 7 U.S.C. § 2020(e)(8)(A), (a)(3)(B); 7 C.F.R. § 272.1(c)(1), (e).

Minnesota's claim of harm relies heavily upon another false construct: the assertion that the Secretary's pilot requires "every" member of a household "*en masse*" to show up for an in-person interview.[82] The Secretary's December 16 pilot does not, however, require this. It called for Minnesota to do what it is supposed to be doing anyway: to "ensure SNAP households [in four counties] met all eligibility requirements for SNAP, including by accounting for the income and resources of any excluded household members, conducting in-person interviews, and using federal eligibility tools like the improved, cost-free Systematic Alien Verification for Entitlements (SAVE) Program database."[83] Further, even assuming the Secretary's pilot called for interviews contrary to any other limitation prescribed by the FNA, the Secretary may waive any such requirement for a pilot. 7 U.S.C. § 2026(b)(1)(A).

Moreover, even assuming that Minnesota someday will recertify SNAP beneficiaries on a less leisurely pace than every 12 months, there is no basis to conclude now whether Minnesota will incur any net additional expenses or burden that constitutes irreparable harm.

Because re-certifying sooner than every 12 months would eliminate work including interim checks and management reports during those 12 months, and because Minnesota

---

[82] *See, e.g.*, Pl.'s Mem. at 9, 18, 21, 24, 25.
[83] Corley Decl. ¶¶ 12-14; *id.*, Ex. C.

has not asked for more time or waivers of procedures, Minnesota has not established any net and irreparable harm.[84]

## III.    THE BALANCE OF THE EQUITIES—HARMS AND PUBLIC INTEREST— FAVORS DEFENDANTS.

Finally, the balance of the hardships and public interest weigh in favor of the Federal Government, and not the State, because of the public record which has called into question the State's ability to detect and prevent massive waste, fraud and abuse of Federal funds. Minnesota's delay and obstruction should not be rewarded with an injunction that would shield the State from its legal obligations and accountability for its acts and omissions.

Although Minnesota fails to demonstrate that it would be irreparably harmed, the United States would be harmed by an injunction.  Minnesota's proposed injunction against the Secretary's pilot would curtail the Federal Government's ability to timely test and discover the extent to which Minnesota is failing to properly administer and enforce SNAP. Weighing—

- Minnesota's public record of failing to detect and prevent fraud waste and abuse;

- its training of SNAP eligibility workers that income limits on receiving Federal Assistance are "punishment" and that they should "dig" to find reasons to avoid referring cases for investigation of fraud and disqualification from SNAP eligibility;

- its withholding from USDA of the data that it pays Minnesota to collect and that the State is using to support its certifications of SNAP eligibility; and

---

[84] Corley Decl. ¶¶ 34-37.

- its inaction on a statutorily authorized pilot, as balanced against Minnesota's contention that it would have been a burden to accelerate the re-certifications it has to do anyway—

the equities weigh in favor of the United States and the taxpaying public. This final factor as well supports the Court declining to block USDA from testing and discovering the extent of fraud, waste, and abuse that is undermining the fisc, the SNAP, and the people it is supposed to serve lawfully.

## IV.   PLAINTIFF SHOULD BE ORDERED TO POST SECURITY IN CONNECTION WITH ANY INJUNCTIVE RELIEF AND THE COURT SHOULD STAY ANY RELIEF.

For the reasons stated above, Defendants submit that the Court can and should deny Plaintiff's motion in its entirety. However, should the Court be inclined to order any injunctive relief, the Court should also order Plaintiffs to post an appropriate bond commensurate with the scope of any such order. *See* Fed. R. Civ. P. 65(c); *cf. Dep't of Educ. v. California*, No. 24A910, 604 U.S. 650, 652 (2025).

To the extent the Court issues injunctive relief, Defendants respectfully request that such relief be stayed pending the disposition of any appeal that is authorized by the Solicitor General, or at a minimum, administratively stayed for a period of forty-eight hours to allow the United States to seek an emergency, expedited stay from the court of appeals if an appeal is authorized. That is especially true because any distributed moneys may be forever lost. *See NIH v. Am. Pub. Health Ass'n*, 606 U.S. __,145 S. Ct. 2658 (2025) (Mem.)

(finding the government irreparably harmed where plaintiffs failed to commit to "repay[ing] grant money if the Government ultimately prevails").

## CONCLUSION

For the foregoing reasons, Defendants respectfully requests that the Motion (i.e., both Plaintiff's request for an emergency temporary restraining order and preliminary injunction or stay) be denied in its entirety.

Respectfully submitted,

Dated: January 8, 2026

DANIEL N. ROSEN
United States Attorney

*s/ Brian A. Mizoguchi*

BY:  BRIAN A. MIZOGUCHI
Special Assistant United States Attorney
Attorney ID No. Md. 8512010433
1400 Independence Ave., SW
Washington, D.C. 20250
brian.mizoguchi@usda.gov
(202) 836-1182

ADINE S. MOMOH
Assistant United States Attorney
Attorney Reg. No. 0390085
600 United States Courthouse
300 South Fourth Street
Minneapolis, MN  55415
Adine.Momoh@usdoj.gov
(612) 664-5600

Attorneys for Defendants