UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| State of Minnesota, by and through its Attorney General, Keith Ellison, | Case No. 25-CV-04767-LMP-JFD |
| Plaintiff, | |
| v. | **REPLY MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER OR EXPEDITED PRELIMINARY INJUNCTION OR STAY** |
| United States Department of Agriculture and Brooke Rollins, as Secretary of the Department of Agriculture, | |
| Defendants. | |

The ability of 440,000 Minnesotans to put food on the table depends on this motion. Defendants' actions are unlawful, arbitrary, and needlessly cruel. This Court should enter relief and protect SNAP from Defendants.

BACKGROUND

I.   **Defendants unlawfully retaliated against Minnesota for seeking relief.**

On January 9, 2026, Secretary Rollins announced that "effective immediately," USDA is "suspending payments on all active awards and any future awards from USDA to the State of Minnesota and the City of Minneapolis, currently totaling over $129.18 million." (Richie Decl. Ex. 19.) Secretary Rollins cited no authority to suspend payments. She explained: "rather than confirm your SNAP rolls are accurate to prevent continuing fraud, you asked the courts to block USDA's directive to recertify the State's SNAP recipients." (*Id.*)

## II.  Minnesota takes SNAP integrity seriously.

The centerpiece of Defendants' response is a 2023 training video that Defendants mischaracterize. (Corley Decl. Ex. A.). The trainers discuss four cases where families were disqualified from SNAP and other programs for providing inaccurate information *despite being eligible*. (*Id.* at 40:07–56:50.) They urge their audience to build trust with applicants to encourage truthful disclosures to avoid *eligible families* losing benefits due to inaccuracies, emphasizing that losing benefits can lead to food insecurity and homelessness. (*Id.* at 39:35–40:00.)

The training advances SNAP's fundamental goal that assistance "shall be furnished to all eligible households[.]" 7 U.S.C. § 2014(a). The video does not show that Minnesota tolerates or encourages fraud. One of the same trainers gave a presentation just three months ago titled "Maintaining Program Integrity in Public Assistance Programs" that discussed the importance of fraud prevention and investigation in SNAP and urged workers to refer suspicious cases to investigators. (Second Perry Decl. ¶ 7 & Ex. 1.)

Defendants claim USDA learned of this video in 2023 and "were so severely alarmed" that they "flagged Minnesota" and "placed them on the next Management Evaluation cycle." (Corley Decl. ¶ 20.) This assertion is undermined by the fact DCYF is not aware of any previous communication from USDA regarding the video. (Second Perry Decl. ¶ 8–9.)  In November 2024, a year after it was supposedly "severely alarmed," FNS informed DCYF that it had closed its Management Evaluation and that Minnesota had resolved all issues. (*Id.* ¶ 11 & Ex. 2.)

2

### III. Defendants' data demand to Minnesota is unlawful and the subject of separate litigation.

Defendants attack Minnesota for not providing them with highly sensitive personal information regarding Minnesota's SNAP recipients. (Dkt. 22 at 11, 25; Corley Decl. ¶ 32.) This is a sideshow and the subject of separate litigation. The district court there held that USDA's data demand is likely unlawful for several reasons, including because USDA intends to share the data with others. *California v. USDA*, 2025 WL 2939227, at *10 & n.24 (N.D. Cal. Oct. 15, 2025). States "are required by the SNAP Act to safeguard information[.]" *Id.* at *10. The district court determined federal law *prohibits* Minnesota from providing the requested information and entered a preliminary injunction against the USDA and Secretary Rollins.[1] *Id.* at *9, 14.

### IV. The federal government has escalated its assault on Minnesota.

In the two weeks since Minnesota filed this motion, the federal government has done the following:

- The Administration for Children and Families (ACF) announced it was withholding childcare funding from Minnesota because of a YouTube video. (*Id.* Exs. 21–23)

- ACF announced it was withholding Temporary Assistance for Needy Families funding from Minnesota. (*Id.* Ex. 24.)

- ACF announced it was withholding Social Services Block Grant funding from Minnesota. (*Id.* Ex. 25.)

