*State of Minnesota*
*v.*
*United States Department of Agriculture, et al.*
U.S. Dist. Ct. No. 25-cv-04767-LMP-JFD

# DECLARATION OF JOSEPH RICHIE

# Exhibit 19

*Secretary Brooke L. Rollins*

Washington, D.C.  20250

January 9, 2026

THE HONORABLE TIM WALZ
*Governor of Minnesota*
*130 State Capitol*
*75 Rev Dr. Martin Luther King Jr. Blvd.*
*St. Paul, MN  55155*

THE HONORABLE JACOB FREY
*Mayor of the City of Minneapolis*
*City Hall*
*350 S. Fifth St., Room 330*
*Minneapolis, MN  55415*

Dear Governor Walz and Mayor Frey,

It is my responsibility as Secretary of Agriculture to ensure sound stewardship of taxpayer dollars by eliminating fraud, waste and abuse in all programs funded by the U.S. Department of Agriculture (USDA). The widespread and systemic fraud associated with federal benefit programs in the State of Minnesota and the City of Minneapolis demonstrate an inability to handle federal resources without additional oversight and accountability measures in place.

During your tenures as Governor of Minnesota and Mayor of Minneapolis, numerous non-profits and businesses have defrauded the federal government in what a federal prosecutor in Minnesota called "a staggering, industrial-scale fraud".[1] Most notably, a Minneapolis-based nonprofit— Feeding Our Future—defrauded U.S. taxpayers of nearly $250 million in federal funds given to them by the Minnesota Department of Education.[2] This fraud scheme involved USDA funding provided to the State of Minnesota to feed hungry children under the Child and Adult Care Food Program (CACFP) and the Summer Food Service Program (SFSP). As of late November, 78 defendants had been charged in what the Department of Justice characterized as the largest COVID-19 fraud scheme in the country.[3]

Other recent examples of alleged fraud in Minnesota include exploitation of the Small Business Administration Paycheck Protection Program[4], a scheme to defraud the Housing Stabilization

---

[1] "What to know about Minnesota's 'industrial-scale fraud' scandal, as more charges are filed and Trump weighs in," CBS NEWS (Dec. 19, 2025), available at: https://www.cbsnews.com/news/what-to-know-minnesota-fraud-scandal-more-charges-filed-trump-walz/.

[2] "Federal Jury Finds Feeding Our Future Mastermind and Co-Defendant Guilty in $250 Million Pandemic Fraud Scheme," U.S. DEPARTMENT OF JUSTICE (Mar. 19, 2025), available at: https://www.justice.gov/usao-mn/pr/federal-jury-finds-feeding-our-future-mastermind-and-co-defendant-guilty-250-million.

[3] "78th Defendant Charged in Feeding Our Future Fraud Scheme," U.S. DEPARTMENT OF JUSTICE (Nov. 24, 2025), available at: https://www.justice.gov/usao-mn/pr/78th-defendant-charged-feeding-our-future-fraud-scheme.

[4] https://smallbusiness.house.gov/news/documentsingle.aspx?DocumentID=407357.

Services Program[5], and alleged fraud in daycare centers[6]. Your Administrations have refused additional accountability and oversight, claiming that criticism of rampant fraud and abuse is "racist."

While the full extent of fraud in Minnesota is not yet known, it is clear that, under your leadership—or lack thereof—fraudsters can take advantage of federal funds and the American taxpayer with impunity. This necessitates federal action to protect taxpayer dollars until adequate safeguards can be established.

Despite a staggering, wide-reaching fraud scandal, your Administrations refuse to provide basic information or take common sense measures to stop fraud. In fact, rather than confirm your SNAP rolls are accurate to prevent continuing fraud, you asked the courts to block USDA's directive to recertify the State's SNAP recipients. Recent news reports also emerged that the Minnesota Department of Human Services repeatedly reported incorrect information about SNAP to the federal government.[7] The Trump administration refuses to allow such fraud to continue.

Therefore, because of your failed leadership and abysmal financial management oversight, I am notifying you that, effective immediately, I am suspending payments on all active awards and any future awards from USDA to the State of Minnesota and the City of Minneapolis, currently totaling over $129.18 million. Within 30 days, you shall provide USDA with payment justifications for all federal dollar expenditures from January 20, 2025, to the present. Going forward, all transactions on awards to the State of Minnesota or the City of Minneapolis will require such payment justification. If those payment justifications are not received, awards will remain suspended.

While your Administrations have turned a blind eye to documented fraud, the Trump Administration has made clear that fraud, waste, and abuse are unacceptable. The American people deserve to know that their taxpayer dollars are helping those in need—not criminals. I look forward to your defense of government spending, making certain any federal dollars are spent with integrity.

Sincerely,

Brooke L. Rollins,
Secretary of Agriculture

---

[5] "Defendants Charged in First Wave of Housing Stabilization Fraud Cases," U.S. DEPARTMENT OF JUSTICE (Sept. 18, 2025), available at: https://www.justice.gov/usao-mn/pr/defendants-charged-first-wave-housing-stabilization-fraud-cases.

[6] Louis Casiano, *"Feds launch 'massive' investigation after viral video alleges Minnesota daycare fraud,"* FOX NEWS (Dec. 29, 2025), available at: https://www.foxnews.com/us/feds-launch-massive-investigation-after-viral-video-alleges-minnesota-daycare-fraud.

[7] *"Minnesota repeatedly reported inaccurate data on SNAP to the federal government,"* ABC NEWS, KSTP (Dec. 15, 2025), available at: https://kstp.com/kstp-news/top-news/minnesota-repeatedly-reported-inaccurate-data-on-snap-to-the-federal-government/.

*State of Minnesota*
*v.*
*United States Department of Agriculture, et al.*
U.S. Dist. Ct. No. 25-cv-04767-LMP-JFD

# DECLARATION OF JOSEPH RICHIE

# Exhibit 20

1   ROB BONTA
    Attorney General of California
2   PAUL STEIN
    ROBIN GOLDFADEN
3   Supervising Deputy Attorneys General
    ANDREW Z. EDELSTEIN
4   ANNA RICH
    JANE REILLEY
5   SEBASTIAN BRADY
    WILLIAM BELLAMY
6   MARIA F. BUXTON
    LIAM E. O'CONNOR
7   Deputy Attorneys General
    State Bar No. 330050
8    455 Golden Gate Avenue, Suite 11000
     San Francisco, CA 94102-7004
9    Telephone: (415) 510-3915
     Fax: (415) 703-5480
10   E-mail: Liam.OConnor@doj.ca.gov
    *Attorneys for Plaintiff State of California*
11
    *Additional counsel listed on signature page*
12
                    IN THE UNITED STATES DISTRICT COURT
13
                    FOR THE NORTHERN DISTRICT OF CALIFORNIA
14
                            SAN FRANCISCO DIVISION
15

16

17  **STATE OF CALIFORNIA, ET AL.**          Case No. **3:25-cv-06310-MMC**

18                            Plaintiffs,    **PLAINTIFF STATES' NOTICE OF
                                             MOTION AND MOTION TO
19                                           ENFORCE OR EXPAND THE
                                             PRELIMINARY INJUNCTION**
20        v.
                                             Date: February 13, 2026
21                                           Time: 9:00 a.m.
                                             Courtroom: 7
22  **UNITED STATES DEPARTMENT OF            Judge: Maxine M. Chesney
    AGRICULTURE, ET AL.**                    Trial Date: None set
23                                           Action Filed: July 28, 2025
                             Defendants.

24

25

26

27

28

---

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................... 1

BACKGROUND .............................................................................................................. 2

I.      Defendants Demand that States Produce Personal and Sensitive SNAP
        Data and Threaten to Withhold Funding for Noncompliance ................................. 2

II.     The Court Enjoins Defendants from Withholding Funding from Plaintiff
        States or Taking Other Steps to Enforce Their Data Demand ............................... 3

III.    Notwithstanding the Court's Injunction, Defendants Renew Their Data
        Demand and Threaten to Withhold Funding from Plaintiff States ....................... 4

LEGAL STANDARD ...................................................................................................... 6

ARGUMENT ................................................................................................................... 6

I.      The Court Should Enforce Its Injunction Against Defendants' Renewed
        Demand and Threats to Withhold Funding. ........................................................... 6

        A.     USDA's proposed protocol still does not ensure compliance with
               § 2020(e)(8)(A)(ii). ..................................................................................... 7

        B.     USDA's renewed demand still lacks an agreed-upon protocol. ................. 9

II.     In the Alternative, the Court Should Expand Its Injunction to Bar
        Defendants' Renewed Demand and Threats to Withhold Funding. ...................... 11

        A.     Defendants' demand is contrary to the Computer Matching Act. ............ 12

        B.     Defendants failed to consider important issues raised by Plaintiffs. ........ 14

        C.     Defendants' demand for unfettered possession of State records is
               contrary to the SNAP Act. ........................................................................ 15

        D.     Defendants' demand arbitrarily circumvents existing privacy
               protections. ................................................................................................. 18

        E.     Plaintiffs will suffer irreparable harm absent injunctive relief and
               the balance of hardships and public interest weigh in their favor. ........... 25

CONCLUSION .............................................................................................................. 25

1

**TABLE OF AUTHORITIES**

2

**Page**

3     CASES

4     *Acosta v. Loc. Union 26, UNITE HERE*
5         895 F.3d 141 (1st Cir. 2018) .................................................................. 16

6     *All. for the Wild Rockies v. Pena*
          865 F.3d 1211 (9th Cir. 2017) ................................................................. 6
7
      *Armstrong v. Brown*
8         939 F. Supp. 2d 1012 (N.D. Cal. 2013) ................................................... 6

9     *Arrington v. Daniels*
          516 F.3d 1106 (9th Cir. 2008) ............................................................... 14
10
      *City and County of S.F. v. Trump*
11        897 F.3d 1225 (9th Cir. 2018) ............................................................... 14

12    *County of Santa Clara v. Noem*
13        No. 25-cv-08330-WHO, 2025 WL 3251660 (N.D. Cal. Nov. 21, 2025) ............... 14

14    *DHS v. Regents of the Univ. of Cal.*
          591 U.S. 1 (2020) ....................................................................... 14, 21
15
      *F.C.C. v. Fox Television Stations, Inc.*
16        556 U.S. 502 (2009) .................................................................... 18, 19

17    *Friends of Back Bay v. U.S. Army Corps of Eng'rs*
18        681 F.3d 581 (4th Cir. 2012) ................................................................ 24

19    *Greater Birmingham Ministries v. Sec'y of State for Ala.*
          105 F.4th 1324 (11th Cir. 2024) ............................................................ 16
20
      *Inst. of Cetacean Research v. Sea Shepherd Conserv. Soc'y*
21        774 F.3d 935 (9th Cir. 2014) ................................................................. 6

22    *J.L. v. Cissna*
23        341 F. Supp. 3d 1048 (N.D. Cal. 2018) .................................................... 19

24    *Lackey v. Stinnie*
          604 U.S. 192 (2025) ........................................................................ 25
25
      *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*
26        463 U.S. 29 (1983) ..................................................................... 20, 21

27    *Nat'l Ass'n of Mfrs. v. Dep't of Def.*
28        583 U.S. 109 (2018) ........................................................................ 10

# TABLE OF AUTHORITIES
**(continued)**

**Page**

*Nat'l Fam. Farm Coal. v. Vilsack*
  758 F. Supp. 3d 1060 (N.D. Cal. 2024) ................................................. 22

*Nw. Env't. Def. Ctr. v. Bonneville Power Admin.*
  477 F.3d 668 (9th Cir. 2007)................................................................. 19

*Ohio v. EPA*
  603 U.S. 279 (2024)................................................................... 14, 21

*Pallek v. Rollins*
  No. 1:25-cv-1650, ECF No. 11-1 (D.D.C. May 30, 2025) .................... 2

*Ramos v. Nielsen*
  321 F. Supp. 3d 1083 (N.D. Cal. 2018) ............................................. 19

*Safe Air for Everyone v. EPA*
  488 F.3d 1088 (9th Cir. 2007)............................................................. 24

*United States v. N.Y. Tel. Co.*
  434 U.S. 159 (1977)............................................................................. 6

*Voter Reference Found., LLC v. Torrez*
  160 F.4th 1068(10th Cir. 2025)........................................................... 16

*Winter v. Nat. Res. Def. Council, Inc.*
  555 U.S. 7 (2008)........................................................................... 6, 25

**STATUTES**

5 U.S.C.
  § 552a ................................................................................................. 13
  § 552a(a)(8) ........................................................................................ 13
  § 552a(a)(11) ...................................................................................... 13
  § 552a(o) ............................................................................................. 14
  § 552a(o)(1) ................................................................. 1, 12, 13, 14
  § 552a(o)(1)(A)-(K) ............................................................................ 12
  § 705.................................................................................................... 1

7 U.S.C.
  § 2015(b)(4) ....................................................................................... 17
  § 2020(x)(2)(A)................................................................................... 23
  § 2020(x)(2)(C) .................................................................................. 24
  § 2020(a)(3).................................................................................. *passim*
  § 2020(e)(8)............................................................... 3, 7, 8, 10
  § 2020(e)(8)(A).................................................................... 1, 4, 8

# TABLE OF AUTHORITIES
### (continued)

**Page**

§ 2020(r) .................................................................................................. 23
§ 2025(c) ............................................................................................ 18, 19
§ 2025(c)(4), (5) .................................................................................... 16
§ 2026 .................................................................................................... 22
§ 2026(n) .......................................................................................... 17, 23
§ 2026(n)(1)-(2) .................................................................................... 22
§ 2026(n)(1)-(4) .................................................................................... 17
§ 2026(n)(4)(B)(i) ................................................................................ 22

## REGULATIONS

7 C.F.R.

§ 272.4(e) .............................................................................................. 24
§ 272.14 ................................................................................................ 23
§ 272.14(b)-(c) ...................................................................................... 23
§ 273.16(i) ............................................................................................ 24
§§ 275.10-275.14 ............................................................................ 18, 19
§§ 275.10-275.15 .................................................................................. 17
§ 276.4 .................................................................................................... 6
§ 276.4(d)(1) ...................................................................................... 5, 12

## COURT RULES

Fed. R. Civ. P. 65 .................................................................................... 1

## OTHER AUTHORITIES

77 Fed. Reg. 48045 (Aug. 13, 2012) .................................................... 23

87 Fed. Reg. 59633 (Oct. 3, 2022) ........................................................ 24

90 Fed. Reg. 26521 (June 23, 2025) ............................................... *passim*

Brooke Rollins (@SecRollins), X (Dec. 2, 2025 11:11 a.m. PST),
    https://x.com/SecRollins/status/1995933975211397454?s=20 ............ 11

*Computerize*, Merriam Webster, https://www.merriam-
    webster.com/dictionary/computerize ................................................ 13

Exec. Order No. 14243, 90 Fed. Reg. 13,681 (Mar. 20, 2025) ................ 2, 8

ICE Policy Memorandum 11066.2 (Oct. 27, 2025),
    https://www.ice.gov/doclib/memos/11066.2.pdf ................................ 8

Plaintiff States' Motion to Enforce or Expand the Preliminary Injunction (Case No. 3:25-cv-06310-MMC)

1

<strong><u>TABLE OF AUTHORITIES</u></strong><br>(continued)

2

<strong><u>Page</u></strong>

3

McGill, et al, *Feasibility of Revising the SNAP Quality Control Review Process*,
  i-ii, 49-54 (2019), https://fns-prod.azureedge.us/sites/default/files/resource-

4

  files/SNAPQC_Feasibility.pdf ................................................................................ 21

5

Ross Douthat, *What Palantir Sees*, NY TIMES (Oct. 30, 2025),

6

    https://www.nytimes.com/2025/10/30/opinion/palantir-shyam-sankar-
    military.html ........................................................................................................ 8

7

SNAP Data Transparency and Oversight Act of 2025,

8

    H.R. 6520, 119th Congress, § 2 (2025) .............................................................. 17

9

*Subject to*, Merriam Webster, https://www.merriam-

10

    webster.com/dictionary/subject%20to ................................................................ 9

11

The White House, *President Trump Hosts a Cabinet Meeting, Dec. 2, 2025*
    (YouTube Dec. 2, 2025), https://www.youtube.com/watch?v=pZSd7jn9CSc ..................... 10

12

USDA, *Ensuring Eligible SNAP Households Get the Right Benefits* (updated Dec.

