**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA**

| | |
|---|---|
| State of Minnesota, by and through its Attorney General, Keith Ellison,<br><br>                        Plaintiff,<br><br>   v.<br><br>United States Department of Agriculture and Brooke Rollins, as Secretary of the Department of Agriculture,<br><br>                       Defendants. | No. 0:25-cv-04767-LMP-JFD<br><br>**BRIEF OF *AMICI CURIAE* STATES OF NEVADA, NEW YORK, ARIZONA, CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, HAWAI'I, ILLINOIS, MARYLAND, MICHIGAN, NEW JERSEY, RHODE ISLAND, VERMONT, WASHINGTON, AND WISCONSIN AND THE DISTRICT OF COLUMBIA IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** |

# TABLE OF CONTENTS

**Page**

**TABLE OF AUTHORITIES** ....................................................................................................... ii
**INTRODUCTION** ........................................................................................................................ 1
**BACKGROUND** ......................................................................................................................... 2
**ARGUMENT** ............................................................................................................................... 5
   A.   The Recertification Demand Undermines the Federal-State Partnership Created by Congress ........................................................................................................... 5
   B.   Amici States Would Suffer Severe Harm if Required to Comply with a Similar Recertification Demand ........................................................................................ 9
**CONCLUSION** ........................................................................................................................ 13

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Hall v. USDA*,
  984 F.3d 825, (9th Cir. 2020) .................................................................................. 2

*Abbott v. Perez*,
  585 U.S. 579, (2018) ............................................................................................ 11

**Statutes**

7 U.S.C. § 2011 ............................................................................................................ 2

7 U.S.C. § 2020 ............................................................................................................ 4

7 U.S.C. § 2020(a)(1) ................................................................................................... 3

7 U.S.C. § 2025(a) .................................................................................................... 3, 9

7 U.S.C. § 2026(b) ....................................................................................................... 7

7 U.S.C. § 2026(b)(1)(A) ......................................................................................... 5, 11

7 U.S.C. § 2026(b)(1)(B)(i) .......................................................................................... 5

7 C.F.R. § 271.3(a) ...................................................................................................... 3

7 C.F.R. § 271.4(a) ...................................................................................................... 3

7 C.F.R. § 272.3 .......................................................................................................... 3

7 C.F.R. § 273.10(f) ............................................................................................. 4, 7, 9

**INTRODUCTION AND INTERESTS OF AMICI**

Amici are the States of Nevada, New York, Arizona, California, Colorado, Connecticut, Delaware, Hawaiʻi, Illinois, Maryland, Michigan, New Jersey, Rhode Island, Vermont, Washington, and Wisconsin and the District of Columbia. Amici States are home to tens of millions of residents who have been forced to endure months of confusion and uncertainty about the federal government's administration of the Supplemental Nutrition Assistance Program (SNAP). In this case, Defendants United States Department of Agriculture (USDA) and Secretary Brooke Rollins are seeking to unilaterally compel Minnesota to recertify 100,000 households containing SNAP recipients within 30 days based on unrelated allegations of fraud, all upon the threatened penalty of losing billions of dollars in federal funding. The question of whether the challenged Recertification Demand is lawful profoundly impacts Amici States, both because States administer the SNAP program and because millions of Amici States' residents rely on SNAP benefits to meet their daily food needs. And given Defendants' repeated interference with SNAP for political reasons, Amici States are concerned that allowing the Recertification Demand to proceed in Minnesota will set the stage for similar demands in Amici States.

Amici States fully support Minnesota's arguments that the Recertification Demand violates the Administrative Procedure Act and the U.S. Constitution's Spending Clause. Amici States write separately to underscore the ways in which the Recertification Demand is inconsistent with the federal-state partnership reflected in the statutes

1

governing SNAP, and to explain how Amici States would be substantially injured if Defendants were permitted to proceed with similar Recertification Demands in their States.

## BACKGROUND

The Supplemental Nutrition Assistance Program has been the country's primary defense against hunger and an important safety net for low-income Americans for over 60 years. SNAP provides monthly benefits to eligible households that can be used to buy food. *Hall v. USDA*, 984 F.3d 825, 831 (9th Cir. 2020) (quoting 7 U.S.C. § 2011). The goal of SNAP is "to 'alleviate . . . hunger and malnutrition' by 'increasing [the] food purchasing power' of low-income households." *Id.* (quoting 7 U.S.C. § 2011).

