UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

State of Minnesota,
by and through its Attorney General,
Keith Ellison,

           Plaintiff,

    v.

United States Department of Agriculture
and Brooke Rollins, Secretary of the
U.S. Department of Agriculture,

           Defendants.

Case No. 0:25-cv-04767-LMP-JFD

**AMENDED COMPLAINT**

## INTRODUCTION

1. Once again, the Trump Administration is threatening to let the needy go hungry.

2. In November 2025, the Trump Administration unlawfully withheld Supplemental Nutrition Assistance Program (SNAP) benefits nationwide and repeatedly attempted to score political points by blaming Democrats for its own actions.

3. Then, in December 2025, the Trump Administration threatened to cut off Minnesota's SNAP funding and disqualify it from SNAP altogether unless Minnesota performed the impossible.

4. On December 16, 2025, Agriculture Secretary Brooke Rollins sent a letter (the "Recertification Letter") to Minnesota Governor Tim Walz purporting to require Minnesota to "recertify" the eligibility of approximately 100,000 SNAP households in

Minnesota in just thirty days from the receipt of the letter, which was January 15, 2026. She further demanded that Minnesota conduct in-person interviews with each of those households as part of the recertification process.

5. Secretary Rollins threatened to take severe punitive actions against Minnesota if it failed to comply, including disqualifying all of Minnesota from SNAP.

6. Defendants have no lawful authority to impose these demands on Minnesota or to punish it for failing to comply. Instead, the demand is part of an ongoing, misguided, and unlawful effort by the federal government to further the federal administration's personal and political grievances with Minnesota and its elected officials.

7. Moreover, conducting in-person interviews and recertifications of approximately 100,000 households within 30 days would be utterly impossible even if Defendants had provided advance notice and Minnesota and its county partners redirected all available resources to the effort. Defendants surely know this.

8. Minnesota filed this action on December 23, 2025 and sought preliminary injunctive relief shortly thereafter to enjoin Defendants from imposing the penalties threatened in the Recertification Letter.

9. On January 9, 2026, Secretary Rollins sent a letter (the "Awards Termination Letter") to Minnesota Governor Tim Walz and Minneapolis Mayor Jacob Frey stating that "effective immediately," she was "suspending payments on all active awards and any future awards from USDA to the State of Minnesota and the City of Minneapolis, currently totaling over $129.18 million." The letter cited no legal authority for doing so but claimed the fact Minnesota filed this lawsuit as one of its justifications.

10.     Then on January 14, 2026, minutes before thisCourt held its hearing on Minnesota's motion for a preliminary injunction with respect to the Recertification Letter, Defendants' counsel handed Plaintiff's counsel a new letter (the "Enforcement Letter") from Secretary Rollins purporting to withhold federal SNAP administrative funding from Minnesota—one of the penalties threatened in the Recertification Letter. That is, Defendants sought to evade judicial review by taking the very action Minnesota had sought to enjoin without allowing this Court an opportunity to make its ruling.

11.     On January 14, 2026, the Court granted Minnesota's motion for a preliminary injunction from the bench, enjoining both the Recertification Letter and the Enforcement Letter. The Court issued a written decision on January 16, 2026. (ECF No. 44.)

12.     Minnesota seeks this Court's intervention to permanently enjoin Defendants' unlawful actions.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this Amended Complaint under 28 U.S.C. §§ 1331 and 1346. Jurisdiction is also proper under the judicial review provisions of the Administrative Procedure Act. *See* 5 U.S.C. §§ 702, 704. The Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202.

14.     Venue is proper in this district under 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1). Defendants are United States agencies or officers sued in their official capacities. The State of Minnesota is a resident of this judicial district, and a substantial part of the events or omissions giving rise to this Amended Complaint occurred within this district.

3

**PARTIES**

15.    Plaintiff State of Minnesota is a sovereign state of the United States of America. Minnesota is represented by and through its chief legal officer, Attorney General Keith Ellison, who is authorized to sue on the State's behalf, including on behalf of its public schools and its citizens. Minn. Stat. § 8.01.

16.    Defendant the United States Department of Agriculture (USDA) is a cabinet agency within the executive branch of the United States government. 28 U.S.C. § 501.

17.    Defendant Brooke Rollins is the Secretary of the USDA. She is charged with the supervision and management of all decisions and actions of that agency. She is sued in her official capacity. 28 U.S.C. § 503.

**FACTUAL ALLEGATIONS**

I.    **SNAP PROVIDES LIFE-SAVING FOOD ASSISTANCE IN MINNESOTA AND THROUGHOUT THE UNITED STATES.**

18.    Congress created SNAP to "safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households" by "permit[ting] low-income households to obtain a more nutritious diet through normal channels of trade by increasing food purchasing power for all eligible households who apply for participation." 7 U.S.C. § 2011. SNAP provides monthly electronic benefits that can be used like cash to purchase qualified food items.

19.    The federal government has long played a critical role in preventing hunger. SNAP's roots date to the first food stamp program in 1939. Congress enacted the Food

4

Stamp Act in 1964.[1] *See generally* Food and Nutrition Service, *A Short History of SNAP*, https://www.fns.usda.gov/snap/history. The 2008 Farm Bill changed the name from the Food Stamp Program to SNAP and replaced the Food Stamp Act of 1977 with the Food and Nutrition Act of 2008 (FNA). *See* Pub. L. No. 110-234.

20.     To qualify, applicants must show their household[2] income is below threshold levels and that they meet other requirements.

21.     Nearly 24 million Americans received SNAP benefits in fiscal year 2024, including about 8.4 million children.

22.     SNAP benefits are "supplemental" for a reason: they help households stretch their food budgets but are not sufficient to fully meet expected food costs. A report showed that in 2024, the maximum per-meal SNAP benefit was insufficient to cover the cost of a modestly price meal in 99% of counties within the United States.[3] Compounding the issue, grocery prices have increased in 2025 at a rate higher than general inflation.

---

[1] *See generally* Food and Nutrition Service, *A Short History of SNAP*, https://www.fns.usda.gov/snap/history.

[2] "Household" is a defined term that includes an individual living alone, an individual living with others but who purchases food and prepares meals alone, or a group who lives together and purchase food and prepare meals together. 7 C.F.R. § 273.1(a).

[3] Urban Institute, *Does SNAP Cover the Cost of a Meal in Your County?*, July 16, 2025, https://www.urban.org/data-tools/does-snap-cover-cost-meal-your-county.

II.    **IN MINNESOTA, THE DEPARTMENT OF CHILDREN, YOUTH, AND FAMILIES ADMINISTERS SNAP IN PARTNERSHIP WITH MINNESOTA'S COUNTIES AND TRIBAL NATIONS.**

23.    The USDA's Food and Nutrition Service (FNS) oversees SNAP, but SNAP is administered by the States. That is, states determine household eligibility and distribute benefits. *See* 7 U.S.C. §§ 2013, 2020.

24.    In Minnesota, the Department of Children, Youth, and Families (DCYF) administers SNAP. Minnesota uses a "State-supervised, county-administered" model. DCYF supervises 87 counties and 3 Tribal Nations that process and review SNAP applications.

25.    This model allows Minnesotans to work with their local county offices to apply for SNAP and to recertify ongoing eligibility. It also allows for higher responsiveness to emergency applications and allows county employees to evaluate eligibility for multiple county-run programs that may be implicated, creating higher efficiency and accuracy.

26.    Counties determine whether a household qualifies for SNAP by collecting information regarding the applicant, individuals who live with the applicant, income, expenses, and assets. Applicants may be asked to submit pay stubs, rent or mortgage documents, medical bills, and other paperwork to verify their eligibility.

27.    Once a county has determined a household is eligible for SNAP, the State, through DCYF, issues payments to participants' Electronic Benefit Transfer cards (EBT) using an EBT vendor. Participants can use their EBT cards just like debit cards to pay for food at grocers, farmers markets, and other retailers.

6

28.    In fiscal year 2024, DCYF issued benefits to an average of approximately 440,000 Minnesotans each month, including 181,980 children and 67,000 elderly individuals. DCYF currently issues about $75 million in benefits each month.

29.    A household is certified for a "certification period." To remain eligible, the household must "recertify" before the certification period expires. *See* 7 C.F.R. §§ 273.10(f), 273.14. Recertification periods cannot exceed twelve months except in limited circumstances. 7 C.F.R. § 273.10(f). In Minnesota, certification periods are either six, twelve, or twenty-four months, with twelve months being most common.

30.    During recertification, the administering county or Tribal Nation asks SNAP participants about changes to income, assets, household composition, or other circumstances that occurred during the certification period. Individuals are also required to notify the county sooner than the next scheduled certification when certain changes affecting eligibility occur.

31.    The applicable county or Tribal Nation also interviews a household member of the SNAP participant during recertification. USDA encourages State agencies to permit these interviews to take place by telephone and requires them to permit telephone interviews in case of "household hardship," including "illness, transportation difficulties, care of a household member, hardships due to residency in a rural area, prolonged severe weather, or work or training hours that prevent the household from participating in an in-office interview." 7 C.F.R. §§ 273.2(e)(2), 273.14(b)(iii), 273.14(b)(3).

32.    Minnesota permits all recertification interviews to take place either by telephone or in-person.

33.     While SNAP benefits are funded by the federal government, the costs of administering SNAP are split evenly between the federal government and Minnesota. *See* 7 U.S.C. § 2025(a). Minnesota spends approximately $160 million per year administering SNAP, $80 million of which is reimbursed by USDA. As discussed above, Minnesota distributes $75 million in benefits per month.

### III.   MINNESOTA TAKES CARE TO ENSURE SNAP PROGRAM INTEGRITY, INCLUDING PREVENTING AND IDENTIFYING FRAUD.

34.     There are numerous statutory and regulatory provisions for preventing, detecting, and eliminating waste, fraud, and abuse in SNAP. *See, e.g.,* 7 U.S.C. §§ 2014a, 2015, 2016(h)(8)–(12), 2016a, 2020, 2024, 2025, 2036b, 2036c; 7 C.F.R. §§ 271.5–8, 272.8–18, 273.15–18, 275–76, 277.16–17, 278.6–7.

35.     Minnesota conducts regular quality control reviews by reviewing a statistically valid sample of SNAP cases to determine whether decisions to deny, suspend, or terminate cases are correct. Federal law establishes standards for state quality control reviews and a process by which state error rates are compared to the national average error rates. 7 U.S.C. § 2025(c); 7 C.F.R. § 275.10(a).

36.     Minnesota also performs regular management evaluations to monitor and assess counties and Tribal Nations in their SNAP administration. As with quality control reviews, federal law sets requirements for management evaluations. 7 C.F.R. §§ 271.2, 275.9(a).

37.     According to the USDA data, Minnesota's payment error rate in 2024 (which includes both overpayments and underpayments) was 8.98%, lower than the national

8

average of 10.93% and lower than the error rates of 33 other States or Territories. Alaska's error rate, by contrast, exceeds 24%.

