UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 0:25-cv-04767-LMP-JFD

STATE OF MINNESOTA, *by and through its Attorney General, Keith Ellison*,

Plaintiff,

v.

UNITED STATES DEPARTMENT OF AGRICULTURE and BROOKE ROLLINS, *Secretary of the U.S. Department of Agriculture*,

Defendants.

MEMORANDUM OF LAW IN SUPPORT OF USDA'S MOTION TO DISMISS

## TABLE OF CONTENTS

**INTRODUCTION** ........................................ **1**

**STATUTORY AND REGULATORY BACKGROUND** ........................................ **5**

A. The Parties. ........................................ 5

B. Overview of SNAP and Recertification. ........................................ 6

C. The Secretary of Agriculture Has Authority to Increase Efficiency of SNAP, Improve Delivery of SNAP Benefits to Eligible Households, and Ensure State Compliance. ........................................ 8

D. Minnesota Has Failed to Safeguard American Taxpayer Dollars. ............ 9

E. USDA Exercised Its Statutory Authority by Establishing the December 16 Pilot to Ensure Federal Dollars Go Only to Those Who Are Eligible. ...................... 14

F. A Party Challenging Agency Action Must Exhaust Their Administrative Remedies before Seeking Judicial Review in Federal Court. ........................................ 16

**FACTUAL ALLEGATIONS** ........................................ **17**

**MOTION TO DISMISS STANDARD** ........................................ **23**

**ARGUMENT** ........................................ **25**

**I. MINNESOTA'S CLAIMS ARE NOT RIPE.** ........................................ **25**

A. Minnesota's Claims Are Not Ripe Because There Has Been No Final Agency Action. ........................................ 25

B. Minnesota's Claims Are Not Ripe Because the State Failed to Exhaust All Administrative Remedies. ........................................ 28

C. Minnesota's Ripeness Defects Apply to All of Their Claims. ................ 30

**II. APA REVIEW IS INAPPLICABLE BECAUSE MINNESOTA HAS AN ADEQUATE ALTERNATIVE REMEDY....................................................... 31**

**III. THE DECEMBER 16 PILOT, JANUARY 9 LETTER, AND JANUARY 14 PILOT DO NOT VIOLATE THE APA OR THE FNA.................. 31**

A. The December 16 Pilot, January 9 Letter, and January 14 Pilot Do Not Violate the APA Procedurally. ........................................................................ 32

B. The December 16 Pilot, January 9 Letter, and January 14 Pilot Do Not Violate the APA as being Contrary to Law and in Excess of Statutory Authority. .... 36

C. The December 16 Pilot, January 9 Letter, and January 14 Pilot Do Not Violate the APA as Being Arbitrary and Capricious. ............................................... 40

**IV. PLAINTIFF'S SPENDING CLAUSE AND ULTRA VIRES CAUSES OF ACTION FALL INDEPENDENTLY. ............................................................ 42**

A. The December 16 Pilot, January 9 Letter, And January 14 Pilot And Their Implementation Do Not Violate the Spending Clause. ............................................ 43

B. Plaintiff's Ultra Vires Claim Fails as a Matter of Law Because Other Adequate Remedies as Pled Exist. .................................................................... 44

**CONCLUSION .................................................................................. 46**

## TABLE OF AUTHORITIES

### CASES

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) .......... 24, 28

*Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967) .......... 26

*Bd. of Educ. for Silver Consol. Schs. v. McMahon*, 791 F. Supp. 3d 1272, 1288 (D.N.M. 2025) .......... 45

*Balt. Gas & Elec. Co. v. FERC*, 954 F.3d 279, 284–85 (D.C. Cir. 2020) .......... 35

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) .......... 24

*Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) .......... 27

*Boire v. Greyhound Corp.*, 376 U.S. 473, 481 (1964) .......... 46

*Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988) .......... 32

*Ctr. for Biological Diversity v. Dep't of the Interior*, 72 F.4th 1166, 1188 (10th Cir. 2023) .......... 37

*Darby v. Cisneros*, 509 U.S. 137, 146 (1993) .......... 26

*FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021) .......... 42

*FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 238 n.7 (1980) .......... 35

*Franklin ex rel. Franklin v. Peterson*, 878 F.3d 631, 635 (8th Cir. 2017) .......... 24

*Gonser v. Cont'l Cas. Co.*, 515 F. Supp. 2d 929, 933 (E.D. Ark. 2007) .......... 6, 18

*Glick v. W. Power Sports, Inc.*, 944 F.3d 714, 717 (8th Cir. 2019) .......... 25

*Hirth v. Iowa Utils. Comm'n*, 771 F. Supp. 3d 1058, 1071 (N.D. Iowa 2025) .......... 18

*James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1095 (D.C. Cir. 1996) .......... 6

*Kenai Oil & Gas, Inc. v. Dep't of Interior*, 671 F.2d 383, 387 n.2 (10th Cir. 1982) ......... 34

*Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 831 (8th Cir. 2003).................................. 6

*Mandan, Hidatsa & Arikara Nation v. U.S. Dep't of the Interior*, 95 F.4th 573, 579 (8th Cir. 2024) ............................................................................................ 32, 42

*Marine Equip. Mgmt. Co. v. United States*, 4 F.3d 643, 646 (8th Cir. 1993) .................... 24

*McCarthy v. Madigan*, 503 U.S. 140, 145 (1992) ........................................................... 30

*Miles v. Simmons Univ.*, 514 F. Supp. 3d 1070, 1080 (D. Minn. 2021) ............................ 46

*Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 67 (2004) ........................................ 27, 34

*Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 680 (2025)..................................... 45, 46

*Org. for Competitive Mkts. v. U.S. Dep't of Agric.*, 912 F.3d 455, 459 (8th Cir. 2018) .... 33

*Pac. Shores Subdivision, Cal. Water Dist. v. U.S. Army Corps of Eng'rs*, 448 F. Supp. 2d 1, 4 (D.D.C. 2006) ............................................................................................ 6

*Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000).......... 25

*Pub. Citizen, Inc. v. FERC*, 839 F.3d 1165, 1169 (D.C. Cir. 2016).................................. 35

*Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1040 (8th Cir. 2016)............................................................................................ 45

*Rowell v. Andrus*, 631 F.2d 699, 702 (10th Cir. 1980) .................................................... 34

*Sackett v. EPA*, 566 U.S. 120, 125 (2012) ....................................................................... 35

*SEC v. Chenery Corp.*, 332 U.S. 194, 201-02 (1947)....................................................... 35

*Shalala v. Ill. Council on Long Term Care*, 529 U.S. 1, 11–13 (2000) ............................ 31

*Sierra Club v. EPA*, 252 F.3d 943, 947 (8th Cir. 2001) ................................................... 32

*State v. Oz*, No. 26-cv-1701 (ECT/DTS), 2026 WL 926185, at *14 (D. Minn. Apr. 6, 2026) .......... 45

*State v. U.S. Dep't of Agric.*, No. 0:25-cv-04767-LMP-JFD, n.6 (D. Minn. Jan. 16, 2026) .......... 27

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94. (1998) .......... 24

*Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1126 (9th Cir. 2009) .......... 26

*Titus v. Sullivan*, 4 F.3d 590, 593 (8th Cir. 1992) .......... 25

*Union Pac. R.R. Co. v. U.S. R.R. Ret. Bd.*, No. 24-2547, 2025 WL 3639277, at *5 (8th Cir. Dec. 16, 2025) .......... 26

*United States v. Fla. E. Coast Ry.*, 410 U.S. 224, 244–45 (1973) .......... 34

*Voyageurs Nat'l Park Ass'n v. Norton*, 381 F.3d 759, 763 (8th Cir. 2004) .......... 33

*Walmart Inc. v. U.S. Dep't of Just.*, 21 F.4th 300, 308 (5th Cir. 2021) .......... 34

*Weinberger v. Salfi*, 422 U.S. 749, 760–61 (1975) .......... 31

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*, 784 F. Supp. 3d 127, 162 (D.D.C. 2025) .......... 44

**STATUTES**

28 U.S.C. § 501 .......... 6

28 U.S.C. § 503 .......... 7

5 U.S.C. § 551 .......... 33, 35

5 U.S.C. § 553 .......... 33

5 U.S.C. § 704 .......... 26, 31, 32

7 U.S.C. § 2011 .......... 7

7 U.S.C. § 2013(a) .......... 7

7 U.S.C. § 2020(d) .......... 7, 8

7 U.S.C. § 2020(g) .......... 10, 16, 17

7 U.S.C. § 2025(c)(1)(G) .......... 14, 15

7 U.S.C. § 2026(b)(1)(A) .......... 10, 21, 37, 38

7 U.S.C. § 2026(b)(1)(B)(i) .......... 2, 39

7 U.S.C. § 2026(b)(1)(B)(ii) .......... 2, 9

7 U.S.C. § 2026(b)(1)(B)(iv)(III)(ff) .......... 40

**RULES**

Fed. R. Civ. P. 12(b)(1) .......... 5

Fed. R. Civ. P. 12(b)(6) .......... 5, 24

Fed. R. Civ. P. 10(c) .......... 18

**REGULATIONS**

7 C.F.R. § 276.7(c) .......... 28, 30

7 C.F.R. § 282.1(b) .......... 36

7 C.F.R. § 271.3 .......... 7

7 C.F.R. § 271.4 .......... 8

7 C.F.R. Part 273 .......... 8

7 CFR § 273.10(g)(1)(i) .......... 8

7 CFR § 273.12(a)(1) .......... 8

7 CFR § 273.14(a) .......... 8

7 CFR § 273.16(c)(1) .......... 11, 12

7 CFR § 273.2(c)(1)(i) .......... 8

7 C.F.R. § 276.4(b) .......... 10

7 C.F.R. § 276.4 .......... 17, 29, 30

7 C.F.R. § 276.5 .......... 17

7 C.F.R. § 276.7 .......... 10

**OTHER AUTHORITIES**

Privacy Act of 1974; System of Records, 90 Fed. Reg. 26,521 (Sept. 23, 2025) .......... 13

Defendants United States Department of Agriculture and Brooke Rollins, as Secretary of the Department of Agriculture (collectively, the "USDA" or "Defendants"), by and through counsel, hereby submits the following memorandum in support of their motion to dismiss the Amended Complaint (ECF No. 60)[1] by the State of Minnesota ("Minnesota," "State," or "Plaintiff") pursuant to Rule 12(b)(1) and (6) of the Federal Rules of Civil Procedure.