- Centers for Medicare & Medicaid Services announced it was withholding over $2 billion in annual funding to Minnesota. (*Id.* Exs. 28–29.)

---

[1] Just three days ago, Minnesota was forced to seek relief for Defendants' violations of the injunction. (Richie Decl. Ex. 20.)

3

- The Justice Department alleged Minnesota is in violation of Title VII and gave it one week to enter a consent decree or face suit. (*Id.* Ex. 30.)

- The Department of Education demanded Minnesota capitulate to its demands within ten days or face litigation. (*Id.* Ex. 31.)

On January 9, 2026, a federal district court entered a temporary restraining order blocking the three ACF funding freezes. (*Id.* Ex. 26.)

But these actions and threats pale in comparison to what is happening on the streets of Minnesota. On January 6, 2026, DHS announced it was launching "[t]he largest DHS operation ever" in Minnesota.[2] The next day, an ICE officer killed a woman in Minneapolis.[3] Secretary of Homeland Security Kristi Noem immediately claimed, contrary to video evidence, that the victim was engaged in "domestic terrorism."[4]

---

[2] Rebecca Santana & Mike Balsamo, *Homeland Security plans 2,000 officers in Minnesota for its 'largest immigration operation ever'*, Associated Press, Jan. 6, 2026, https://apnews.com/article/immigration-enforcement-ice-noem-minnesota-somali-db661df6de1131a034da2bda4bb3d817.

[3] Tim Sullivan & Giovanna Dell'orto, *ICE officer shoots and kills a woman during the Minneapolis immigration crackdown*, Minn. Star Tribune, Jan. 7, 2026, https://www.startribune.com/shooting-is-reported-in-minneapolis-where-the-feds-are-conducting-an-immigration-crackdown/601559712.

[4] Sarah Nelson, *DHS Secretary Kristi Noem's comments in wake of woman's fatal shooting by ICE agent*, Minn. Star Tribune, Jan. 7, 2026, https://www.startribune.com/dhs-secretary-kristi-noems-comments-in-wake-of-womans-fatal-shooting-by-ice-agent/601559810.

Hours after the killing, immigration officers violently raided a Minneapolis high school.[5] Some districts in the Twin Cities thereafter closed out of safety concerns, with those remaining open reporting extremely high levels of absenteeism.[6]

The FBI swiftly blocked state officials from investigating.[7] Asked why, President Trump cited "crooked officials" in Minnesota, "an incompetent governor fool," and fraud by "people from Somalia."[8] He continued:

> It's a very corrupt state. I feel that I won Minnesota, I think I won it all three times…I won it all three times in my opinion and it's a corrupt state…But I won Minnesota three times and I didn't get credit for it. I did so well in that state every time…That's a crooked state.

*Id.* To state the obvious, President Trump lost Minnesota in all three of his presidential campaigns.[9]

---

[5] Ben Garvin, et al., *Violence at a Minneapolis School Hours After ICE Shooting*, N.Y. Times, Jan. 11, 2026, https://www.nytimes.com/video/us/100000010633405/minneapolis-border-patrol-school-ice.html.

[6] Elizabeth Shockman, *Schools close, fears rise among Minnesota families, students amid ICE operations*, MPR News, Jan. 9, 2026, https://www.mprnews.org/story/2026/01/09/ice-presence-sparks-fear-for-minnesota-familes-students-schools.

[7] Jeff Day & Paul Walsh, *FBI takes over probe into fatal ICE shooting over state officials' objections*, Minn. Star Tribune, Jan. 8, 2026, https://www.startribune.com/fbi-pushes-minnesota-investigators-aside-in-ice-shooting-probe-ellison-calls-move-a-stupid-thing/601560196.

[8] *President Trump Participates in a Meeting with Oil and Gas Executives,* The White House (Youtube, Jan. 9, 2026), https://www.youtube.com/watch?v=iaE8lw8_x30&t=30s (relevant portion beginning at 54:14 and ending at 56:05).