13

    9, 2025), https://www.fns.usda.gov/snap/qc ........................................................ 18

14

USDA, *Feasibility of Revising the Supplemental Nutrition Assistance Program*

15

    *(SNAP) Quality Control Review Process (Summary)* (Dec. 2019),
    https://fns-prod.azureedge.us/sites/default/files/resource-

16

    files/SNAPQC_Feasibility-Summary.pdf ........................................................... 22

17

18

19

20

21

22

23

24

25

26

27

28

v

## NOTICE OF MOTION AND MOTION TO ENFORCE OR EXPAND THE PRELIMINARY INJUNCTION

**PLEASE TAKE NOTICE** that on February 13, 2026, at 9:00 a.m., in Courtroom 7 of the above-entitled court, located at 455 Golden Gate Avenue, San Francisco, California, Plaintiffs the States of California, New York, Arizona, Colorado, Connecticut, Delaware, Hawaiʻi, Illinois, Maine, Maryland, Michigan, Minnesota, New Jersey, New Mexico, Oregon, Rhode Island, Washington, Wisconsin, the District of Columbia, the Commonwealth of Massachusetts, the Office of The Governor ex rel. Andy Beshear, in his official capacity as Governor of the Commonwealth of Kentucky, and the Office of The Governor ex rel. Josh Shapiro, in his official capacity as Governor of the Commonwealth of Pennsylvania (collectively, Plaintiffs or Plaintiff States) will and hereby do move this Court pursuant to 5 U.S.C. § 705, Federal Rule of Civil Procedure 65, and Local Rules 7-1 and 7-2 for an order enforcing or expanding the Preliminary Injunction (ECF No. 106) and prohibiting Defendants United States Department of Agriculture (USDA) and Secretary Brooke Rollins from enforcing Defendants' renewed demand for personal and sensitive data on Supplemental Nutrition Assistance Program (SNAP) applicants and recipients for USDA's "National SNAP Information Database" (SNAP Database) system of records, 90 Fed. Reg. 26521 (June 23, 2025), until Plaintiffs' challenges to the legality of the demand and the SNAP Database program can be adjudicated.

This Motion is based on this Notice; the accompanying Memorandum of Points and Authorities; the supporting declarations filed herewith; the Amended Complaint for Declaratory and Injunctive Relief (ECF No. 84); the Court's Preliminary Injunction and all supporting briefing and evidence; this Court's file; and any other matters properly before the Court.

1

1

**INTRODUCTION**

2      In disregard of this Court's preliminary injunction, USDA has renewed its demand for six

3   years' worth of SNAP applicant and recipient records, and again threatened to penalize States by

4   withholding potentially hundreds of millions of dollars of necessary funding. Although USDA

5   has now "proposed" a data and security protocol, its latest demand violates the Court's injunction

6   because its protocol would *still* permit data sharing and use that is unlawful under this Court's

7   order. ECF No. 106 ("PI Order") at 18-19 (citing 7 U.S.C. § 2020(e)(8)(A)). Furthermore, when

8   Plaintiffs provided a detailed response to the proposed protocol, including suggested edits,

9   questions, and clarifications, USDA rejected Plaintiffs' concerns out of hand, claiming that States

10  have "no discretion" in the matter—contrary to the SNAP Act's explicit requirement that any

11  protocol must be agreed to by the States. *See* PI Order at 13 (citing 7 U.S.C. § 2020(a)(3)). In

12  fact, the only significant revision USDA made to the proposed protocol *exacerbates* the risk of

13  unlawful disclosure and use by adding a broad loophole for sharing the demanded data with other

14  agencies, including the Department of Homeland Security, for purposes unrelated to SNAP.

15     USDA has now unilaterally terminated negotiations, once again initiating noncompliance

16  proceedings and threatening draconian penalties if Plaintiff States do not comply with USDA's

17  unlawful demands. This "my way or the highway" approach has left States with no choice but to

18  seek enforcement of the Court's order on an emergency basis.

19     Even if USDA's renewed demand is beyond the scope of the existing injunction, the Court

20  should expand that injunction, because the renewed demand is contrary to law for the same

21  reasons as USDA's original demand: it violates § 2020(e)(8)'s restrictions on data sharing and

22  use and it is unsupported by an agreed-upon protocol, as required by § 2020(a)(3).

23     In addition, the expanded record supporting this motion underscores additional ways that

24  Defendants' actions violate the Administrative Procedure Act (APA). USDA's renewed demand

25  is contrary to law because the Computer Matching Act prohibits Plaintiffs from disclosing records

26  "for use in a computer matching program" absent an agreement that meets minimum statutory

27  requirements. 5 U.S.C. § 552a(o)(1). And in unilaterally terminating negotiations with Plaintiffs,

28  USDA has arbitrarily dismissed their concerns that the proposed protocol would create significant

1

1    data security risks, including the risks of unlawful disclosure and use.

2         Also, as Plaintiffs have previously argued, USDA's renewed demand is contrary to law

3    because § 2020(a)(3) only provides USDA with authority to obtain *access to*—not unfettered

4    *possession of*—States' SNAP records. This is a foundational flaw that the Court should revisit in

5    light of new developments and evidence. Finally, USDA's renewed demand makes clear that in

6    establishing the SNAP Database, USDA has arbitrarily ignored its prior findings that it lacks the

7    authority to create such a system, and it has arbitrarily circumvented privacy protections built into

8    the existing systems that were carefully designed to accomplish the claimed goals of the new

9    database.

10        The Court should enforce its injunction order against the renewed demand or (if

11   necessary) expand the injunction to prevent an endless cat-and-mouse game of relitigating

12   variations of the same fundamentally unlawful demand for States' data.

## BACKGROUND

### I.   DEFENDANTS DEMAND THAT STATES PRODUCE PERSONAL AND SENSITIVE SNAP DATA AND THREATEN TO WITHHOLD FUNDING FOR NONCOMPLIANCE

16        In May 2025, USDA and its "assigned Department of Government Efficiency ('DOGE')

17   team" sought to obtain SNAP data directly from the States' third-party electronic benefit transfer

18   (EBT) processors. ECF No. 59-12 (IL Decl.), Ex. 1. USDA claimed it was implementing a March

19   20 executive order directing federal agencies to eliminate so-called "information silos," to gain

20   "unfettered access to comprehensive data from all State programs," and to then share that data

21   across the federal government in furtherance of the Administration's goals. ECF No. 59-7 (CA

22   Decl.), Ex. B (citing Exec. Order No. 14243, 90 Fed. Reg. 13,681 (Mar. 20, 2025)).

23        In June, after USDA was sued by private plaintiffs for failing to follow the Privacy Act,

24   among other laws, it published a System of Records Notice (SORN), which describes a new

25   "National Supplemental Nutrition Assistance Program (SNAP) Information Database" (SNAP

26   Database) containing SNAP applicants' and recipients' PII, including their names, Social Security

27   Numbers (SSNs), dates of birth, and addresses. 90 Fed. Reg. 26521; *see Pallek v. Rollins*, No.

28   1:25-cv-1650, ECF No. 11-1, ¶¶ 13-14 (D.D.C. May 30, 2025). USDA sought comment only on

2

its planned "routine uses" of the data, which contemplated broad redisclosure of States' SNAP records to myriad agencies and individuals that have nothing to do with administering SNAP. *E.g.*, 90 Fed. Reg. at 26522 ("When a record on its face, or in conjunction with other records, indicates a violation or potential violation of law . . . USDA/FNS may disclose the record to the appropriate agency, whether Federal, foreign, State, local, or tribal[.]").

On July 9, USDA demanded that the States produce virtually all SNAP applicant and recipient data dating back to 2020—including applicants' and recipients' names, SSNs, dates of birth, and addresses—no later than July 30. ECF No. 59-7 (CA Decl.), Exs. C, D; *see also* 90 Fed. Reg. at 26522 (SORN listing categories of demanded data). In the following weeks, USDA doubled down on its demand, threatening to impose crippling monetary penalties on noncomplying States. ECF No. 59-7 (CA Decl.), Ex. E; *see* ECF No. 59 at 7 n.4. In many cases, USDA threatened to disallow funding in amounts that greatly *exceed* a State's total administrative funding—a plainly coercive move that is untethered to the regulations. ECF No. 75-1, Ex. C.

## II.   THE COURT ENJOINS DEFENDANTS FROM WITHHOLDING FUNDING FROM PLAINTIFF STATES OR TAKING OTHER STEPS TO ENFORCE THEIR DATA DEMAND

Plaintiffs filed the present action on July 28, and soon after moved for a preliminary injunction to bar Defendants from enforcing their data demand. ECF Nos. 1, 59. After issuing a temporary restraining order to preserve the status quo while the parties briefed Defendants' last-minute arguments, ECF Nos. 83, 94, the Court granted a preliminary injunction on October 15, concluding that Plaintiffs are likely to prevail on their claim that Defendants' demand is contrary to law for at least three independent reasons. PI Order at 13-19.[1]

***First***, the Court rejected Defendants' contentions that 7 U.S.C. § 2020(e)(8) provides USDA with authority to collect States' records. That subsection merely permits States to disclose otherwise-confidential data to specified recipients—it does not by itself require them to turn over data to USDA. PI Order at 14-18. Therefore, Defendants' demand was likely unlawful. *Id.* Although a different provision of the SNAP Act, 7 U.S.C. § 2020(a)(3), may provide some authority for USDA to access States' records, as the Court explained, the plain text "requires

---

[1] The preliminary injunction covers all Plaintiffs except Nevada. PI Order at 2 n.2.

1   USDA and a State agency to agree to data and security protocols before the State agency is

2   required to provide the SNAP records demanded by USDA." *Id.* at 13. There was no such

3   protocol in place, however; indeed, USDA had never even proposed one. *See id.*

4        ***Second***, the Court held that Defendants' demand likely violated § 2020(e)(8)(A) because

5   it swept in data that is not "obtained from applicant households," such as transactional records

6   and SNAP usage and retailer data. PI Order at 18 (citing ECF No. 59-7 (CA Decl.), Ex. D).

7        ***Third***, the Court held that Defendants' demand was likely unlawful because USDA had

8   "announced its intent" to disclose and use the data in "ways well beyond those permitted under

9   § 2020(e)(8)(A)(ii)." PI Order at 18. The Court stressed that, because Plaintiff States "are

10  required by the SNAP Act to safeguard information they obtain from applicant households and

11  are permitted to disclose such information under § 2020(e)(8)(A) only for the limited purposes set

12  forth therein," the Plaintiff States "are *prohibited* from disclosing information" under such

13  circumstances—where USDA has "announce[d] in advance an intent to use the information for

14  purposes beyond those set forth in § 2020(e)(8)(A)(ii)." *Id.* at 18-19 (emphasis added).

15       After finding that Plaintiffs established irreparable harm and that the balance of the

16  equities and the public interest supported an injunction, PI Order at 21-24, the Court preliminarily

17  enjoined USDA "from disallowing SNAP funding based on Plaintiff States' failure to comply

18  with the demands set forth in the [USDA's] formal warning letters or otherwise acting thereon,"

19  *id.* at 25. Defendants did not appeal the Court's order, and the deadline to do so has now passed.

20  **III.   NOTWITHSTANDING THE COURT'S INJUNCTION, DEFENDANTS RENEW THEIR DATA
21         DEMAND AND THREATEN TO WITHHOLD FUNDING FROM PLAINTIFF STATES**

22       Despite the Court's injunction, USDA renewed its data demand in letters to Plaintiff

23  States on November 24. Ladov Decl., Ex. A (Renewed Demand) & Attachments. As discussed in

24  more detail below, the renewed demand included a proposed protocol, but USDA claimed that

25  "there can be no good faith objection" to it, and required Plaintiff States to respond within a week

26  stating whether they would comply. *Id.* at 1. Among other problems, the proposed protocol makes

27  clear that the renewed demand is governed by the same SORN, which includes the "routine uses"

28  that the Court found violate the SNAP Act, *see* PI Order at 18-19 & n.24. Indeed, although USDA

4

1   told the Court in September that it would amend the SORN to "clarify that data will not be

2   disclosed except as authorized by the [SNAP Act]," ECF No. 90-1 (USDA Decl.) ¶¶ 10-12, it has

3   not done so.

4        On December 8, Plaintiffs sent a letter detailing problems with the proposed protocol and

5   seeking clarification about USDA's plans in order to offer additional substantive suggestions.

6   Ladov Decl., Ex. B (Pls.' Dec. 8 Ltr.). Plaintiffs requested a response by December 15.

7        Ignoring that request, USDA responded after the close of business Eastern Time on

8   December 23. Rather than trying to reach agreement with Plaintiffs, USDA rejected their

9   concerns out of hand and accused them of seeking "delay" just by raising those concerns. *See*

10  Ladov Decl., Ex. C (USDA Dec. 23 Ltr.) at 1. Worse still, USDA's letter states that it serves as

11  an advance notification under 7 C.F.R. § 276.4(d)(1), thereby initiating noncompliance

12  proceedings to withhold Plaintiffs' funding. *Id.* at 6-7. This notice required Plaintiffs to commit

13  by January 6 to turn over the data, *id.*—a deadline that was later extended to January 9.

14  Defendants also revised their proposed protocol, not to address any of the concerns raised by

15  Plaintiffs, but instead to reserve their purported right to share access to their new SNAP Database

16  with other parties "to the extent required by law." Ladov Decl., Ex. C, Attachment (USDA

17  Revised Protocol) § 4.2; *see id.*, Ex. D § 4.2 (redline showing changes in the revised proposed

18  protocol).[2] This seemingly innocuous proviso appears to be a Trojan Horse intended to leave

19  room for USDA to share States' applicant data with immigration enforcement authorities, and

20  perhaps other federal agencies, in violation of the SNAP Act.

21       On January 9, Plaintiff States responded to USDA by its prescribed deadline, explaining

22  that they are unable to agree to USDA's renewed demand, including because it fails to cure the

23  defects identified in this Court's order, but also that they remain ready to work with USDA in

24  good faith towards an agreed-upon protocol that complies with the SNAP Act and other

25  applicable laws. Ladov Decl. Ex. F (Pls.' Jan. 9 Ltr.).

26

27  _____

28      [2] For ease of reference, Plaintiffs refer to USDA's Revised Protocol throughout, including when referring to provisions that remain unchanged from the original version.

**LEGAL STANDARD**

Courts have broad authority to issue orders to "secure compliance with [their] earlier orders and governing law." *Armstrong v. Brown*, 939 F. Supp. 2d 1012, 1018 (N.D. Cal. 2013); *see also United States v. N.Y. Tel. Co.*, 434 U.S. 159, 172 (1977) (federal courts can issue orders as "necessary or appropriate to effectuate and prevent the frustration of orders"). "In deciding whether an injunction has been violated it is proper to observe the objects for which the relief was granted and to find a breach of the decree in a violation of the spirit of the injunction, even though its strict letter may not have been disregarded." *Inst. of Cetacean Research v. Sea Shepherd Conserv. Soc'y*, 774 F.3d 935, 949 (9th Cir. 2014) (citation omitted).

Plaintiffs' alternative request for an order expanding the Court's existing injunction is governed by *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008): To prevail, Plaintiffs must show that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. Under the "sliding scale" test, Plaintiffs also may prevail by showing "serious questions" going to the merits—a lesser showing than a likelihood of success on the merits—and that "the balance of hardships tips *sharply* in [their] favor, and the other two *Winter* factors are satisfied." *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017) (citation omitted).

**ARGUMENT**

**I.    THE COURT SHOULD ENFORCE ITS INJUNCTION AGAINST DEFENDANTS' RENEWED DEMAND AND THREATS TO WITHHOLD FUNDING.**

As noted above, this Court's preliminary injunction bars USDA "from disallowing SNAP funding based on Plaintiff States' failure to comply with the demands set forth in [USDA's] formal warning letters or otherwise acting thereon." PI Order at 25. Yet USDA has renewed its prior demand, requesting the *same* SNAP data for the same SNAP Database, including all the same PII (names, dates of birth, addresses, and SSNs) and more (e.g., immigration sponsor identity, absent parent status, and SNAP EBT Card Number). *Compare* Renewed Demand, *with* PI Order at 3-4 (describing prior demand). USDA is also invoking the same authority—7 C.F.R.

6

§ 276.4—to impose draconian financial penalties on non-complying States. *Compare* USDA Dec. 23 Ltr. at 6-7, *with* ECF No. 59-7 (CA Decl.), Ex. G (prior advance notification letter).

USDA apparently believes it can circumvent the preliminary injunction, simply because its renewed demand includes a proposed data and security protocol. Not so. As explained below, USDA's renewed demand fails to cure either of the major legal defects the Court identified in its preliminary injunction order: it still would permit applicant data to be disclosed and used in violation of § 2020(e)(8)(A)(ii), *see* PI Order at 18-19, and it still lacks an agreed-upon data and security protocol, as required by § 2020(a)(3), *see* PI Order at 13.