In 2024, SNAP helped more than 41 million people meet their basic nutritional needs.[1] More than 62% of SNAP participants are members of households with children, and more than 37% are members of households with elderly or disabled individuals.[2] SNAP is therefore a critical tool in ensuring that children in America do not attend school on empty stomachs, that the elderly have the nutritional sustenance they need, and that working families have the ability to thrive.

---

[1] *See* Ctr. on Budget & Policy Priorities, *Policy Basics: The Supplemental Nutrition Assistance Program (SNAP)* (updated Nov. 25, 2024), https://www.cbpp.org/research/food-assistance/the-supplemental-nutrition-assistance-program-snap.

[2] *Id.*

Like many other benefits programs, SNAP operates through a federal-state partnership. While SNAP is overseen at the federal level by the Food and Nutrition Service (FNS), a component of USDA, 7 C.F.R. § 271.3(a), States (often through their counties) administer SNAP on the ground, processing applications and issuing SNAP benefits to eligible recipients, *id.* § 271.4(a); *see* 7 U.S.C. § 2020(a)(1). In addition, while the federal government is currently responsible for fully funding SNAP benefits, States and the federal government share the costs of administering SNAP. *See* 7 U.S.C. § 2025(a).

States have considerable flexibility in administering SNAP.[3] The purpose of this flexibility is to "enable[] State agencies to tailor the program to better meet the needs of eligible households within their jurisdictions."[4] Some States administer the program through a single state-level agency, while others delegate the administration of SNAP to county, regional, or municipal governments.[5]

As part of their administrative responsibility, States review initial and recertification applications for SNAP to ensure that households are eligible for SNAP

---

[3] *See, e.g.*, 7 C.F.R. § 272.3 (allowing states to develop operating guidelines and forms and apply for a variety of waivers); *see generally* Casey McConnell et al., *Supplemental Nutrition Assistance Program: State Options Report* (17th ed. 2025) (summarizing SNAP options available to States as of October 1, 2024), https://fns-prod.azureedge.us/sites/default/files/resource-files/snap-stateOptionsReport-17edition-120925.pdf.

[4] *Id.* at 10.

[5] *Id.* at 18.

benefits. *See generally* 7 U.S.C. § 2020. Unless the State has obtained a waiver, State agencies may certify households in which all adult members are 60 years of age or older or have disabilities for a maximum of 24 months. 7 C.F.R. § 273.10(f)(1). All other households are certified for a maximum of 12 months. *Id.* § 273.10(f).[6] At the end of a certification period, households may complete a renewal, and, if they are eligible, the state agency will certify them for another certification period.

Similarly, States work with the federal government to maintain "one of the most rigorous quality control systems in the federal government."[7] SNAP data is closely reviewed at both the state and federal level to ensure that benefits are being correctly distributed.[8] SNAP fraud is likewise investigated both by state agencies and by USDA "working closely with state and federal partners."[9] The result is that "SNAP fraud is rare."[10]

As part of the federal-state partnership, the federal government can work with state agencies through voluntary pilot projects to develop operational improvements for

---

[6] States may obtain waivers to lengthen these certification periods.

[7] USDA, *SNAP Quality Control* (updated Dec. 9, 2025), https://fns.usda.gov/snap/qc.

[8] *Id.*

[9] USDA, *SNAP Fraud Prevention* (last updated Nov. 12, 2025), https://www.fns.usda.gov/snap/fraud.

[10] Randy Alison Aussenberg, Congressional Rsch. Serv., IF10860, *Supplemental Nutrition Assistance Program: Errors and Fraud* (updated Apr. 7, 2025), https://www.congress.gov/crs-product/IF10860.

4

SNAP. The statutes governing SNAP permit USDA to "conduct on a trial basis, in one or more areas of the United States, pilot or experimental projects designed to test program changes that might increase the efficiency of" the program and to "improve the delivery of" SNAP benefits. 7 U.S.C. § 2026(b)(1)(A). USDA can conduct such a pilot project only if it is "consistent with the goal . . . of providing food assistance to raise levels of nutrition among low-income individuals" and "the project includes an evaluation to determine the effects of the project." *Id.* § 2026(b)(1)(B)(i). States typically apply to be considered for participation in a pilot project. For example, during the first Trump administration, USDA implemented a SNAP online payment program and clarified that, despite broad public interest in the federal government's expansion of the pilot program, "the responsibility is on state agencies, their third-party processor, and any retailers who wish to participate."[11] Nothing in the text of the statutes or the implementing regulations authorizes USDA to compel a State's participation in a pilot project.