38.     The Congressional Research Service acknowledged as recently as April 2025 that "SNAP fraud is rare, according to available data and reports" and that error rates generally reflect incorrect eligibility determinations, not fraud.[4]

39.     In addition to federally-mandated quality control review and management evaluations, Minnesota also has a State Fraud Prevention Investigation (FPI) program administered by counties and Tribal Nations to investigate possible recipient fraud in public assistance programs, including SNAP. This program actively pursues and investigates cases, with a focus on fraud prevention.

40.     Minnesota also accepts tips and referrals from all sources about potential fraud or abuse (providing a website, email, hotline, and mail reporting option).

## IV.     STATES MAY VOLUNTARILY PARTICIPATE IN "SECTION 2026 PROJECTS," WHICH MUST COMPLY WITH STATUTORY REQUIREMENTS.

41.     Various provisions of the FNA permit or require the USDA to institute "pilot projects" to improve the efficiency and effectiveness of the SNAP program.

42.     One such provision permitting pilot projects ("Section 2026 projects") is 7 U.S.C. § 2026(b)(1)(A):

> The Secretary may conduct on a trial basis, in one or more areas of the United States, pilot or experimental projects designed to test program changes that might increase the efficiency of the supplemental nutrition assistance program and improve the delivery of supplemental nutrition assistance program

---

[4] Congressional Research Service, *Supplemental Nutrition Assistance Program: Errors and Fraud*, Apr. 7 2025 (https://www.congress.gov/crs-product/IF10860).

9

benefits to eligible households, and may waive any requirement of this chapter to the extent necessary for the project to be conducted.

7 U.S.C. § 2026(b)(1)(A).

43.    Section 2026 projects must comply with certain statutory and regulatory requirements:

a.  USDA may not conduct a Section 2026 project unless "the project is consistent with the goal of the supplemental nutrition assistance program of providing food assistance to raise levels of nutrition among low-income individuals" and "the project includes an evaluation to determine the effects of the project." *Id.* § 2026(b)(1)(B)(i).

b.  USDA may not conduct a Section 2026 project that "denies assistance to an otherwise eligible household or individual if the household or individual has not failed to comply with any work, behavioral, or other conduct requirement under [SNAP] or another program." *Id.* § 2026(b)(1)(B)(iv)(III)(bb).

c.  "Permissible" Section 2026 projects are those that "improve program administration," "increase the self-sufficiency of [SNAP] recipients," "test innovative welfare reform strategies," or "allow greater conformity with the rules of other programs than would [otherwise] be allowed[.]" *Id.* 2026(b)(1)(B)(ii).

d.  USDA may not conduct a Section 2026 project that, among other things, is inconsistent with a state's plan of operations, the state's requirement "promptly" to process an application within 30 days or the requirement that USDA and the state evenly share SNAP administrative costs under 7 U.S.C. § 2025(a). *Id.* § 2026(b)(1)(B)(iv)(III).

e.  If a proposed Section 2026 project "will likely have a significant impact on the public," the USDA must publish a notice in the Federal Register at least 30 days before the project begins that "set[s] forth the specific operational procedures" and "explain[s] the basis and purpose" of the project. 7 C.F.R. § 282.1(b). If it receives "significant comments," USDA must "take such action as may be appropriate prior to implementing the project." *Id.*

f.  A Section 2026 project must "include[] an evaluation to determine the effects of the project." 7 U.S.C. § 2026(b)(1)(B)(i)(II).

10

44. Participation in Section 2026 projects is voluntary: USDA cannot compel participation.

45. As noted above, subject to the above requirements, the Secretary may "waive any requirement" of the FNA in connection with a Section 2026 project. 7 U.S.C. § 2026(b)(1)(A). She does so in response to waiver requests from Section 2026 participants. *See id.* § 2026(b)(1)(D).

## V. THE FNA PROVIDES PROCEDURES FOR SANCTIONING STATES FOR NONCOMPLIANCE.

46. The FNA permits USDA to sanction states for noncompliance with the FNA or its regulations, the state's plan of operation, the state's plan for automated data processing, or statutory requirements applying to automated data processing. *See* 7 U.S.C. § 2020(g).

47. Potential sanctions include withholding SNAP administrative funds. *Id.* Before doing so, FNS must provide multiple warnings and provide the state with opportunities to correct any noncompliance. *See* 7 C.F.R. § 276.4(d).

48. FNS must first issue an "advance warning" advising the State agency in writing of the deficiency and providing a specific period of time to correct it. *Id.* § 276.4(d)(1).

49. If a State fails to correct the deficiencies within the time specified in the advance warning (or if a State agency fails to comply with a corrective action plan), FNS then must issue a "formal warning." *Id.* § 276.4(d)(2).

50. After receiving a formal warning, a State agency has 30 days to either submit evidence that it is in compliance or a corrective action proposal. *Id.* § 276.4(d)(2)(ii).

11

51.    USDA may withhold administrative funds only if the State agency fails to respond to a formal warning within 30 days, provides an "unsatisfactory" response, or "fails to meet the commitments" it made in a corrective action proposal. *Id.* § 276.4(e).

52.    The State agency may then appeal the withholding. *Id.* §§ 276.4(f), 276.7.

## VI.    THE TRUMP ADMINISTRATION HAS REPEATEDLY USED SNAP AS A POLITICAL WEAPON.

53.    The Trump Administration has used SNAP as a political weapon and repeatedly violated the FNA and its implementing regulations. Not including this case, Minnesota and dozens of other states have had to sue three times to stop the federal government's unlawful conduct.

### a.    The federal government unlawfully demands SNAP data.

54.    States collect highly sensitive data regarding SNAP applicants and recipients, including home addresses, Social Security numbers, and household income for millions of Americans.

55.    Because this data is sensitive—and federal and state privacy laws protect it—the federal government has always asked States to share limited data sets (*e.g.*, a statistically significant sample without personally identifying information) for quality control checks.

56.    But earlier this year USDA demanded that States turn over nearly all of their sensitive SNAP records since January 2020 and threatened States with noncompliance procedures—including cutting SNAP administrative funding—if they did not comply.

57.     Twenty-two states and the District of Columbia, including Minnesota, sued to stop USDA's unlawful demands. In October 2025, a federal district court granted a preliminary injunction, finding it likely that "the SNAP Act prohibits [States] from disclosing to USDA the information demanded in the formal warnings." *California v. USDA*, 2025 WL 2939227, at *10 (N.D. Cal. Oct. 15, 2025). The court further noted that "USDA has announced its intent to use such information in ways well beyond those permitted under [the FNA]." *Id.* The court enjoined USDA from disallowing SNAP funding based on the states' failure to comply with the unlawful demands. *Id.* at *14.

58.     Despite the preliminary injunction, USDA renewed its data demands in November and December 2025 and again threatened to withhold SNAP funding from states that did not comply. The district court issued a second preliminary injunction enjoining USDA from disallowing SNAP funding based on its renewed November and December 2025 data demands. *California v. USDA*, __ F. Supp. 3d __, 2026 WL 534417 (N.D. Cal. Feb. 26, 2026).

### b. The federal government unlawfully withholds SNAP benefits during the government shutdown.

59.     The federal government had never before tried to halt SNAP benefits during government shutdowns.

60.     But in October 2025, USDA announced it was suspending all SNAP benefits due to the then ongoing shutdown, despite having billions of dollars in contingency funding available to fund benefits. USDA posted a banner on its website blaming "Senate

Democrats" for the cessation of SNAP benefits, claiming they had done so "to hold out for healthcare for illegal aliens and gender mutilation procedures."

61.   President Trump posted on social media that "SNAP BENEFITS . . . will be given only when the Radical Left Democrats open up government, which they can easily do, and not before!"[5]

62.   Two federal district courts found that USDA's attempt to shut off SNAP benefits was likely unlawful. *See Massachusetts v. USDA*, 808 F. Supp. 3d 194, 201–04 (D. Mass. 2025) ("*Massachusetts I*"); *R.I. State Council of Churches v. Rollins*, 2025 WL 3050100, at *1–2 (D.R.I. Nov. 1, 2025).

63.   One federal district court further found it "clear that the administration is withholding full SNAP benefits for political purposes." *R.I. State Council of Churches v. Rollins*, 808 F. Supp. 3d 370, 385 (D.R.I. 2025).

### c. The federal government tries to unlawfully withhold SNAP benefits from non-citizens.

64.   On July 4, 2025, Congress passed the One Big Beautiful Bill Act (OBBB), which narrowed the categories of non-citizens eligible for SNAP. *See* Pub. L. No. 119-21, § 10108, 139 Stat. 72, 85 (2025).

65.   Four months later, on October 31, 2025, USDA issued guidance to the States that went beyond OBBB and said, for example, that refugees, those granted asylum, and others who entered the United States through humanitarian protection programs could

---

[5] Donald J. Trump (@realDonaldTrump), Truth Social (Nov. 4, 2025, at 11:06 AM), https://perma.cc/6QAN-54YU.

never be eligible for SNAP. It also said that many categories of immigrants were no longer exempt from a five-year waiting period imposed on some lawful permanent residents before they can access SNAP.

66. Twenty-one states and the District of Columbia sued to stop USDA from implementing this unlawful guidance and moved for a preliminary injunction. On December 15, 2025, a federal district court entered a preliminary injunction barring USDA from enforcing its unlawful guidance. *See New York v. Rollins*, Case No. 6:25-cv-02186-MTK (D. Or. Dec. 15, 2025) (ECF No. 64).

## VII.   THE TRUMP ADMINISTRATION TARGETS MINNESOTA AND ITS POLITICAL LEADERS.

67. The Trump Administration has unlawfully targeted Minnesota because of personal animosity toward Minnesotan politicians, disagreements with policy choices made by the Minnesota legislature, and bias against Minnesota residents of Somali descent. Indeed, in the context of litigation with Saint Paul, the Trump Administration has admitted to targeting states led by Democrats.[6]

68. Trump has repeatedly demonstrated personal animosity toward Minnesota Governor Tim Walz, the Democratic vice-presidential nominee in the 2024 election.

---

[6] Meryl Kornfield, *Trump administration admits to targeting blue states for energy grant cuts*, The Washington Post, Dec. 17, 2025, https://www.washingtonpost.com/politics/2025/12/17/blue-state-cuts-trump-grants.

69.     For example, in the wake of the assassination of former State Speaker of the House Melissa Hortman and her husband Mark Hortman, President Trump said that Governor Walz is "so whacked out, I'm not calling him."[7]

70.     President Trump has referred to Governor Walz by a crude nickname, called him a "dangerously liberal extremist," and just last month used a slur to call him "the seriously re----ed Governor of Minnesota, Tim Walz."[8] On December 1, 2025, the Trump Administration published a highly partisan missive titled, "Yes, There's Something Wrong With Walz—and it cost Taxpayers $1 Billion" on the official White House website. In that posting, the White House called Governor Walz "deeply disturbed" and falsely claimed that "the massive [Feeding our Future] scandal unfolded on Walz' watch—and he did absolutely nothing about it."[9]

71.     President Trump has also repeatedly disparaged Minnesota Congresswoman Ilhan Omar. [10]

---

[7] Cheyanne M. Daniels, *Trump won't call 'whacked out' Walz after Minnesota shooter charged*, Politico, June 17, 2025, https://www.politico.com/news/2025/06/17/trump-walz-phone-call-00410141.