## INTRODUCTION

Minnesota is the site of one of the largest fraud schemes in American history. The Feeding Our Future scandal and related prosecutions exposed massive fraud, waste, and abuse in Minnesota's administration of federal taxpayer dollars. They exposed Minnesota's predisposition to mismanaging and wasting federal taxpayer dollars despite the legal guardrails. And they exposed that the State may have been complicit in intentionally encouraging the under-reporting of erroneous or fraudulent payments, including with respect to the Supplemental Nutrition Assistance Program ("SNAP"). In turn, the federal government, specifically USDA, took action to improve the delivery of SNAP benefits to eligible households and to help ensure that those in need receive assistance.

Minnesota commenced this politically motivated lawsuit in an attempt to thwart those efforts. It claims that the State has been targeted. However, the concerns that USDA has raised and is trying to remedy is based on activity that has occurred across U.S. presidential administrations. Minnesota's invocation of partisanship is a blatant attempt to

[1] Hereinafter cited to as "Compl. ¶ __."

distract from the questions of whether USDA's actions and efforts were within their authority to prescribe, and whether USDA's actions and efforts are supported by any rational basis. The answer to both questions is, "yes."

The Secretary of Agriculture has authority to increase efficiency of SNAP, improve delivery of SNAP benefits to eligible households, and ensure state compliance. To test program changes that might increase the efficiency of SNAP and improve the delivery of SNAP benefits to eligible households, the Secretary "may conduct on a trial basis, in one or more areas of the United States, pilot or experimental projects. . . ." 7 U.S.C. § 2026(b)(1)(A). Any project conducted by the Secretary must be consistent with SNAP's goal of providing food assistance among low-income individuals and must include an evaluation to determine the effects of the projects. 7 U.S.C. § 2026(b)(1)(B)(i). Further, the Secretary may conduct a project that is designed, in relevant part, to improve SNAP administration. 7 U.S.C. § 2026(b)(1)(B)(ii).

With respect to rational basis, it can hardly be disputed that Minnesota has failed to safeguard American taxpayer dollars. In a recording of its program manager training SNAP eligibility workers, Minnesota's SNAP agency admitted that "fraud has never been a big focus for me" while also acknowledging that fraud "[e]xists in government from top to bottom."[2] Minnesota's SNAP training instructs State officials responsible for SNAP

[2]Declaration of Sheila Corely, dated January 8, 2026 (ECF No. 23), Ex. A, hereinafter cited to as "Corely Decl. __." Ms. Corely is Chief of Staff to the Deputy Under Secretary for the Food, Nutrition, and Consumer Services mission area, which is a component of USDA.

eligibility determinations and fraud referrals to "stop"[3] and first consider their own "bias,"[4] "equity,"[5] and racial and ethnic disparities;[6] the relative proportion by race of people disqualified for fraud;[7] the adverse consequences if they are disqualified from receiving food stamps;[8] and "why" someone has violated SNAP, suggesting stress and memory issues could excuse violations.[9]

Minnesota urged its SNAP eligibility workers to be "trusting" because "suspicious" "cynical" mindsets can "hinder" their impact,[10] and "dig" for ways to avoid adverse outcomes,[11] fraud investigation referrals, and disqualifications from SNAP,[12] disparaging as "punishment" income limits on eligibility for receiving public assistance.[13] Since the summer of 2025, USDA has requested that States produce the data they collect, with federal funding assistance, and use, to determine households' eligibility to receive SNAP and the amount of SNAP benefits to be paid—100 percent of which is federally funded. Unlike the majority of States, Minnesota refuses to produce this data to USDA.

With that background, on December 16, 2025, the Secretary of Agriculture wrote to the Governor of Minnesota, citing highly publicized and ongoing fraud and requiring the

[3] *Id.* at 37:00-38:00.
[4] *Id.* at 16:18-24:00; 37:00:39:30.
[5] *Id.* at 10:53-12:00.
[6] *Id.* at 30:18-33:30.
[7] *Id.* at 30:18-34:00, 1:04-1:05.
[8] *Id.* at 15:22-16:18; 39:30-41:30.
[9] *Id.* at 37.00-38.00.
[10] *Id.* at 26:30-30:18.
[11] *Id.* at 15:00-16:00.
[12] *Id.* at 1:11-1:13.
[13] *Id.* at 51:00-51:30.

State to participate in a pilot project, run on a trial basis "pursuant to 7 U.S.C. 2026(b)(1)(A) to . . . improve the delivery of SNAP benefits to eligible households" and noting that "[m]ore accurate certifications of eligibility for SNAP benefits will ensure that those in need receive assistance."[14] The State already is obligated to perform recertifications of households on a rolling basis to avoid unlawfully paying out federal funds to ineligible recipients. The Secretary's pilot involves no change other than to perform, once, an accelerated re-certification of eligibility. The recertification could be done using the same procedures Minnesota already should be following.

Minnesota never responded to the Secretary or USDA to ask for more time, or to propose alternatives to the pilot schedule or methods that would lead Minnesota to comply with the pilot.[15] Instead, Minnesota remained silent until it filed its Complaint (which has since been amended) two days before Christmas and then moved to enjoin the Secretary's pilot. Minnesota's conduct reveals that it has no intention of complying with the Secretary's eligibility recertification requirement. In so doing, Minnesota caused the alleged impossibility of timely compliance and potential consequences that it begged the Court to enjoin on a preliminary basis, and now, on a permanent one.

USDA now moves to dismiss Minnesota's Amended Complaint in its entirety and with prejudice for lack of subject matter jurisdiction, Fed. R. Civ. P. 12(b)(1), or for failure to state a claim upon which relief can be granted, Fed. R. Civ. P. 12(b)(6).

---

[14] Corley Decl., Ex. C.
[15] Corley Decl. ¶¶ 34-37.

## STATUTORY AND REGULATORY BACKGROUND

As a general rule, a court may only consider the pleadings when a motion is made under Rule 12 of the Federal Rules of Civil Procedure. However, matters of public and administrative record referenced in or otherwise embraced by the complaint, including statutory and regulatory background, can be considered without converting the motion to dismiss into a motion for summary judgment. *See Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 831 (8th Cir. 2003); *Gonser v. Cont'l Cas. Co.*, 515 F. Supp. 2d 929, 933 (E.D. Ark. 2007).

The administrative record can include anything considered directly or indirectly by the agency. *See James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1095 (D.C. Cir. 1996) ("The administrative record includes all materials 'compiled' by the agency, that were 'before the agency at the time the decision was made.'") (citations omitted); *Pac. Shores Subdivision, Cal. Water Dist. v. U.S. Army Corps of Eng'rs*, 448 F. Supp. 2d 1, 4 (D.D.C. 2006) ("This Court has interpreted the 'whole record' to include 'all documents and materials that the agency directly or indirectly considered . . . . [and nothing] more nor less.'") (citations omitted and internal quotation marks omitted, in part).

### A. The Parties.

Minnesota, the Plaintiff, is a sovereign state of the United States of America.[16] Defendant USDA is a cabinet agency within the executive branch of the United States government.[17] Defendant Brooke Rollins is the Secretary of the USDA. She is charged with

[16] Compl. ¶ 15.
[17] *Id.* ¶ 16 (citing 28 U.S.C. § 501).

the supervision and management of all decisions and actions of that agency. She is being sued in her official capacity.[18]

**B. Overview of SNAP and Recertification.**

The Supplemental Nutrition Assistance Program, also known as "SNAP," is the successor to the Food Stamp Program and is the nation's largest nutrition assistance program.[19] Through SNAP, Congress sought to "alleviate . . . hunger and malnutrition," and to "permit low-income households to obtain a more nutritious diet." 7 U.S.C. § 2011. Once enrolled in the program, eligible individuals and households receive monthly benefits on an electronic benefit transfer ("EBT") card, which can be used like a debit card at authorized retail food stores to purchase food.[20]

USDA's Food and Nutrition Service ("FNS") is responsible for administering SNAP for retail food stores and issuing administrative rules. *See* 7 U.S.C. § 2013(a), (c); 7 C.F.R. § 271.3. FNS also oversees the States' administration of SNAP, including reviewing the States' Plans of Operations and their payment accuracy. 7 U.S.C. § 2020(d).[21] States, on the other hand, administer day-to-day operation of the program through their designated agencies. *See id.* § 2020(a). This includes determining eligibility and benefit amounts,

---

[18] *Id.* ¶ 17 (citing 28 U.S.C. § 503).
[19] *See* Food and Nutrition Act of 2008, 7 U.S.C. § 2011, *et seq.* ("FNA"); *see also* Supplemental Nutrition Assistance Program ("SNAP"), U.S. Dep't of Agric., Putting Healthy Food within Reach for Those in Need (updated May 27, 2025), https://perma.cc/5KYW-MJ56.
[20] Corley Decl. ¶ 5.
[21] Corley Decl. ¶ 6.

issuing benefits to eligible households, and ensuring program integrity with respect to SNAP recipients. *Id.* § 2020(a)(1); 7 C.F.R. § 271.4.

To participate in SNAP, households must apply and meet all applicable eligibility requirements, including limits on income and resources. 7 C.F.R. § 273.2(c)(1)(i).[22] Once the State has confirmed eligibility for SNAP participation, including conducting any required verifications, the household is certified to participate in SNAP. *See* 7 C.F.R. § 273.10(g)(1)(i). Once a household is certified to participate, it must comply with reporting requirements to maintain its eligibility throughout the certification period.[23] The reporting requirements can vary by household and State option, but the reporting requirements include monthly reporting, quarterly reporting, simplified reporting (periodic reporting), and change reporting.[24] *See* 7 C.F.R. § 273.12(a)(1). In addition to reporting requirements, households must also timely apply for recertification prior to the end of their certification period to ensure there is no disruption in benefits.[25] *See* 7 C.F.R. § 273.14(c). For recertification, the State Agency "must establish procedures for notifying households of expiration dates, providing application forms, scheduling interviews, and recertifying eligible households prior to the expiration of certification periods," and "[h]ouseholds must apply for recertification and comply with interview and verification requirements."[26] 7 C.F.R. § 273.14(a).