[9] Election results available at: https://www.sos.mn.gov/elections-voting/election-results

## ARGUMENT

**I.     Minnesota has a fair chance of prevailing on its APA claims.**

    **a.  Defendants violated the APA's procedures.**

Defendants observe that the APA's notice and comment procedures apply only to "regulations" but do not address Minnesota's argument that the Recertification Letter amends existing regulations. *See Iowa League of Cities v. E.P.A.*, 711 F.3d 844, 875–76 (8th Cir. 2013).

Defendants claim the Secretary may "waive" the APA's procedures under her authority to "waive any requirement" of the FNA in connection with pilot projects. But this is not a pilot project: Defendants cannot compel participation in pilot projects, and this project would be unlawful regardless. And the Secretary only can waive requirements for participants, not herself. She approves or denies waiver requests, making clear the waivers are for others. *See* 7 U.S.C. § 2026(b)(1)(D). And her waiver authority extends only to the requirements of "this chapter" (i.e. Title 7, Chapter 51). *Id.* § 2026(b)(1)(A). The APA's procedures are in Title 5, Chapter 5. *See* 5 U.S.C. § 553. That section provides the circumstances in which its procedures can be dispensed with, which Defendants do not argue are met. *Id.* § 553(b), (d).

And USDA's regulations *specifically require* notice and comment for § 2026(b) projects that "will likely have a significant impact on the public." 7 C.F.R. § 282.1. FNS must publish notice in the Federal Register at least 30 days before the project and consider any comments received. *Id.* Obviously that requirement applies here, where the project will affect approximately 100,000 households.

6

b. **The Recertification Letter is contrary to law.**

i. **Defendants cannot compel Minnesota to participate in a SNAP pilot project.**

In December 2024, FNS published in the Federal Register that "State agencies *voluntarily* conduct demonstration projects" under the statutory provision they rely on here. *See* 89 Fed. Reg. 104,965 (Dec. 26, 2024) (emphasis added). Defendants have not identified *any* previous instance in which they compelled participation and have offered no reasons for departing from their own understanding.

Defendants contend nothing in the statute says the Secretary *doesn't* have authority to compel participation. (Dkt. 22 at 16.) But federal agencies only have the authority *given* to them by statute, not any authority not affirmatively withheld. *See, e.g., FEC v. Cruz*, 596 U.S. 289, 301 (2022).

Defendants agree that every other use of the phrase "pilot projects" in the FNA refers to noncompulsory, opt-in projects.[10] (Dkt. 22 at 17.) They offer superficial distinctions between those provisions and § 2026(b), none of which suggest any reason to overcome the presumption that Congress does not "silently attach[] different meanings to the same term in the same or related statutes." *Azar v. Allina Health Servs.*, 587 U.S. 566, 574 (2019). That Congress may require the Secretary to implement certain projects[11] or that some

---

[10] Defendants are correct that Minnesota intended to cite § 2021(i) in their moving brief, not § 2021(h)(3)(i).

[11] If anything, the fact that § 2026(b)(1) does not require the Secretary to implement any projects makes it *less* likely Congress intended to permit her to compel participation.

7

involve non-State entities does not suggest Congress intended "pilot projects" to mean compulsory projects in § 2026(b) when it has a different meaning throughout the FNA.

Nor do noncompulsory projects "render the Secretary's pilot authority meaningless[.]" (Dkt. 22 at 16.) Defendants acknowledge they have successfully conducted voluntary pilot projects. (Corley Decl. ¶ 27); *see also* 89 Fed. Reg. 104,965.

Minnesota also argued that the fact States request waivers for § 2026(b) projects showed the projects are optional, not compulsory. (Dkt. 6 at 17.) Defendants do not respond to this argument.[12]

Defendants admitted just a year ago that "State agencies voluntarily conduct demonstration projects" under § 2026(b). 89 Fed. Reg. 104,965. That was correct, and they cannot require Minnesota to participate in this one.