### A. USDA's proposed protocol still does not ensure compliance with § 2020(e)(8)(A)(ii).

The Court previously found that "USDA has announced its intent to use [SNAP applicants' information] in ways well beyond those permitted under § 2020(e)(8)(A)(ii)," including by asserting in the SORN "the right to disclose the data to a number of entities, including numerous entities that are not assistance programs, and for purposes other than the administration or enforcement of the programs referenced in § 2020(e)(8)(A)(i)." PI Order at 18 (citing 90 Fed. Reg. at 26522-23). Thus, the Court held that Plaintiffs are "likely to show the SNAP Act prohibits them from disclosing to USDA the information demanded[.]" *Id.* at 19.

The facts that led the Court to this conclusion have not changed with USDA's renewed demand and proposed protocol.[3] First, the renewed demand relies on the same SORN as the relevant authority for the collection. USDA Revised Protocol § 5 (citing 90 Fed. Reg 26521). That SORN has not been amended, despite Defendants' representations months ago that they would do so. ECF No. 90-1 (USDA Decl.) ¶¶ 10-12. When Plaintiff States asked USDA how it would reconcile differences between the SORN and the protocol, *see* Pls. Dec. 8 Ltr. at 14,

---

[3] While USDA now focuses on § 2020(a)(3) as the source of authority for its demand instead of § 2020(e)(8), the latter subsection still governs disclosure and use of States' applicant data; USDA cannot simply ignore its restrictions. By its terms, this provision applies to *any* disclosure of "information obtained from applicant households," § 2020(e)(8)(A)(i), which encompasses the vast majority of the information USDA seeks here. Indeed, USDA has previously acknowledged that its authority to collect and utilize SNAP applicant data is "subject to confidentiality and limitations on disclosure at [7 U.S.C. § 2020(e)(8)]"). Reyes Decl. (WA), Ex. A at 2; *see also* Reagan Decl. (IL), Ex. A at 9.

1  USDA again promised it would, someday, amend the SORN, but it also made clear that, while

2  USDA plans to drop the SORN's reference to foreign governments, it will not amend the

3  language that this Court found transgresses § 2020(e)(8)(A), *see* USDA Dec. 23 Ltr. at 6.

4         Second, in addition to failing to cure the defects in the SORN, USDA flatly refused to

5  close related loopholes in its proposed protocol that seem intended to permit the disclosure and

6  use of applicant data in violation of § 2020(e)(8)(A)(i). Most notably, while the protocol limits

7  "access" to the SNAP Database itself by other federal agencies, it contains no restriction on

8  USDA's ability to *disclose* information from the database to other federal agencies—something

9  that the Information Silos Executive Order, cited by USDA in its demand and its SORN,

10  expressly dictates. *See* USDA Revised Protocol § 2.1.1 (citing Exec. Order No. 14243, 90 Fed.

11  Reg. 13,681 (Mar. 20, 2025); *see also* 90 Fed. Reg. 26521 (same). Plaintiffs asked USDA to

12  amend the proposed protocol to prohibit USDA from *disclosing* the demanded data "except to

13  persons 'directly connected with the administration' of the SNAP Act, for the purpose of

14  administering or enforcing the SNAP Act only"; to confirm that it would comply with

15  § 2020(e)(8) by "limit[ing] its use of the data to 'ensure the integrity of the SNAP program'

16  only"; and to confirm that it would not share participant data with the Department of Homeland

17  Security or its subagencies "for use in immigration enforcement activities." Pls. Dec. 8 Ltr. at 12-

18  13. In response, USDA stated only that "[i]n the event it receives external requests for data,

19  USDA will follow all applicable laws," USDA Dec. 23 Ltr. at 6, and added language to its

20  proposed protocol reflecting this position, USDA Revised Protocol § 4.2 (stating that "access to

21  the SNAP Information Database may [only] be provided to . . . [a]ny other federal agency" "to

22  the extent required by law"). This provides no assurance at all, because U.S. Immigration and

23  Customs Enforcement (ICE) has publicly announced its position that it may demand other federal

24  agencies to turn over any "lawfully collected information" for use in immigration enforcement.

25  ICE Policy Memorandum 11066.2 (Oct. 27, 2025).[4]

26        _____

         [4] Available at https://www.ice.gov/doclib/memos/  11066.2.pdf. Additionally, Palantir
         executive Shyam Sankar has publicly recognized that the data used by the Palantir platform
27  ("ImmigrationOS") supporting ICE enforcement and removal operations is being pulled from
         "applications for benefits." *See* Ross Douthat, *What Palantir Sees*, NY TIMES (Oct. 30, 2025),
28  https://www.nytimes.com/2025/10/30/opinion/palantir-shyam-sankar-military.html.

1    USDA also refused to agree to any transparency or enforcement mechanism in the

2    protocol—the lack of which would make it impossible for Plaintiff States to know how their

3    SNAP records and applicant data are being shared and used. *Compare* Pls.' Dec. 8 Ltr. at 12-13,

4    *with* USDA Dec. 23 Ltr. Most importantly, Plaintiffs requested that USDA "include protocol

5    language that alerts any State immediately if ICE or any other DHS subagency requests access to

6    or use of this data and provides at least 30 days for that State to respond (and if necessary take

7    legal action) to prevent such data sharing[.]" Pls.' Dec. 8 Ltr. at 12-13. USDA ignored the issue

8    altogether, heightening concerns that USDA will use the data in ways that violate the SNAP Act.

9    In these circumstances—where President Trump has directed federal agencies to share

10   State data across the federal government, USDA has already "announced its intent" to disclose

11   and use applicant data outside of § 2020(e)(8)(A)(ii)'s restrictions, PI Order at 18, and USDA has

12   failed to amend its SORN and its data and security protocol to comply with § 2020(e)(8)(A)(ii)—

13   USDA's renewed demand violates the preliminary injunction, and Plaintiff States continue to be

14   statutorily "prohibit[ed]" from complying with the demand, PI Order at 18.

15       **B.   USDA's renewed demand still lacks an agreed-upon protocol.**

16   The Court previously recognized that § 2020(a)(3) "requires USDA and a State agency to

17   *agree to* data and security protocols *before* the State agency is required to provide the SNAP

18   records demanded by USDA." PI Order at 13 (emphasis added). USDA has failed to cure this

19   defect: regardless of whether the terms that USDA seeks to unilaterally impose actually constitute

20   a "data and security protocol," as that term is normally understood, it is still not a "data and

21   security protocol[] *agreed to by the State agency*." § 2020(a)(3)(B)(i) (emphasis added).

22   With its latest letter, USDA has taken the remarkable position that § 2020(a)(3) does not

23   make an agreed-upon protocol a "condition" at all, and that it only needs to abide by a data and

24   security protocol agreed to by the States if it chooses to enter into one. USDA Dec. 23 Ltr. at 2.

25   Yet again, USDA disregards both the Court's order (*see* PI Order at 12-13) and the plain meaning

26   of Congress's words. *See Subject to*, Merriam Webster, https://www.merriam-

27   webster.com/dictionary/subject%20to (defining "subject to" as "dependent on something else to

28   happen or be true"). Congress expressly provided that the relevant "records . . . shall . . . be made

1    available, *subject to* data and security protocols agreed to by the State agency and Secretary,"

2    § 2020(a)(3)(B)(i)—not (as USDA would have it) that the records shall be made available,

3    *regardless of whether* there are data and security protocols agreed to by the State agency.

4    USDA's interpretation would rewrite the statute altogether, which neither the agency nor the

5    Court can do. *See Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 123 (2018) ("[T]his Court

6    is not free to 'rewrite the statute' to the Government's liking."); PI Order at 17 (declining to adopt

7    USDA's interpretation that would have rewritten § 2020(e)(8)).

8         As the plain meaning of the "subject to" phrase indicates, it allows States to secure an

9    effective data and security protocol—one that would safeguard their personal and sensitive data

10   from being leaked, breached, illegally disclosed, or illegally used—"before" States are "required"

11   to grant access to their records. PI Order at 13. Accordingly, in response to USDA's renewed

12   demand, Plaintiff States explained, in painstaking detail, the significant problems with USDA's

13   proposed protocol—including that it would put millions of Americans' sensitive data at risk and

14   that it did not even ensure that USDA would follow the "strict limitations" that Congress has

15   "placed on the use of" applicant data. PI Order at 18; *see* Pls.' Dec. 8 Ltr. Plaintiff States offered

16   this response in good faith, just as they had responded to USDA's original demand. *See* PI Order

17   at 12 n.14 (observing that "there is no evidence that any Plaintiff State has refused to negotiate

18   protocols," and that "some of the Plaintiff States ha[d] advised USDA of their willingness to

19   negotiate protocols that would apply to the data USDA seeks, but ha[d] received no response").

20        Meanwhile, USDA never made any real attempt to reach agreement. Even before

21   Plaintiffs had an opportunity to respond to the renewed demand, Secretary Rollins announced

22   during a televised cabinet meeting that she had already decided to penalize "blue states"

23   (referring to Plaintiffs), stating that "as of next week we have begun and will begin to stop

24   moving federal funds into those states until they comply" with USDA's renewed demand.[5] She

25   then announced on X: "NO DATA, NO MONEY – it's that simple," and accused Plaintiffs of

26

27

28        [5] The White House, *President Trump Hosts a Cabinet Meeting, Dec. 2, 2025*, at 59:45-
     1:00:33 (YouTube Dec. 2, 2025), https://www.youtube.com/watch?v=pZSd7jn9CSc.

1   "protecting their bribery schemes."[6] USDA's renewed demand itself mirrors the Secretary's

2   sentiments, stating unequivocally that "there can be *no good faith objection* to the attached

3   protocols." Renewed Demand at 1 (emphasis added). And Defendants' counsel has similarly

4   asserted that States have no "discretion" in the matter. Ladov Decl., Ex. E.

5        Then, after Plaintiffs' response, USDA unilaterally terminated negotiations without

6   addressing the problems Plaintiffs raised. *See infra* § II(B). Accordingly, Plaintiffs States have

7   declined to acquiesce to USDA's renewed demand—as they are statutorily *required* to do. *See* PI

8   Order at 18-19 (holding that Plaintiffs are "prohibited from disclosing" applicant data to USDA,

9   given the agency's stated intent to disclose and use that data "for purposes beyond those set forth

10  in § 2020(e)(8)(A)(ii)").

11       In short, the Court recognized in its PI Order that USDA lacks authority to enforce its

12  original demand under § 2020(a)(3) without an agreed-upon data and security protocol. *See* PI

13  Order at 13. USDA has not cured this fundamental defect. Therefore, the Court should enforce its

14  order against USDA's renewed demand and threats to disallow funding.

15  **II.   IN THE ALTERNATIVE, THE COURT SHOULD EXPAND ITS INJUNCTION TO BAR
         DEFENDANTS' RENEWED DEMAND AND THREATS TO WITHHOLD FUNDING.**

16

17       If the Court finds that Defendants' renewed data demand and financial threats violate the

18  existing injunction, then that should be the end of the analysis; the Court may defer consideration

19  of Plaintiffs' remaining arguments until summary judgment, when the Court may fully consider

20  the issues on a complete administrative record. However, if the Court finds that the Defendants'

21  renewed demand is beyond the scope of its preliminary injunction, then it should expand its

22  preliminary injunction to bar the renewed demand, because Plaintiffs are likely to prevail on their

23  arguments that it violates the APA in multiple ways, in addition to the defects discussed above.[7]

24       As explained below, USDA's renewed demand is contrary to the Computer Matching Act,

25       [6] Brooke Rollins (@SecRollins), X (Dec. 2, 2025 11:11 a.m. PST),
    https://x.com/SecRollins/status/1995933975211397454?s=20.

26       [7] Whether characterized as a new demand or a continuation of the enjoined demand,
    USDA's December 23 letter constitutes a final agency action. It is "not only is final but also

27  determines Plaintiff States' obligations and the consequences flowing from a failure to comply
    therewith." PI Order at 9. Specifically, USDA's December 23 letter instructs the Plaintiff States

28                                                                    (continued…)

1   because Plaintiffs may not disclose the demanded records absent a written agreement that meets

2   minimum statutory requirements. *See infra* § II(A). USDA has also arbitrarily failed to consider

3   important issues raised by Plaintiffs, including that USDA's proposed protocol fails to protect

4   States' records against data security risks. *See infra* § II(B). Finally, as the expanded preliminary

5   record shows, Plaintiffs are likely to prevail on their claims that USDA lacks statutory authority

6   to demand unfettered possession and control of State SNAP records, *see infra* § II(C), and that

7   USDA's proposed SNAP Database arbitrarily abandons long-standing agency practice and

8   circumvents existing data privacy protections, *see infra* § II(D).

9       **A.   Defendants' demand is contrary to the Computer Matching Act.**

10      In their response to USDA's proposed protocol, Plaintiff States objected that USDA's

11  proposed protocol fails to comply with the Computer Matching and Privacy Protection Act

12  ("Computer Matching Act"), which ***prohibits*** States from disclosing records "for use in a

13  computer matching program" except pursuant to a written agreement that meets minimum

14  statutory requirements. 5 U.S.C. § 552a(o)(1); *see* Pls.' Dec. 8 Ltr. at 2. Among other things, the

15  agreement must specify: the purpose of the program; each data element that will be used;

16  procedures for verifying information produced by the program; procedures for protecting data

17  security and privacy; and prohibitions on the duplication and redisclosure of records. 5 U.S.C.

18  § 552a(o)(1)(A)-(K). As Plaintiff States noted in their letter, they have previously entered into

19  necessarily detailed computer matching agreements with USDA, including to implement the

20  National Accuracy Clearinghouse (NAC) and Electronic Disqualified Recipient System (eDRS)

21  systems. *Id.*; *see* Reyes Decl. (WA), Ex. A; Reagan Decl. (IL), Ex. A at 3; Tomasky Decl. (NY)

22  ¶¶ 12-17.

23      In response to Plaintiffs' letter, USDA did not dispute that its proposed protocol fails to

24  comply with 5 U.S.C. § 552a(o)(1). Instead, it suggested that it need not comply with the

25  Computer Matching Act because the agency may not use States' records in a computer matching

26

27  ———————————
    to "construe this letter as your Advance Notification pursuant to 7 CFR 276.4(d)(1)" that USDA
    intends to disallow funding. USDA Dec. 23 Ltr. at 6. The Court has held that such formal steps
28  toward disallowance are evidence of a final agency action. PI Order at 8-9.

1    program, first stating that "FNS's uses of data" will not "be automatic," USDA Dec. 23 Ltr. at 5,

2    and later refusing to describe which data "will be analyzed, how, and when," *id.* at 6.

3        But USDA has already made clear that it intends to use the demanded records for a

4    "computer matching program," which is defined to include "any computerized comparison of . . .

5    two or more automated systems of records or a system of records with non-Federal records" in

6    order to "establish[] or verify[]" applicants' "eligibility" for "cash or in-kind assistance or

7    payments under Federal benefit programs." 5 U.S.C. § 552a(a)(8). Indeed, in its Privacy Impact

8    Assessment, USDA explained that it is using the SNAP Database to "verify[] SNAP recipient

9    eligibility" by "leverag[ing] data-sharing across Federal and State systems to identify and rectify

10   any ineligible, duplicate, or fraudulent SNAP enrollments or transactions," ECF No. 59-7, (CA

11   Decl.) Ex. A at 13, by conducting "[i]nter-Agency data matches" "using automated scripts and

12   queries on the compiled database" as well as "matching algorithms," *id.* at 5.[8]

13       In these circumstances, where USDA has already expressed its intent to use the demanded

14   records in a computer matching program, 5 U.S.C. § 552a(o)(1) *prohibits* Plaintiff States from

15   disclosing the demanded records without a necessarily detailed computer matching agreement.

16   *See* 5 U.S.C. § 552a(o)(1) ("No record which is contained in a system of records may be

17   disclosed to a recipient agency . . . for use in a computer matching program except pursuant to a

18   [computer-matching agreement] between the source agency and the recipient agency . . . ."); *see*

19   *also* PI Order at 18-19 (holding that because USDA has stated its intent to violate

20   § 2020(e)(8)(A)(ii), that subsection prohibits Plaintiff States from disclosing applicant data).[9]

21   _____

22   [8] Available at https://www.usda.gov/sites/default/files/documents/fns-snap-information-
     database-pia.pdf. USDA previously tried to argue that it is not engaging in an "automated"

23   comparison of data, ECF No. 72 at 30 (citation omitted), but the statute expressly applies to "any
     *computerized*" comparison of data, 5 U.S.C. § 552a(a)(8) (emphasis added), which USDA

24   indisputably intends to do with the demanded records. *See Computerize*, Merriam Webster,
     https://www.merriam-webster.com/dictionary/computerize (defining "computerize" as "to carry
     out, control, or produce by means of a computer").