## ARGUMENT

**A.  The Recertification Demand Undermines the Federal-State Partnership Created by Congress**

SNAP operates in all 50 States, the District of Columbia, Guam, and the U.S. Virgin Islands. As discussed above (at pp. 3-5), Congress created SNAP as a federal-state partnership that preserves the federal government's ability to create certain eligibility

---

[11] USDA, Press Release, *Vermont Added to Innovative SNAP Online Pilot Program* (Apr. 24, 2020), https://www.usda.gov/about-usda/news/press-releases/2020/04/24/vermont-added-innovative-snap-online-pilot-program.

5

frameworks while giving States discretion to administer SNAP based on the needs of their residents.

For example, Congress gave States considerable flexibility in how to calculate assets for purposes of assessing eligibility for SNAP benefits.[12] Likewise, States have flexibility in implementing the general recertification timelines set by federal law.[13] Some State agencies therefore certify nearly all households for the same length of time, even though some households might be eligible for longer periods, while others certify households for varying lengths of time according to household circumstances.[14] Moreover, USDA's regulations have long permitted States to obtain waivers for various procedural requirements, such as waivers of the requirement for in-person rather than telephone interviews or, for certain households, waivers of the interview requirement altogether.[15]

The Recertification Demand at issue in this case undermines the carefully reticulated federal-state partnership in several ways. First, the Demand unreasonably upends the existing regulatory mechanism for recertification procedures and removes the

---

[12] *See, e.g.*, Randy Alison Aussenberg & Gene Falk, Congressional Rsch. Serv., R42505, *Supplemental Nutrition Assistance Program (SNAP): A Primer on Eligibility and Benefits* 8-9 (updated Sept. 29, 2025), https://www.congress.gov/crs-product/R42505.

[13] McConnell et al., *State Options Report*, supra at 13.

[14] *Id.*

[15] *Id.* at 33, 36.

statutory flexibility that Congress provided to the States. As Minnesota notes in its motion for a preliminary injunction, the Recertification Demand "effectively adjusts the current certification periods for households in the Recertification Counties such that they all terminate on January 15, 2026." ECF No. 6, at 20-21. But it is state agencies that are responsible for determining the certification period for each household, within statutory parameters, not USDA. *See* 7 C.F.R. §273.10(f). The Recertification Demand does not grapple with the various statutory and regulatory provisions that govern the States' recertification procedures generally, nor does it attempt to justify its intrusion into a state administrative process that, by design, leaves room for flexibility in state implementation.

Second, the Recertification Demand appears to represent the first time that USDA has attempted to compel a State to participate in a pilot project over its objection and subject to the threat of losing statutorily mandated federal administrative funding. The Demand does not—and cannot—identify a source of statutory authority for such a monumental intrusion on state sovereignty. Indeed, just one year ago, USDA specified in an information collection request that "[s]tate agencies *voluntarily* conduct demonstration projects" subject to FNS approval pursuant to 7 U.S.C. § 2026(b). *See* 89 Fed. Reg. 104965 (Dec. 26, 2024) (emphasis added). The Recertification Demand does not explain how USDA's unprecedented attempt to find in § 2026(b) the authority to impose such projects on unwilling States can be squared with the general statutory scheme governing SNAP, broader principles of federalism, or the agency's prior interpretations of the statute.

7

Finally, the Recertification Demand undermines Congress's respect for state partnership in the administration of SNAP because it evinces the current administration's hostility towards certain politically disfavored States. Congress has consistently understood food security to be a bipartisan issue of concern. But instead of working in partnership with the States to alleviate harm and malnutrition, USDA is trying to wield SNAP as a weapon. As Minnesota notes in its motion for a preliminary injunction, the Demand is just one piece of a full-scale attack on the State by the federal government, including numerous lawsuits against the State and its officers, multiple derogatory public statements about state officials, and increasingly violent and disruptive immigration enforcement in the State's largest cities. *See* ECF No. 6, at 10-13, 26-27. Even without that additional context, it would be clear that the Recertification Demand is motivated by political animus—not good-faith concerns about fraud—as the fraud that Defendants claim prompted the Demand did not involve SNAP and was perpetrated by a sponsoring organization, not individual recipients. ECF No. 1, at 16. To be sure, the federal government is entitled to disagree with policy choices made by certain States; however, nothing in the text of the statutes governing SNAP allows USDA to force a state to participate in a pilot project as political retribution.[16]

---

[16] On December 18, 2025, USDA ordered Colorado to comply with a nearly identical Recertification Demand "pilot project," which required the recertification of more than 100,000 Coloradan households in five of Colorado's largest counties during the winter holidays. USDA threatened sanctions, including potential removal of Colorado from the SNAP program, for failure to complete the imposed tasks. This unlawful demand is the subject of current litigation in *Colorado v. Trump*, No. 1:25-cv-3428 (D. Colo. filed Oct.