[8] Zak Failla, *Trump Uses Slur Against Gov. Tim Walz in Thanksgiving Truth Social Tirade; Walz Fires Back*, Msn.com, Nov. 28, 2025, https://www.msn.com/en-us/news/politics/trump-uses-slur-against-gov-tim-walz-in-thanksgiving-truth-social-tirade-walz-fires-back/ar-AA1RllEY.

[9] The White House, *Yes, "There's Something Wrong with Walz"—and it Cost Taxpayers $1 Billion*, Dec. 1, 2025, https://www.whitehouse.gov/articles/2025/12/yes-theres-something-wrong-with-walz-and-it-cost-taxpayers-1-billion/.

[10] Dareh Gregorian, *Trump calls Ilhan Omar 'garbage' and says Somalis should 'go back to where they came from'*, NBC News, Dec. 2, 2025, https://www.nbcnews.com/politics/donald-trump/trump-calls-ilhan-omar-garbage-somalis-go-back-came-from-rcna247041.

72.     President Trump has also recently defamed Minnesota's Somali community. In November 2025, President Trump falsely claimed that Somalis were "completely taking over the once great state of Minnesota" and forming violent gangs.[11] He said they should "go back to where they came from" and "I don't want them in our country."[12]

73.     The Trump Administration has increasingly targeted Minnesota not just with words but actions.

74.     In November 2025, President Trump posted on social media that he would terminate Temporary Protected Status (TPS) for Somalis in Minnesota and shortly thereafter ordered that green cards for Somalis be reexamined, falsely claiming "[h]undreds of thousands of Somalians [sic] are ripping off our country and ripping apart that once great state."[13]

75.     In December 2025, the Trump administration launched an "intensive immigration enforcement operation primarily targeting hundreds of undocumented Somali immigrants in the Minneapolis-St. Paul region" that is still ongoing.[14]

76.     At its peak, approximately 3,000 immigration officers were deployed to Minnesota as part of "Operation Metro Surge," making it the largest immigration enforcement effort in United States history.

---

[11] *Id.*

[12] *Id.*

[13] Conor Wight, *President Trump orders green cards from Somalia, other countries of 'concern' be reexamined*, CBS Minnesota, Nov. 30, 2025, https://www.cbsnews.com/minnesota/news/trump-orders-green-cards-somalia-countries-concern-reexamined/.

[14] Hameed Aleaziz, et al., *New ICE Operation Is Said to Target Somali Migrants in Twin Cities*, N.Y. Times, Dec. 2, 2025, https://www.nytimes.com/2025/12/02/us/politics/ice-somali-migrants-minneapolis-st-paul.html.

77.     On January 7, 2026, a federal immigration agent shot and killed Renee Good, a 37-year-old Minnesota resident and U.S. citizen while conducting immigration duties in connection with Operation Metro Surge.

78.     In the wake of that killing, instead of projecting calm, President Trump made clear that federal operations in Minnesota were intentionally punitive, posting on social media "FEAR NOT, GREAT PEOPLE OF MINNESOTA, THE DAY OF RECKONING & RETRIBUTION IS COMING!"[15]

79.     On January 14, 2026, federal immigration agents shot Julio Cesar Sosa-Celis in Minneapolis. Soon thereafter, the U.S. Department of Justice indicted Mr. Sosa-Celis and another man, Alfredo Alejandro Aljorna, with assaulting a federal officer. But that prosecution quickly unraveled as it became clear the federal agents involved had lied in their testimony. The Justice Department eventually dismissed the case.[16]

80.     On January 24, 2026, federal immigration agents shot and killed Alex Pretti in Minneapolis. Without evidence, administration officials rushed to label Mr. Pretti—an

---

[15] Donald J. Trump (@realDonaldTrump), Truth Social (Jan. 13, 2026, 7:40 AM CT), https://truthsocial.com/@realDonaldTrump/posts/115888070937502023; *see also* The White House (@WhiteHouse), X (Jan. 13, 2026 8:12), https://x.com/WhiteHouse/status/2011079008205611073 ("FEAR NOT, GREAT PEOPLE OF MINNESOTA, THE DAY OF RECKONING & RETRIBUTION IS COMING!").

[16] Liz Sawyer, *Federal agents lied about why they shot a Venezuelan man in Minneapolis. Their story quickly fell apart.*, Minn. Star Tribune, Mar. 8, 2026, https://www.star-tribune.com/federal-agents-lied-about-why-they-shot-a-venezuelan-man-in-minneapolis-their-story-quickly-fell-apart/601567060.

ICU nurse at a Veteran's Administration Hospital—as a "terrorist," "lunatic," and "assassin."[17]

81. In the hours after Mr. Pretti's killing, Secretary of Defense Pete Hegseth succinctly articulated the administration's attitude toward Minnesota: "ICE > MN."[18]

82. Federal agencies have also withheld funds, demanded data, and begun new investigations of Minnesota programs at an unprecedented volume:

a. On December 1, 2025, the U.S. Department of Justice notified the Minnesota Department of Health that one of its grant programs related to health disparities was under investigation.

b. That same day, U.S. Transportation Secretary Sean Duffy purported to give Minnesota 30 days to revoke commercial driver's licenses that the U.S. Department of Transportation characterized as unlawful.

c. Also that same day, the U.S. Treasury Secretary Scott Bessent announced (via social media) that the Treasury Department would investigate claims that Minnesota tax dollars may have been diverted to terrorist organizations.

d. On or around December 2, 2025, the administrator of the U.S. Small Business Administration announced (via social media) that she was ordering an investigation based on the Feeding our Future scheme.

e. On December 4, 2025, the Administration for Children and Families division of the U.S. Department of Health and Human Services used the Feeding our Future fraud scheme as an excuse to demand Minnesota provide "the complete universe of TANF administrative data for all recipients from 2019 through 2025."

f. On December 9, 2025, the U.S. Department of Justice filed a lawsuit against Minneapolis Public Schools over the schools' collective bargaining agreement.

---

[17] David Gilbert, *The Instant Smear Campaign Against Border Patrol Shooting Victim Alex Pretti*, Wired, Jan. 24, 2026, https://www.wired.com/story/the-instant-smear-campaign-against-border-patrol-shooting-victim-alex-pretti/.

[18] Secretary Pete Hegseth (@PeteHegseth), X (Jan. 24, 2026 3:48 PM), https://x.com/PeteHegseth/status/2015180028623851750?s=20.

g.  Also on December 9, 2025, the U.S. Department of Education and U.S. Department of Health and Human Services demanded the State of Minnesota enter into an agreement by December 15, 2025 related to transgender student athletes. That communication was followed by a letter dated December 22, 2025 threatening enforcement action against the State.

h.  On December 12, 2025, the federal government sent six separate letters to the State of Minnesota demanding a large volume of data (including names, dates of birth, SSNs, and addresses) related to the following separate programs: Refugee Cash Assistance, Refugee Medical Assistance, Child Care and Development Fund program, Community Services Block Grant program, Social Services Block Grant program, Low Income Energy Assistance Program, Parents in Community Action program, Head Start, and Title IV-E funding. That same day the federal government sent two more letters to other Minnesota recipients, including Minneapolis Mayor Jacob Frey.

i.  On December 15, 2025, the U.S. Department of Labor sent a letter to the Minnesota Department of Employment and Economic Development stating it would conduct an onsite visit in January 2026 to investigate alleged fraud.

j.  On December 30, 2025, the Administration for Children and Families (ACF) announced it was withholding childcare funding from Minnesota.

k.  On January 6, 2026, ACF announced it was withholding Temporary Assistance for Needy Families funding from Minnesota.

l.  Also on January 6, 2026, the Centers for Medicare & Medicaid Services announced it was withholding over $2 billion in annual funding for Minnesota's Medicaid program.

m.  On January 9, 2026, the Department of Homeland Security and U.S. Citizenship and Immigration Services announced the launch of "Operation PARRIS" in Minnesota, which targeted refugees—people lawfully admitted to the United States—for arrest and detention.

n.  On February 4, 2026, news media reported that the White House instructed the Centers for Disease Control and Prevention (CDC) to cut funding to Minnesota and three other Democrat-led states.[19] Shortly thereafter, the Trump

---

[19] Josh Christenson, *White House Instructs DOT, CDC to cut $1.5B in grants for Dem states, citing 'waste and mismanagement'*, N.Y. Post, Feb. 4, 2026, https://nypost.com/2026/02/04/us-news/white-house-instructs-dot-cdc-to-cut-1-5b-in-woke-green-grants-for-dem-states/.

Administration announced it was terminating two CDC grants to Minnesota with over $38 million remaining to be paid.

o. On February 25, 2026, Vice President JD Vance announced the Trump Administration was withholding $259 million in funding for Minnesota's Medicaid program.

## VIII. DEFENDANTS ATTEMPT TO UNLAWFULLY TERMINATE SNAP AND GRANT FUNDING TO MINNESOTA.

### a. The Trump Administration threatens to terminate SNAP in Minnesota unless Minnesota complies with unlawful, impossible demands.

83. On December 16, 2025, Secretary Rollins sent a letter (the "Recertification Letter") to Governor Walz asserting there is "highly publicized and ongoing fraud affecting federally funded benefits in the State of Minnesota[.]" (Ex. 1.) The only support for this assertion, as with many of the actions described above, was the "Feeding Our Future" fraud, which occurred in approximately 2020–21 during the COVID-19 pandemic and did not involve SNAP. (*Id.*)

84. Secretary Rollins stated that "USDA is hereby requiring Minnesota to participate in a Supplemental Nutrition Assistance Program (SNAP) pilot project, conducted pursuant to 7 U.S.C. § 2026(b)(1)(A), to increase the efficiency of SNAP and improve the delivery of SNAP benefits to eligible households." (*Id.*) She claimed that "[m]ore accurate certifications of eligibility for SNAP benefits will ensure that those in need receive assistance, raising levels of nutrition among low-income individuals." (*Id.*)

85. Secretary Rollins stated the "pilot project" required Minnesota to take various actions, including recertifying all SNAP households in Hennepin, Ramsey,

21

Washington, and Wright counties (the "Recertification Counties") within 30 days of receipt of the letter (i.e. by January 15, 2026). (*Id.*)

86.     The Recertification Letter imposes new requirements for this recertification process that go beyond what is required by USDA's regulations during the typical recertifications every household must complete at regular intervals.