[22] *See generally* 7 § U.S.C. 2014; 7 C.F.R. Part 273.
[23] Corley Decl. ¶ 7.
[24] *Id*.
[25] Corley Decl. ¶ 12.
[26] *Id*.

### C. The Secretary of Agriculture Has Authority to Increase Efficiency of SNAP, Improve Delivery of SNAP Benefits to Eligible Households, and Ensure State Compliance.

Congress has, in various provisions, given USDA broad authority to carry out different types of pilot projects. To test program changes that might increase the efficiency of SNAP and improve the delivery of SNAP benefits to eligible households, the FNA provides that the Secretary "may conduct on a trial basis, in one or more areas of the United States, pilot or experimental projects. . . ." 7 U.S.C. § 2026(b)(1)(A). "The Secretary may not conduct a project under subparagraph (A) unless—(I) the project is consistent with the goal of [SNAP] of providing food assistance to raise levels of nutrition among low-income individuals; and (II) the project includes an evaluation to determine the effects of the project." *Id.* § 2026(b)(1)(B)(i).

Congress broadly defined permissible goals for such projects, including to "improve program administration." 7 U.S.C. § 2026(b)(1)(B)(ii)(I). Thus, the Secretary may conduct a project that is designed, in relevant part, to improve SNAP administration. *Id.* § 2026(b)(1)(B)(ii). While the Secretary is permitted to waive any requirement of the FNA "to the extent necessary for the project to be conducted," the FNA provides a list of restrictions on permissible projects that outline certain provisions that cannot be waived. *Id.* § 2026(b)(1)(A)(iii). Neither the FNA nor its corresponding regulations prescribe a specific mechanism the Secretary must use to waive requirements for a Section 2026(b)(1)(B) project *initiated by the Secretary*. Rather, the Secretary is required

to follow specific procedures only when waivers are requested by a *State* under Section 2026(b)(1)(D).[27]

The FNA also provides USDA authority to ensure state compliance. 7 U.S.C. § 2020(g). The relevant regulations permit USDA to either suspend or disallow funds, the difference being that suspension is a temporary withholding of all or a portion of the federal funds of a State's budget to administer SNAP. Disallowance, on the other hand, is a denial by USDA of otherwise reimbursable administrative costs. *See* 7 C.F.R. § 276.4(b), (c). The administrative process for withholding funds is established by 7 C.F.R. § 276.4 and 7 C.F.R. § 276.7.[28]

**D. Minnesota Has Failed to Safeguard American Taxpayer Dollars.**

Minnesota and its operation of FNS programs have been a point of concern for USDA across administrations.[29] In September 2022, the Justice Department announced criminal charges against 47 defendants for their alleged roles in a $250 million fraud scheme in Minnesota that exploited a Federally-funded child nutrition program administered by USDA FNS.[30] Over the next three years, the extent of the perpetrated fraud became more apparent. In September 2025, the Justice Department announced that it had

[27] *Compare* 7 U.S.C. § 2026(b)(1)(A) *with id.* § 2026(b)(1)(D).
[28] *See also* Corley Decl. ¶¶ 5-15.
[29] *See* Corley Decl. ¶¶ 16-24.
[30] Department of Justice, *U.S. Attorney Announces Federal Charges Against 47 Defendants in $250 Million Feeding Our Future Fraud Scheme* (Sept. 20, 2022), https://www.justice.gov/archives/opa/pr/us-attorney-announces-federal-charges-against-47-defendants-250-million-feeding-our-future; Federal Bureau of Investigations, *Dozens Charged in $250 Million COVID Fraud Scheme* (Sept. 21, 2022), https://www.fbi.gov/news/stories/dozens-charged-in-250-million-covid-fraud-scheme-092122. *See* Corley Decl. ¶ 17.

charged the 75th defendant in this scheme.[31] Throughout this entire scheme, Federal funds provided to Minnesota by USDA FNS that were intended as reimbursements for the cost of serving meals to children were instead misappropriated and laundered to enrich the defendants.[32]

In late 2023, staff at USDA learned of a SNAP training by Minnesota Department of Human Services ("MDHS"), the precursor to the Minnesota Department of Children, Youth, and Families ("MDCYF")—the agency within Minnesota that administered SNAP.[33] The video of the training, entitled, "Fraud Prevention and Investigations: The Impact On Children Living In Poverty," contained numerous assertions that alarmed FNS staff.[34] Perhaps most concerning was a statement made by the Minnesota SNAP Program Manager, who said, "I came into this field to help. Um, fraud has never been a big focus for me. And I'm not saying it doesn't exist. Of course, of course it does. It exists in government from top to bottom. Um, I just went on record of saying that, didn't I?"[35]

This sentiment of the SNAP Program Manager was borne out in the advice she provided throughout the training, where on multiple occasions she described clear instances of intentional Program violations as defined at 7 C.F.R. § 273.16(c)(1) and encouraged training participants to find ways around reporting a violation.[36] For example,

---

[31] Department of Justice, *75th Defendant Charged in Feeding Our Future Fraud Scheme* (Sept. 4, 2025), https://www.justice.gov/usao-mn/pr/75th-defendant-charged-feeding-our-future-fraud-scheme.
[32] *See* Corley Decl. ¶ 18.
[33] *See* Corley Decl. ¶ 19.
[34] *See* Corley Decl. ¶; *id.*, Ex. A.
[35] See Corley Decl., Ex. A at 41:50–42:08.
[36] *See* Corley Decl., Ex. A.

one participant asked, "But how do you avoid disqualification?" for an individual who lied about having a second income that was subsequently discovered. The SNAP Program Manager replied:

> Boy, dig and I think . . . just keep engaging in conversation. And I might say "I don't want to send someone. I want to resolve this together with—between you and I—so that we can move forward. I don't want to send somebody." . . . You don't want them to be disqualified and it's okay to say that.[37]

This training video and the programmatic inaccuracies it contained concerned USDA staff so much that they placed Minnesota on the next Management Evaluation cycle, flagging them as "at risk."[38] Minnesota's predisposition to mismanaging and wasting Federal dollars despite law to the contrary has seemingly continued, regardless, as is evidenced by State policy memos that violate federal rules.[39]

Then, in December 2025, a Minnesota news agency reported that Minnesota "repeatedly reported incorrect information about [SNAP] to the federal government."[40] According to the report, MDCYF, which took over SNAP administration in 2024, then continued to rely on the flawed data to respond to questions about SNAP.[41] According to the MDCYF Commissioner, the agency "just learned about that fairly recently, when folks

---

[37] Corley Decl., Ex. A at 1:12:01–1:12:58.
[38] Corley Decl. ¶¶ 20-21.
[39] Corley Decl. ¶¶ 20-21. *See also* MNDHS, "Who is exempt from the SNAP general work rules?" (Nov. 2025), https://www.dhs.state.mn.us/main/idcplg?IdcService=GET_DYNAMIC_CONVERSION&RevisionSelectionMethod=LatestReleased&dDocName=cm_00280612 (listing "homelessness" as an exemption to general work requirements).
[40] Kristen Swanson, *Minnesota Repeatedly Reported Inaccurate data on SNAP to the Federal Government*, KTSP.COM (Dec. 15, 2025), https://kstp.com/kstp-news/top-news/minnesota-repeatedly-reported-inaccurate-data-on-snap-to-the-federal-government/.
[41] *Id.*

started reaching out to us."[42] In an interview with the news agency, Minnesota's SNAP Commissioner answered questions about the prevalence of fraud in SNAP in Minnesota.[43] She responded that less than 1% of SNAP recipients are found to have committed fraud, with only 143 intentional program violations committed.[44] However, "[t]he department later confirmed that the SNAP issuance data and fraud numbers in the last three USDA State Activity Reports were incorrect."[45]

The latest revelations concerning the inaccuracy of Minnesota's reported data, including its fraud numbers, were all the more troubling in light of Minnesota's repeated refusal to provide participant data to the SNAP Information Database.[46] Without access to Minnesota's participant data, USDA is in the position of paying Federal dollars to Minnesota to operate a program that Minnesota's staff acknowledges contains fraud that it does not know the extent of and did not recognize inaccurate data without the public's assistance.[47] Further, FNS's review of the data it has gathered in the SNAP Information Database from complying States has shown that States with a county-administered program, like Minnesota, are more likely to have higher rates of fraud, waste, and abuse than States that do not delegate administration of SNAP to the county level.[48]

---

[42] *Id.*
[43] *Id.*
[44] *Id.*
[45] *Id.*
[46] *See* Privacy Act of 1974; System of Records, 90 Fed. Reg. 26,521 (Sept. 23, 2025).
[47] *See* Corley Decl., Ex. A at 41:50–42:08; Swanson, *supra* note 40.
[48] Corley Decl. ¶ 16.

Minnesota's claims that it protects SNAP program integrity and implements anti-fraud measures are misleading. Minnesota previously stated that "Federal data confirms" its Quality Control and Management Evaluation measures are "effective" at protecting SNAP program integrity because of its FFY 2024 "Payment Error Rate" of 8.98 percent.[49] Although it is true that Minnesota's data indicates an error rate was 8.98 percent, that rate was so high that the State was required, by statute, to develop and implement a Corrective Action Plan for its payment errors.[50] Being required to take corrective action as a result of payment errors certainly cannot constitute federal confirmation of program integrity or effective management.