### ii. Pilot projects do not permit Defendants to impose new obligations on States.

Defendants do not dispute that the Secretary cannot impose new requirements on States in pilot projects. Instead they argue the Recertification Letter only requires Minnesota "to promptly complete responsibilities it already had." (Dkt. 22 at 18.) That defies belief: requiring a year's worth of recertifications to occur within 30 days is obviously "new." If that is not already clear it is made plain by the fact the Secretary could not waive

---

[12] Defendants also argue that § 2026(b)(1)(C) "discusses projects that are…requested by the State," supposedly in contrast to projects under § 2026(b)(1)(A). (Dkt. 22 at 16.) Nothing in § 2026(b)(1)(C) indicates this. Regardless, § 2026(b)(1)(C) does not authorize pilot projects, it creates a requirement for all programs "approved under this chapter after November 28, 1990," including those under § 2026(b)(1)(A). So there is no contrast between § 2026(b)(1)(C) projects, which do not exist, and § 2026(b)(1)(A) projects.

any existing requirements (her only authority for pilot projects) that would result in a requirement that Minnesota recertify all households in the Recertification Counties in thirty days. And it completely ignores the in-person interview requirement Defendants are imposing.

### iii. This "pilot project" is prohibited by the FNA.

§ 2026(b)(1) sets basic criteria for pilot projects and defines "permissible projects" and "prohibited projects." Minnesota showed this "pilot project" does not meet those criteria, is outside the scope of the "permissible projects" and is within the scope of the "prohibited projects." (Dkt. 6 at 19–20.) Defendants have forfeited any response to these arguments by not responding.

### iv. The Recertification Letter would require Minnesota to violate the FNA and its regulations.

Defendants do not deny the Recertification Letter requires Minnesota to violate myriad federal laws. Instead they argue the Secretary can waive FNA provisions in pilot projects. (Dkt. 22 at 17.) As discussed above, this is not a valid pilot project so she lacks that authority. Regardless, she has not purported to waive any requirement. (Second Perry Decl. ¶ 15 & Ex. 5.)

### v. Defendants lack authority to take the actions threatened in the Recertification Letter.

Minnesota showed nothing in § 2020(g) permits Defendants to penalize Minnesota for not submitting to the demands in the Recertification Letter and that no provision of the

FNA permits Defendants to disqualify Minnesota from SNAP, as they have threatened. (Dkt. 6 at 21–22.) Defendants have again forfeited this issue by not responding.[13]

### c. The Recertification Letter is arbitrary and capricious.

#### i. Defendants' stated reason for this "pilot project" is unsupported.

The Feeding Our Future fraud provides no reason to believe Minnesota has higher-than-average SNAP beneficiary fraud. (Dkt. 6 at 23.) Defendants do not dispute this. But they claim that the Recertification Letter "was not justified solely" by Feeding Our Future and offer entirely new reasons. (Dkt. 22 at 20; *see also id.* at 13.) But these are not stated in the letter, and "[i]t is a foundational principle of administrative law that judicial review of agency action is limited to the grounds that the agency invoked when it took the action." *DHS v. Regents of the Univ. of Calif.*, 591 U.S. 1, 20 (2020) (internal quotation omitted).

And the newly proffered reasons are equally unsupported. The evidence does not bear out USDA's claimed "concerns . . . over the course of multiple years" (Dkt. 22 at 20). (*See* Second Perry Decl. ¶¶ 4–14.)

#### ii. Defendants have not explained a rational connection between purported SNAP fraud and *en masse* recertification.

The Recertification Letter did not explain how rapid, *en masse* recertification would rectify SNAP fraud. It would in fact *hamper* Minnesota's ability to detect fraud. (Dkt. 6 at 24.) Defendants still have not explained this. The closest they come is claiming

---

[13] Defendants briefly describe § 2020(g)'s procedures but do not dispute that they do not apply to pilot project nonparticipation. (Dkt. 22 at 7; Corley Decl. ¶¶ 30–31.)

recertification would "illuminate instances of MDCYF employee fraud" in addition to beneficiary fraud, but they do not explain how. (*Id.* at 14; *see also* Corley Decl. ¶ 28.)