25   [9] When ruling on Plaintiffs' preliminary injunction motion, the Court preliminarily found
     that there was insufficient evidence that USDA "intend[ed] to act in violation of the strictures set

26   forth in the Computer Matching Act." *See* PI Order at 21 n.26. However, Plaintiffs previously did
     not press the argument they raise here: that 5 U.S.C. § 552a requires USDA to enter into

27   computer matching agreements *with Plaintiff States*. *See* PI Mot. at 20-21; *see also* 5 U.S.C. §
     552a(a)(11) (defining "source agency" to include "any State . . . which discloses records to be

28   used in a matching program").

1    Therefore, USDA's renewed demand that Plaintiff States violate 5 U.S.C. § 552a(o)(1) is contrary

2    to law and should be enjoined.[10]

3         **B.   Defendants failed to consider important issues raised by Plaintiffs.**

4         Under the APA, agency action is arbitrary and capricious when the agency has "failed to

5    consider important aspects of the problem" before it. *DHS v. Regents of the Univ. of Cal.*, 591

6    U.S. 1, 4 (2020) (citation modified). Here, USDA did precisely that. In particular, after USDA

7    issued its renewed demand, Plaintiff States raised concerns that USDA's proposed protocol would

8    still expose Plaintiffs' records to unlawful disclosure and use. In response, USDA ignored these

9    concerns and instituting noncompliance proceedings. *See* USDA Dec. 23 Ltr. This plug-your-ears

10   approach violates the APA. *See Ohio v. EPA*, 603 U.S. 279, 293 (2024) (agency acted arbitrarily

11   and capriciously by "offer[ring] no reasoned response"); *Arrington v. Daniels*, 516 F.3d 1106,

12   1112 (9th Cir. 2008) (courts "may not 'infer an agency's reasoning from mere silence'").

13        ***First***, USDA disregarded Plaintiffs States' objections that the renewed demand and

14   proposed protocol fail to comply with statutory restrictions on data disclosure and use contained

15   within the SNAP Act, *see supra* § I(A), and the Computer Matching Act, *see supra* § II(A).

16        ***Second***, as noted above, Plaintiff States expressed concern that USDA's proposed

17   protocol lacks enforcement mechanisms, such as monitoring, auditing, automated controls, or

18   documented consequences. Pls.' Dec. 8 Ltr. at 3. Without methods to ensure compliance, the

19   protocol's purported restrictions on access to the SNAP Database merely serve as statements of

20   intent, and improper data disclosure and usage may go unprevented, unnoticed, and uncorrected.

21   *Id.*; Dennis Decl. (KY) ¶ 19; Tomasky Decl. (NY) ¶¶ 15-17. This leaves Plaintiffs States without

22   assurance that their records and their applicant data will be handled consistent with their

23        [10] In their opposition to Plaintiffs' preliminary injunction motion, USDA argued that
     Plaintiffs lack standing to challenge USDA's violations of the Computer Matching Act on the
24   ground that those failures are distinct from USDA's data demand and cause Plaintiffs "no injury."
     *See* ECF No. 72 at 21-22. Defendants are wrong. Just as Defendants' demand that Plaintiffs either
25   violate the SNAP Act's data disclosure restrictions or lose federal funding injures Plaintiffs, so
     too does their demand that Plaintiffs either violate 5 U.S.C. § 552a(o)'s data disclosure
26   restrictions or lose federal funding. *See City and County of S.F. v. Trump*, 897 F.3d 1225, 1236
     (9th Cir. 2018) (threatened loss of federal funding "satisfies Article III's standing requirement.");
27   *County of Santa Clara v. Noem*, No. 25-cv-08330-WHO, 2025 WL 3251660, at *43 (N.D. Cal.
     Nov. 21, 2025) ("Hobson's choice" between accepting unlawful terms for federal funding and
28   losing federal funding constitutes irreparable harm).

1   representations to participants and consistent with the statutory restrictions on the disclosure and

2   use of the demanded data. Pls.' Dec. 8 Ltr. at 3. USDA's response failed to consider this issue

3   whatsoever, which is another reason why its renewed demand is arbitrary and capricious.

4       **Third**, because USDA's data demand is unprecedented in scope, it creates significant risks

5   of illegal use, disclosure, and hacking. Pls.' Dec. 8 Ltr. at 2. USDA dismissed these risks,

6   asserting that Plaintiff States have previously uploaded far more limited datasets to USDA for

7   quality control purposes, and, in USDA's view, "[i]t is simply baseless to object to providing a

8   complete [dataset], rather than just a sample," because transferring "data of the same type but in

9   greater *volume*" presents no greater risk. USDA Dec. 23 Ltr. at 4 (emphasis in original). But

10  transferring data in vastly greater quantities and centralizing it in one place *does* present greater

11  risks: more data housed in a single database, as USDA proposes, can more easily be wrongfully

12  used or disclosed or hacked. *See, e.g.,* ECF No. 59-3 (Piazza Decl.) ¶¶ 5-12; Reyes (WA) Decl.

13  ¶ 6. And those risks are exacerbated here, because, as noted above, USDA's proposed protocol

14  includes weak restrictions on the disclosure and use of applicant data and lacks enforcement

15  mechanisms. *See, e.g.,* Reyes Decl. (WA) ¶¶ 5, 7-11.

16      **Finally**, as with USDA's original demand, USDA's renewed demand insists that Plaintiffs

17  produce the demanded records "no later than 30 days" after receipt of the demand. Renewed

18  Demand at 2. As Plaintiffs noted in their preliminary injunction motion, this is a near-impossible

19  timeline for many Plaintiffs, particularly those with large caseloads. *See* ECF No. 59 (PI Mot.) at

20  13. Collecting and securely producing almost six-years' worth of numerous data elements is a

21  time-consuming process that would require thousands of personnel hours for many Plaintiffs. For

22  example, New York's agency estimates that it would take *at least* 120 days to collect the

23  demanded data. Tomasky Decl. (NY) ¶ 32. USDA's refusal to grapple with this basic logistical

24  challenge and decision to demand production in just 30 days is also arbitrary and capricious.

25      **C.      Defendants' demand for unfettered possession of State records is contrary
26              to the SNAP Act.**

27      USDA's renewed demand that Plaintiff States turn over *possession* of their SNAP records

28  to USDA is also contrary to law, because it falls well outside of the carefully cabined right of

15

1    access to "inspect" and "audit" granted in 7 U.S.C. § 2020(a)(3).

2         Section 2020(a)(3) was enacted to ensure that USDA could "inspect" and "audit" state

3    SNAP records to monitor State agencies' administration of SNAP, either through remote access

4    or in person. The plain language of the statute provides that ("subject to" agreed-upon data and

5    security protocols) States must "ma[ke] available for inspection and audit" "[a]ll records, and the

6    entire information systems in which records are contained, that are covered in subparagraph (A),"

7    § 2020(a)(3)(B)(i)—not that States must "provide," "transmit," or "furnish" any records. That

8    distinction is important: *access* to State records allows for the "inspection" and "audit" of those

9    records as contemplated by § 2020(a)(3), while still allowing the State agency to maintain

10   possession and control of the records and, accordingly, to protect the privacy and security of

11   SNAP participants' data as required by law. *See Greater Birmingham Ministries v. Sec'y of State*

12   *for Ala.*, 105 F.4th 1324, 1333 (11th Cir. 2024) (noting that a right to "inspection" does not

13   encompass a right to copy, take possession of, or receive via electronic disclosure); *Acosta v. Loc.*

14   *Union 26, UNITE HERE*, 895 F.3d 141, 144 (1st Cir. 2018) (holding right to "inspection" does

15   not include copying or taking handwritten notes, but only "[t]o look upon; to view closely and

16   critically, esp. so as to ascertain quality of state, to detect errors, etc.; to scrutinize[.]"); *Voter*

17   *Reference Found., LLC v. Torrez*, 160 F.4th 1068, 1081(10th Cir. 2025) ("To 'inspect' is to 'look

18   carefully into' or to 'view closely and critically.'"). By contrast, when a state agency turns over

19   *possession* of SNAP records, it loses control of them, and risks allowing USDA to retain, copy,

20   redisclose, or manipulate the data, thereby creating the myriad data security and privacy problems

21   which Plaintiff States have raised throughout this litigation.

22        Elsewhere in the SNAP Act, Congress has differentiated between giving USDA

23   *access* to data versus turning over *possession* of data. For example, in contrast to the right of

24   access for inspection and auditing granted in § 2020(a)(3), § 2025 requires a state agency to

25   "***submit*** . . . data concerning the operations of the State agency . . . sufficient for the Secretary to

26   establish the State agency's payment error rate." 7 U.S.C. § 2025(c)(4), (5) (emphasis added).

27   Congress created this obligation to "submit" data in the context of a statutorily prescribed quality

28   control system, which expressly requires USDA to determine a state agency's payment error rate

based on a "probability sample of participating households." *Id.* § 2025(c)(2)(A).[11] Similarly, in the portion of the SNAP Act governing "eligibility disqualifications," Congress directed USDA to promulgate regulations to "ensure that [certain] information . . . with respect to a specific individual" found ineligible due to fraud or program violations "is *forwarded to* the Office of the Secretary by any appropriate State or Federal entity for the use of the Secretary in administering the provisions of this section." 7 U.S.C. § 2015(b)(4) (emphasis added). Thus, Congress knows how to require that States hand over information to USDA when necessary, as for purposes of calculating payment error rates and adjudicating specific claims. But no authorization exists for USDA to demand production of data on millions of individuals, as USDA has done here.[12]

Finally, as discussed below, *see infra* § II(D), in a different section of the SNAP Act dealing with the creation of longitudinal databases tracking SNAP usage patterns over time, Congress directed States to "share" applicant data from such databases with "researchers and the Secretary," but due to "Federal and State privacy standards and requirements" that data must first be *de-identified*. *See* 7 U.S.C. § 2026(n)(1)-(4). The SNAP Database that Secretary Rollins wants to create here is exactly that: a longitudinal database containing information on every applicant and participant for the past five years. Yet, by statute, USDA is only entitled to *de-identified* data for such purposes. *Id*. USDA's attempt to pool PII from State SNAP records without regard to the restrictions in 7 U.S.C. § 2026(n) and these "Federal and State privacy standards and requirements" further demonstrates that the SNAP Database project far exceeds the authority to inspect and audit State program administration authorized by § 2020(a)(3).

Because § 2020(a)(3) only requires State agencies to make records available for inspection and audit so that USDA can monitor State performance, and does not require States to

---

[11] The statute also requires USDA to analyze this sample of state data using regulated methods that produce "valid statistical results." *Id.* § 2025(c)(1)(B)(i)(I); *see also* 7 C.F.R. §§ 275.10-275.15 (setting forth requirements for quality control sampling plan and analysis). As explained below (*see infra* § II(D)), this careful approach to data production and analysis is a far cry from USDA's new SNAP Database.

[12] Members of Congress recently introduced legislation that would amend § 2020 to require the "*provision* of recipient data" to USDA as a condition of participation in SNAP. SNAP Data Transparency and Oversight Act of 2025, H.R. 6520, 119th Congress, § 2 (2025) (emphasis added). This proposal, apparently introduced in reaction to this lawsuit, further suggests that the SNAP Act *as currently written* does not authorize the Secretary's current data demands.

17

1  turn over possession of their most sensitive SNAP data for USDA to retain, copy, and disclose,

2  USDA's renewed data demand exceeds the authority granted in § 2020(a)(3) and is contrary to

3  law.

**D.    Defendants' demand arbitrarily circumvents existing privacy protections.**

5  USDA's renewed demand and proposed protocol also provide fresh evidence that USDA

6  seeks to circumvent the privacy protections that are engrained in long-standing agency practice,

7  required by Congress for longitudinal data-pooling, and built into existing quality control

8  systems. USDA's failure to explain its actions renders them arbitrary and capricious.

**1.    USDA has failed to acknowledge and explain its departure from long-standing agency practice.**

10  When an agency changes its position, it must "display awareness that it *is* changing

11  position" and "show that there are good reasons" for its new position. *F.C.C. v. Fox Television*

12  *Stations, Inc.*, 556 U.S. 502, 515 (2009). Here, USDA has failed to acknowledge and explain its

13  departure from its long-standing practice of collecting only limited sample datasets to review

14  State agencies' administration of SNAP. *See* 7 U.S.C. § 2025(c); 7 C.F.R. §§ 275.10-275.14.

15  Plaintiff States and USDA have long operated a two-tiered system for monitoring accurate

16  administration of SNAP under the SNAP Act and USDA's implementing regulations. At the first

17  tier, State agencies periodically review a large sample of cases for errors and conduct processes to

18  root out issues like duplicate enrollment and deceased enrollees. At the second tier, USDA

19  reviews a smaller, but statistically significant, sample of cases based on agreed-upon testing

20  policies, and provides feedback to State agencies. As USDA describes the system:

> The SNAP quality control process is a rigorous, two-tier system, that involves both state and federal reviews to assess the accuracy of household eligibility and benefit determinations nationwide. Every year, states review a total of 50,000 SNAP cases nationwide, and USDA conducts a re-review of about half of those cases to ensure accurate reporting by states. Quality control reviewers follow established processes for assessing the accuracy of eligibility and benefit decisions, which include verifying data on household circumstances through a variety of sources and directly interviewing households to confirm case information.

26  USDA, *Ensuring Eligible SNAP Households Get the Right Benefits* (updated Dec. 9, 2025),

27  https://www.fns.usda.gov/snap/qc.

28  Plaintiff States have already submitted unrebutted evidence that, within this two-tier

18

1   system, USDA had a long-standing practice of not collecting all applicants' and participants' data

2   and instead reviewing only limited datasets, thereby avoiding the data security and privacy risks

3   that come with pooling so much sensitive data in one place. *See, e.g.*, 7 U.S.C. § 2025(c); 7 C.F.R.

4   §§ 275.10-275.14; ECF No. 59-3 (Piazza Decl.) ¶¶ 5-12, 20 (declaration by former Chief of FNS

5   explaining this long-standing agency practice); ECF No. 59-7 (CA Decl.) ¶¶ 18–26, 70; Reyes

6   Decl. (WA) ¶ 6. With its recent data demands, USDA has abandoned this practice without even

7   "display[ing] awareness" that it is doing so. *Fox Television Stations*, 556 U.S. at 515; *see* ECF

8   No. 59-3 (Piazza Decl.) ¶ 20 ("[i]n SNAP's 60-year history, USDA has never needed nor sought

9   anywhere near the same scope of PII").

10          Defendants have not disputed that they are departing from this long-standing agency

11   practice; instead, they have merely asserted that there is no "definitive previous regulation or

12   policy statement establishing a policy to only sample." ECF No. 72 at 11. But as a matter of law,

13   Plaintiff States need not point to "a formal rule or policy"; an agency must equally explain any

14   "shift in agency practice." *Ramos v. Nielsen*, 321 F. Supp. 3d 1083, 1109 (N.D. Cal. 2018); *see,*

15   *e.g., Nw. Env't. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 687 (9th Cir. 2007) (agency

16   departure from "long-standing practice" was arbitrary and capricious); *J.L. v. Cissna*, 341 F.

17   Supp. 3d 1048, 1063 (N.D. Cal. 2018) (agency's "sharp departure from prior practice" was

18   arbitrary and capricious). Therefore, given the additional evidence and legal support offered with

19   this motion, Plaintiffs' respectfully urge the Court to reconsider its preliminary conclusion that

20   Plaintiffs States previously "made an insufficient showing" of a "change in policy," *see* PI Order

21   at 19, and to instead hold that USDA has arbitrarily abandoned its long-standing practice without

22   even "display[ing] awareness" that it is doing so. *Fox Television Stations*, 556 U.S. at 515.

23          In addition, USDA has failed to offer "good reasons" for collecting the trove of

24   applicants' PII that it now demands. *Fox Television Stations*, 556 U.S. at 515. Notably, USDA's

25   proposed protocol claims that the agency is "minimiz[ing] unnecessary data collection," USDA

26   Revised Protocol § 1.3; that it "shall collect only the data elements necessary to achieve specific,

27   legally permissible goals, such as fraud detection, duplicate enrollment prevention, and program

28   integrity checks," *id*. § 2.2.2; and that it will limit its collection to exclude "sensitive PII unless

19

1    directly relevant to these goals," *id.* But as Plaintiffs noted in their response to USDA, the

2    proposed protocol does not exclude sensitive PII at all, and USDA requests "numerous data

3    elements that do not appear necessary to investigate fraud, waste, and abuse, especially at an

4    aggregate level." Pls.' Dec. 8 Ltr. at 3-4; Tomasky Decl. (NY) ¶¶ 18-23 (explaining why several

5    demanded data elements "do not seem to be useful or necessary for accomplishing USDA's stated

6    purposes").