8

### B. Amici States Would Suffer Severe Harm if Required to Comply with a Similar Recertification Demand

If a similar Recertification Demand were imposed on Amici States, they would find compliance overwhelmingly burdensome and most likely impossible. Federal law requires Amici States to establish recertification timelines for all SNAP recipients, with States permitted some flexibility as to the precise length of the recertification periods. 7 C.F.R. § 273.10(f). As a result, all Amici States (like Minnesota) recertify households on a rolling basis as they come up for recertification throughout the year, which makes the task manageable and allows staff to perform other tasks like reviewing new applications. The Recertification Demand upends that routine process. Instead of recertifying only a fraction of all SNAP recipients each month, a State would be required by such a Recertification Demand to recertify 100% of recipients in its largest counties during a single 30-day period.

Amici States are not equipped for that undertaking. Amici States strive to efficiently use their resources to provide benefits to their SNAP recipients. Indeed, Amici States are currently responsible for half of the administrative costs of the program, 7 U.S.C. § 2025(a), so they are incentivized to run a lean operation.[17] Creating and

---

29, 2025). Like Minnesota, Colorado has been repeatedly singled out by the Administration despite its below national average payment error rates and robust program-integrity efforts.

[17] States will be forced to shoulder 75% of administrative costs starting in fiscal year 2027, making the need for efficiency even greater. 7 U.S.C. § 2025(a).

9

maintaining the capacity for the enormous, unprecedented task of recertifying all SNAP households in one 30-day period would be a senseless waste of resources.

Amici States are a diverse group, but no matter how an Amici State is situated, it is highly unlikely that it could perform the impossible task assigned by a similar Recertification Demand. Some Amici States provide SNAP benefits to millions of recipients a month; others, to less than 150,000 recipients. Some delegate recertification to counties; others handle recertification at the state-agency level. Some are geographically small and densely populated; others are expansive and sparsely populated. But for different reasons, all Amici States would likely be unable to comply with the Recertification Demand. Large States or agencies would be overwhelmed trying to process millions of recertification applications and interviews all at once. Small States or agencies might have a smaller caseload, but they also have less staff and other resources to dedicate to those recertifications.

If Amici States nevertheless were forced to try to fulfill a similar Recertification Demand, they would suffer significant harm. Trying to comply would require an enormous amount of resources, resulting in serious disruptions to agencies' functions and potentially even causing States to curtail or suspend other social programs so that they could reassign staff and resources to the recertification project. Amici States would struggle to have enough resources to comply with such demands and still conduct routine and important social-services activities such as processing SNAP, Temporary Aid for Needy Families, and rental assistance applications; enforcing child-support orders; and

10

investigating social-services fraud. Such a scenario would harm not only the recipients of Amici States' social services; it would also harm Amici States directly by infringing on their interest in pursuing their policy priorities. *See Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018) (explaining that a state's "inability to enforce its duly enacted plans clearly inflicts irreparable harm").

Such a massive diversion of resources would also undermine Amici States' SNAP stewardship. It would require the rushed training of employees from other divisions who had never worked on SNAP recertifications, with the inevitable result of more mistakes during the recertification process. It would divert attention from new applications, possibly preventing needy families from timely accessing SNAP. And (as noted above) it would leave little to no time for social-services agencies to investigate fraud. All of those consequences contradict SNAP pilot projects' statutory purpose of "test[ing] program changes that might increase the efficiency of [SNAP] and improve the delivery of [SNAP] benefits to eligible households." 7 U.S.C. § 2026(b)(1)(A).