87.     It states that Minnesota must "account[] for the income and resources of any excluded household members, conduct[] in-person interviews, and us[e] federal eligibility tools like the improved, cost-free Systematic Alien Verification for Entitlements (SAVE) Program database." (*Id.*)

88.     The Recertification Letter threatens that "[f]ailure to participate in this pilot project as specified by USDA will trigger noncompliance procedures codified in 7 U.S.C. § 2020(g). It may also affect Minnesota's continued participation in SNAP." (*Id.*)

89.     Defendants had no legal basis to impose these requirements on Minnesota or to penalize Minnesota for not complying with them. And as discussed below, DCYF and the Recertification Counties determined compliance would be impossible in any event. Minnesota therefore sued Defendants on December 23, 2025 and shortly thereafter sought a preliminary injunction enjoining Defendants from taking any adverse action against Minnesota based on the Recertification Letter.

90.     Secretary Rollins trumpeted the Recertification Letter with a taunting tweet to Governor Walz that seemed to emphasize the inadequate time she had provided for the

22

recertifications:[20]



b. **Defendants retaliate against Minnesota for suing by terminating grant funding.**

91.     On January 9, 2026, Secretary Rollins sent a letter (the "Awards Termination Letter") to Minnesota Governor Tim Walz and Minneapolis Mayor Jacob Frey stating that

[20] Secretary Brooke Rollins (@SecRollins), Twitter (Dec. 16, 2025 at 12:51 p.m.), https://x.com/SecRollins/status/2001002163900932248.

"effective immediately," she was "suspending payments on all active awards and any future awards from USDA to the State of Minnesota and the City of Minneapolis, currently totaling over $129.18 million." (Ex. 2.)

92.     The Awards Termination Letter alleged there was "widespread and systemic fraud associated with federal benefit programs in the State of Minnesota and the City of Minneapolis[.]" (*Id.*) In support, the letter referenced the "Feeding Our Future" and recent unsubstantiated allegations of fraud, including those stemming from a right-wing influencer's YouTube video. (*Id.*)

93.     The Awards Termination Letter did not allege any fraud in connection with the "awards" that the letter suspends payment on. The letter did not even identify any "awards" subject to these actions.[21]

94.     The Awards Termination Letter cited the fact that Minnesota had asserted its legal rights in this lawsuit as a reason for suspending "all active awards and any future awards," stating "rather than confirm your SNAP rolls are accurate to prevent continuing fraud, you asked the courts to block USDA's directive to recertify the State's SNAP recipients." (*Id.*)

95.     The Awards Termination Letter cited no legal authority permitting Defendants to suspend "all active awards and any future awards." (*Id.*)

---

[21] At the preliminary injunction hearing in this case, Defendants' counsel clarified that the "awards" referenced in the letter did not concern SNAP benefits or administrative costs but "all grants to Minnesota," including "grants to universities, to do agricultural research and other things." (Jan. 14, 2026 Tr. at 23–24, 50.)

24

**c. Defendants attempt to evade judicial review by cutting Minnesota SNAP funding immediately before the preliminary injunction hearing.**

96. Minnesota filed this suit on December 23, 2025 and informed Defendants' counsel that same day that they intended to move for preliminary relief.

97. Minnesota filed its motion for a preliminary injunction on December 30, 2025. As discussed above, the Recertification Letter threatened to take actions including withholding SNAP administrative funds if Minnesota did not comply with the letter's demands by January 15, 2026. Minnesota therefore requested that this Court hold a hearing early enough to permit it to issue a decision by January 15. At Defendants' request, the Court set the hearing for January 14.

98. On January 14, 2026, just minutes before the preliminary injunction hearing began, Defendants' counsel handed Plaintiff's counsel a letter dated January 14, 2026 from Secretary Rollins addressed to Governor Walz (the "Enforcement Letter") stating that effective "immediately," Defendants were withholding SNAP administrative funding from Minnesota. (Ex. 3.)

99. Defendants had given Minnesota until January 15 to comply with the Recertification Letter before cutting administrative funding and had known for weeks that Minnesota was seeking a preliminary injunction barring them from withholding SNAP administrative funding. But they attempted to evade judicial review by withholding those funds before the deadline they had set and before the Court had an opportunity to decide the motion.

100.   The Enforcement Letter claims there are "allegations" of fraud in Minnesota without providing additional detail. It states:

> FNS regularly analyzes all available data, including data received from States, in its efforts to eliminate fraud. Though Minnesota has not provided FNS with requested State-level data, FNS has undertaken a review of available reporting, data, and other open-source information to assess fraud indicia related to the Supplemental Nutrition Assistance Program (SNAP). This review's findings will inform prompt action under a new pilot project, which the Secretary[22] establishes pursuant to 7 U.S.C. § 2026(b)(1)(A).

101.   As discussed above, a federal district court determined it would likely violate federal law for Minnesota to turn over the "requested State-level data" referenced in the Enforcement Letter, and that court enjoined Defendants from disallowing SNAP administrative funding from Minnesota for not providing the data. *California*, 2025 WL 2939227, at *10, 14.

102.   The Enforcement Letter did not state what reporting, data, and open-source information FNS had reviewed to assess fraud and did not share the "findings" that purportedly "inform[ed] prompt action." (Ex. 3.)

103.   The Enforcement Letter vaguely stated that "Minnesota's persistent and public indifference to an ongoing fraud and an unwillingness to comply with safeguards against fraud constitute a pattern for purposes of 7 U.S.C. § 2020(g)" but did not did not identify any specific actions or nonactions by Minnesota.

104.   As discussed above, the FNA and its regulations contain procedures for withholding SNAP administrative funding from a State agency for noncompliance with the

---

[22] Secretary Rollins refers to herself in the third person throughout the Enforcement Letter.

26

FNA. These procedures require FNS to particularly identify the alleged deficiencies, to issue an advance warning followed by a formal warning, and to provide opportunities after each for the state to correct any deficiencies before funds are withheld. *See* 7 U.S.C. § 2020(g); 7 C.F.R. § 276.4.

105.    The Compliance Letter did not provide these warnings or permit Minnesota any opportunity to correct its alleged failure. As described above, the Compliance Letter did not even identify the alleged failure. Instead, the Compliance Letter states that "FNS immediately withholds the Federal government's portion of Minnesota's administrative costs for the first quarter of calendar year 2026 and concurrently seeks immediate corrective action." (Ex. 3.)

106.    The Enforcement Letter acknowledged the FNA's procedures for withholding administrative funds but claimed the Secretary was "waiving" them under the guise of "a new pilot project…pursuant to 7 U.S.C. § 2026(b)(1)(A)." (Ex. 3.) The letter states:

> In previous, less severe instances of noncompliance, States typically have a longer opportunity for corrective action after formal notice and an administrative process to contest a suspension of payments for administrative costs. However, pursuant to the Secretary's authority in 7 U.S.C. § 2026(b)(1)(A), and with particular attention to the policy objective codified in 7 U.S.C. § 2020(g), this pilot project modifies these administrative procedures to accelerate corrective action and more promptly address the significant fraud concerns in Minnesota, as well as to improve the integrity, efficiency, and delivery of SNAP to eligible households.

(*Id.*)

### d. This Court enters a preliminary injunction enjoining Defendants from enforcing the Recertification Letter or Enforcement Letter.

107.    On January 14, 2026, this Court entered a preliminary injunction from the bench enjoining Defendants from taking any adverse action against Minnesota based on

the Recertification Letter or from withholding SNAP administrative funding from Minnesota as threatened in the Enforcement Letter. On January 16, 2026, this Court entered a written order further explaining its decision. (ECF No. 44.)

## IX.   DEFENDANTS ATTEMPT TO IMPOSE AN IDENTICAL RECERTIFICATION "PILOT PROJECT" ON COLORADO.

108.   Defendants have attempted to impose this recertification "pilot project" on only one other state: Colorado.

109.   On December 17, 2025, Defendants sent Colorado Governor Jared Polis a letter nearly identical to the Recertification Letter they sent to Governor Walz (the "Colorado Letter"). (Ex. 4.)

110.   The Colorado Letter purports to require Colorado to recertify all SNAP households in five counties within 30 days using the same procedures specified in Minnesota's Recertification Letter. The five counties are all in metropolitan Denver and include over 100,000 SNAP households.

111.   Colorado, like Minnesota, has been a frequent target of the Trump Administration in recent months.

112.   On March 16, 2026, the U.S. District Court for the District of Colorado issued a written order granting a preliminary injunction enjoining the USDA from enforcing the Colorado Letter. *See Colorado v. Trump*, __ F. Supp. 3d __, 2026 WL 734048 (D. Colo. Mar. 16, 2026).

113.   In that order, the court described the Colorado Letter as part of a broader effort by the Trump Administration "to punish Colorado":

28

Although Colorado was not forewarned, the Recertification Letter did not arrive in a vacuum. On December 11th, President Trump announced that he had pardoned former Mesa County Clerk and Recorder Tina Peters for her convictions of state crimes related to her efforts to breach Colorado voting machines and election data. Later that week, at an Oval Office media event, the President attacked "weak and pathetic" Governor Polis for not releasing Ms. Peters.

The following week, the Trump Administration launched a barrage of threats and actions designed, by all appearances, to punish Colorado: terminating $109 million in Department of Transportation funds, signaling the cancellation of $615 million in Department of Energy funds, announcing a plan to dismantle the National Center for Atmospheric Research in Boulder, and denying two requests from the State for disaster relief assistance. The December 17th Recertification Letter directing Colorado to participate in the pilot project arrived amid this flurry.

*Id.* at *6 (internal citations omitted).

114.   The court found that "the pilot project plainly violates the statutes and regulations governing SNAP, the Constitution, and is contrary to reasoned and reasonable agency decision-making," finding it "unlawful many times over." *Id.* at *1.

115.   Among other things, the court found the pilot project to be arbitrary and capricious because it "seems to be about punishment and nothing more." *Id.* at *18. The court noted it "need not turn a blind eye to the fact that the Recertification Letter arrived during a week of apparent punishments and threats aimed at Colorado, nor that the identical Minnesota Letter was accompanied by a taunting social media post from the Secretary," stating "[t]his larger context gives the game away[.]" *Id.*

29

**X.    THE RECERTIFICATION LETTER IS ARBITRARY AND CAPRICIOUS, UNLAWFUL, AND WOULD INFLICT IRREPARABLE HARM ON MINNESOTA.**

**a.  The Recertification Letter's stated reasons for imposing the "pilot project" are unreasoned and unsupported.**

116.   The Recertification Letter does not even allege, must less provide evidence of, any SNAP fraud in Minnesota or the Recertification Counties.

117.   Instead, the letter cites the Feeding Our Future fraud as the reason for singling out Minnesota for this "pilot project." (Ex. 1.) That pandemic-era scheme targeted a different food relief program that allowed organizations to receive reimbursement for large-scale distribution of prepared meals they claimed to be providing to school children.

118.   The Feeding Our Future perpetrators exploited the COVID-19 pandemic to enrich themselves between 2020 and January 2022, with some individuals stealing tens of millions of dollars to enrich themselves. That was possible because the Federal Child Nutrition Program, as designed by the federal government, permitted large reimbursements based on claimed headcounts and tally sheets, and relied on the veracity of sponsoring organizations rather than individual identifying information.