Minnesota also contends that USDA "recently reviewed Minnesota's processes and found that [M]DCYF was fully discharging its SNAP responsibilities with no issues."[51] Again, this is misleading. Management Evaluations are conducted only on discrete portions of a State's SNAP operations at a given time, and the various "functional areas" examined by the Management Evaluations are on timed review cycles.[52] For example, there can be Management Evaluations conducted on State Management Evaluation Systems, PAR – Program Access Review (local and state – evaluates how accessible a program is within the State based on a myriad of state performance measures), ABAWD – Able-Bodied

---

[49] *See* Memorandum in Support of Plaintiff's Motion for a Temporary Restraining Order or Expedited Preliminary Injunction or Stay (ECF No. 6) at 5, hereinafter cited to as "Pl.'s Mem. at ___."

[50] Corley Decl. ¶ 22. *See also* 7 U.S.C. § 2025(c)(1)(G) (requiring a Corrective Action Plan to reduce payment errors for State Agencies with a payment error rate of 6% or greater).

[51] Pl.'s Mem. at 3 (citing Declaration of Jovon Perry [ECF No. 10] ¶ 10).

[52] Corley Decl. ¶ 24.

Without Dependents (this refers to a specific subset of SNAP recipients who are subject to particular work requirements), E&T – Employment & Training (this refers to a program that relates to helping participants access jobs and skills training), QC Statistics/QC Integrity – Quality Control (this is a specific systems within SNAP that evaluates the payment accuracy of States), Recipient Claims, Recipient Integrity, SNAP-Ed – this is the name of a concluded nutrition education grant program within SNAP, and EBT – Electronic Benefit Transfer (this refers to the electronic system of benefit issuance and use), anywhere from every 2 years to every 6 years. The Management Evaluation that Minnesota cites in support of its contention was focused on the State Management Evaluation System—not its compliance with ABAWD requirements, its handling of recipient claims, or crucially, its handling of recipient integrity.[53]

Further, Minnesota is relying on figures based on the data that it collected under the direction of program management that, as previously stated, trained State workers to strive to avoid finding and referring fraud for investigation.[54] Those figures cannot be relied upon.

### E. USDA Exercised Its Statutory Authority by Establishing the December 16 Pilot to Ensure Federal Dollars Go Only to Those Who Are Eligible.

As a result of the information obtained by USDA concerning Minnesota's administration of SNAP and FNS programs, generally—the Feeding Our Future fraud scheme, the MDHS SNAP Fraud Training Video, the reporting of inaccurate SNAP issuance and fraud information to USDA over a period of years, the repeated subsequent

---

[53] *See id.*
[54] Corley Decl. ¶¶ 19-21.

failure to discover errors and fraud on its own, a "Payment Error Rate" necessitating formal corrective actions, and its refusal to provide to USDA the underlying participant data that would enable USDA to ascertain accurately Minnesota's ability to administer SNAP—the Secretary exercised her statutory authority and created the pilot outlined in her December 16, 2025 letter (the "December 16 Pilot").[55] The December 16 Pilot stated that the State's failure to comply with the pilot project would trigger the statutory process applicable to noncompliance by a State agency with a SNAP-related obligation.[56]

Minnesota has argued that the establishment of this pilot project is a remedial action to force it into compliance for the maladministration of SNAP.[57] In support of this contention, Minnesota cited to 7 U.S.C. § 2020(g)–(h), (l) and contended that because Congress provided specific tools for bringing States into compliance with the FNA, a pilot project cannot be used in support of this purpose.[58] However, this mischaracterizes the action at hand. The purpose behind the December 16 Pilot is to test whether such recertification actions are effective in detecting known but undetected fraud in a State's SNAP program and effectively "re-setting" the State's SNAP administration to one of full compliance when remedial actions such as management evaluations and corrective action plans have previously fallen short.[59] And, contrary to Minnesota's assertion that this pilot

---

[55] Corley Decl. ¶¶ 25-29; *see id.*, Ex. C; *see* Compl., Ex. 1.
[56] Compl., Ex. 1 (citing 7 U.S.C. § 2020(g)).
[57] *See* Pl.'s Mem. at 18.
[58] *Id.*
[59] Corley Decl. ¶¶ 25-29.

project "could only detect SNAP recipient fraud," which USDA is dedicated to eliminating, this pilot project would also illuminate instances of MDCYF employee fraud.[60]

### F. A Party Challenging Agency Action Must Exhaust Their Administrative Remedies before Seeking Judicial Review in Federal Court.

Before USDA may impose consequences on States for noncompliance with a FNA obligation, regulations dictate that significant procedures must be followed unless otherwise waived by the USDA. *See* 7 C.F.R. § 276.4 (suspension or disallowance of administrative funds); *id.* § 276.5 (injunctive relief). USDA must provide the State with notice of the deficiency and an opportunity to correct it, and if the State does not do so, USDA must then provide a Formal Warning that describes the deficiency and nature of the noncompliance. 7 U.S.C. § 2020(g); *see* 7 C.F.R. § 276.4(d)(1)-(2).[61]

From there, the exhaustion process includes several steps. The State agency has 30 days from receipt of the warning to either submit evidence of compliance or submit a corrective action proposal. 7 C.F.R. § 276.4(d)(2)(ii)-(iii). If the State agency is still deficient after that period, USDA must determine the "appropriate" funds to be suspended or withheld, § 2020(g), and FNS must notify the State. 7 U.S.C. § 2020(g); 7 C.F.R. § 276.4(e).

The State agency may generally stay enforcement by seeking an administrative appeal under Section 2023. 7 U.S.C. § 2020(g) (any withholding is "subject to

[60] Corley Decl. ¶ 28.
[61] 7 C.F.R. § 276.4(d)(2)(i) ("Formal warnings shall include the following information: . . . .).

administrative and judicial review under section 2023"), *id.* § 2023(a)(3) ("If such . . . State agency is aggrieved by such action, it may . . . file a written request for an opportunity to submit information in support of its position"). The State may appeal the decision in accordance with procedures at 7 C.F.R. § 276.7. The filing of a timely appeal automatically stays enforcement of FNS's claims, except in limited circumstances. 7 C.F.R. § 276.7(e). And a State agency aggrieved by USDA's final determination in that appeal may obtain judicial review in district court. 7 U.S.C. § 2023(a)(13); 7 C.F.R. § 276.7(j). When pursued, exhaustion of these remedies can take months or even years.[62]

## FACTUAL ALLEGATIONS

The following facts from the 267 allegations in Plaintiff's 62-page, Amended Complaint, along with the documents referenced therein, are germane to the present motion.[63] Allegations in the Amended Complaint that are irrelevant, impertinent, overtly political, legal conclusions, or otherwise not germane to the legal claims at issue have been omitted.

---

[62] Declaration of Shiela Corley in Support of Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction, dated January 22, 2026 (ECF No. 52-1, No. 1:25-cv-03428-RBJ (Colo. 2026) ¶ 53. *See supra* note 2.

[63] "As a general rule, a court may only consider the pleadings when a motion is made under Rule 12 of the Federal Rules of Civil Procedure. However, documents attached to the complaint, matters of public and administrative record referenced in the complaint, and uncontested documents whose contents are alleged in a complaint can be considered to decide a motion to dismiss." *Gonser v. Cont'l Cas. Co.*, 515 F. Supp. 2d 929, 933 (E.D. Ark. 2007). *See also Hirth v. Iowa Utils. Comm'n*, 771 F. Supp. 3d 1058, 1071 (N.D. Iowa 2025) ("On the other hand, when a copy of a 'written instrument' is attached to a pleading, it is considered 'a part of the pleading for all purposes.' . . . These documents include 'exhibits attached to the complaint.'" (citing Fed. R. Civ. P. 10(c))).

On December 16, 2025, Secretary Rollins sent a letter to Governor Tim Walz of the State of Minnesota.[64] In that letter, Secretary Rollins provided support for, and outlined the purposes of, the December 16 Pilot:

> Amid highly publicized and ongoing fraud affecting federally funded benefits in the State of Minnesota, including the multi-million-dollar Feeding Our Future fraud scheme that exploited the United States Department of Agriculture's (USDA) Food and Nutrition Service's (FNS) Child Nutrition Programs, USDA is hereby requiring Minnesota to participate in a Supplemental Nutrition Assistance Program (SNAP) pilot project, conducted pursuant to 7 U.S.C. 2026(b)(1)(A), to increase the efficiency of SNAP and improve the delivery of SNAP benefits to eligible households.[65]

Secretary Rollins stated that "[m]ore accurate certifications of eligibility for SNAP benefits will ensure that those in need receive assistance, raising levels of nutrition among low-income individuals."[66] The December 16 Pilot outlined the various actions USDA was requiring MDCYF to take, including recertifying all SNAP households in Hennepin, Ramsey, Washington, and Wright counties within 30 days of receipt of the letter (i.e., by January 15, 2026).[67] The December 16 Pilot also required that MDCYF, as part of the recertification process, "account[] for the income and resources of any excluded household members, conduct[] in-person interviews, and us[e] federal eligibility tools like the improved, cost-free Systematic Alien Verification for Entitlements (SAVE) Program database."[68] In the letter, Secretary Rollins stated, "Failure to participate in this pilot project

---

[64] Compl. ¶ 83; *id.*, Ex. 1.
[65] Compl., Ex. 1.
[66] *Id.*
[67] *Id.*; Compl., Ex. 1.
[68] Compl. ¶ 87; *id.*, Ex. 1.

as specified by USDA will trigger noncompliance procedures codified in 7 U.S.C. § 2020(g). It may also affect Minnesota's continued participation in SNAP."[69]

Since receiving the December 16 Pilot, the State made no effort to comply.[70] Although the December 16 Pilot invited the State to submit questions about the project and provided contact information,[71] the State did not contact USDA with questions or concerns regarding the project, nor request any extensions. Instead, on December 23, 2025, Minnesota sued Defendants and shortly thereafter sought a preliminary injunction enjoining Defendants from taking adverse action against Minnesota based on the December 16 Pilot.[72]

On January 9, 2026, Secretary Rollins sent a letter (the "January 9 Letter") to Minnesota Governor Walz and Minneapolis Mayor Jacob Frey stating, "The widespread and systemic fraud associated with federal benefit programs in the State of Minnesota and the City of Minneapolis demonstrate an inability to handle federal resources without additional oversight and accountability measures in place."[73] In support, Secretary Rollins referenced the Feeding Our Future fraud prosecution and "[o]ther recent examples of alleged fraud in Minnesota includ[ing] exploitation of the Small Business Administration Paycheck Protection Program, a scheme to defraud the Housing Stabilization Services

---

[69] Compl. ¶ 88; *id.*, Ex. 1.
[70] *See* Order Granting Motion for a Preliminary Injunction, filed on January 16, 2026 (ECF No. 44), at 42–43, hereinafter cited to as "P.I. Order at __."
[71] Compl., Ex. 1.
[72] Compl. ¶ 89.
[73] *Id.* ¶ 91; Compl., Ex. 2.