### iii. Defendants acted arbitrarily by requiring Minnesota to perform the impossible.

Defendants do not contest Minnesota's significant evidentiary showing that it would be impossible to comply with the Recertification Letter. Nor do they deny it is *per se* unlawful to demand an impossible task. (Dkt. 22 at 20.)

Instead they claim "Minnesota cites to many of its State-elected options as hurdles," claiming "the State is at liberty to alter" them. (*Id.* at 20.) This is nonsense: the reasons for impossibility include inadequate staffing, inadequate notice from Defendants, inability to provide adequate notice to beneficiaries, inability to compel in-person interviews, federal statutes and regulations, holidays, weather, and immigration enforcement, none of which Minnesota "is at liberty to alter."[14] ICE's recent actions have made compliance significantly more difficult as residents stay home in fear.

Defendants also argue the Secretary could waive statutory requirements. Even if this were true, it would cure only a sliver of the problems. But again, the Secretary cannot waive requirements because this "project" is prohibited by the FNA, and regardless, she has not offered or purported to waive any requirement.

---

[14] The only "State-elected option" cited was Minnesota's practice of providing 45 days' notice before recertifications. (Dkt. 6 at 8.) USDA requires at least one month's notice. 7 C.F.R. § 273.14(b)(1)(i). It also requires Minnesota to provide 120 days' notice before making "major changes" to SNAP operations. *Id.* § 272.15.

And, unbelievably, Defendants contend "Minnesota caused the alleged impossibility" by not "ask[ing] for more time" or "propos[ing] any alternatives[.]" (Dkt. 22 at 3; *see also id.* at 22.) Defendants demanded that Minnesota take specified actions within thirty days and threatened ruinous consequences for failure to comply. They did not invite a negotiation and *do not deny* the letter was "final agency action."

### iv. Defendants ignored serious reliance interests.

Defendants do not dispute that agency action is unlawful when it fails to consider serious reliance interests. Instead, Defendants claim they considered the interests of SNAP participants. (Dkt. 22 at 20.) But again, Defendants are limited to the reasons given at the time of the action; courts cannot accept "post hoc rationalizations for agency action." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983). Regardless, Defendants still do not explain their reasoning, nor do they claim they considered the reliance interests of Minnesota or the Recertification Counties.

### v. Defendants targeted Minnesota for partisan purposes.

Defendants make no serious effort to dispute they targeted Minnesota for partisan purposes. This targeting is confirmed by Defendants' response to this lawsuit: withholding $129 million from Minnesotans, without any claim to legal authority, because Minnesota sued to stop the unlawful Recertification Letter.

The partisan targeting is further confirmed by the accelerating pace at which the federal government is freezing funding from Minnesota, the callous statements from high-ranking officials in the aftermath of a killing by a federal agent in Minneapolis, and by the President's statements that he will not permit Minnesota to investigate that killing because

it is a "crooked state" and because of his delusions that he "won Minnesota three times" and "didn't get credit for it."

## II.  Minnesota has a fair chance of prevailing on its Spending Clause claim.

For the reasons above, Defendants lack authority to impose the Recertification Letter on Minnesota, which defeats Defendants' only response to Minnesota's Spending Clause claim.

## III.  Minnesota will suffer irreparable harm without emergency relief.

Critically, Defendants do not dispute that without relief Minnesotans will lose SNAP benefits statewide, nor do they dispute this would constitute irreparable harm. Nor have Defendants contested the damage that would be inflicted on SNAP administration if the Recertification Letter stands.

Defendants do not engage with Minnesota's irrefutable evidence of irreparable harm. Defendants just repeat their complaint that Minnesota did not ask for more time, claiming against all logic this proves Minnesota faces no harm. (Dkt. 22 at 21–22.) Defendants also argue loss of trust cannot be irreparable harm, (*id.* at 23), despite holdings to the contrary.[15] *See, e.g., Rogers Grp., Inc. v. City of Fayetteville, Ark.*, 629 F.3d 784, 789 (8th Cir. 2010) (loss of goodwill is irreparable harm); *City of Chicago v. Sessions*, 264 F.