7         Accordingly, Plaintiff States asked USDA to explain why the agency needs certain PII

8    elements, so Plaintiffs could propose appropriate amendments to the draft protocol to help USDA

9    achieve its stated goal of minimizing unnecessary collection of applicants' PII. Pls.' Dec. 8 Ltr. at

10   3-4, 6, 12. Plaintiffs also offered to work with USDA to provide information at a higher level of

11   specificity depending on each agency's available data and technological capabilities (e.g.,

12   providing an age range rather than birthdate, or the county or ZIP code instead of a home address)

13   to protect personal privacy. *Id.* at 4. Additionally, Plaintiffs suggested that USDA could minimize

14   unnecessary retention of applicants' PII by committing to using data solely for analyses described

15   in the protocol and then deleting the data, as the agency has done with PII in the past. *Id.*

16        USDA's December 23 response letter dismissed these questions and suggestions, in

17   violation of the agency's basic obligations under the APA. Rather than "articulate a satisfactory

18   explanation" for the scope of its demands, *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm*

19   *Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), USDA refused to "disclose" how it intends to use

20   participants' PII, based on the completely baseless suggestion that Plaintiff States would use that

21   information to manipulate data "to avoid detection of noncompliance with SNAP requirements."

22   USDA Dec. 23 Ltr. at 6. USDA's refusal to explain its insistence on pooling SNAP applicants'

23   and participants' PII is particularly concerning given this Administration's well-publicized efforts

24   to use public benefits data for immigration enforcement and other purposes. *See supra* n.4. And

25   the agency's refusal to explain how it will use and analyze this data is unreasonable given

26   Defendants' misleading statements regarding their "snapshot findings" in the SNAP data

27

28

collected from other states.[13] By careening ahead while "entirely fail[ing] to consider" the issues

Plaintiffs have raised about the scope of USDA's collection and retention of applicants' and

recipients' PII—contrary to USDA's own stated goals to minimize such collection and

retention—USDA has acted arbitrarily and capriciously. *State Farm*, 463 U.S. at 43.[14]

### 2. USDA has failed to consider important aspects of the problem of collecting all applicant data into a single federal database.

USDA's renewed data demand is also arbitrary and capricious because USDA has

"simply ignored important aspects of the problem" of collecting all applicant data into a single

federal database. *Ohio*, 603 U.S. at 295 (citation modified).

**First**, with its renewed demand, USDA has now made clear that the agency intends to

pool all SNAP applicant and participant data into a single database to "employ a foundational

fraud, waste, and abuse verification [program] similar to the SNAP Quality Control program."

USDA Revised Protocol § 6.1. In other words, USDA intends to initiate a one-tier quality control

process. But USDA previously found that it *lacks authority* to do just that, and its failure to

acknowledge this finding—let alone explain why it no longer holds—is arbitrary and capricious.

In 2019, USDA commissioned a study to examine the feasibility of direct federal review

of SNAP administration—in other words, a "one-tier" quality control system—and concluded

that direct review would require substantial statutory, regulatory, and programmatic changes. *See*

McGill, et al, *Feasibility of Revising the SNAP Quality Control Review Process*, i-ii, 49-54

(2019).[15] As is pertinent here, USDA stated that "Congress would need to make statutory changes

to enable certain aspects of a one-tier QC system, including a requirement for FNS to conduct all

QC reviews instead of States and to effectively support a data-sharing infrastructure between FNS

and other Federal agencies," and USDA "would need to develop regulations to provide guidance

---

[13] *See, e.g.,* ECF Nos. 99-1 (CA Decl.) & 99-2 (IL Decl.) (refuting Defendants' "snapshot review" of data collected from other states)

[14] To the extent that USDA's data collection efforts are motivated by other concerns, such as gathering information on SNAP applicants and recipients to use in immigration enforcement activities unrelated to SNAP, then the agency is also acting arbitrarily and capriciously by relying on "factors which Congress has not intended it to consider." *State Farm*, 463 U.S. at 43. And an agency's action cannot be upheld based on justifications the agency did not present when it acted. *E.g.*, *Regents of the Univ. of Cal.*, 591 U.S. at 23-24.

[15] Available at https://fns-prod.azureedge.us/sites/default/files/resource-files/SNAPQC_Feasibility.pdf.

21

1    on how to implement the legislation." USDA, *Feasibility of Revising the Supplemental Nutrition*

2    *Assistance Program (SNAP) Quality Control Review Process (Summary)* (Dec. 2019).[16] Congress

3    and USDA have done none of these things.

4         Yet, as USDA acknowledges, it is now effectively trying to create a one-tier verification

5    program "similar to the SNAP Quality Control program." USDA Revised Protocol § 6.1.1. By

6    failing to address its past finding that it lacks the authority to do so, USDA has "'failed to

7    consider an important aspect of the problem' that the agency itself had identified." *Nat'l Fam.*

8    *Farm Coal. v. Vilsack*, 758 F. Supp. 3d 1060, 1076 (N.D. Cal. 2024) (citation omitted).

9         **Second**, USDA has failed to consider how its data demands for the SNAP Database

10   circumvent privacy protections that Congress has established for pooling of participant data.

11        As part of the SNAP Act's provisions governing "research, demonstration, and

12   evaluations" of SNAP programs (*see* 7 U.S.C. § 2026), Congress has authorized State agencies

13   (who collect and directly review applicant and participant data) to create "longitudinal

14   database[s]" containing "information about households and members of households" receiving

15   SNAP benefits—i.e., exactly what USDA seeks to do with its proposed SNAP Database. 7 U.S.C.

16   § 2026(n)(1)-(2). But in order to "protect the privacy" of participant data, Congress imposed strict

17   requirements on the creation of such databases. *Id.* § 2026(n)(4)(B)(i). In particular, "unique

18   identifier[s]" must be used for each participant, to allow the participant data to be analyzed and

19   compared "in multiple participating States over time *while protecting participant privacy.*" *Id.*

20   § 2026(n)(3)(C) (emphasis added). Moreover, Congress expressly prohibited the pooling of PII

21   that USDA is attempting now, by specifying that longitudinal databases shall not include any

22   "personally identifiable information (including social security number, home address, or contact

23   information)." 7 U.S.C. § 2026(n)(4)(B)(i) (emphasis added).

24        Consistent with these statutory restrictions, Plaintiff States suggested that Defendants use

25   deidentified participant data for its SNAP Database project. *See* Pls.' Dec. 8 Ltr. at 4 ("Given the

26   bulk review and processing USDA is engaging in, it is unclear why deidentified data could not

27   _____

28   [16] Available at https://fns-prod.azureedge.us/sites/default/files/resource-
     files/SNAPQC_Feasibility-Summary.pdf.

1    serve as a functionally identical and more secure means of identifying facts about program

2    integrity to share with the States." (citation omitted)). USDA dismissed Plaintiffs' suggestion

3    outright, claiming (contrary to 7 U.S.C. § 2026(n)) that there is no "valid basis to object to

4    [USDA's] request that States produce longitudinal data" that includes the SNAP participants' PII.

5    *See* USDA Dec. 23 Ltr. at 4. In doing so, USDA has arbitrarily and capriciously failed to consider

6    an important protection for participant data—one that Congress itself deemed necessary for the

7    creation of a longitudinal database.

8        ***Third***, USDA has failed to consider how its data demands for the SNAP Database

9    circumvent privacy protections built into existing systems that address its purported goals.

10   According to USDA, the SNAP Database is needed to identify duplicate enrollments and

11   deceased enrollees. *See* USDA Revised Protocol § 6.2.1. But USDA has failed to consider that

12   Congress and USDA have already established effective systems to address these issues, *without*

13   the need to aggregate massive amounts of PII in a national database, and *with* robust privacy

14   protections.

15       To address the common occurrence of the death of a SNAP recipient, USDA has

16   promulgated a regulation directing states to "establish a system to verify and ensure that benefits

17   are not issued to individuals who are deceased," including by entering into a computer matching

18   agreement with the Social Security Administration (SSA) in order to check their rolls against

19   SSA's Death Master File. 7 C.F.R. § 272.14; *see* 7 U.S.C. § 2020(r); Tomasky Decl. (NY) ¶ 28

20   (discussing prescribed system of identifying deceased recipients). USDA has found that requiring

21   States to conduct this check more frequently than upon application and once a year thereafter

22   would "not effectively promote Program integrity." 77 Fed. Reg. 48045, 48046 (Aug. 13, 2012).[17]

23       To address duplicate benefits, USDA and States—at Congress's direction—are already

24   implementing the National Accuracy Clearinghouse (NAC), a program "to prevent multiple

25   issuances of [SNAP] benefits to an individual by more than 1 [one] State agency simultaneously."

26   _____

       [17] As the Court previously observed, USDA regulations also ensure that SNAP recipients
27   have an opportunity to challenge inaccurate data before benefits are cut off. PI Order at 23-24
     (citing 7 C.F.R. § 272.14(b)-(c)). And USDA has offered no evidence that the inevitable presence
28   of recently deceased individuals in SNAP files is proof of fraud, waste, or abuse. *See* Tomasky
     Decl. (NY) ¶ 27-29.

7 U.S.C. § 2020(x)(2)(A). USDA itself has found that "[o]nce the NAC is successfully implemented nationwide, the Department expects that active cases of duplicate participation across State lines will largely be eliminated." 87 Fed. Reg. 59633, 59657 (Oct. 3, 2022). In establishing the program, Congress required USDA and State agencies to protect the privacy of data used for the NAC. *See, e.g.*, 7 U.S.C. § 2020(x)(2)(C) (instructing USDA that it may *only* use data submitted to the NAC for that purpose; that data should be retained for no longer than needed; and that data should be used in a manner "that protects the identity and location of a vulnerable individual (including a victim of domestic violence) that is an applicant for, or recipient of, [SNAP] benefits"); *see also* ECF No. 59-3 (Piazza Decl.) ¶¶ 7-9 (explaining how Congress and USDA worked together when creating the NAC to address data privacy and security concerns). And USDA concluded that only a limited set of PII—not including, for example, home addresses—is necessary to check for duplicate participation.[18] 87 Fed. Reg. at 59654-55; *see also* Tomasky Decl. (NY) ¶ 20-21 (explaining that home address is a static field that may not be current and has not been used to prevent duplicative SNAP benefits).[19]

For the foregoing reasons, Defendants' renewed data demand illustrates USDA's disregard for the privacy protections previously afforded by the agency's own long-standing practices, by Congress for longitudinal data-pooling, and by existing systems that already perform the intended functions of the SNAP Database. This "material misapprehension of the baseline conditions" renders USDA's demands arbitrary and capricious. *Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581, 588 (4th Cir. 2012); *see also Safe Air for Everyone v. EPA*, 488 F.3d 1088, 1101-02 (9th Cir. 2007) (holding that agency action was "arbitrary, capricious, or

---

[18] With its renewed demand, USDA has considered none of the privacy protections mentioned in this paragraph. At most, USDA has claimed that it cannot use a separate privacy protection: the NAC's cryptographic hashing. *See* USDA Dec. 23 Ltr. at 4-5. But USDA also has not demonstrated any legitimate basis for circumventing that privacy protection.

[19] To the extent USDA is concerned with *intra*-state duplicate participation, there is also a system for that. *See* 7 C.F.R. § 272.4(e). And there are even more examples of how USDA's SNAP Database duplicates existing programs used by Plaintiff States to combat fraud, waste, and abuse. *See* Tomasky Decl. (NY) ¶ 31. For example, States are required to provide information on Intentional Program Violations (IPV) and program sanctions to USDA, and to use the Electronic Disqualified Recipient system (eDRS) created by FNS to check whether SNAP applicants have been disqualified from the program for fraud. *See* 7 C.F.R. § 273.16(i). Notably, the regulation governing IPVs specifies the data elements that a State agency must report to FNS, which are narrower than the elements currently being demanded. *Id.* § 273.16(i)(3).

1  otherwise not in accordance with law" because it rested on a "legally erroneous" and "flawed

2  premise").

3  **E.     Plaintiffs will suffer irreparable harm absent injunctive relief and the**
   **balance of hardships and public interest weigh in their favor.**

4

5      The remaining *Winter* factors are easily met here for the reasons articulated in Plaintiffs'

6  first preliminary injunction motion (*see* ECF No. 59 at 21-25, ECF No. 75 at 1-5, 14-15) and

7  adopted in the Court's PI Order, *see* PI Order at 21-24. In short, Plaintiffs would suffer

8  irreparable harm absent injunctive relief, because Defendants' threatened funding cuts would

9  "likely . . . require [Plaintiff States] to cut staffing and otherwise greatly reduce their ability to

10 comply with their obligations under the SNAP Act to administer benefits, including, for example,

11 the speed with which applications can be reviewed and required reports can be prepared." PI

12 Order at 21. Additionally, the balance of hardships and public interest weigh in Plaintiffs' favor in

13 light of these harms. *Id.* at 22-24. Meanwhile, USDA has failed to make any evidentiary showing

14 of ongoing widespread fraud, waste, or abuse in Plaintiff States' SNAP programs[20]—let alone

15 that any showing that USDA needs the demanded data to address any ongoing issues, especially

16 considering the existing quality control processes and the fact that the data USDA seeks is largely

17 years old. *See Lackey v. Stinnie*, 604 U.S. 192, 200 (2025) ("The purpose of a preliminary

18 injunction is merely to preserve the relative positions of the parties until" issues can be fully

19 adjudicated, and "to balance the equities as the litigation moves forward.").

20                                    **CONCLUSION**

21     The Court should grant Plaintiffs' Motion and bar Defendants from enforcing their renewed

22 demand for SNAP applicant and recipient data and from taking any adverse action against

23 Plaintiff States on the basis that they have failed to comply with the renewed demand.

24

25          [20] Notably, this Court has found that Defendants' "snapshot review" of the supposed
   waste, fraud, and abuse that USDA has identified in SNAP data submitted by other States fails to
26 show that any such issues affect Plaintiff States, and it was further undermined by Plaintiff States'
   evidence and Defendants' own regulations (for example, while Defendants claimed that they
27 found "'over 300,000 potential instances of deceased individuals' being enrolled in SNAP," their
   own regulations "prohibit State agencies from removing a deceased person immediately upon
28 learning or otherwise being notified of a death." PI Order at 23-24 (citations omitted).