Complying with the Recertification Demand would harm Amici States in another way: it would undermine efforts to ensure enrollment of eligible residents in social-services programs that address the States' needs. To enroll as many eligible residents as possible in social-services programs, Amici States have overcome stigma, misinformation, and distrust by acting predictably and transparently and by avoiding unnecessary burdens on recipients. The Recertification Demand runs counter to that practice—it departs from SNAP recipients' long-established recertification timelines,

without warning and without good reason. Forcing Amici States to abandon longstanding practices—and imposing significant burdens on the SNAP recipients—to meet an impossible deadline will inevitably erode the trust between recipients and the Amici State agencies that serve as the face of SNAP and other social services. In response, Amici States would need to spend time and money educating recipients about the Recertification Demand and reassuring them that benefits will still be available once the process is completed. This would likely require developing, creating, and disseminating custom letters, updated notices, and other new materials.

But even after a resource-intensive educational campaign, Amici States expect that the Recertification Demand's disruption of services and erosion of trust would result in fewer eligible households enrolling in social-services programs. That would injure Amici States because social-services programs like SNAP are preventative in nature, reducing the need for later, more expensive state-funded services. For example, declining nutrition among Amici States' residents caused by lower SNAP enrollment would lead to worse health outcomes, burdening state-funded healthcare systems. And there is no reason to believe any loss of trust that Amici States' social-services agencies suffered would be limited to SNAP enrollment. Other programs administered by the agencies, such as rental-assistance programs that keep residents out of homelessness, could likewise be impacted by declining enrollment.

This Court should therefore find the Recertification Demand unlawful and enjoin its enforcement. Doing so will not only protect Minnesota from the Recertification

Demand's destructive consequences, but it will also discourage USDA from trying to impose those same consequences on other States.

## CONCLUSION

This Court should grant Plaintiff's motion for a preliminary injunction.

| | |
|---|---|
| **SPENCER FANE LLP** | **OFFICE OF THE NEVADA ATTORNEY GENERAL** |
| By: */s/ Ariel K. Lierz*<br>    Ariel K. Lierz, #397355<br>    Luke J. Wolf, #399986<br>100 South 5th Street, Suite 2500<br>Minneapolis, Minnesota 55402<br>Phone: (612) 268-7000<br>Fax: (612) 268-7001<br>alierz@spencerfane.com<br>lwolf@spencerfane.com | By: */s/ K. Brunetti Ireland*<br>    K. Brunetti Ireland (*pro hac vice pending*)<br>Chief of Special Litigation<br>Office of the Nevada Attorney General<br>1 State of Nevada Way, Ste. 100<br>Las Vegas, NV 89119<br>kireland@ag.nv.gov |

*Attorneys for Amici States*

## ADDITIONAL AMICI STATES:

LETITIA JAMES
*Attorney General*
*State of New York*
28 Liberty Street
New York, NY 10005

KRISTIN K. MAYES
*Attorney General*
*State of Arizona*
2005 N. Central Ave.
Phoenix, AZ 85004

ROB BONTA
*Attorney General*
*State of California*
300 S. Spring St.
Los Angeles, CA 90013

PHILIP J. WEISER
*Attorney General*
*State of Colorado*
Office of the Attorney General
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203

WILLIAM TONG
*Attorney General*
*State of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

KATHLEEN JENNINGS
*Attorney General*
*State of Delaware*
820 N. French Street
Wilmington, DE 19801

BRIAN L. SCHWALB
*Attorney General*
*District of Columbia*
400 Sixth Street, NW
Washington, D.C. 20001

ANNE E. LOPEZ
*Attorney General*
*State of Hawai'i*
425 Queen Street
Honolulu, HI 96813

KWAME RAOUL
*Attorney General*
*State of Illinois*
115 S. LaSalle St.
Chicago, IL 60603

ANTHONY G. BROWN
*Attorney General*
*State of Maryland*
200 Saint Paul Place
Baltimore, MD 21202

DANA NESSEL
*Attorney General*
*State of Michigan*
P.O. Box 30212
Lansing, Michigan 48909

MATTHEW J. PLATKIN
*Attorney General*
*State of New Jersey*
25 Market Street
Trenton, NJ 08625

PETER F. NERONHA
*Attorney General*
*State of Rhode Island*
150 South Main Street
Providence, RI 02903

CHARITY R. CLARK
*Attorney General*
*State of Vermont*
109 State Street
Montpelier, VT 05609

NICHOLAS W. BROWN
*Attorney General*
*State of Washington*
P.O. Box 40100
Olympia, WA 98504

JOSHUA L. KAUL
*Attorney General*
*State of Wisconsin*
17 W. Main Street
Madison, WI 53703