119.   But it would be exceedingly difficult to perpetrate a similar scheme via SNAP recipient fraud. Although there have been instances nationwide of significant SNAP frauds, these schemes have involved retailer fraud or wrongdoers skimming or stealing SNAP recipient's card numbers and draining the accounts.[23] Here, the proposed "pilot

---

[23] *See, e.g.,* U.S. Government Accountability Office, *Stolen SNAP Benefits Cost Beneficiaries Millions*, Dec. 2, 2025, https://www.gao.gov/blog/stolen-snap-benefits-cost-

project" does nothing to discover these types of fraud. The "pilot project" targets only SNAP recipient fraud. Recipient fraud occurs when people, for example, lie about their income or identity or sell benefits for cash. The amount of information gathered at the time of application and recertification reduces the opportunities for wide-scale fraud, and the relatively modest amounts available make such schemes less lucrative, requiring far more work to steal less money. SNAP households in Minnesota receive, on average, $314 in benefits per month.

120. The large-scale Feeding Our Future fraud, which ended years ago and involved non-profits and shell companies lying about the number of children they were feeding to reap hundreds of millions of dollars, simply provides no reason to believe individuals in Minnesota are committing SNAP recipient fraud at greater rates than the rest of the nation in order to obtain an average of $314 in food benefits per month.

121. Even if the Recertification Letter had provided any reason to believe there was widespread SNAP beneficiary fraud in Minnesota—which it doesn't—it still fails to explain why it was this "pilot project" would address that supposed fraud.

122. For example, the Recertification Letter does not state why or how Defendants selected the Recertification Counties.

---

beneficiaries-millions; Neal Riley, *2 Massachusetts store owners charged in $7 million SNAP fraud case*, CBS News, Dec. 17, 2025, https://www.cbsnews.com/boston/news/snap-massachusetts-fraud-boston/; Madeline Bartos, *7 charged in Pennsylvania SNAP trafficking operation that stole $775k*, CBS Pittsburgh, Dec. 18, 2025, https://www.cbsnews.com/pittsburgh/news/pennsylvania-snap-trafficking-operation/?intcid=CNR-01-0623.

123.    Nor does the Recertification Letter explain why Defendants prescribed accelerated recertifications using in-person interviews to address the supposed fraud. As described below, these procedures are likely to *harm* Minnesota's ability to detect and remedy fraud.

124.    The Recertification Letter does not explain why only 30 days are given to complete the recertifications, with no opportunity for advance planning. Secretary Rollins's taunting tweet to Governor Walz seemed to emphasize the inadequate time provided. ("Tick. Tock. ⏰ ").

125.    The Recertification Letter fails to even consider the operational burdens imposed by the "pilot project," which are discussed below.

126.    Nor does the Recertification Letter even consider the significant reliance interests of Minnesota, DCYF, the Recertification Counties, and Minnesota's SNAP beneficiaries, all of whom rely on and have invested in SNAP being run as provided in the FNA and USDA's regulations.

### b. The Recertification Letter's demands are impossible to comply with.

127.    Approximately 98,000 households and 191,000 individuals receive SNAP benefits in the Recertification Counties, constituting approximately 45% of SNAP households statewide. It would have been impossible to recertify them within 30 days of receipt of the Recertification Letter even using the normal recertification process required by 7 C.F.R. § 273.14.

128.    But that process was made significantly more onerous by requiring in-person interviews. USDA's regulations recognize that in-person interviews often impose

32

unnecessary burdens. *See* 7 C.F.R. § 273.2(e)(2). The USDA therefore encourages State agencies to permit telephone interviews, *see id.* § 273.14(b)(1)(iii), and it requires State agencies to permit telephone interviews in cases of "household hardship," which must include, at a minimum, "illness, transportation difficulties, care of a household member, hardships due to residency in a rural area, prolonged severe weather, or work or training hours that prevent the household from participating in an in-office interview." *Id.* §§ 273.14(b)(3), 273.2(e)(2).

129.  The Recertification Counties lack adequate physical space for the number of in-person interviews required by the Recertification Letter. Privacy and confidentiality would both be compromised. *See* 7 C.F.R. § 273.2(3)(1) ("Facilities must be adequate to preserve the privacy and confidentiality of the interview.").

130.  Even if adequate office space existed, Minnesota and the Recertification Counties cannot compel households to appear for interviews. USDA's regulations provide that "State agencies may not require households to report for an in-office interview during their certification period[.]" 7 C.F.R. § 273.2(e)(1). "For example, State agencies may not require households to report en masse for an in-office interview during their certification periods simply to review their case files, or for any other reason." *Id.*

131.  Home visits are not viable either. In addition to requiring significantly more resources, USDA's regulations prohibit home-based interviews unless a household meets specified hardship criteria and requests an in-home interview. 7 C.F.R. §§ 273.2(e)(2), 273.14(b)(3).

33

132.    The USDA requires Minnesota to provide at least one month's notice before recertifications, 7 C.F.R. § 273.14(B)(1)(I), and Minnesota's practice is to provide 45 days' notice. Neither would have been possible here.

133.    Simply notifying recipients of the need for unexpected recertifications and scheduling in-person interviews involves significant work. DCYF did not have enough copies of the required notice forms in stock to send to all households in the Recertification Counties at once. Even if it did, printing and sending them and scheduling nearly 100,000 in-person interviews would take significant time.

134.    And it is difficult to communicate with many recipients. For example, many recipients are homeless and receive mail via General Delivery, which often involves a significant delay between when mail is sent and when it is received.

135.    USDA regulations require Minnesota to schedule interviews so that a household has at least 10 days following the interview to provide verification documents for the recertification. 7 C.F.R. § 273.14(B)(3)(iii). So to complete recertifications by January 15, 2026, the latest an interview could have occurred was January 5.

136.    Conducting nearly 100,000 in-person interviews was made even more difficult by the fact that USDA required this to happen in the heart of the Minnesota winter, a time with frequent severe weather and inability to travel.

137.    Moreover, the thirty-day period from December 16, 2025 to January 15, 2026 includes three major holidays (Christmas, Hannukah, and New Year's Day). Indeed, that period includes some of the most important holidays of the year for many Minnesotans,

often involving travel, planned time away from work, and important family obligations, limiting the availability of both employees and recipients to complete the recertifications.

138.    So in reality, the time for completing nearly 100,000 interviews was significantly shorter than thirty days because interviews could not have begun immediately upon receipt of the letter on December 16 but could only have been scheduled over time with significant effort by county staff and cooperation by recipients. The interviews would have needed to be completed within twenty days after receipt of the letter to provide households with sufficient time to provide verification documents, and the timeframe was further reduced by the holiday season.

139.    The mandated recertifications and in-person interviews were further complicated by the fact that the USDA ordered this to occur while the U.S. Department of Homeland Security (DHS), including officers from U.S. Immigration and Customs Enforcement (ICE)  and U.S. Customs and Border Patrol (CBP), engaged in "Operation Metro Surge" in the Twin Cities.

140.    It has been widely reported that DHS is engaging in racial profiling by stopping and detaining people of color regardless of citizenship or immigration status.[24] Indeed, a judge in this district recently determined in Operation Metro Surge, DHS adopted a policy permitting officers to stop people "based on ethnicity or race without reasonable suspicion

---

[24] *See, e.g.,* Emmy Martin et al., *Racial profiling concerns grow as ICE expands presence in Twin Cities*, Minn. Star Tribune, Dec. 18, 2025, https://www.startribune.com/racial-profiling-concerns-grow-as-ice-expands-presence-in-twin-cities/601545116.

that the individuals were violating immigration laws." *Hussen v. Noem*, __ F. Supp. 3d __, 2026 WL 657936, at *37 (D. Minn. Mar. 9, 2026).

141.    Predictably, many residents have been afraid to leave their homes, including citizens and others with lawful status.[25] The Recertification Counties include the Twin Cities and the metropolitan area that DHS is targeting. In-person interviews would have been made more difficult by the fact that individuals in many qualifying households—including people of color or those in mixed-status households[26]—were already fearful of leaving their homes and would have been particularly fearful of meeting with a government official during ongoing DHS activity.

---

[25] *See, e.g.,* Jason Rantala, *Trump's immigration policies are hurting Minneapolis small businesses, owners say*, CBS Minnesota, Dec. 16, 2025, https://www.cbsnews.com/minnesota/news/trump-immigration-minneapolis-small-business-impact/ ("The Trump administration's increased immigration enforcement has made many Twin Cities residents afraid to leave their homes"); Nina Moini & Aleesa Kuznetsov, *'People seek our food to feel close to home': Minneapolis chef says ICE fears hurt business*, Dec. 17, 2025, https://www.mprnews.org/episode/2025/12/17/people-seek-our-food-to-feel-close-to-home-minneapolis-chef-says-ice-fears-hurt-business ("[P]eople that look like us…are afraid to go out because they're going to be racially profiled. They might get kidnapped with no reason."); Tesfaye Negussie & Sabina Ghebremedhin, *Somalis in Minnesota say ICE agents already targeting their community*, ABC News, Dec. 8, 2025, https://abcnews.go.com/US/somalis-minnesota-ice-agents-targeting-community/story?id=128080449 ("[Minneapolis City Council member Jamal Osman] said that people are afraid to leave their houses, and he is advising those of Somali descent to carry passports everywhere they go.").

[26] "Mixed-status households" are those where at least one member is not eligible for SNAP because of his or her immigration status. These often include one or more parents without lawful presence who have U.S. citizen children. Mixed-status households are still eligible for SNAP. *See* 273.11(c)(3).

142.   Indeed, one DHS tactic is to arrest Minnesota residents at county courthouses when they appear for hearings.[27] Even if Minnesota and the Recertification Counties could have assured recipients that state and county employees presented no risk of unlawful immigration enforcement, they could not have assured them that DHS would not target recipients appearing for mandatory interviews.

143.   Attempting to complete this mammoth process in the timeframe provided would have required the Recertification Counties to redirect all available staff to working exclusively on SNAP recertifications, causing harm to county residents who need assistance with other programs or services.

144.   The Recertification Counties would also have experienced significant human resources and labor relations issues by attempting to demand that their staffs complete this impossible task.

145.   Further, recertifications must occur on a regular cadence. *See* 7 C.F.R. §§ 273.10(f), 273.14(a). Recertifying all existing households in a thirty-day period creates a recurring glut of recertifications at regular intervals for years to come. The Recertifying Counties would likely need to hire additional staff to repeat those recertifications despite the fact those additional staff would be unnecessary most of the year.

---

[27] *See, e.g.,* Katrina Pross, *ICE arrests target immigrants at Hennepin County courthouse, causing 'immense' anxiety*, Sahan Journal, January 28, 2025, https://sahanjournal.com/public-safety/ice-arrests-minneapolis-hennepin-county-courthouse/; Jeff Day, *Federal agents make a chaotic arrest at downtown Minneapolis courthouse amid swarm of lawyers, observers*, Minn. Star Tribune, Feb. 10, 2026, https://www.startribune.com/federal-agents-make-a-chaotic-arrest-at-downtown-minneapolis-courthouse-amid-swarm-of-lawyers-observers/601579880.