Program, and alleged fraud in daycare centers."[74] Secretary Rollins also stated that "rather than [the State] confirm your SNAP rolls are accurate to prevent continuing fraud, you asked the courts to block USDA's directive to recertify the State's SNAP recipients."[75] She added, "Recent news reports also emerged that the Minnesota Department of Human Services repeatedly reported incorrect information about SNAP to the federal government."[76]

Accordingly, Secretary Rollins notified the Governor and Mayor that "effective immediately" she was "suspending payments on all active awards and any future awards from USDA to the State of Minnesota and the City of Minneapolis, currently totaling over $129.18 million."[77] Moreover, Secretary Rollins explained how the award suspensions could be lifted:

> Within 30 days, you shall provide USDA with payment justifications for all federal dollar expenditures from January 20, 2025, to the present. Going forward, all transactions on awards to the State of Minnesota or the City of Minneapolis will require such payment justification. If those payment justifications are not received, awards will remain suspended.[78]

On January 14, 2026, Secretary Rollins sent Governor Walz a letter regarding a new pilot project (the "January 14 Pilot") established pursuant to 7 U.S.C. § 2026(b)(1)(A), which was to be informed by the following:

> FNS regularly analyzes all available data, including data received from States, in its efforts to eliminate fraud. Though Minnesota has not provided FNS with requested State-level data, FNS has undertaken a review of

[74] Compl., Ex. 2 (footnotes omitted).
[75] *Id.*
[76] *Id.* (footnotes omitted).
[77] Compl. ¶ 91; *id.*, Ex. 2.
[78] Compl., Ex. 2.

> available reporting data, and other open-source information to assess fraud indicia related to [SNAP]. This review's findings will inform prompt action under a new pilot project[.][79]

Secretary Rollins stated that the purpose of the January 14 Pilot is to "improve program administration by States, increase the efficiency of SNAP, address deficiencies in program integrity, and enhance the delivery of SNAP benefits to eligible households."[80] In the letter, Secretary Rollins also concluded that FNS "immediately withholds the Federal government's portion of Minnesota's administrative costs for the first quarter of calendar year 2026 and concurrently seeks immediate corrective action" because the Secretary determined a "pattern of lack of compliance" existed:[81]

> Under 7 U.S.C. 2020(g), upon finding "a pattern of lack of compliance by a State agency," the Secretary "shall . . . withhold from the State" the Federal government's share of the State's administrative costs. Minnesota's persistent and public indifference to ongoing fraud and an unwillingness to comply with safeguards against fraud constitute a pattern for purposes of 7 U.S.C. 2020(g).[82]

Secretary Rollins explained that while "[i]n previous, less severe instances of noncompliance, States typically have a longer opportunity for corrective action after formal notice and an administrative process to contest a suspension of payments for administrative costs."[83] However, here, "pursuant to the Secretary's authority in 7 U.S.C. 2026(b)(1)(A), and with particular attention to the policy objective codified in 7 U.S.C. 2020(g)," the January 14 Pilot "modifies these administrative procedures to accelerate corrective action

---

[79] *Id*., Ex. 3.
[80] *Id.*
[81] *Id.*
[82] *Id.*
[83] *Id.*

and more promptly address the significant fraud concerns in Minnesota, as well as to improve the integrity, efficiency, and delivery of SNAP to eligible households."[84]

As with the December 16 Pilot, since receiving the January 14 Pilot, Minnesota made no effort to comply. Although the January 14 Pilot invited the State to submit questions about the project and provided contact information,[85] the State did not contact USDA with questions or concerns regarding the project, nor request any extensions.

On January 14, 2026, this Court entered a preliminary injunction from the bench enjoining USDA from taking any adverse action against Minnesota based on the December 16 Pilot and January 14 Pilot.

On January 15, 2026, the 30-day compliance period identified in the December 16 Pilot lapsed. On January 16, 2026, this Court filed a written order further explaining its preliminary injunction decision.

On March 25, 2026, Minnesota filed an Amended Complaint, alleging that the USDA's actions violate the APA because: (1) the USDA did not follow APA-mandated procedures in 5 U.S.C. § 553 before sending the Recertification Letter (Count I); (2) the USDA's demands are contrary to law and exceed the USDA's authority (Count II); and (3) the USDA's actions are arbitrary and capricious (Count III). Minnesota further alleges that the USDA's demands violate the Spending Clause of the United States Constitution (Count IV) and that the USDA otherwise acted beyond the scope of its constitutional and statutory authority under the doctrine of ultra vires (Count V).

---

[84] *Id.*

[85] Compl., Ex. 3.

To date, Minnesota does not argue, and there is no evidence to show, that USDA has initiated noncompliance procedures against it under 7 U.S.C. § 2020(g) or otherwise with respect to the December 16 Pilot and January 14 Pilot, as would be necessary to withhold funding from the State. Likewise, there is neither a specific allegation in the Amended Complaint nor evidence to show that USDA suspended any awards as referenced in the January 9 Letter.

## MOTION TO DISMISS STANDARD

USDA raises various grounds for dismissal of the State's Amended Complaint in its entirety and with prejudice, including some that implicate the subject matter jurisdiction of this Court. To the extent there may be a question as to whether the motion should be brought under Rule 12(b)(1) or (6), it is of no moment in this case because USDA brings its motion under both. Jurisdiction is always the "first and fundamental question" for the court. *Franklin ex rel. Franklin v. Peterson*, 878 F.3d 631, 635 (8th Cir. 2017) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998)). Federal courts are courts of limited jurisdiction and as such may only hear matters that fall within the jurisdiction of the federal courts as authorized by Congress. *Steel Co.*, 523 U.S. at 94–95; *Marine Equip. Mgmt. Co. v. United States*, 4 F.3d 643, 646 (8th Cir. 1993). In any event, the standards of review for motions brought under Rule 12(b)(1) and (6) are well-established.

To survive a motion to dismiss under Rule 12(b)(6), a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 662. The factual allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

Although well-pleaded allegations of material fact are accepted as true and reasonable inferences are to be drawn in a non-movant's favor, the Court "need not accept as true a plaintiff's conclusory allegations or legal conclusions drawn from the facts." *Glick v. W. Power Sports, Inc.*, 944 F.3d 714, 717 (8th Cir. 2019) (citations omitted). In assessing pleading sufficiency, the Court does not consider legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 678–79. "[W]here the wellpleaded facts do not permit the court to infer more than the mere possibility of misconduct," the claim should be dismissed. *Id.* at 679.

With respect to Rule 12(b)(1), a complaint may be challenged successfully for lack of subject matter jurisdiction either on its face or on the factual truthfulness of its averments. *Titus v. Sullivan*, 4 F.3d 590, 593 (8th Cir. 1992). If a party challenges the factual basis for jurisdiction, as USDA does here, "the [district] court may not deny the motion to dismiss merely by assuming the truth of the facts alleged by the plaintiff and disputed by the defendant," but "must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss." *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000).

In other words, in this factual attack, Minnesota does "not enjoy the benefit of the allegations in [its] pleadings being accepted as true." *Branson Label, Inc. v. City of*

*Branson*, 793 F.3d 910, 914–15 (8th Cir. 2015) (quoting *Menchacha v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980)).

## ARGUMENT

## I. MINNESOTA'S CLAIMS ARE NOT RIPE.

Minnesota seeks an order to prevent USDA from taking any action with respect to the December 16 Pilot, January 9 Letter, or January 14 Pilot. But Minnesota failed to take the steps that are statutorily prescribed before any such action could conceivably occur. The State cannot challenge any such future enforcement at this time as those claims are not ripe.

Ripeness is a twofold inquiry that requires courts to "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967). Critical in this evaluation is whether the challenged action is final, *accord Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1126 (9th Cir. 2009) (citation omitted), and whether the alleged "aggrieved party" has exhausted all administrative remedies expressly prescribed by statute or agency rule. *Darby v. Cisneros*, 509 U.S. 137, 146 (1993). Each will be discussed in turn.

### A. Minnesota's Claims Are Not Ripe Because There Has Been No Final Agency Action.

In the context of APA disputes, the APA only makes "final" agency action reviewable by a court. 5 U.S.C. § 704; *see also Union Pac. R.R. Co. v. U.S. R.R. Ret. Bd.*, No. 24-2547, 2025 WL 3639277, at *5 (8th Cir. Dec. 16, 2025) (citation omitted) (explaining that the APA provides for review of a "final agency action for which there is

no other adequate remedy in a court"); *see State v. U.S. Dep't of Agric.*, No. 0:25-cv-04767-LMP-JFD, n.6 (D. Minn. Jan. 16, 2026) (citing same). In limiting APA review to "final" agency action, Congress restricted "pervasive oversight by federal courts over the manner . . . of agency compliance with . . . congressional directives," which would "inject[] the judge into day-to-day agency management." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 67 (2004).

Agency action is final if it satisfies two conditions: (1) the action must mark the consummation of the agency's decision-making process and not be merely tentative or interlocutory in nature, and (2) "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). Neither condition is satisfied here for the December 16 Pilot, January 9 Letter, or January 14 Pilot.

Minnesota alleges that the December 16 Pilot, January 9 Letter, and January 14 Pilot are final agency actions. Specifically, Minnesota contends, "The Recertification Letter [i.e., December 16 Pilot], Awards Termination Letter [i.e., January 9 Letter], and Enforcement Letters [sic][86] [i.e., January 14 Pilot] [ ] are final agency actions because they mark the consummation of USDA's decision-making process and determine rights or obligations

[86] At times, in the Amended Complaint, the State refers to the "Enforcement Letter" as the "Compliance Letter." Presumably, the State is referring to the same document attached as Exhibit 3 to the Amended Complaint. *Compare* Compl. ¶ 105 *with* Compl. ¶ 106.

from which legal consequences will flow."[87] But this Court need not accept those legal conclusions, which are couched as fact. *See Iqbal*, 556 U.S. at 678–79.