---

[15] The authorities Defendants cite are off point. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006), holds a policy affecting Plaintiffs' opportunities for Navy promotions was not irreparable. *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013), holds plaintiffs lacked standing to challenge a surveillance law when they could not show they had been or will be surveilled. It does not discuss irreparable harm. *Alliance for Retired Americans v. Bessent*, 770 F. Supp. 3d 79, 107–09 (D.C. Cir. 2025), holds that dissemination of private information to a small number of people obligated to keep it confidential is not irreparable harm.

Supp. 3d 933, 950 (N.D. Ill. 2017) ("Once such trust is lost, it cannot be repaired through an award of money damages…").

Defendants further claim that Minnesota's harm arguments are built on a "false construct" that the Recertification Letter "requires 'every' member of a household '*en masse*' to show up for an in-person interview." (Dkt. 22 at 24.) The Recertification Letter requires every household to interview in-person, not every household member, and Minnesota never argued otherwise. The language Defendants complain of ("requir[ing] households to report en masse") comes from USDA's regulations. *See* 7 C.F.R. § 273.2(e)(1).

Finally, Defendants argue "there is no basis to conclude" the Recertification Letter would cause Minnesota to "incur any net additional expenses." (Dkt. 22 at 24.) But Minnesota submitted uncontroverted evidence of those expenses, including the massive overtime that would be needed.

## IV.   The balance of equities and public interest require relief.

Defendants claim an injunction would harm them by "curtail[ing]" their ability to implement this program. (Dkt. 22 at 25.) This is no harm at all because Defendants have no lawful authority to implement this program.

And this factor requires *weighing* potential harm to the defendant against harms to the plaintiff and the public if relief is withheld. Defendants do not dispute that approximately 440,000 Minnesotans will go hungry if this Court denies relief. Defendants do not even acknowledge this human cost. This harm vastly outweighs the harm of "curtailing" an unlawful program. Defendants' refusal to weigh these equities is not only legal error, it is a moral failing.

V.   **The Court should not require a bond or stay relief.**

This Court should not require a bond because Defendants would not suffer damages from the wrongful issuance of an injunction. *See Rud v. Johnston*, 2023 WL 2600206, at *9 (D. Minn. Mar. 22, 2023). Nor should the Court stay its order, which would expose Minnesotans to hunger while not protecting Defendants from harm.

VI.   **The Court should enjoin Defendants from retaliating against Minnesota.**

Defendants have already retaliated against Minnesota for filing this suit. The Court should not only enjoin Defendants from enforcing the Recertification Letter but from retaliating against Minnesota for filing this lawsuit or not undertaking unlawful recertifications.

## CONCLUSION

For the above reasons, the Court should swiftly enter a preliminary injunction against Defendants.

Dated:  January 12, 2026             Respectfully submitted,

                                                  KEITH ELLISON
                                                  Attorney General
                                                  State of Minnesota

                                                  **<u>s/ Joseph Richie</u>**
                                                  JOSEPH RICHIE
                                                  Special Counsel
                                                  Atty. Reg. No. 0400615

                                                  LIZ KRAMER
                                                  Solicitor General
                                                  Atty. Reg. No. 0325089

                                                  PETER J. FARRELL
                                                  Deputy Solicitor General

Atty. Reg. No. 0393071

KATHERINE BIES
Special Counsel
Atty. Reg. No. 0401675

BRIAN CARTER
Special Counsel
Atty. Reg. No. 0390613

LINDSEY MIDDLECAMP
Special Counsel
Atty. Reg. No. 0392589

445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2125
(651) 300-0921 (Voice)
(651) 282-5832 (Fax)
joseph.richie@ag.state.mn.us
liz.kramer@ag.state.mn.us
peter.farrell@ag.state.mn.us
katherine.bies@ag.state.mn.us
brian.carter@ag.state.mn.us
lindsey.middlecamp@ag.state.mn.us

*Attorneys For Plaintiff State of Minnesota*

|#6273297-v1