                                           25

1   Dated: January 9, 2026                         Respectfully submitted,

2                                                  ROB BONTA
                                                   Attorney General of California
3                                                  PAUL STEIN
                                                   Supervising Deputy Attorney General
4                                                  ANDREW Z. EDELSTEIN
                                                   ANNA RICH
5                                                  JANE REILLEY
                                                   EDWARD P. WOLFE
6                                                  ROBIN GOLDFADEN
                                                   SEBASTIAN BRADY
7                                                  WILLIAM BELLAMY
                                                   MARIA F. BUXTON
8                                                  LIAM E. O'CONNOR

9                                                  /s/ Liam E. O'Connor
                                                   LIAM E. O'CONNOR
10                                                 DEPUTY ATTORNEY GENERAL
                                                   Attorneys for Plaintiff State of California

11
     Letitia James                                Kwame Raoul
12   Attorney General of New York                 Attorney General of Illinois

13   /s/ Mark Ladov                               /s/ Sherief Gaber
     Mark Ladov                                   Harpreet K. Khera
14   Special Counsel                              Bureau Chief, Special Litigation
     Julie Dona                                   Sherief Gaber
15   Special Counsel                              Assistant Attorney General
     28 Liberty St.                               115 S. LaSalle St., 35th Flr.
16   New York, NY 10005                           Chicago, Illinois 60603
     (212) 416-8240                               (773) 590-7127
17   mark.ladov@ag.ny.gov                         Harpreet.Khera@ilag.gov
     Attorneys for Plaintiff State of New York    Attorneys for Plaintiff State of Illinois

18

19   Kristin Mayes                                Philip J. Weiser
     Attorney General of Arizona                  Attorney General of Colorado
20
     /s/ Hayleigh S. Crawford                     /s/ David Moskowitz
21   Hayleigh S. Crawford (AZ No. 032326)         David Moskowitz
     Luci D. Davis (AZ No. 035347)                Deputy Solicitor General
22   2005 N. Central Ave. Phoenix, AZ 85004       Colorado Department of Law
     (602) 542-3333                               1300 Broadway, 10th Floor
23   Hayleigh.Crawford@azag.gov                   Denver, CO 80203
     Luci.Davis@azag.gov                          Phone: (720) 508-6000
24   ACL@azag.gov                                 david.moskowitz@coag.gov
     Attorneys for Plaintiff State of Arizona     Attorneys for Plaintiff State of Colorado

25

26

27

28

| | | |
|---|---|---|
| 1 | William Tong<br>Attorney General of Connecticut | Kathleen Jennings<br>Attorney General of Delaware |
| 2 | | |
| 3 | */s/ Janelle R. Medeiros*<br>Janelle R. Medeiros | */s/ Vanessa L. Kassab*<br>Ian R. Liston |
| | Special Counsel for Civil Rights | Director of Impact Litigation |
| 4 | 165 Capitol Ave | Vanessa L. Kassab |
| | Hartford, CT 06106 | Deputy Attorney General |
| 5 | (860) 808-5020 | Delaware Department of Justice |
| | Janelle.Medeiros@ct.gov | 820 N. French Street |
| 6 | *Attorneys for Plaintiff State of Connecticut* | Wilmington, DE 19801 |
| | | (302) 683-8899 |
| 7 | | vanessa.kassab@delaware.gov |
| | | *Attorneys for Plaintiff State of Delaware* |
| 8 | | |
| 9 | Brian L. Schwalb | Anne E. Lopez |
| | Attorney General for the District of Columbia | Attorney General of Hawai'i |
| 10 | */s/ Nicole S. Hill* | */s/ Kaliko'onālani D. Fernandes* |
| | Nicole S. Hill | David D. Day |
| 11 | Assistant Attorney General | Special Assistant to the Attorney General |
| | Office of the Attorney General for the District | Kaliko'onālani D. Fernandes |
| 12 | of Columbia | Solicitor General |
| | 400 Sixth Street, NW | 425 Queen Street |
| 13 | Washington, D.C. 20001 | Honolulu, HI 96813 |
| | (202) 727-4171 | (808) 586-1360 |
| 14 | nicole.hill@dc.gov | kaliko.d.fernandes@hawaii.gov |
| | *Attorneys for Plaintiff District of Columbia* | *Attorneys for Plaintiff State of Hawai'i* |
| 15 | | |
| 16 | Office of The Governor *ex rel.* Andy Beshear, | Aaron M. Frey |
| | in his official capacity as Governor of the | Attorney General of Maine |
| 17 | Commonwealth of Kentucky | |
| | | */s/ Brendan Kreckel* |
| 18 | */s/ S. Travis Mayo* | Brendan Kreckel |
| | S. Travis Mayo | Assistant Attorney General |
| 19 | General Counsel | Office of the Attorney General |
| | Taylor Payne | 6 State House Station |
| 20 | Chief Deputy General Counsel | Augusta, ME 0433-0006 |
| | Laura C. Tipton | Tel.: 207-626-8800 |
| 21 | Deputy General Counsel | Fax: 207-287-3145 |
| | Office of the Governor | brendan.kreckel@maine.gov |
| 22 | 700 Capitol Avenue, Suite 106 | *Attorneys for Plaintiff State of Maine* |
| | Frankfort, KY 40601 | |
| 23 | (502) 564-2611 | |
| | travis.mayo@ky.gov | |
| 24 | taylor.payne@ky.gov | |
| | laurac.tipton@ky.gov | |
| 25 | *Attorneys for Plaintiff Kentucky Governors'* | |
| | *Office* | |
| 26 | | |
| 27 | | |
| 28 | | |

Anthony G. Brown
Attorney General of Maryland

*/s/ James C. Luh*
James C. Luh
Senior Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6411
jluh@oag.state.md.us
*Attorneys for Plaintiff State of Maryland*

Andrea Joy Campbell
Attorney General of Massachusetts

*/s/ Katherine Dirks*
Katherine Dirks
Chief State Trial Counsel
Cassandra Thomson
Assistant Attorney General
Office of the Massachusetts Attorney General
1 Ashburton Place Boston, MA 02108
(617) 963-2277
katherine.dirks@mass.gov
cassandra.thomson@mass.gov
*Attorneys for Plaintiff Commonwealth of Massachusetts*

Dana Nessel
Attorney General of Michigan

*/s/ Neil Giovanatti*
Neil Giovanatti
Bryan Beach
Assistant Attorneys General
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
giovanattin@michigan.gov
beachb@michigan.gov
*Attorneys for Plaintiff State of Michigan*

Keith Ellison
Attorney General of Minnesota

*/s/ Joseph R. Richie*
Joseph R. Richie
Special Counsel
445 Minnesota Street, Suite 1400
St. Paul, Minnesota, 55101
(651) 300-0921
joseph.richie@ag.state.mn.us
*Attorneys for Plaintiff State of Minnesota*

Matthew J. Platkin
Attorney General of New Jersey

*/s/ Kashif T. Chand*
Kashif T. Chand (NJ Bar No. 016752008)
Assistant Attorney General
New Jersey Office of the Attorney General,
Division of Law
124 Halsey Street, 5th Floor
Newark, NJ 07101
Tel: (973) 648-2052
kashif.chand@law.njoag.gov
*Attorneys for Plaintiff State of New Jersey*

Raúl Torrez
Attorney General of the State of New Mexico

*/s/ Steven Prefrement*
Steven Perfrement
Senior Litigation Counsel
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501
SPerfrement@nmdoj.gov
505-601-7727
*Attorneys for the State of New Mexico*

28

1

2

Dan Rayfield  
Attorney General of Oregon

*/s/ Scott P. Kennedy*  
Scott P. Kennedy  
Senior Assistant Attorney General  
Oregon Department of Justice  
100 SW Market Street  
Portland, OR 97201  
Tel (971) 453-9050  
Fax (971) 673-5000  
Scott.Kennedy@doj.oregon.gov  
*Attorneys for Plaintiff State of Oregon*

Josh Shapiro, in his official capacity as  
Governor of the Commonwealth of  
Pennsylvania

*/s/ Jacob B. Boyer*  
Jennifer Selber  
General Counsel  
Jacob B. Boyer  
Deputy General Counsel  
Pennsylvania Office of the Governor  
30 N. 3rd St., Suite 200  
Harrisburg, PA 17101  
(717) 460-6786  
jacobboyer@pa.gov  
*Counsel for Governor Josh Shapiro*

Peter F. Neronha  
Attorney General of Rhode Island

*/s/ Madeline R. Becker*  
Madeline R. Becker (RI Bar No. 10034)  
Special Assistant Attorney General  
150 South Main Street  
Providence, RI 02903  
(401) 274-4400, Ext. 2151  
mbecker@riag.ri.gov  
*Attorneys for Plaintiff State of Rhode Island*

Nicholas W. Brown  
Attorney General of Washington

*/s/ Jennifer K. Chung*  
Jennifer K. Chung, WSBA #51583  
William Mcginty, WSBA #41868  
Assistant Attorneys General  
800 Fifth Avenue, Suite 2000  
Seattle, WA 98104  
206-464-7744  
jennifer.chung@atg.wa.gov  
william.mcginty@atg.wa.gov  
*Attorneys for Plaintiff State of Washington*

Joshua l. Kaul  
Attorney General of Wisconsin

*/s/ Karla Z. Keckhaver*  
Karla Z. Keckhaver  
Assistant Attorney General  
Wisconsin Department of Justice  
Post Office Box 7857  
Madison, Wisconsin 53707-7857  
608-264-6365  
karla.keckhaver@wisdoj.gov  
*Attorneys for Plaintiff State of Wisconsin*

*State of Minnesota*
*v.*
*United States Department of Agriculture, et al.*
U.S. Dist. Ct. No. 25-cv-04767-LMP-JFD

# DECLARATION OF JOSEPH RICHIE

# Exhibit 21

December 30, 2025

The Honorable Tim Walz
Governor of Minnesota
Saint Paul, Minnesota

Dear Governor Walz:

On December 12, the Administration for Children and Families (ACF) formally requested that the State of Minnesota provide comprehensive administrative data and related documentation for the Child Care and Development Fund (CCDF) no later than December 26, 2025. As of today, your office has failed to provide the required information, instead delaying in the form of an extension request. Given the seriousness of the allegations surrounding Minnesota's administration of federal programs. I am troubled by your lack of timely response.

Yesterday, Assistant Secretary for Family Support Alex Adams spoke with the Director of the Minnesota Child Care Services, copied below. She could not confirm whether the perceived fraud is isolated to specific counties or rampant throughout your state.

In contrast to your Administration's actions, HHS is committed to ensuring the integrity of federal programs. ACF will be assessing the scope and source of any irregularities. I am expanding our prior request, as authorized by 45 CFR 98.90(c). I demand transparency of your state's use of federal welfare dollars.

## 1. Specific data for child care centers flagged as fraudulent

Recent viral reports indicate prolonged gross mismanagement of federal child_care funds awarded to your state. These funds are entrusted to you and your Administration for disbursement to local providers. Yet, reports have come to ACF's attention that your Administration has failed to ensure fidelity of public funds. To address these allegations, please provide the total amount of CCDF or TANF child care funds received by each of the following centers between 2022-2025:
- Quality Learning "Learing" [sic] Center
- Mako Child Care
- Mini Childcare Center
- ABC Learning Center
- Future Leaders Early Learning Center

For any of the above centers that did receive TANF or CCDF funds, also provide the following:
- All attendance records for the same period,
- All licensing, inspection, and monitoring reports including annual inspections,
- All complaints, investigations, referrals, or enforcement actions related to these centers, and
- Any internal state assessments or communications referencing these centers, including fraud concerns, irregularities, or discrepancies in reported enrollment or operations.

## 2.  Complete CCDF Administrative Data (all available years; minimum 2022-2025)

I now demand the information we requested on December 12th: the full CCDF administrative data in the state's possession for all recipients including the following:
- Name, address, social security number, date of birth, and any state-issued identification numbers used for program administration.

## 3.  Information related to alleged fraud networks and oversight failures

Due to the volume of allegations involving fraudulent child care centers and organized networks exploiting CCAP, provide the following:
- Internal state assessments of fraud risks,
- Records of referrals to law enforcement or federal agencies,
- Anti-fraud measures submitted in Minnesota's CCDF State Plans (2022-2025), and
- Any evidence that political considerations, community pressures, or DEI-related directives influenced or constrained fraud prevention or enforcement activities.

## 4.  Comprehensive list of all CCDF Funded Providers and intermediaries (2022-2025)

Provide a complete list of all entities receiving CCDF funds directly or indirectly, including child care providers, subcontractors, service providers, local agencies, and community organizations. For each entity, include:
- Total CCDF funding received (2022 -2025),
- The purpose of funding,
- Documentation of oversight, monitoring, inspection, and verification activities, and
- Any corrective actions, sanctions, or investigations undertaken.

In addition, provide the total number of subsidized children in care at each provider receiving federal assistance, including any vacant slots at directly funded providers. This should include both authorized and paid amounts, broken out by year, to allow for a full reconciliation of claimed capacity.

The Honorable Tim Walz
Page 3

The accumulating allegations suggest that your Administration's improper use of federal
funds is severe, widespread, and costly. While these funds were intended to support Americans in need,
your Administration, through negligence or malice, may have propagated the biggest welfare fraud in
American history.

The families who rely on these programs and the taxpayers who fund them deserve accountability and
corrective action. I expect your Administration's full cooperation in determining the scope of misuse of
federal resources.

HHS demands the information no later than January 9, 2026. If you fail to provide satisfactory responses
to the above questions, we may withhold CCDF funds to the state of Minnesota and impose the penalties
specified in 45 CFR 98.92 and 45 CFR 262.1.

The State of Minnesota will be placed on a temporary restricted drawdown for all CCDF funds
provided by ACF until further notice, with specific instructions for these restrictions to be provided by
January 5th, 2026.

Happy new year.

Sincerely,

James O'Neill
Deputy Secretary

*State of Minnesota*
*v.*
*United States Department of Agriculture, et al.*
U.S. Dist. Ct. No. 25-cv-04767-LMP-JFD

# DECLARATION OF JOSEPH RICHIE

# Exhibit 22

1/11/26, 4:05 PM
CASE 0:25-cv-04767-LMP-JFD    Doc. 26-1    Filed 01/12/26    Page 46 of 74
Deputy Secretary Jim O'Neill : "We have frozen all child care payments to the state of Minnesota. You have probably read the s...





**New to X?**

Sign up now to get you

Sign u

Sign

Creat

By signing up, you agree
Privacy Policy, including

### Deputy Secretary Jim O'Neill ✔ ☐
@HHS_Jim

We have frozen all child care payments to the state of Minnesota.

You have probably read the serious allegations that the state of Minnesota has funneled millions of taxpayer dollars to fraudulent daycares across Minnesota over the past decade.

Today we have taken three actions against the blatant fraud that appears to be rampant in Minnesota and across the country:

← **Post**

Starting today, all ACF payments across America will require a justification and a receipt or photo evidence before we send money to a state.

2. Alex Adams and I have identified the individuals in @nickshirleyy's excellent work. I have demanded from @GovTimWalz a comprehensive audit of these centers. This includes attendance records, licenses, complaints, investigations, and inspections.

3. We have launched a dedicated fraud-reporting hotline and email address at childcare.gov Whether you are a parent, provider, or member of the general public, we want to hear from you.

We have turned off the money spigot and we are finding the fraud. @ACFHHS @HHSGov



0:00 / 1:58

Last edited 4:51 PM · Dec 30, 2025 · **13.7M** Views

💬 12K    ↻ 30K    ♡ 153K    🔖 7.5K    ⬆️

💬 Read 12.2K replies

Something wer

Terms of Service  |  Priva
Accessibility  |  Ads info

*State of Minnesota*
*v.*
*United States Department of Agriculture, et al.*
U.S. Dist. Ct. No. 25-cv-04767-LMP-JFD

# DECLARATION OF JOSEPH RICHIE

# Exhibit 23

ADMINISTRATION FOR

# CHILDREN & FAMILIES

**Office of the Assistant Secretary** | 330 C Street, S.W., Suite 4034
Washington, DC 20201 | www.acf.gov

January 5, 2025

The Honorable Tim Walz
Governor
State of Minnesota
130 State Capitol
75 Rev. Dr. Martin Luther King Jr. Blvd.
Saint Paul, Minnesota 55155

Dear Governor Walz:

This letter provides directions the Temporary Drawdown Restriction issued to the State of
Minnesota pursuant to the Child Care and Development Block Grant (CCDBG) Act of 1990, as
amended, and the implementing regulations at 45 C.F.R. Part 98.

As stated in the Department's correspondence dated December 30, 2025, the Administration for
Children and Families (ACF) has placed the State of Minnesota on a restricted drawdown status
for all Child Care and Development Fund (CCDF) awards administered by your office. This
action was taken in response to the State's failure to provide required administrative data, the
seriousness of the allegations regarding misuse of federal child care funds, and the need to ensure
the integrity of federal program expenditures.

The enclosed Temporary Drawdown Restriction Directions outline the conditions that Minnesota
must meet before any further CCDF funds may be accessed through the Payment Management
System (PMS). These requirements, including the submission of aggregated, non-identifiable
attendance documentation supporting each drawdown request, are mandatory conditions
precedent to the release of federal funds. They will remain in effect until ACF determines that
the State has implemented adequate internal controls to ensure full compliance with federal fiscal
accountability standards.

Pursuant to the Child Care and Development Block Grant (CCDBG) Act of 1990, as amended
(42 U.S.C. §§ 9857–9858q), and the implementing regulations at 45 C.F.R. Part 98, including
but not limited to the fiscal accountability requirements under §§ 98.60, 98.65, and 98.67, the
following condition is hereby imposed on the State of Minnesota ("Lead Agency") as a
prerequisite to the drawdown of federal Child Care and Development Fund (CCDF) grant funds
from the Administration for Children and Families (ACF):

1. **Requirement to Submit Attendance Documentation Prior to Drawdown**

Before any federal CCDF funds may be drawn from the Payment Management System (PMS), the Lead Agency shall submit to ACF sufficient documentation demonstrating that the amounts requested for drawdown are supported by verifiable attendance records for subsidized child care services.

2. **Nature and Form of Required Documentation**

The attendance documentation submitted must:
    (a) Reflect actual units of service delivered (e.g., days, hours, or other units consistent with the Lead Agency's approved payment practices);
    (b) Be contemporaneous records maintained by providers or the Lead Agency or its subrecipients that substantiate the basis for payment;
    (c) Be aggregated or otherwise deidentified such that no personally identifiable information (PII) or identifiable child level data is disclosed, consistent with the confidentiality protections required under the CCDBG Act; and
    (d) Be sufficient for ACF to determine that the drawdown amount is reasonable, allowable, and allocable under federal law.