### i.  *Hennepin County*

146.   As of November 2025, Hennepin County had 54,316 active SNAP households, including 86,987 individuals.

147.   Hennepin County typically processes about 4,500 to 5,500 recertifications each month. The Recertification Letter would have required it to process roughly ten times that normal volume.

148.   Hennepin County officials determined it was not possible for them to comply. Hennepin County did not have enough available staff members with the necessary expertise to perform 54,316 recertifications in 30 days.

149.   Redirecting all available staff members to SNAP recertifications would have required Hennepin County to halt other critical work, including:

a.  Staffing telephone lines for SNAP and cash assistance recipients (which receive approximately 80,000 calls per month);

b.  Processing new applications, changes, or updates for SNAP and cash assistance programs;

c.  Regular work in Quality, Training, Appeals, Technology, Emergency Assistance and Emergency General Assistance, and Housing Support; and

d.  All onsite services other than SNAP recertification (Hennepin County sees about 10,000 residents onsite per month).

### ii.  *Ramsey County*

150.   As of November 2025, Ramsey County had approximately 34,000 active SNAP households, including 58,131 individuals.

151. Ramsey County typically processes about 2,800 recertifications each month. The Recertification Letter would have required it to process over twelve times that normal volume.

152. Ramsey County officials determined it was not possible for them to comply. Ramsey County did not have enough available staff members with the necessary expertise to perform 34,000 recertifications in 30 days.

153. Redirecting all available staff members to SNAP recertifications would have required Ramsey County to halt other work, including for other critical services, such as:

   a. Staffing telephone lines for SNAP and cash assistance recipients (which receive approximately 10,000 calls per month);

   b. Processing new applications, changes, or updates for SNAP and cash assistance programs;

   c. Regular work in Quality, Training, Appeals, Technology, Emergency Assistance and Emergency General Assistance, and Housing Support; and

   d. All onsite services other than SNAP recertification (Ramsey County sees about 5,000 residents onsite per month).

### iii. *Washington County*

154. As of December 2025, Washington County had 5,447 active SNAP households, including 10,394 individuals.

155. Washington County typically processes about 600 recertifications each month. The Recertification Letter would have required it to process approximately nine times that normal volume. Washington County officials determined it was not possible for them to comply.

39

156. Washington County determined that attempting to comply would have over-whelmed its staff capacity, increased processing errors, undermined its ongoing efforts to identify SNAP fraud, and caused eligible households to lose SNAP benefits.

#### iv. *Wright County*

157. As of December 2025, Wright County had 2,861 active SNAP households, including 5,522 individuals.

158. Wright County typically processes about 300 recertifications each month. The Recertification Letter would have required it to process nearly ten times that normal volume. Wright County officials determined it was not possible for them to comply.

159. Wright County determined that attempting to comply would have over-whelmed its staff capacity, increased processing errors, undermined its ongoing efforts to identify SNAP fraud, and caused eligible households to lose SNAP benefits.

#### c. The Recertification Letter would undermine Minnesota's efforts to identify SNAP fraud.

160. There is no reason to believe that the proposed "pilot project" would have been successful in discovering SNAP fraud. USDA offers no evidence of any fraud among Minnesota's SNAP beneficiaries.

161. In addition, SNAP households are already recertified at regular intervals. There is no reason to believe that this process would have discovered fraud that would not be discovered at a household's next scheduled recertification.

162. Nor has USDA provided any reason to believe that in-person interviews are more effective at detecting fraud than the telephone interviews that are typically used.

163.     In fact, conducting recertifications at the frantic pace USDA demanded would be *less* effective at detecting fraud than conducting recertifications as they come due, when employees have the time and resources necessary to complete them thoroughly.

164.     The "pilot project" would have required the Recertification Counties to recertify even those households that were recently recertified. For instance, a household that was recertified on December 15 would have needed to be recertified *again* sometime between December 16 and January 15. Repeating that same process is exceedingly unlikely to detect fraud and is a poor use of resources.

165.     In fact, the "pilot project" would likely have *harmed* Minnesota's ability to detect SNAP beneficiary fraud. DCYF and the Recertification Counties would have been forced to divert all available resources to recertification efforts at the expense of the Fraud Prevention Investigation program and other tools more useful for discovering fraud than recertifications.

### d. The Recertification Letter does not comply with the statutory and regulatory requirements for Section 2026 projects.

166.     The proposed "pilot project" does not comply with many of the statutory and regulatory requirements for Section 2026 projects.

167.     The Recertification Letter's pilot project is impermissible because it contravenes SNAP's core objective of "providing food assistance to raise levels of nutrition among low-income individuals[.]" 7 U.S.C. § 2026(b)(1)(B)(i)(I). The project all but guarantees that eligible households will lose benefits because of the administrative challenges imposed by the Recertification Letter.

41

168.    For the same reason, the Recertification Letter's pilot project violates the prohibition on Section 2026 projects that "den[y] assistance to an otherwise eligible household or individual if the household or individual has not failed to comply with any work, behavioral, or other conduct requirement[.]" *Id.* § 2026(b)(1)(B)(iv)(III)(bb).

169.    Congress restricted "[p]ermissible projects" to those intended to "improve program administration," "increase the self-sufficiency of [SNAP] recipients;" "test innovative welfare reform strategies," or "allow greater conformity with the rules of other programs than would be allowed but for this paragraph." 7 U.S.C. § 2026(b)(1)(B)(ii). This "project" is none of these. Forcing the Recertification Counties to abandon all other SNAP-related work (e.g. processing applications, changes, and appeals) and do a year's worth of recertification work in just 30 days with no reason to believe it will catch more fraud than performing recertifications on their usual timeline does not "improve program administration," it harms it tremendously.

170.    The Recertification Letter makes no provision for an "evaluation to determine the effects of the project," as required by law. 7 U.S.C. § 2026(b)(1)(B)(i)(II).

171.    The proposed "pilot project" is an "impermissible" Section 2026 project because it is "inconsistent" with the FNA's requirements that Minnesota "provide timely, accurate, and fair service" to SNAP applicants and participants and that it "develop an application containing the information necessary to comply" with federal law. *Id.* §§ 2026(b)(1)(B)(iv)(III)(ff), 2020(e)(2)(B).

172.    Among other things, the "pilot project" would be inconsistent with these requirements because it would require Minnesota (1) to end SNAP recipients' certification

42

periods before their assigned termination dates, (2) to terminate certification periods for reasons unrelated to the recipient's eligibility or conduct, and (3) to provide inadequate notice to households of the ending of their certification periods, all in violation of the FNA and its regulations. *See* 7 U.S.C. § 2020(e)4); 7 C.F.R. §§ 273.10(f), 273.10(g)(1)(i)(A).

173.    The "pilot project" is also an "impermissible" Section 2026 project because it is "inconsistent" with other provisions of the FNA. *See* 7 U.S.C. § 2026(b)(1)(B)(iv)(III)(hh).

174.    In particular, it is inconsistent with the requirement that USDA pay half of a state's SNAP administrative costs. *See id.* § 2025(a). The Recertification Letter threatened to withhold these funds, and the Enforcement Letter did in fact withhold them.

175.    The "pilot project" further violates USDA's regulation requiring that Section 2026 projects that are likely to have "a significant impact on the public" must first be published in the Federal Register 30 days before the project begins. 7 C.F.R. § 282.1(b).

176.    This project would clearly have a significant impact on the public: it would require nearly 100,000 households to recertify out of schedule, without adequate notice, and to submit to in-person interviews. Yet Defendants did not provide the required notice or accept comments on the proposed project.

   **e.  The Recertification Letter is outside the scope of Defendants' authority.**

177.    Defendants exceeded their authority in issuing the Recertification Letter because the Recertification Letter's demands require Minnesota to violate federal laws and regulations.

178. The Recertification Letter would require Minnesota to violate several statutory and regulatory provisions. For example, as discussed above, federal law prohibits Minnesota from, for example, terminating SNAP recipients' certification periods early, providing them with inadequate notice of the termination, or requiring them to submit to in-person recertification interviews.

179. The Recertification Letter would also require Minnesota to violate its FNS-approved State Plan of operation, in violation of statute and regulation. *See* 7 U.S.C. § 2020(g); 7 C.F.R. § 276.1.

180. Defendants claim they can impose these obligations on Minnesota because the Secretary may waive certain requirements of the FNA in connection with Section 2026 projects. There are several problems with this claim.

181. First, as discussed above, the Recertification Letter violates several requirements for Section 2026 projects. The Recertification Letter is not a valid Section 2026 project.

182. Second, participation in Section 2026 projects is optional. Defendants cannot compel states to participate in Section 2026 projects. Before the Recertification Letter, USDA had never before attempted to compel participation in a Section 2026 project. The Enforcement Letter and Colorado Letter are the only other attempts the USDA has ever made to compel participation in Section 2026 projects by unwilling participants.

183. Third, Defendants' authority to "wave any requirement" of the FNA explicitly refers to waivers *requested* by a state participating in a Section 2026 project. *See*

44

7 U.S.C. § 2026(b)(1)(D)(i). It does not allow Defendants to "waive" all statutory provisions relating to SNAP when *creating* a Section 2026 project.

184.    Fourth, even if Defendants *could* waive certain requirements here (which they cannot for the reasons above), they have not in fact done so. When Defendants provide waivers in connection with Section 2026 projects, they provide formal, specific notice of those waivers. They have not done so here.

185.    Fifth, Defendants' authority in Section 2026 projects is limited to waiving requirements; they cannot impose new ones. Even if, for example, Defendants could have waived the prohibition on terminating certification periods early and other legal impediments, those waivers might have *permitted* Minnesota to recertify all households in the Recertification Counties within 30 days of receiving the Recertification Letter but would not have *required* Minnesota to do so.

186.    Sixth, nothing in the FNA permits Defendants to withhold SNAP administrative funds or disqualify Minnesota from participating in SNAP for refusing to participate in a Section 2026 project. The FNA permits Defendants, after following certain procedures, to withhold administrative funds only because of a "pattern of lack of compliance" with the FNA or its regulations (or with certain state plans). 7 U.S.C. § 2020(g). Minnesota's refusal to perform the tasks demanded in the Recertification Letter does not violate the FNA or its regulations; in fact, complying with those demands would violate the FNA and its regulations.

187.    Defendants claim an extraordinary power: the ability to rewrite the FNA and its regulations at will, without notice, merely by calling it a Section 2026 "pilot project."

45

That power would subsume all of the FNA, resulting in only a requirement that the USDA and the Secretary may implement SNAP as they please. Congress did not—and could not—grant Defendants that extraordinary ability.

### f. The Recertification Letter violates the APA's procedural requirements.

188.   The Administrative Procedures Act (APA) requires notice-and-comment procedures before an agency may promulgate a legislative rule. *See* 5 U.S.C. § 533.