To the extent Minnesota contests the enforcement of any potential sanction under the APA and seeks this Court's review thereof, this Court lacks subject matter jurisdiction because the December 16 Pilot, January 9 Letter, and January 14 Pilot are not final agency actions. The FNA and its regulations outline a detailed administrative review process of USDA's decision to suspend or disallow funds.[88] That process includes the State being able to appeal the decision in accordance with procedures at 7 C.F.R. § 276.7(c).[89] As non-compliance procedures have not begun yet, let alone concluded with a final determination following the extensive steps outlined above for the December 16 Pilot, January 9 Letter, or January 14 Pilot, there is no "final agency action" under the APA for the State to challenge.

Further, Minnesota seeks a permanent injunction along with resolution of a host of legal issues, even though it has not been sanctioned and thus, has not been harmed. With respect to the December 16 Pilot, this Court has already acknowledged that compliance harm is moot:

> [W]hen Minnesota moved for a preliminary injunction on December 29, 2025, ECF No. 5, the substantial compliance costs Minnesota complained about were real and imminent. But now, with the arrival of the January 15,

---

[87] *See, e.g.*, Compl. ¶¶ 239, 248, 254 (citing *Bennett v. Spear*, 520 U.S. 157, 177–78 (1997)). By doing so, Minnesota then asserts APA-based causes of action based on alleged APA procedural violations (Count I), USDA taking action that is contrary to law and in excess of statutory authority (Count II), and USDA actions were "arbitrary and capricious" (Count III).

[88] *See* Statutory and Regulatory Background § F.

[89] *See* 7 C.F.R. § 276.7(g) (State permitted to submit additional evidence).

> 2026 deadline, it does not appear that any of the compliance costs were borne out. Nor does it appear that the Recertification Letter imparts any continuing obligations on Minnesota, such that these compliance costs would remain at issue moving forward. ECF No. 22 at 24 (the USDA asserting that it "simply called for a one-time acceleration . . . of the work that Minnesota is in all events obligated to perform"). In some respects, then, the issue of compliance harm is moot.[90]

Equally important, Minnesota does not argue, and there is no evidence to show, that USDA has initiated noncompliance procedures against it under 7 U.S.C. § 2020(g) or otherwise with respect to either the December 16 Pilot or the January 14 Pilot, as would be necessary to withhold funding from the State.

And as for the January 9 Letter, it was not followed by action to cut off or terminate grants based on the December 16 Pilot or otherwise. There is no specific allegation as to any award being suspended nor evidence to show that USDA suspended any awards as referenced in the January 9 Letter. If USDA were ultimately to impose a sanction, which it has not, it is unknown what specific legal issues would still be relevant at that time, or what specific evidence USDA would rely on to impose a sanction.

### B. Minnesota's Claims Are Not Ripe Because the State Failed to Exhaust All Administrative Remedies.

Additionally, Minnesota's claims are not ripe because the State failed to exhaust all administrative remedies before filing the present lawsuit. Previously stated, the exhaustion process includes several steps. The State agency has 30 days from receipt of the warning to either submit evidence of compliance or submit a corrective action proposal. 7 C.F.R. § 276.4(d)(2)(ii)-(iii). If the State agency is still deficient after that period, USDA must

[90] P.I. Order at 42.

determine the "appropriate" funds to be suspended or withheld, § 2020(g), and FNS must notify the State. 7 U.S.C. § 2020(g); 7 C.F.R. § 276.4(e).

The State agency may generally stay enforcement by seeking an administrative appeal under Section 2023. 7 U.S.C. § 2020(g) (any withholding is "subject to administrative and judicial review under section 2023"), *id.* § 2023(a)(3) ("If such . . . State agency is aggrieved by such action, it may . . . file a written request for an opportunity to submit information in support of its position"). The State may appeal the decision in accordance with procedures at 7 C.F.R. § 276.7. The filing of a timely appeal automatically stays enforcement of FNS's claims, except in limited circumstances. 7 C.F.R. § 276.7(e). And a State agency aggrieved by USDA's final determination in that appeal may obtain judicial review in district court. 7 U.S.C. § 2023(a)(13); 7 C.F.R. § 276.7(j). When pursued, exhaustion of these remedies takes months or even years.[91] Courts do not permit litigants to bypass that scheme simply because they would prefer a faster forum. *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992).

The record is clear that there is much to be resolved via the administrative process. Since receiving the December 16 Pilot, January 9 Letter, and January 16 Pilot, Minnesota has not exhausted any step in the administrative remedy process. Further judicial review at this juncture would circumvent this scheme.

---

[91] *Supra* note 62.

### C. Minnesota's Ripeness Defects Apply to All of Their Claims.

For the avoidance of doubt, these threshold exhaustion deficiencies apply to all of Minnesota's claims, including their non-APA claims, specifically their Spending Clause claim (Count IV) and ultra vires claim (Count V). Minnesota styles its Amended Complaint to include non-APA claims apparently to avoid the finality requirement of 5 U.S.C. § 704 or excuse its failure to exhaust remedies. But these claims lack independent substance.

Each challenges the same agency action (the December 16 Pilot, January 9 Letter, and January 14 Pilot), relies on the same factual predicates (apparently alleged politically motivated behavior and alleged overreach), and seeks the same relief (stay of the effective dates, vacatur, and permanent injunctions barring their implementation). The Spending Clause claim and ultra vires claim are APA-procedural challenges in constitutional clothing. For each count, Minnesota contends USDA either lacked congressional authority, did not comply with it (e.g., failed to provide notice and comment), or exceeded it—which are effectively the same APA-arguments Minnesota makes under Counts I, II, and III. Where, as here, the standing and substantive basis for a constitutional claim arise under a federal statute, the claim must be channeled through the administrative review process Congress created. *Weinberger v. Salfi*, 422 U.S. 749, 760–61 (1975); *Shalala v. Ill. Council on Long Term Care*, 529 U.S. 1, 11–13 (2000). Minnesota cannot evade that requirement by relabeling its APA challenges as constitutional, ultra vires claims.

In short, the issues Minnesota identifies are not fit for judicial decision yet. Even though this Court granted the States's preliminary injunction, it should reject Minnesota's request to skip the aforementioned-exhaustion steps, advance to judicial review, and seek

a permanent injunction. The lack of a sanction—coupled with Minnesota's ability in the future to challenge any *potential* sanction before it ever takes effects, show that Minnesota's claims fail for lack of subject matter jurisdiction under Rule 12(b)(1) and as a matter of law for failure to state a claim under Rule 12(b)(6).

## II. APA REVIEW IS INAPPLICABLE BECAUSE MINNESOTA HAS AN ADEQUATE ALTERNATIVE REMEDY.

Even if the December 16 Pilot, January 9 Letter, and January 14 Pilot were final agency actions—and they are not—APA review is unavailable where an adequate alternative remedy exists. *See* 5 U.S.C. § 704 ("agency action for which there is no other adequate remedy in a court" is subject to judicial review). The FNA regulatory framework provides exactly that. That structured path to challenge the December 16 Pilot, January 9 Letter, and January 14 Pilot is precisely the kind of adequate alternative remedy that forecloses resort to the APA in federal court. *See Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988).

## III. THE DECEMBER 16 PILOT, JANUARY 9 LETTER, AND JANUARY 14 PILOT DO NOT VIOLATE THE APA OR THE FNA.

Even if Minnesota's claims are ripe (which they are not) and even if Minnesota exhausted its administrative rights under the APA (which they did not), Minnesota's claims lack merit and are unavailing as a matter of law. Under the APA, review of an agency decision is limited. *Mandan, Hidatsa & Arikara Nation v. U.S. Dep't of the Interior*, 95 F.4th 573, 579 (8th Cir. 2024). This standard of review gives "agency decisions a high degree of deference." *Id.* (citing *Sierra Club v. EPA*, 252 F.3d 943, 947 (8th Cir. 2001)). The reviewing court decides whether the agency's decision was "based on consideration of

the relevant factors and whether there has been a clear error of judgment." *Id.* (quoting *Voyageurs Nat'l Park Ass'n v. Norton*, 381 F.3d 759, 763 (8th Cir. 2004) (cleaned up). "If an agency's determination is supportable on any rational basis," then a reviewing court "must uphold it." *Id.* (citing *Org. for Competitive Mkts. v. U.S. Dep't of Agric.*, 912 F.3d 455, 459 (8th Cir. 2018)). Applying this framework, Counts I, II, and III of the Amended Complaint should be dismissed as a matter of law.

**A. The December 16 Pilot, January 9 Letter, and January 14 Pilot Do Not Violate the APA Procedurally.**

Minnesota alleges in Count I of the Amended Complaint that USDA violated the APA because they failed to follow 5 U.S.C. § 553. The State argues that the December 16 Pilot, January 9 Letter, and January 14 Pilot impose legislative rules, and that as a result, the APA required USDA to proceed through notice and comment.[92] Specifically, Minnesota contends:

> Defendants did not provide notice of proposed rulemaking to Minnesota, the Recertification Counties, or any interested person. Defendants did not provide any opportunity to participate or comment. Defendants did not provide a concise statement of the rules' basis and purpose. And Defendants made the rules effective immediately, without waiting 30 days after providing final notice.[93]

Minnesota is mistaken that 5 U.S.C. § 553 even applies.