3. **Prohibition on Child Identifiable Data**

Consistent with the CCDBG Act's confidentiality provisions at 42 U.S.C. § 9858i(a)(1)(E), the Lead Agency shall **not** submit any documentation containing:
- Names of children or parents;
- Social Security numbers;
- Dates of birth;
- Addresses; or
- Any other information that directly identifies an individual child or family.

Attendance documentation must be provided in an aggregated, non-identifiable format.

4. **Condition Precedent to Accessing Federal Funds**

No drawdown request shall be approved, and no federal CCDF funds shall be released, unless and until ACF determines that the attendance documentation submitted:
- Adequately supports the amount requested; and
- Demonstrates that services were delivered to eligible children consistent with the CCDBG Act.

5. **Ongoing Compliance**

This drawdown restriction shall remain in effect until ACF determines that the Lead Agency has established and implemented internal controls sufficient to ensure that all

future drawdown requests are supported by reliable attendance documentation consistent with federal and state law.

Before submitting records in compliance with the foregoing drawdown requirements, the state representative will acknowledge that a knowing false statement relating to compliance with the above requirements and/or eligibility for programs funded under CCDF may result in liability under the False Claims Act, 31 U.S.C. § 3729, and/or criminal liability, including under 18 U.S.C. §§ 287 and 1001.

Failure to comply with all conditions may result in delayed drawdowns, disallowances, or other enforcement actions authorized under 45 C.F.R. § 98.92.

The families who rely on these programs and the taxpayers who fund them deserve transparency and accountability, and ACF expects the State's full cooperation.

Please ensure that all relevant state agencies, officials, and financial officers receive and adhere to the enclosed directions immediately. If Minnesota intends to submit documentation in response to these requirements, such submissions must be complete, accurate, and fully compliant with federal confidentiality protections.

ACF will provide further technical instructions regarding the restricted drawdown process as requested. We expect your Administration's prompt attention to these matters.

Sincerely,

Alex J. Adams
Assistant Secretary
Administration for Children and Families

CC: Tikki Brown, Commissioner, Department of Children, Youth & Families

*State of Minnesota*
*v.*
*United States Department of Agriculture, et al.*
U.S. Dist. Ct. No. 25-cv-04767-LMP-JFD

# DECLARATION OF
# JOSEPH RICHIE

# Exhibit 24



**Office of the Assistant Secretary** | 330 C Street, S.W., Suite 4034
Washington, DC 20201 | www.acf.gov

January 6, 2026

Governor Tim Walz
Office of the Governor
130 State Capitol
75 Rev. Dr. Martin Luther King Jr. Blvd.
Saint Paul, Minnesota 55155

Dear Governor Walz,

The Trump Administration has made clear its commitment to rooting out fraud, protecting taxpayer dollars, and ensuring program integrity across all federal benefit programs. The Administration for Children and Families (ACF) is concerned by the potential for extensive and systemic fraud in Temporary Assistance for Needy Families (TANF) services that rely on federal funding. These concerns have been heightened by recent federal prosecutions and additional allegations that substantial portions of federal resources were fraudulently diverted away from the American families they were intended to assist. Additionally, ACF has reason to believe that the State of Minnesota is illicitly providing illegal aliens with TANF benefits intended for American citizens and lawful permanent residents.

Effective today, ACF is reviewing Minnesota's TANF State Plan for completeness and for program compliance with applicable laws. As a result,  ACF is placing the state TANF program on a restricted drawdown in accordance with 2 C.F.R. § 200.339.

To aid ACF in a timely review, I am requesting that the State of Minnesota provide the complete universe of TANF administrative data that exist and are in the state's possession for all recipients for all available years, and at least 2022 to 2025. This includes recipient name, address, Social Security Number (if collected), date of birth, A-number (as applicable), and any state identification numbers used for program administration. This information, requested pursuant to 45 C.F.R. § 98.90, is necessary for ACF to conduct a thorough review of program operations and to assess the extent of any irregularities that may have occurred.

ACF also requests documentation demonstrating that the State of Minnesota has verified the eligibility of all TANF applicants and recipients in accordance with the requirements of the Personal Responsibility and Work Opportunity Reconciliation Act, 8 U.S.C. § 1611, which limits TANF eligibility to United States citizens and qualified aliens. This documentation should include the policies, procedures, system controls, and verification records used by Minnesota to confirm citizenship or qualified alien status during the application and recertification processes.

In addition to individual-level recipient data, ACF is requesting a comprehensive list of all organizations, subcontractors, service providers, local agencies, community groups, and any other entities that received TANF funds from the State of Minnesota, directly or indirectly, during the period from 2019 through 2025. For each organization, to the extent the information exists and is in the state's possession, I request the amount of TANF funding provided, the purpose for which the funds were awarded, and documentation describing the State's oversight mechanisms, monitoring activities, and verification processes used to ensure proper use of TANF dollars.

I request that this information be transmitted to ACF by January 20, 2026. My staff will coordinate directly with the appropriate state officials to establish a secure transfer method and confirm technical specifications.

The State of Minnesota is placed on a temporary restricted drawdown for all TANF funds provided by ACF until further notice, pending review of the state's current TANF plan for completeness and ACF confirming compliance with applicable laws.

Thank you for your attention to this critical matter. Please contact my office with any questions or to arrange next steps.

Sincerely,

Alex J. Adams
Assistant Secretary
Administration for Children and Families
U.S. Department of Health and Human Services


CC: Tikki Brown, Commissioner, Department of Children, Youth, and Families
Shaneen Moore, Assistant Commissioner, Family Well-Being Administration

*State of Minnesota*
*v.*
*United States Department of Agriculture, et al.*
U.S. Dist. Ct. No. 25-cv-04767-LMP-JFD


# DECLARATION OF JOSEPH RICHIE


# Exhibit 25



**Office of the Assistant Secretary** | 330 C Street, S.W., Suite 4034
Washington, DC 20201 | www.acf.gov

January 6, 2026

Governor Tim Walz
Office of the Governor
130 State Capitol
75 Rev. Dr. Martin Luther King Jr. Blvd.
Saint Paul, Minnesota 55155

Dear Governor Walz,

The Trump Administration has made clear its commitment to rooting out fraud, protecting taxpayer dollars, and ensuring program integrity across all federal benefit programs. On December 12, 2025, ACF sent a letter to your office requesting individual recipient data, eligibility verification, and a comprehensive list of all organizations, subcontractors, service providers, local agencies, community groups, and any other entities that receive SSBG funds from Minnesota. In Assistance Commissioner Rebecca St. George's response your office stated that the Minnesota Department of Children, Youth, and Families (DCYF) would provide a response by January 9, 2026.

While ACF appreciates the initial response, your office has failed to sufficiently address concerns of misuse of funds, including unlawfully providing illegal aliens with benefits. Moreover, your office has not demonstrated that the state has effective mechanisms in place to prevent fraud. ACF will be conducting a thorough review of the State's use of funding. As a result, ACF is notifying your office that the State is not authorized to further draw down SSBG funding until this review is complete.

The State of Minnesota will be placed on a temporary restricted drawdown for all SSBG funds provided by ACF until further notice, pending successful and satisfactory review of all of the requested information.

Thank you for your attention to this critical matter. Please contact my office with any additional questions.

Sincerely,

Alex J. Adams
Assistant Secretary
Administration for Children and Families
U.S. Department of Health and Human Services

CC: Shireen Gandhi, Temporary Commissioner, Minnesota Department of Human Services
Andrew J. Richter, Communications Specialist, Child Safety and Permanency Division

*State of Minnesota*
*v.*
*United States Department of Agriculture, et al.*
U.S. Dist. Ct. No. 25-cv-04767-LMP-JFD


# DECLARATION OF JOSEPH RICHIE


# Exhibit 26

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| State of New York et al.,<br><br>                    Plaintiffs,<br><br>         -against-<br><br>Administration for Children and Families et al.,<br><br>                    Defendants. | 26-CV-172 (AS)<br><br><u>ORDER</u> |

ARUN SUBRAMANIAN, United States District Judge:

On January 8, 2026, plaintiffs filed an emergency motion for temporary restraining order, seeking to preserve the status quo pending the resolution of their forthcoming motion for a preliminary injunction. Acting in its Part I capacity, this Court received plaintiffs' motion, including the affirmation of Jessica Ranucci and accompanying exhibits, plaintiffs' memorandum of law, and plaintiffs' complaint. The Court held a hearing on the motion on January 9, 2026.

For the reasons stated in plaintiffs' motion, the Court finds that good cause has been shown for the issuance of a temporary restraining order under Fed. R. Civ. P. 65(b) and a stay under 5 U.S.C. § 705. The Court GRANTS plaintiffs' motion, and ORDERS the following relief. Defendants are:

1. Directed to restrain and stayed from implementing the ACF Funding Freeze, as applied to the Child Care Development Fund, Temporary Assistance to Needy Families, and Social Services Block Grants programs. *See* Dkt. 8 at 1. This includes the entirety of the letters sent to plaintiffs on January 5 and 6; and

2. Directed to immediately remove any restrictions, outside of permitted statutory authority, on plaintiffs' ability to draw down funds under the Child Care Development Fund, Temporary Assistance to Needy Families, and Social Services Block Grants programs.

The Court further finds that plaintiffs have demonstrated that no security is required. The Court exercises its discretion to decline to require plaintiffs to post a bond. *See Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 136 (2d Cir. 1997).

This relief is preliminary in nature and is designed to protect the status quo while plaintiffs' motion for a preliminary injunction is briefed and decided. The order shall automatically expire in 14 days, subject to any further order from the Court. *See* Fed. R. Civ. P. 65(b)(2).

Judge Broderick will inform the parties concerning the schedule for briefing on the preliminary-injunction motion.

SO ORDERED.

Dated: January 9, 2026
        New York, New York

_____
ARUN SUBRAMANIAN
United States District Judge

2

*State of Minnesota*
*v.*
*United States Department of Agriculture, et al.*
U.S. Dist. Ct. No. 25-cv-04767-LMP-JFD


# DECLARATION OF
# JOSEPH RICHIE


# Exhibit 27



DEPARTMENT OF HEALTH & HUMAN SERVICES                    Centers for Medicare & Medicaid Services

Administrator
Washington, DC  20201

January 6, 2026
The Honorable Tim Walz
Governor of Minnesota
130 State Capitol
75 Rev. Dr. Martin Luther King Jr. Blvd.
St. Paul, MN 55155

Dear Governor Walz:

As has been widely reported—and as acknowledged by the State of Minnesota—there is significant and ongoing fraud within Minnesota's Medicaid program. Investigations by the Centers for Medicare & Medicaid Services (CMS), the Department of Health and Human Services Office of Inspector General (HHS OIG), the Department of Justice (DOJ), the Federal Bureau of Investigation (FBI), and other federal partners have identified widespread fraud, waste, and abuse (FWA) in Minnesota Medicaid and repeated failures by the State to adequately address it.

These investigations have revealed schemes involving billing for services not rendered, services billed at levels not supported by documentation, and exploitation of vulnerable Medicaid beneficiaries for financial gain. Federal law enforcement has identified complex fraud schemes involving networks of providers operating across multiple high-risk service categories, including services delivered through Minnesota's home- and community-based services system.

Recent investigations have focused on fourteen high-risk Medicaid services that the State itself has identified as particularly vulnerable to fraud.  According to CMS's analysis of Minnesota Medicaid data, these 14 programs consume $3.75 billion annually in federal and state taxpayer resources.  CMS's analysis of Minnesota Medicaid data shows extraordinary growth in provider enrollment and payments for several of these services that is inconsistent with beneficiary growth and service utilization trends. Despite warning signs that have been evident for years, the State has not implemented sufficient safeguards to prevent ongoing improper payments.

Accompanying this letter is a notification outlining steps CMS will be taking to safeguard taxpayer resources and protect vulnerable populations from Minnesota fraudsters.  CMS is conducting a focused review of past CMS-64 quarterly receipts from the State and will defer funding based on findings of FWA, as well as initiating non-compliance withhold processes for future quarters.  The full legal authority for these steps is outlined in the attached notification.  In addition, CMS will continue to exercise strong oversight of State actions to address ongoing and widespread FWA.

This will require your leadership to address.

Sincerely,

Mehmet Oz, M.D.
Administrator
Centers for Medicare & Medicaid Services

*State of Minnesota*
*v.*
*United States Department of Agriculture, et al.*

U.S. Dist. Ct. No. 25-cv-04767-LMP-JFD

# DECLARATION OF JOSEPH RICHIE

# Exhibit 28



DEPARTMENT OF HEALTH & HUMAN SERVICES                    Centers for Medicare & Medicaid Services

*Administrator*
Washington, DC  20201

January 6, 2026

The Honorable Tim Walz
Governor of Minnesota
130 State Capitol
75 Rev. Dr. Martin Luther King Jr. Blvd.
St. Paul, MD  55155G

Dear Governor Walz:

This letter provides notice and an opportunity for a hearing on a finding by the Centers for Medicare & Medicaid Services (CMS) of significant noncompliance with applicable statutory and regulatory requirements in the operation of the Minnesota Medicaid program, because the Minnesota Medicaid agency fails to adequately identify, prevent, and address fraud in its Medicaid program.

As described further in this letter, federal law and regulation require states to maintain effective administrative controls, conduct audits, cooperate with federal integrity efforts, enforce accountability, and protect Medicaid funds from fraud, waste, and abuse (FWA).  As has been widely reported—and acknowledged by the State of Minnesota—there is significant and ongoing fraud within Minnesota's Medicaid program. Investigations by the CMS, the Department of Health and Human Services Office of Inspector General (HHS OIG), the Department of Justice (DOJ), the Federal Bureau of Investigation (FBI), and other federal partners have identified widespread FWA in Minnesota's Medicaid program and repeated failures by the State to adequately address it.

These investigations have revealed schemes involving billing for services not rendered, services billed at levels not supported by documentation, and exploitation of vulnerable Medicaid beneficiaries for financial gain. Federal law enforcement has identified complex fraud schemes involving networks of providers operating across multiple high-risk service categories, including services delivered through Minnesota's home and community-based services system.

CMS has been engaged in numerous on-site and virtual discussions with state agency staff to discuss the known fraud schemes and severe lack of state oversight mechanisms in place to meet minimum oversight requirements. Specifically, in December 2025, CMS met onsite with state agency staff and law enforcement to see firsthand the historical deficiencies in the state's ability to proactively identify potential Medicaid FWA.  The lack of processes to receive reports and compile data on allegations of FWA demonstrates that the state is not in compliance with section 1902(a)(64) of the Social Security Act (the Act). States are required to ensure their state plan provides a mechanism to receive reports from beneficiaries and others and compile data concerning alleged instances of waste, fraud, and abuse relating to the operation of the Medicaid Act. In addition, pursuant to 42 CFR 455, Subpart A, States are required to implement methods for identifying, investigating, and referring suspected Medicaid fraud. These methods must include a pathway to receive complaints of Medicaid fraud or abuse from any source and methods for identifying any questionable practices. This information and related data sources must be used to pursue robust preliminary and full investigations, as appropriate, as well as refer cases to law enforcement, if applicable. These regulatory authorities

reflect one of the core pillars of state Medicaid oversight that CMS expects every state to have in place effectively. We have raised these issues to the state and as we discuss below, the state has been unable to resolve it's inability to maintain compliance, resulting in its inability to identify or prevent widespread fraud, waste and abuse of the program.

Pursuant to section 1904 of the Social Security Act and 42 CFR 430.35, CMS is providing the Minnesota Medicaid agency with an opportunity for a hearing on these findings of noncompliance with statutory and regulatory requirements. If these findings are upheld or unchallenged following this opportunity for a hearing, a portion of federal financial participation (FFP), as specified in more detail below, will be withheld until CMS makes a finding that the State has come into compliance with the statute and regulations.

The factual details of the findings, the withholding, how the Minnesota Medicaid agency can request a hearing on the findings, and the steps Minnesota can take to avoid sanctions by coming into compliance are described below.

**Factual Findings**

CMS's concerns are not limited to isolated incidents. Minnesota has historically had significant deficiencies in proactively identifying suspected Medicaid FWA, primarily through limitations in data analytics and monitoring.  These limitations have become prolific in many areas of the state's Medicaid program and are well documented in CMS and other oversight agency audit reports. For example, CMS conducted an audit of the State's Personal Care Services program in 2019, which resulted in numerous findings and recommendations that reflect the State's deficiencies in basic oversight efforts.[1] The State's own Office of the Legislative Auditor released a report in 2021 about the deficiencies in the PCS program.[2] In addition, the HHS OIG documented the state's failure to effectively oversee its Nonemergent Medical Transportation (NEMT) program in a 2017 report.[3]

Recent investigations have focused on fourteen high-risk Medicaid services that the State itself has identified as particularly vulnerable to fraud (linked here: https://mn.gov/dhs/program-integrity/). According to CMS analysis of Minnesota Medicaid data, these fourteen programs consume $3.75 billion in federal and state taxpayer resources.  CMS analysis of Minnesota Medicaid data shows extraordinary growth in provider enrollment and payments for several of these services that is inconsistent with beneficiary growth and service utilization trends. Despite warning signs that have been evident for years, the State has not implemented sufficient safeguards to prevent ongoing improper payments.