189.   The Recertification Letter is a legislative rule because it purports to impose new duties on Minnesota, backed with the threat of sanctions. *See Iowa League of Cities v. E.P.A.*, 711 F.3d 844, 873 (8th Cir. 2013).

190.   Defendants violated the APA by promulgating the Recertification Letter without observing required notice-and-comment procedures.

### g. The Recertification Letter improperly punishes Minnesota for partisan reasons.

191.   As discussed above, the Trump Administration has repeatedly singled out Minnesota and its leaders in recent months for disparagement and ridicule.

192.   Those statements have been accompanied by an unprecedented bevy of actions taken against Minnesota, with the President himself warning the "people of Minnesota" that "THE DAY OF RECKONING & RETRIBUTION IS COMING!"

193.   Those actions include withholding massive amounts of federal funding from Minnesota with no legal basis, supposedly premised on nonspecific fraud allegations.

194.   They also include a massive influx of immigration officers who engaged in widespread unlawful behavior, and who shot and killed two Minnesotans.

46

195.     The Recertification Letter arrived in the midst of these remarkable punitive actions against Minnesota, accompanied by a taunting tweet from Secretary Rollins to Governor Walz.

196.     This Court cannot not "ignore the disconnect between the decision made and the explanation given." *Dep't of Comm. v. New York*, 588 U.S. 752, 785 (2019). Defendants attempted to impose the Recertification Letter upon Minnesota as punishment, plain and simple. *See Colorado*, 2026 WL 734048, at *18 ("the pilot project seems to be about punishment and nothing more"); *see also Level the Playing Field v. FEC*, 961 F.3d 462, 464 (D.C. Cir. 2020) ("decisions featuring unjustifiable bias or partisanship are precisely the types of agency actions that 'would work a violation of the arbitrary-and-capricious standard"); *R.I. State Council*, 808 F. Supp. 3d at 384–86 (rejecting USDA's reasons for suspending SNAP benefits as "pretext" and finding "SNAP benefits are being withheld for political reasons").

    **h. Minnesota would have been irreparably harmed by attempting to comply with the Recertification Letter.**

        **i. Attempting to comply with the Recertification Letter would have caused Minnesota to incur significant costs that cannot be recouped by damages.**

197.     As discussed above, attempting to recertify nearly 100,000 households in just 30 days, including performing in-person interviews for all of them, would be massively burdensome and expensive, and would generate ongoing costs as a massive glut of households would continue to need to be recertified at regular intervals for years.

198.     Those costs would not be recoverable against Defendants. *See United States v. Testan*, 424 U.S. 392, 400 (1976) (no damages claims against United States without waiver of sovereign immunity). Economic injuries for which damages are not available due to sovereign immunity are irreparable injuries. *See Missouri v. Trump*, 128 F.4th 979, 996 (8th Cir. 2025).

### ii. Attempting to comply with the Recertification Letter would have undermined the trust that Minnesota has built with those in need of food assistance.

199.     Those that need food assistance are often reluctant to enroll in SNAP. USDA found that in fiscal year 2020, only 78% of eligible people received SNAP benefits.

200.     Minnesota has worked for years and expended significant resources to build trust with residents in need of food assistance to encourage SNAP participation.

201.     Imposing arbitrary rules on short notice erodes the trust between SNAP recipients and Minnesota. Requiring households to recertify—even if they just recently did so—would cause confusion and distrust. All SNAP households in Minnesota, not just those in the Recertification Counties, would be left to question what new conditions might be imposed on them without notice or whether USDA will penalize Minnesota in ways that makes it impossible to provide them with SNAP benefits.

202.     And although these requirements are being imposed by Defendants, it would be State employees or its county partners who will need to explain these things to SNAP recipients, creating the impression that it is Minnesota imposing these onerous, arbitrary requirements and undermining the trust that Minnesota has worked to build.

      **iii. Attempting to comply with the Recertification Letter would have irreparably harmed Minnesota because needy families would lose SNAP benefits.**

203. Attempting to comply with the Recertification Letter would have predictably resulted in households losing SNAP benefits not because they were ineligible but because they were not able to complete the recertification process and in-person interviews.

204. Removing those needy households from SNAP would transfer costs to Minnesota and its local governments and community organizations, as those families would increasingly rely on emergency services and safety net programs like local food banks, or will go hungry.

205. Food banks are already strained because USDA cut $500 million in food deliveries last year.[28]

206. Booting needy families off SNAP would harm public health and wellbeing. Loss of SNAP causes hunger and malnutrition, which are associated with many poor health outcomes in children including poor concentration, decreased cognitive function, fatigue, depression, and behavioral problems.

207. These outcomes in turn harm Minnesota's education system. Children without nutritious food struggle to learn, while access to nutritious food is associated with better educational outcomes, including improved attendance, behavior, grades, and test scores.[29]

---

[28] *See* Tami Luhy, *Food banks scramble after USDA halts $500 million in deliveries*, CNN (Mar. 22, 2025), https://www.cnn.com/2025/03/22/politics/food-banks-usda-delivery-halt.
[29] *See* Sehrish Naveed et al., *An Overview on the Associations between Health Behaviors and Brain Health in Children and Adolescents with Special Reference to Diet Quality*, 17(3) Int'l J. Env't Res. Pub. Health. (Feb. 4, 2020), https://doi.org/10.3390/ijerph17030953.

208.    Minnesota would need to devote additional resources to address these health and education problems.

209.    SNAP is also critical to adults' health. Low-income adults who participate in SNAP incur about $1,400 less in medical care costs per year than low-income non-participants. Food insecurity generally is associated with higher healthcare costs, including emergency room visits, hospitalizations, and related costs.

210.    Loss of SNAP benefits would harm state healthcare systems and programs that partially depend on state funds, like MinnesotaCare.

211.    Cutting SNAP benefits for eligible households also has downstream effects. It harms merchants who accept SNAP benefits, including grocers and farmers markets, and has ripple effects for all of Minnesota's economy.

### iv. Attempting to comply with the Recertification Letter would have irreparably harmed Minnesota by increasing its payment error rate, leading to severe financial consequences.

212.    The OBBB creates penalties for States whose SNAP payment error rates exceed specified thresholds, requiring those States to shoulder a portion of the costs of their SNAP benefits. *See* 7 U.S.C. § 2013(a)(1)–(2). Errors made during the current fiscal year bear on the assessed penalties. *See id.* § 2013(a)(2)(B)(ii)(I).

213.    The diversion of resources for a rushed recertification process would inevitably lead to errors in eligibility determinations and payment calculations, increasing Minnesota's payment error rate and triggering potentially massive financial consequences. Economic injuries for which damages are not available due to sovereign immunity are irreparable injuries. *See Missouri*, 128 F.4th at 996.

### i. Minnesota would be irreparably harmed by the punitive actions Defendants threatened in the Recertification Letter.

214.    As discussed above, Minnesota could not possibly have complied with the Recertification Letter. But for injunctive relief from this Court, Minnesota would therefore be subject to the sanctions Defendants have threatened, which include loss of SNAP administrative funding (via the provisions of 7 U.S.C. § 2020(g)) and "Minnesota's continued participation in SNAP." (Ex. 1.)

215.    Being disqualified from SNAP—something not authorized anywhere by law—would be devastating to Minnesota. It would drastically magnify each of the harms discussed above.

216.    Indeed, a statewide loss of SNAP benefits "creates a substantial risk that SNAP recipients will need to rely on, and potentially overwhelm, existing state resources and services," causing "imminent fiscal injury" to Minnesota. *Massachusetts I*, 808 F. Supp. 3d at 200, *see also id.* at 204 (loss of SNAP benefits "undoubtedly result[s] in substantial harm" to States). A statewide loss of SNAP benefits would further "result in major operational disruptions and administrative burdens across [State] agencies and fiscal and operational harm to state programs that will be overwhelmed by residents lacking essential SNAP benefits." *Massachusetts v. USDA*, __ F. Supp. 3d __, 2025 WL 3155810, at *2 (D. Mass. Nov. 12, 2025) ("*Massachusetts II*").

217.    The loss of SNAP administrative funds would also irreparably harm Minnesota. *See Massachusetts II*, 2025 WL 3155810, at *10 (describing lost of SNAP administrative funding as "dire consequences"); *California*, 2025 WL 2939227, at *12–13 (finding

51

threatened loss of SNAP administrative funding constitutes irreparable harm); *California v. USDA*, 800 F. Supp. 3d 1015, 1027–28 (N.D. Cal. 2025) (same).

218.    Minnesota relies on and plans for significant federal funds to administer SNAP. As discussed above, Minnesota receives approximately $80 million per year from the federal government for administrative costs. Minnesota and the counties and Tribal Nations that administer SNAP would be unlikely to be able to take on those costs themselves, effectively causing a shutdown of SNAP in Minnesota (and its concomitant harms).

**XI.    THE AWARDS TERMINATION LETTER IS ARBITRARY AND CAPRICIOUS, UNLAWFUL, AND WOULD INFLICT IRREPARABLE HARM ON MINNESOTA.**

219.    As discussed above, the January 9, 2026 Awards Termination Letter "suspend[ed] payments on all active awards and any future awards from USDA to the State of Minnesota and the City of Minneapolis," purports to require Minnesota and Minneapolis to "provide USDA with payment justifications for all federal dollar expenditures from January 20, 2025, to the present, and states that "[g]oing forward, all transactions on awards to the State of Minnesota or the City of Minneapolis will require such payment justification." (Ex. 2)

220.    Like the Recertification Letter, the Awards Termination Letter alleged "widespread and systemic fraud associated with federal benefit programs in the State of Minnesota and the City of Minneapolis[.]" (*Id.*) But the letter did not allege any fraud in connection with the grants affected by the letter. In fact, the only proven fraud mentioned in the letter is the Feeding Our Future fraud, which, as discussed above, occurred years

ago. Feeding Our Future provides no reason to believe there is fraud in connection with USDA grants to Minnesota.

221.    The letter also referenced "examples of *alleged* fraud in Minnesota." (*Id.* (emphasis added).) But it offered no evidence for these allegations, which again do not relate to the grants affected by the letter.

222.    The Awards Termination Letter claims Minnesota "refuse[s] to provide basic information or take common sense measures to stop fraud." (*Id.*) As an example, the letter cites the fact Minnesota filed this lawsuit, stating "you asked the courts to block USDA's directive to recertify the State's SNAP recipients." (*Id.*) But Minnesota is entitled to assert its legal rights and to contest the unlawful Recertification Letter. It is arbitrary and capricious for Defendants to retaliate against Minnesota for doing so.

223.    The Awards Termination Letter does not explain how "suspending payments" on grants and requiring "payment justifications" would address the claimed (but unproven) "widespread and systemic fraud associated with federal benefit programs[.]" (*Id.*) Those actions do *nothing* with respect to federal benefit programs.