The APA defines a "rule" as "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4). "Agencies make rules when they announce principles of general

---

[92] Compl. ¶¶ 236-245.
[93] Compl. ¶ 244.

applicability and future effect." *Walmart Inc. v. U.S. Dep't of Just.*, 21 F.4th 300, 308 (5th Cir. 2021) (citing *United States v. Fla. E. Coast Ry.*, 410 U.S. 224, 244–45 (1973)). Here, the December 16 Pilot, January 9 Letter, and January 14 Pilot did not set "generally applicable" standards for States or impose future obligations. Instead, USDA issued a single, one-time discrete requirement applicable to four specific counties. USDA thus was not required to proceed through notice and comment. *Cf. Rowell v. Andrus*, 631 F.2d 699, 702 (10th Cir. 1980) (explaining that § 552(a)(1)(D) only "requires each agency to publish in the Federal Register *substantive rules of general applicability* adopted as authorized by law" (emphasis added) (quotation marks omitted)).

Minnesota insists that the December 16 Pilot, January 9 Letter, and January 14 Pilot impose legislative rules because they "substantively amend[] or add[] to, versus simply interpreting the contours of, [] preexisting rule[s]."[94] But Minnesota incorrectly presumes that only rules can impose duties. An agency can establish rules of general applicability, but it also can exercise its authority through specific orders, as has been true since well before the APA was ever promulgated. *See Norton*, 542 U.S. at 61–62 (distinguishing "an agency statement of . . . future effect designed to implement, interpret, or prescribe law or policy" (rule)" from "a final disposition . . . in a matter other than rule making" (order)"); *cf. Kenai Oil & Gas, Inc. v. Dep't of Interior*, 671 F.2d 383, 387 n.2 (10th Cir. 1982) (holding that an agency official's "exercise of his discretion not to approve a particular proposal . . . is not a rule under the APA" ); *see also SEC v. Chenery Corp.*, 332 U.S. 194,

[94] Compl. ¶ 240 (citations omitted).

201-02 (1947) (explaining that the SEC could take action "in the form of an order" in a particular matter even in the "absence of a general rule or regulation"; requiring the SEC to act only by "formulating" general rules would "stultify the administrative process").

Contrary to Minnesota's view, the December 16 Pilot, January 9 Letter, and January 14 Pilot amounts to "orders" or "the equivalent." *See* 5 U.S.C. §§ 551(6) (defining agency "order" as "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing"), 551(13). Courts interpret the term "order" broadly. *See Pub. Citizen, Inc. v. FERC*, 839 F.3d 1165, 1169 (D.C. Cir. 2016) ("[W]e have previously defined 'order' expansively to include any agency action capable of review on the basis of the administrative record." (citation and quotation marks omitted)). An APA "order" has long been understood to apply to a discrete agency action—like this one—directed to a specific party. *FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 238 n.7 (1980) (determining that the FTC's issuance of a complaint was "part of a final disposition" and therefore an "order" under the APA and explaining that such an interpretation was consistent with the APA's legislative history); *Balt. Gas & Elec. Co. v. FERC*, 954 F.3d 279, 284–85 (D.C. Cir. 2020) (concluding that a binding directive issued to a utility by FERC staff qualified as an "order" under 5 U.S.C. § 551(6)); *Sackett v. EPA*, 566 U.S. 120, 125 (2012) (treating EPA directive to landowners to restore a site as an order under the APA).

USDA effectively issued orders when it exercised its statutory authority in the December 16 Pilot, January 9 Letter, and January 14 Pilot directing a particular party

(Minnesota) to take specific, discrete actions within a specific timeframe. Therefore, USDA was not bound to follow notice and comment when issuing them.

Minnesota next contends that FNS was required to proceed through notice and comment under its own regulations.[95] But FNS did not act arbitrarily and capriciously in determining that the project at issue would not impose a "significant impact" on the public; therefore, by statute, notice and comment was not necessary. To the extent this regulation would have required such notice, the requirement was waived by the Secretary, as permitted by statute.

"At least 30 days prior to the initiation of a demonstration project, FNS shall publish a General Notice in the Federal Register if the demonstration project will likely have a significant impact on the public." 7 C.F.R. § 282.1(b). The State contends that FNS was required to determine that the pilot project was likely to have a significant impact on the public because it required recertifications that may lead to unexpected interviews of SNAP recipients, and because some SNAP recipients could lose benefits.[96] Here, though, USDA determined that the pilot project was not likely to have a significant impact on the public.[97] That determination satisfies the deferential arbitrary and capricious standard.

The State does not cite (and Defendants have not found) any cases interpreting the phrase "significant impact" in this regulation. But in other contexts, courts have recognized that an agency's determination that an action would not have a significant impact implicates

---

[95] Compl. ¶¶ 47-49, 104.
[96] *Id.* ¶¶ 175-176.
[97] *Supra* note 62 ¶ 28.

agency expertise and should not be overturned unless the determination was arbitrary and capricious. *Cf. Ctr. for Biological Diversity v. Dep't of the Interior*, 72 F.4th 1166, 1188 (10th Cir. 2023).

In any event, even if the regulation required prior notice to be published, that provision does not warrant setting aside the entire project. In the FNA, Congress expressly permitted USDA to waive such requirements to facilitate the pilot project. 7 U.S.C. § 2026(b)(1)(A). The regulations do not explain how they can be waived, and the Secretary, by issuing the program, can be taken to have implicitly waived the notice requirement.

### B. The December 16 Pilot, January 9 Letter, and January 14 Pilot Do Not Violate the APA as being Contrary to Law and in Excess of Statutory Authority.

Minnesota alleges in Count II of the Amended Complaint that the December 16 Pilot, January 9 Letter, and January 14 Pilot each violate the FNA and exceed the authority it confers on the Secretary for several reasons.[98] However, the actual allegations in the Amended Complaint regarding this claim focus on the December 16 Pilot alone.[99] Notwithstanding, none of the allegations have merit.

First, Minnesota argues that the December 16 Pilot violates several requirements for Section 2026 projects.[100] But the FNA gives the USDA Secretary broad discretion to conduct pilot projects that, among other things, "might increase the efficiency of the supplemental nutrition assistance program" or "improve program administration." 7 U.S.C.

---

[98] Compl. ¶¶ 166-187, 246-251.
[99] Compl. ¶¶ 166-187.
[100] *See, e.g.*, *id.* ¶ 181.

§ 2026(b)(1)(A)-(B). The statute does contemplate that States *may* affirmatively request waivers of regulatory requirements to conduct pilot projects, but Section 2026(b) does not state that the Secretary may conduct pilot projects *only* where a State affirmatively sought a waiver. *See id.* § 2026(b)(1)(D). Nothing in the statutory language limits the Secretary's authority in this manner.

Minnesota also contends that "[p]articipation in Section 2026 projects is voluntary: USDA cannot compel participation."[101] Minnesota makes this bold assertion in their Amended Complaint without any reference to legal authority. To the contrary, Section 2026 does not contain any language suggesting that the only manner in which the Secretary can carry out pilot projects is to secure voluntary cooperation from a State. Indeed, since the Secretary is *required* to carry out those pilot projects, the Secretary would presumably have to compel States to participate if no state voluntarily agreed to participate.

Second, Minnesota contends USDA's "authority in Section 2026 projects is limited to waiving requirements; they cannot impose new ones."[102] Section 2026(b) does not contain any language suggesting that the *only* way the Secretary may conduct a pilot project is through a waiver of existing requirements. Moreover, as explained above, the December 16 Pilot (as well as the January 14 Pilot) did not impose any new requirements; rather, it simply required that certain counties in Minnesota conduct recertifications as they normally would, but on an accelerated timeframe.

[101] *Id.* ¶ 44.
[102] *Id.* ¶ 185.

Third, Minnesota contends the December 16 Pilot "is impermissible because it contravenes SNAP's core objective of "providing food assistance to raise levels of nutrition among low-income individuals[.]"[103] Section 2026(b) prohibits pilot projects that are not "consistent with the goal of . . . providing food assistance to raise levels of nutrition among low-income individuals." 7 U.S.C. § 2026(b)(1)(B)(i)(I). Minnesota asserts that the project is inconsistent with this goal because it would, among other things, allegedly deny assistance to those who cannot be interviewed in person and be recertified within 30 days.[104] As explained above, the December 2016 Pilot does not require in-person interviews beyond those that are normally required during recertifications.

The December 16 Pilot also does not state that the State must unenroll households that are unable to complete the recertification process within the 30 days. Rather, the December 16 Pilot simply requires the State to unenroll any household that it determines is ineligible, as it would be required to do in the ordinary course of the recertification process.[105]

Section 2026(b) also requires that pilot projects include "an evaluation to determine the effects of the project." 7 U.S.C. § 2026(b)(1)(B)(i)(II). Minnesota asserts that the December 16 Pilot does not expressly provide for such an evaluation.[106] However, the December 16 Pilot requires the State to "[d]ocument and preserve all information relied

---

[103] *Id.* ¶ 167 (citing 7 U.S.C. § 2026(b)(1)(B)(i)(I)).
[104] *See id*.
[105] *See* Compl., Ex. 1.
[106] *Id.* ¶ 170.

upon to demonstrate compliance with this pilot project."[107] The purpose of this requirement is to allow the Secretary to evaluate the results of the project once it is completed, and USDA will do so.

The State further argues that Section 2026(b) prohibits projects that are inconsistent with the requirement that State agencies provide timely, accurate, and fair service to SNAP applicants and recipients.[108] Specifically, Minnesota argues the December 16 Pilot "would be inconsistent with these requirements because it would require Minnesota (1) to end SNAP recipients' certification periods before their assigned termination dates, (2) to terminate certification periods for reasons unrelated to the recipient's eligibility or conduct, and (3) to provide inadequate notice to households of the ending of their certification periods, all in violation of the FNA and its regulations."[109] As explained above, the December 16 Pilot does not impose new burdens or rules on beneficiaries. Minnesota asserts, "Each of the USDA Letters retroactively imposes new conditions on Minnesota that Minnesota did not agree to when it elected to participate in SNAP or accepted grant funding from USDA."[110] But nothing in the December 16 Pilot says that it "retroactively change[s] the rules" of eligibility. Rather, the December 16 Pilot requires Minnesota to unenroll ineligible households according to existing eligibility requirements.

---

[107] *See* Compl., Ex. 1.
[108] *Id.* ¶ 171 (citing 7 U.S.C. § 2026(b)(1)(B)(iv)(III)(ff)).
[109] *Id.* ¶ 172.
[110] *Id.* ¶ 260.