**Applicable Statutory and Regulatory Provisions**

Pursuant to § 1902(a)(64) of the Act, States are required to ensure their state plan provides a mechanism to receive reports from beneficiaries and others and compile data concerning alleged instances of waste, fraud, and abuse relating to the operation of the Medicaid Act.   In addition, pursuant to 42 CFR 455, Subpart A, State are required to implement methods for identifying,

---

[1] https://www.cms.gov/medicare-medicaid-coordination/fraud-prevention/fraudabuseforprofs/downloads/mnfy18.pdf
[2] https://www.auditor.leg.state.mn.us/ped/updates/2021/dhspca.pdf
[3] https://oig.hhs.gov/reports/all/2017/minnesota-did-not-always-comply-with-federal-and-state-requirements-for-claims-submitted-for-the-nonemergency-medical-transportation-program/

investigating, and referring suspected Medicaid fraud. These methods must include a pathway to receive complaints of Medicaid fraud or abuse from any source and methods for identifying any questionable practices. This information and related data sources must be used to pursue robust preliminary and full investigations, as appropriate, as well as refer cases to law enforcement, if applicable.

Prior CMS oversight work has identified consistent non-compliance with the State's ability to proactively identify suspected Medicaid FWA, primarily through limitations in data analytics and monitoring. It should also be mentioned that Minnesota's submission of its quarterly expenditure reports through the Form CMS-64, includes a certification that the state is operating under the authority of its approved Medicaid state plan.

**Discussions with the State Medicaid Agency**

Beginning in July 2024, CMS began working with the State to address concerns of potential fraud in the housing stabilization program (HSS) through Unified Program Integrity Contractor (UPIC) audits. In April 2025, CMS and its UPIC presented the State with preliminary findings from the 3 HSS providers for input about payment policies and state exceptions to rules. Shortly after, in June 2025, the State requested the audits be transferred to the State for investigation. In August, October, and November 2025, CMS continued discussions with the state to address issues with closing the HSS program, reviewing provider enrollment actions, and redesigning the State's program integrity operations, among other issues. On December 5, 2025, CMS formally notified the Minnesota Medicaid Director of these concerns and directed the State to submit a comprehensive corrective action plan (CAP) by December 31, 2025. Finally, as noted previously, in December 2025, CMS met onsite with state agency staff and law enforcement to see firsthand the historical deficiencies in the state's ability to proactively identify potential Medicaid FWA.

While the State submitted a document labeled as a CAP to CMS on December 31, 2025, CMS has determined that it is deficient. The plan relies heavily on temporary or future-contingent measures, lacks enforceable timelines and performance metrics, acknowledges current noncompliance with key federal requirements, and provides limited assurance of accountability for past misconduct.

Given the widespread concerns that these fraudulent activities were undertaken by individuals with ties outside of the U.S. and that some of the funds were then transferred outside of the U.S., CMS sees nothing in the CAP that would result in the State being able to understand ownership or corporate structure of providers and how the State will work with law enforcement to assure that no Medicaid funds are used to support criminal international entities.

The CAP largely emphasizes prospective controls while providing limited assurance of meaningful accountability for past misconduct. Although the State references a forthcoming historical claims review, it does not commit to specific enforcement actions, recovery targets, referral thresholds, or timelines for resolving identified overpayments or fraud. Absent clear commitments to corrective financial remedies and sanctions, the CAP does not adequately protect the fiscal integrity of the Medicaid program. The CAP also fails to adequately address how claim editing will be applied, such as whether those edits will deny payments or whether the data will identify claims with attributes appropriate for additional scrutiny, such as outlier billers, utilization trends in high-risk services, and other appropriate flags. The CAP should also include how artificial intelligence and other modern

automated methods will be used to address the rampant fraud in the program, and how performance of these methods will be assessed.

Additionally, Minnesota's draft Program Integrity Playbook identifies additional vulnerabilities and gaps in its oversight operations that are not addressed in the CAP. CMS expects Minnesota to also address the outstanding issues in its updated CAP. For example:

- **Prior Authorization Program:** Please provide additional details on Minnesota's assessment of its prior authorization program and enhancements that are needed.
- **Provider Training and Education:** Please specify what enhancements or changes Minnesota proposes to make its provider training and education efforts more effective, such as pre-enrollment training; post-enrollment training; billing and documentation training; fraud, waste, and abuse training; and compliance and legal obligations training, among any others identified by the state.
- **DHS Employee Training and Education:** Please specify what enhancements or changes Minnesota proposes to make to its DHS employee training and education efforts to identify, evaluate, and mitigate fraud, waste, and abuse in the state's Medicaid program.
- **Surveillance and Utilization Review (SURS):** Minnesota stated in its draft Program Integrity Playbook that is implementing a formal SURS system. Please provide additional information the status of the SURS system, its capabilities, and how it will feed into the state's broader program integrity efforts and lead generating activities.
    **Managed Care Oversight:** Please include information as to how the state plans to enhance oversight of its managed care plans (MCPs). This includes relevant state-MCP contract language (including any barriers within existing contract language that need to be addressed), the state's ability to conduct data analytics on managed care claims and spending, processes for and evaluations of referring potential fraud from the MCP to the state/law enforcement (including implementation of payment suspensions), and recovery of identified overpayments, among any other issues identified by the state.

**Focused Financial Reviews of Expenditures on the CMS-64**

Given the severity and persistence of these deficiencies, CMS must take additional steps to protect the integrity of the Medicaid program and federal taxpayer dollars. Pursuant to section 1903 of the Social Security Act and implementing regulations in 42 CFR 430 Subpart C, CMS has the authority to conduct reviews of state expenditures reported on the quarter Form CMS-64  Accordingly, CMS intends to immediately initiate a focused CMS-64 review of all fourteen high-risk services self-identified by the state starting with the most recently certified CMS-64 (Quarter Four of Federal Fiscal Year 2025). As necessary, CMS intends to issue deferral or disallowance of any FFP claimed by the state that does not meet applicable federal requirements.

**Determination of Non-Compliance and FFP Withholding**

The CMS has concluded that the Minnesota Medicaid agency is operating its program in substantial noncompliance with federal requirements described in sections 1902(a)(64) of the Act, generally requiring the State to ensure sufficient controls to prevent, detect, and address fraud, waste, and abuse.

Subject to the state's opportunity for a hearing, CMS will withhold a portion of FFP from the Minnesota Medicaid quarterly claim of expenditures on the Form CMS-64 until such time as the Minnesota Medicaid agency is, and continues to be, in compliance with the federal requirements. The quarterly withholding will be calculated based on the federal share for one quarter's amount of the previous calendar year's annual total paid expenditures for the fourteen high-risk services, estimated as $515,154,947.56, or an alternative substantiated amount per quarter based on evidence provided by the state to the Administrator or his designee of an accurate amount of fraudulent expenditures. This amount may increase based on additional findings of fraud or insufficient progress towards mitigating fraud—until Minnesota demonstrates full and sustained compliance with federal Medicaid requirements. The withholding will end when the Minnesota Medicaid agency fully and satisfactorily implements a comprehensive CAP that addresses FWA in the 14 high-risk service areas to bring the program into compliance with the federal requirements.

**Opportunity to Request a Hearing**

The State has 10 days from the date of this letter to request a hearing. If a request for hearing is submitted timely, the hearing will be convened by the designated hearing officer below, 30 days after the date of the Federal Register notice, at the CMS Regional Office in Chicago, Illinois, in accordance with the procedures set forth in federal regulations at 42 CFR part 430, subpart D. The Hearing Officer also should be notified if the Minnesota Medicaid agency requests a hearing but cannot meet the timeframe expressed in this notice. The Hearing Officer designated for this matter is:

Ben Cohen
Centers for Medicare & Medicaid Services
7111 Security Blvd, Suite B1-15-15
Baltimore, MD, 21244

At issue in any such hearing will be:

a.  Whether the evidence establishes that Minnesota has failed to substantially comply with the federal requirements described in section 1902(a)(64) of the Social Security Act and the federal regulations implementing those provisions.

b.  Whether Minnesota's failure to substantially comply with those federal requirements supports the partial withholding of FFP imposed by CMS.

If the Minnesota Medicaid agency plans to come into compliance with the federal requirements, the Minnesota Medicaid agency should submit, by January 30, 2026 a revised comprehensive CAP including the timeframe for implementation and any performance or quality metrics the state will use to evaluate effectiveness of the actions.

CMS will continue to exercise strong oversight of State actions to address these issues. CMS will review and negotiate the terms of an acceptable corrective action plan and will monitor progress closely. Our goal is to have the Minnesota Medicaid agency come into compliance, and CMS continues to be available to provide technical assistance to help achieve this outcome.

Page 6

Should you not request a hearing within 5 days of this letter, the withholding of funds will be imposed, contingent on the State's progress toward compliance as discussed above.

Please provide any response or questions regarding this matter to Kimberly.Brandt@cms.hhs.gov.

Sincerely,

Mehmet Oz, M.D.
Administrator
Centers for Medicare & Medicaid Services

Cc:    John Connolly
       Minnesota Medicaid Director

       Dan Brillman
       Director, Center for Medicaid & CHIP Services, Centers for Medicare & Medicaid Services

       Kimberly Brandt
       Acting Director, Center for Program Integrity, Centers for Medicare & Medicaid Services

*State of Minnesota*
*v.*
*United States Department of Agriculture, et al.*
U.S. Dist. Ct. No. 25-cv-04767-LMP-JFD

# DECLARATION OF
# JOSEPH RICHIE

# Exhibit 29

**U.S. Department of Justice**

Civil Rights Division

---

DJ 170-39-85

*Employment Litigation Section – 4CON*
*950 Pennsylvania Ave, NW*
*Washington DC 20530*
*www.justice.gov/crt/emp*

January 8, 2026

***Via Electronic Mail***

Keith Ellison
Attorney General of Minnesota

c/o

Nick Pladson
Assistant Attorney General
State of Minnesota
Nick.Pladson@ag.state.mn.us

> Re:   Authorized Lawsuit Against the State of Minnesota Pursuant to Section 707 of Title VII of the Civil Rights Act of 1964, as Amended

Dear Mr. Ellison:

This letter is to inform you of the results of the Department of Justice's (Department) investigation into whether the State of Minnesota is engaged in a pattern or practice of discrimination on the basis of race and sex against job applicants and employees in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* (Title VII).

Based on our investigation, the Department has concluded that Minnesota has maintained, and continues to maintain, discriminatory policies and practices governing State employees and prospective employees to accomplish race- and sex-balancing goals for its workforce. Specifically, Minnesota makes staffing and personnel decisions—including hiring, promotions, transfers, and layoffs—and limits, segregates, and classifies State employees and prospective employees, based on race, color, national origin, and sex. In doing so, Minnesota discriminates against State employees and prospective employees who do not belong to "protected groups," defined by Minnesota as "females, persons with disabilities, and members of the following minorities: Black, Hispanic, Asian or Pacific Islander, and American Indian or Alaskan native." Minn. Stat. § 43A.02, subd. 33. Minnesota therefore has engaged in, and continues to engage in, employment practices that discriminate on the basis of race and sex in violation of Section 703(a)(1) and (2) of Title VII, 42 U.S.C. § 2000e-2(a)(1) & (2), and a pattern or practice of discrimination under Section 707 of Title VII, 42 U.S.C. § 2000e-6.

Under Section 707, the Attorney General may apply to the appropriate court for an order that will ensure future compliance with Title VII and remedy the effects of past discrimination. 42 U.S.C. § 2000e-6. This responsibility has been delegated to the Assistant Attorney General of the Civil Rights Division, who has authorized the filing of a lawsuit against Minnesota concerning its discriminatory employment policies and practices pursuant to Minn. Stat. §§ 43A.19 & 43A.191 and Minn. Admin. R. ch. 3905.

The United States is willing to resolve this matter by entering a pre-litigation consent decree that would permanently enjoin Minnesota from relying on race, color, national origin, or sex in its employment decisions. If you are interested in pursuing a resolution of this matter on these terms, please contact Acting Deputy Assistant Attorney General Eric Sell, who has been assigned to represent the United States in this case, by January 14, 2026. Mr. Sell can be contacted by telephone at (202) 600-0739 and by email at Eric.Sell@usdoj.gov. Unless there is a reasonable certainty that we can reach a resolution without contested litigation, the United States is prepared to file a complaint in federal district court by January 15, 2026.

Sincerely,

Harmeet K. Dhillon
Assistant Attorney General
Civil Rights Division


By:      s/ *Eric Sell*
Eric Sell
Acting Deputy Assistant Attorney General



cc:

Lindsey Middlecamp
lindsey.middlecamp@ag.state.mn.us

Sophie Hayek
sophie.hayek@ag.state.mn.us

Peter Farrell
peter.farrell@ag.state.mn.us

Liz Kramer
liz.kramer@ag.state.mn.us

*State of Minnesota*
*v.*
*United States Department of Agriculture, et al.*
U.S. Dist. Ct. No. 25-cv-04767-LMP-JFD

# DECLARATION OF JOSEPH RICHIE

# Exhibit 30

January 12, 2026

Commissioner Willie Jett
Minnesota Department of Education
400 NE Stinson Blvd,
Minneapolis, MN 55413
c/o Liz Kramer, Solicitor General
Office of the Minnesota Attorney General
Sent via email only, to: liz.kramer@ag.state.mn.us

Don Peschel, Board President
Erich Martens, Executive Director
Minnesota State High School League
2100 Freeway Boulevard
Brooklyn Center, MN 55430-1735
c/o Kevin Beck, Attorney
Sent via email only, to: kbeck@kmbecklaw.com

Re:    ED OCR Case Numbers 05254060 and 05258901 – Letter of Impending
       Enforcement Action

Dear Messrs. Jett, Peschel, and Martens:

As you know, the U.S. Department of Education, Office for Civil Rights (OCR) issued a Letter of Findings (Notice of Violation) in the above referenced cases, 05254060 (Minnesota Department of Education (MDE)) and 05258901 (Minnesota State High School League (MSHSL)), on September 30, 2025. The letter was accompanied by a proposed voluntary resolution agreement that specifies actions to remedy current and past discrimination and prevent future similar violative conduct.

On October 10, 2025, MDE, through the Minnesota Attorney General's Office, asked OCR to provide a deadline for its response to the Letter of Findings and proposed resolution agreement. MSHSL did not respond to the Letter of Findings or to OCR's request to negotiate a resolution.

On December 9, 2025, OCR asked both the MDE and the MSHSL to indicate by December 15, 2025, whether they were interested in signing a voluntary resolution agreement to resolve this matter, or to indicate if we are at impasse. On December 15, 2025, the MDE, through the Minnesota Attorney General's Office, informed OCR that the MDE will not accept the OCR's proposed voluntary resolution or engage OCR in negotiations.

On December 22, 2025, based on the MDE's proactive refusal to negotiate resolution of OCR's findings of non-compliance, and the MSHSL's failure to respond, OCR issued an Impasse Letter informing the MDE and the MSHSL that OCR would issue a Letter of Impending Enforcement Action in 10 calendar days if a resolution agreement is not reached within that 10-day period. On December 23, 2025, the MSHSL informed OCR the MSHSL will not agree to or

*Page **2** –05254060 and 05258901 – Letter of Impending Enforcement Action*

negotiate a resolution agreement.  MDE provided no response subsequent to its December 15 refusal.

Based on the MDE's and the MSHSL's refusal to enter into a resolution agreement to resolve OCR's findings of noncompliance, OCR is issuing this Letter of Impending Enforcement Action. The statement of the allegations, OCR's jurisdictional authority, findings of fact, and conclusions are set forth in the attached Letter of Findings (Notice of Violation) issued September 30, 2025, and incorporated by reference herein.

If the MDE and the MSHSL fail to enter into a resolution agreement with OCR within 10 calendar days from the issuance of this letter, OCR may refer this matter to the United States Department of Justice for potential enforcement. This letter does not constitute final agency action.

Respectfully,

BRADLEY BURKE

Digitally signed by BRADLEY BURKE
Date: 2026.01.12 09:44:20 -06'00'

Bradley R. Burke
Regional Director