224.    The Awards Termination Letter did not acknowledge or discuss Minnesota's reliance interests in continuing to receive funding under grants it has already received or its interest in continuing to receive grants without the imposition of new and burdensome requirements.

225.    Federal regulations provide procedures for suspending or terminating grants. *See* 2 C.F.R. § 200.339–343. Defendants acted contrary to law by failing to comply with those procedures.

226.    As with the Recertification Letter, there is a clear disconnect between the decision made in the Awards Termination Letter and the explanation given. The Awards Termination Letter, like the Recertification Letter, arrived during an unprecedented amount of punitive actions taken by the Trump Administration against Minnesota and was sent to punish Minnesota and its leaders.

227.    Minnesota would be irreparably harmed by the Awards Termination Letter, including by retroactive imposition of new requirements on existing grants and by suspension of any "future awards from USDA."

## XII.    THE ENFORCEMENT LETTER IS ARBITRARY AND CAPRICIOUS, UNLAWFUL, AND WOULD INFLICT IRREPARABLE HARM ON MINNESOTA.

228.    The Enforcement Letter fails to provide a rational basis for the decision it announces. It cites "highly publicized, substantial, and ongoing fraud" but does not allege any SNAP fraud in Minnesota, much less provide evidence of it.

229.    Nor does the Enforcement Letter explain why the action taken—withholding SNAP administrative funds—would address alleged SNAP fraud.

230.    The Enforcement Letter does not consider the reliance interests that Minnesota, DCYF, and SNAP applicants and recipients have in continued administrative funding.

231.    The Enforcement Letter is arbitrary and capricious because the Recertification Letter threatened to withhold administrative funding if Minnesota did not comply by January 15, 2026. But the Enforcement Letter took that action before that deadline arrived and immediately before a court hearing on whether that action would be lawful.

54

232.     The Enforcement Letter is contrary to law because it does not follow the statutory and regulatory procedures required to withhold administrative funding.

233.     The Enforcement Letter purports to "waive" those requirements under the guise of a Section 2026 pilot project. But that pilot project is invalid for the same reasons the Recertification Letter's pilot project is invalid. Once again, Defendants wrongfully claim the extraordinary power to rewrite the FNA as they please so long as they posit it as a "pilot project."

234.     The Enforcement Letter is arbitrary and capricious because, like the Recertification Letter and the Awards Termination Letter, its purpose is to punish Minnesota for partisan reasons.

235.     As described above, Minnesota would be irreparably harmed by the loss of SNAP administrative funds.

## COUNT I
### Administrative Procedure Act—Procedural Violation (5 U.S.C. § 706(2)(D))
### (Against all Defendants)

236.     Plaintiff realleges and incorporates by reference the allegations set forth above.

237.     USDA is an "agency" as defined by the Administrative Procedure Act (APA). See 5 U.S.C. § 551(1).

238.     The FNA provides that all regulations for the SNAP program must be promulgated "in accordance with the procedures set forth in section 553 of title 5." 7 U.S.C. § 2013(c).

55

239.     The Recertification Letter, Awards Termination Letter, and Enforcement Letters (the "USDA Letters") are final agency actions because they mark the consummation of USDA's decision-making process and determine rights or obligations from which legal consequences will flow. *See Bennett v. Spear*, 520 U.S. 157, 177–78 (1997).

240.     The USDA Letters impose legislative rules because they "substantively amend[] or add[] to, versus simply interpreting the contours of, [] preexisting rule[s]." *Iowa League of Cities, v. E.P.A.*, 711 F.3d 844, 873 (8th Cir. 2013); *see also N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018) (a legislative rule "assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself"); *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251–52 (D.C. Cir. 2014) (legislative rules "purport[] to impose legally binding obligations or prohibitions"). Each of the USDA Letters is directly contrary to existing law and regulation.

241.     The APA's notice-and-comment procedures apply to legislative rules. *See* 5 U.S.C. § 553. Those procedures require advanced notice of proposed rulemaking followed by an opportunity to participate by interested persons. *Id.* § 553(b)–(c).

242.     When an agency promulgates a final rule, it must include "a concise general statement of [its] basis and purpose." 5 U.S.C. § 553(c).

243.     Unless an exception applies, a substantive rule must be published or served at least 30 days before its effective date. 5 U.S.C. § 553(d).

244.     Defendants failed to follow any of these requirements. Defendants did not provide notice of proposed rulemaking to Minnesota, the Recertification Counties, or any interested person. Defendants did not provide any opportunity to participate or comment.

Defendants did not provide a concise statement of the rules' basis and purpose. And Defendants made the rules effective immediately, without waiting 30 days after providing final notice.

245.    Minnesota is entitled to a stay of the effective dates of the USDA Letters pending judicial review, to vacatur of the USDA Letters, and to preliminary and permanent injunctions barring their implementation. *See* 7 U.S.C. §§ 705–06.

## COUNT II
## Administrative Procedure Act—Contrary to Law and in Excess of Statutory Authority (5 U.S.C. § 706(2)(A) & (C))
### (Against all Defendants)

246.    Plaintiff realleges and incorporates by reference the allegations set forth above.

247.    USDA is an "agency" as defined by the APA. *See* 5 U.S.C. § 551(1).

248.    The USDA Letters are final agency actions because they mark the consummation of USDA's decision-making process and determine rights or obligations from which legal consequences will flow. *See Bennett*, 520 U.S. at 177–78.

249.    The APA requires the Court to "hold unlawful and set aside" agency actions, findings, and conclusions that are "not in accordance with law" or "in excess of statutory . . . authority." 5 U.S.C. § 706(2)(A) & (C).

250.    The USDA Letters are not in accordance with law and in excess of Defendants' statutory authority, including for the reasons described above.

57

251.     Minnesota is entitled to a stay of the effective dates of the USDA Letters pending judicial review, to vacatur of the USDA Letters, and to preliminary and permanent injunctions barring their implementation. *See* 7 U.S.C. §§ 705–06.

## COUNT III
**Administrative Procedure Act—Arbitrary and Capricious (5 U.S.C. § 706(2)(A))**
**(Against all Defendants)**

252.     Plaintiff realleges and incorporates by reference the allegations set forth above.

253.     USDA is an "agency" as defined by the APA. *See* 5 U.S.C. § 551(1).

254.     The USDA Letters are final agency actions because they mark the consummation of USDA's decision-making process and determine rights or obligations from which legal consequences will flow. *See Bennett*, 520 U.S. at 177–78.

255.     The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary [or] capricious." 5 U.S.C. § 706(2)(A). An agency is action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

256.     The USDA Letters are arbitrary and capricious, including for the reasons described above.

58

257.     Minnesota is entitled to a stay of the effective dates of the USDA Letters pending judicial review, to vacatur of the USDA Letters, and to preliminary and permanent injunctions barring their implementation. *See* 7 U.S.C. §§ 705–06.

### COUNT IV
### Spending Clause Violation
### (Against all Defendants)

258.     Plaintiff realleges and incorporates by reference the allegations set forth above.

259.     "Congress may attach conditions on the receipt of federal funds." *South Dakota v. Dole*, 483 U.S. 203, 206 (1987). However, any conditions must be imposed "unambiguously" to enable "States to exercise their choice knowingly, cognizant of the consequences of their participation." *Id.* at 207 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)).

260.     Each of the USDA Letters retroactively imposes new conditions on Minnesota that Minnesota did not agree to when it elected to participate in SNAP or accepted grant funding from USDA. Minnesota did not have "clear notice" of these conditions when it elected to participate in SNAP and accepted the grants at issue. *See Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006).

261.     "Though Congress' power to legislate under the spending power is broad, it does not include surprising participating States with post acceptance or 'retroactive' conditions." *Pennhurst*, 451 U.S. at 25. That is, not even Congress could impose these new conditions upon Minnesota, and certainly not Defendants acting without—and in fact contrary to—congressional authority.

262.     Minnesota is entitled to preliminary and permanent injunctions barring implementation of the USDA Letters and, pursuant to 28 U.S.C. § 2201, to a declaration that the USDA Letters and their implementation violates the Spending Clause of the U.S. Constitution.

## COUNT V
### Ultra Vires
### (Against all Defendants)

263.     Plaintiff realleges and incorporates by reference the allegations set forth above.

264.     Defendants cannot take actions that exceed the scope of their constitutional or statutory authority.

265.     Federal courts may grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015); *see also Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689 (1949) (ultra vires actions "may be made the object of specific relief").

266.     Defendants' actions challenged here are contrary to law and beyond their authority because they lack constitutional or statutory authority to impose the conditions of the USDA Letters upon Minnesota or to punish Minnesota as threatened in the USDA Letters.

267.     Minnesota is entitled to preliminary and permanent injunctions barring implementation of the USDA Letters and, pursuant to 28 U.S.C. § 2201, to a declaration that the USDA Letters and their implementation is outside Defendants' constitutional and statutory authority.

60

**PRAYER FOR RELIEF**

WHEREFORE, Minnesota respectfully requests that this Court enter judgment in its favor and grant the following relief:

1.   Pursuant to 5 U.S.C. § 705, an order staying the USDA Letters and their implementation;

2.   Pursuant to 5 U.S.C. § 706, an order vacating the USDA Letters and their implementation;

3.   A temporary restraining order and/or preliminary injunction enjoining Defendants from implementing the USDA Letters or taking any actions against Minnesota for failure to comply with the USDA Letters, including but not limited to withholding SNAP administrative funds or disallowing Minnesota's continued participation in SNAP;

4.   A permanent injunction enjoining Defendants from implementing the USDA Letters or taking any actions against Minnesota for failure to comply with the USDA Letters, including but not limited to withholding SNAP administrative funds, disallowing Minnesota's continued participation in SNAP, or imposing the conditions in the Awards Termination Letter;

5.   A declaration that Defendants' actions are unlawful;

6.   Award Minnesota its fees, costs, and expenses, including attorney's fees, to the extent permitted by law; and

7.   Grant other such relief as this Court finds appropriate.

Dated:  March 25, 2026

KEITH ELLISON
Attorney General
State of Minnesota

**s/ Joseph Richie**
JOSEPH RICHIE
Special Counsel
Atty. Reg. No. 0400615

LIZ KRAMER
Solicitor General
Atty. Reg. No. 0325089

61

PETER J. FARRELL
Deputy Solicitor General
Atty. Reg. No. 0393071

KATHERINE BIES
Special Counsel
Atty. Reg. No. 0401675

BRIAN CARTER
Special Counsel
Atty. Reg. No. 0390613

LINDSEY MIDDLECAMP
Special Counsel
Atty. Reg. No. 0392589
445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2125
(651) 300-0921 (Voice)
(651) 282-5832 (Fax)
Joseph.Richie@ag.state.mn.us
liz.kramer@ag.state.mn.us
peter.farrell@ag.state.mn.us
Katherine.Bies@ag.state.mn.us
Brian.Carter@ag.state.mn.us
Lindsey.Middlecamp@ag.state.mn.us

*Attorneys For the State of Minnesota*

|#6258165-v1

62