Minnesota also asserts that the December 16 Pilot would require it to violate federal laws and regulations, as well as (vaguely) its FNS-approved state plan of operation,[111] But the State does not elaborate on or support these allegations other than with conclusory statements, which appear to be premised on the same arguments addressed above.

Fourth, Minnesota argues that the December 16 Pilot's reference to possible sanctions under 7 U.S.C. § 2020(g) is unlawful. Specifically, Minnesota argues that § 2020(g) allows sanctions only "for noncompliance with the FNA or its regulations, the state's plan of operation, the state's plan for automated data processing, or statutory requirements applying to automated data processing."[112] However, the FNA gives the Secretary broad authority to conduct pilot projects. A refusal to participate in a pilot project established pursuant to that authority thus constitutes a violation of the FNA. And, in any event, Minnesota can argue that fact if there is a future administrative process to impose sanctions.

### C. The December 16 Pilot, January 9 Letter, and January 14 Pilot Do Not Violate the APA as Being Arbitrary and Capricious.

Minnesota alleges in Count III of the Amended Complaint that the December 16 Pilot, January 9 Letter, and January 14 Pilot are agency actions that are arbitrary and capricious.[113] However, such is not the case.

Agency action is arbitrary and capricious if:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem,

---

[111] *Id.* ¶ 179.
[112] *Id.* ¶¶ 46, 186.
[113] *Id.* ¶¶ 219-226, 228-251, 252-257.

> offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Mandan, Hidatsa & Arikara Nation*, 95 F.4th at 580. An agency must provide "a satisfactory explanation for its action[,] including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted). This Court may not substitute its own policy judgment for that of the agency.[114] *Id.* Instead, this Court must "simply ensure[ ] that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision."[115] *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

Here, USDA has satisfied this standard. USDA has a rational basis for establishing the December 16 Pilot and January 14 Pilot in Minnesota and issuing the January 9 Letter. Contrary to Minnesota's assertions, the December 16 Pilot was not justified solely by the Feeding Our Future scandal—as is evidenced by the letter stating the basis as "highly publicized and ongoing fraud… *including* the multi-million-dollar feeding Our future fraud scheme."[116]

As discussed previously, when launching the December 16 Pilot, USDA determined that it should consider a SNAP program integrity initiative because of ongoing fraud affecting federally funded benefits across the nation generally and in Minnesota

---

[114] P.I. Order at 33 (citing same).
[115] *Id.* (citing same).
[116] Compl., Ex. 1 (emphasis added).

specifically. USDA had particular concerns with States that have delegated SNAP implementation to counties and with the integrity of Minnesota's SNAP compliance specifically. USDA's decision making considered MDCYF performance, public reporting, and concerns over the State's administration of SNAP over the course of multiple years.[117] This, in and of itself, demonstrates that this action was not partisan, but rather legitimate, programmatic intervention.

Even so, while Minnesota asserts the activity it seeks to enjoin is impossible to comply with and did not factor in reliance interests, both are incorrect assertions. First, Minnesota cites to many of its State-elected options as hurdles to compliance—options the State is at liberty to alter. Second, it ignores the Secretary's authority to waive statutory requirements as needed to conduct the pilot—meaning all hurdles that would truly render the pilot impossible can be removed. Third, Minnesota assumes that USDA failed to consider the reliance interests of SNAP participants in Minnesota, however, that is not the case. USDA weighed its options and decided the greater risk to SNAP was the over billions of taxpayer dollars sent to Minnesota each year and the benefits being spent by fraudsters instead of families who were actually eligible.

In sum, USDA's decision was not arbitrary and capricious under governing law.

## IV. PLAINTIFF'S SPENDING CLAUSE AND ULTRA VIRES CAUSES OF ACTION FALL INDEPENDENTLY.

Minnesota's failure to exhaust is an independent bar to the present action. That deficiency applies with equal force to Minnesota's constitutional and ultra vires counts,

---

[117] *See* Corley Decl. ¶ 16-24; *see id.*, Ex. D.

which are, in substance, APA challenges repackaged in different doctrinal clothing—they rise or fall with the same requirement that Minnesota must first complete the administrative process Congress prescribed. Nonetheless, both causes of action fall on their own on the merits as a matter of law. Each claim is addressed in turn.

### A. The December 16 Pilot, January 9 Letter, And January 14 Pilot And Their Implementation Do Not Violate the Spending Clause.

In Count IV of the Amended Complaint, Minnesota asserts a violation of the Spending Clause of the U.S. Constitution predicated on its assertion that "[e]ach of the USDA Letters (i.e., the December 16 Pilot, January 9 Letter, and January 14 Pilot) retroactively imposes new conditions on Minnesota that Minnesota did not agree to when it elected to participate in SNAP or accepted grant funding from USDA."[118] Minnesota further asserts that the State "did not have 'clear notice' of these conditions when it elected to participate in SNAP and accepted the grants at issue."[119] However, Count IV fails as a matter of law.

The Spending Clause is inapplicable where, as here, a plaintiff does not allege that the relevant statute (the FNA) is itself unlawful. As several district courts have recently recognized, the Spending Clause is implicated only "when *Congress* imposes a spending or funding condition." *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*, 784 F. Supp. 3d 127, 162 (D.D.C. 2025) (emphasis added), *appeal filed*, No. 25-5277 (D.C. Cir. July 28, 2025); *see id.* (examining Supreme Court Spending-Clause cases

---

[118] Compl. [ECF No. 60] ¶ 260 (citing *Arlington Cent. Sch. Dist. v. Murphy*, 548 U.S. 291, 296 (2006)).
[119] *Id.*

to recognize that the doctrine is only applicable where plaintiffs allege that a statute is unlawful). Where plaintiffs—like Minnesota here—fail to challenge "congressional action," they "cannot state a claim under the Spending Clause." *Id.* at 162–63; *see also Bd. of Educ. for Silver Consol. Schs. v. McMahon*, 791 F. Supp. 3d 1272, 1288 (D.N.M. 2025) (same).

In any event, even if the Spending Clause were applicable—which it is not—Minnesota's challenge still fails on the merits because, as discussed earlier, the December 16 Pilot, January 9 Letter, and January 14 Pilot comport with and arise entirely out of the FNA's statutory requirements.[120]

### B. Plaintiff's Ultra Vires Claim Fails as a Matter of Law Because Other Adequate Remedies as Pled Exist.

A claim of ultra vires agency action is a claim to "equitable relief where an agency's action was ultra vires—that is, 'unauthorized by any law and ... in violation of the rights of the individual.' " *State v. Oz*, No. 26-cv-1701 (ECT/DTS), 2026 WL 926185, at *14 (D. Minn. Apr. 6, 2026) (quoting *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 680 (2025)). The ultra vires "claim is essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds*." Nuclear Regul. Comm'n*, 605 U.S. at 681–82 (citation omitted).

[120] When ruling on Plaintiff's P.I. motion, this Court did not reach Counts IV and V. P.I. Order at 39 ("Because the Court concludes that Minnesota is likely to prevail on at least one, and likely several, of its substantive APA claims, the Court need not consider Minnesota's procedural APA claims, its constitutional claim, or its *ultra vires* claim." (citing *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1040 (8th Cir. 2016))).

Recognizing that ultra vires review is susceptible to becoming an "end-run" around limitations imposed by judicial-review statutes (like the APA), the Supreme Court has "strictly limited nonstatutory ultra vires review" to instances where "an agency has taken action entirely in excess of its delegated powers and contrary to a specific prohibition in a statute." *Id.* (citing *Nuclear Regul. Comm'n v. Texas*, 605 U.S. at 681). Ultra vires review is not available "simply because an agency has arguably reached 'a conclusion which does not comport with the law.'" *Id.* (quoting *Boire v. Greyhound Corp.*, 376 U.S. 473, 481 (1964)). "Ultra vires review is also unavailable if, as is usually the case, a statutory review scheme provides aggrieved persons with a meaningful and adequate opportunity for judicial review, or if a statutory review scheme forecloses all other forms of judicial review." *Id.* (citation modified). Courts reject attempts to recast ordinary statutory or legal disputes as ultra vires claims, particularly where established remedial frameworks apply. *Nuclear Regul. Comm'n*, 605 U.S. at 681–82.

Here, Plaintiff's allegations in Count V—at most—sound in other causes of action, namely APA-Counts I-III. An agency that exercises a power it possesses in a manner a plaintiff considers improper has not acted ultra vires; it acts, at most, arbitrarily. The ultra vires label does not create a standalone claim, and thus, it fails on the merits.

Further, dismissal of Count V with prejudice is appropriate here because amendment would be futile. "A dismissal with prejudice is typically appropriate when a plaintiff has shown 'persistent pleading failures' despite one or more opportunities to amend [ ], or when the record makes clear that any amendment would be futile," *Miles v. Simmons Univ.*, 514 F. Supp. 3d 1070, 1080 (D. Minn. 2021) (internal citations omitted). Minnesota's ultra vires

theory rests on a legal defect: Count V and Counts I-III are duplicative legal theories, and Count V does not provide an independent basis for relief. This is the same count—albeit based on allegations that Minnesota added based on events that transpired after it filed its initial complaint on December 23, 2025. Thus, no further amendment of Count V can cure its deficiency. This Court should dismiss Count V with prejudice.

**CONCLUSION**

For the foregoing reasons, the Court should grant USDA's motion and dismiss the Amended Complaint in its entirety and with prejudice.

Respectfully submitted,

Dated: April 24, 2026

DANIEL N. ROSEN
United States Attorney

*s/ Adine S. Momoh*

BY: ADINE S. MOMOH
Assistant United States Attorney
Attorney Reg. No. 0390085
600 United States Courthouse
300 South Fourth Street
Minneapolis, MN 55415
Adine.Momoh@usdoj.gov
(612) 664-5600

BRIAN A. MIZOGUCHI
Special Assistant United States Attorney
Attorney ID No. Md. 8512010433
1400 Independence Ave., SW
Washington, D.C. 20250
brian.mizoguchi@usda.gov
(202) 836-1182

Attorneys for Defendants