UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

State of Minnesota,
by and through its Attorney General,
Keith Ellison,

        Plaintiff,

  v.

United States Department of Agriculture
and Brooke Rollins, as Secretary of the Department of Agriculture,

        Defendants.

Case No. 25-CV-04767-LMP-JFD

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

    Defendants ignore Minnesota's well-pleaded allegations by constructing a counter-narrative that is inappropriate on a motion to dismiss and that this Court already rejected in granting a preliminary injunction. Defendants recycle arguments this Court and a companion case have already rejected. They continue to mischaracterize their own actions, claiming the Recertification Letter does not impose any new obligations or require in-person interviews. And they argue their own failure to "initiate noncompliance proceedings"—which they "waived" for themselves—makes their actions unreviewable. This Court already determined Minnesota is likely to prevail: clearly the Amended Complaint meets the lower threshold of stating a claim. Defendants' motion should be denied.

## BACKGROUND

I.   **THE USDA OVERSEES STATES' ADMINISTRATION OF SNAP.**

The Supplemental Nutrition Assistance Program (SNAP) helps needy households afford food. 7 U.S.C. § 2011. SNAP is governed by the Food and Nutrition Act of 2008 (FNA), 7 U.S.C. §§ 2011–2036d. The USDA's Food and Nutrition Service (FNS) division oversees SNAP, but day-to-day administration falls to the states. *Id.* §§ 2013(a), 2020.

Relevant statutory and regulatory background is discussed in this Court's preliminary injunction order. ECF 44 ("PI Order") at 4–12. Of particular relevance is that eligible households are assigned definite periods of eligibility known as "certification periods." 7 U.S.C. § 2020(e)(4); 7 C.F.R. § 273.10(f). To remain eligible, a household must "recertify" before its certification period ends. States interview households during recertification. *Id.* § 273.14(b)(3). USDA permits states to conduct those interviews by telephone. *Id.* § 273.2(e)(2).

USDA pays half of each state's SNAP administration costs. 7 U.S.C. § 2025(a). If a state fails to comply with SNAP statutes or regulations, USDA may seek "a suspension or disallowance" of the federal share of administrative funds. 7 C.F.R. § 276.1(a)(4); *see also* 7 U.S.C. § 2020(g). USDA must follow certain processes mandated by the FNA and its own regulations, including providing an "advance notification" and "formal warning" and allowing the state time to take corrective action after each notice. *Id.* § 276.4(d); *see also* 7 U.S.C. § 2020(g).

A decision made under these procedures to disallow funds (but not to suspend funds) is subject to administrative review. *See* 7 C.F.R. §§ 276.4(f), 276.7(a). Neither the FNA nor

2

accompanying regulations require states to pursue those procedures before pursuing other remedies.

## II. MINNESOTA'S DEPARTMENT OF CHILDREN, YOUTH, AND FAMILIES SUPERVISES SNAP BENEFITS FOR 440,000 MINNESOTANS.

In Minnesota, the Department of Children, Youth, and Families (DCYF) administers SNAP. Am. Compl. ¶ 24. Minnesota uses a "State-supervised, county-administered" model whereby DCYF supervises counties and Tribal Nations who process SNAP applications. *Id.* The most common recertification period in Minnesota is 12 months. *Id.* ¶ 29. Minnesota permits all recertification interviews to occur by telephone. *Id.* ¶ 32.

Approximately 440,000 Minnesotans receive SNAP benefits, totaling approximately $75 million each month in benefits. *Id.* ¶ 28. Minnesota spends about $160 million each year on SNAP administration, half of which is reimbursed by USDA. *Id.* ¶ 33.

## III. DEFENDANTS DEMAND THAT FOUR MINNESOTA COUNTIES RECERTIFY ALL HOUSEHOLDS IN 30 DAYS.

On December 16, 2025, Secretary of Agriculture Brooke Rollins sent Minnesota Governor Tim Walz a two-page letter that "is as astonishing as it is brief." *Colorado v. Trump*, --- F. Supp. 3d ---, 2026 WL 734048, at *2 (D. Colo. Mar. 16, 2026). The letter (the "Recertification Letter") states:

> Amid highly publicized and ongoing fraud affecting federally funded benefits in the State of Minnesota, including the multi-million-dollar Feeding Our Future fraud scheme….USDA is hereby requiring Minnesota to participate in a Supplemental Nutrition Assistance Program (SNAP) pilot project, conducted pursuant to 7 U.S.C. § 2026(b)(1)(A)[.]

Ex.[1] 1. This "pilot project" (a "Section 2026 Project") required Minnesota to "[c]onduct recertifications, within 30 days of receipt of this letter, of all SNAP households in Hennepin, Ramsey, Washington, and Wright counties" using "in-person interviews[.]" *Id.* It warned that "[f]ailure to participate in this pilot project…will trigger noncompliance procedures codified in 7 U.S.C. 2020(g). It may also affect Minnesota's continued participation in SNAP." *Id.* The Secretary's letter coincided with a "taunting social media post." *Colorado*, 2026 WL 734048, at *18.



---

[1] "Ex." refers to the exhibits to the Amended Complaint.

Am. Compl. ¶ 90.

The four counties (the "Recertification Counties") contain approximately 98,000 households and 191,000 individuals who receive SNAP, about 45% of Minnesota's totals. *Id.* ¶ 127. It would be impossible for DCYF and the Recertification Counties to recertify these households in just 30 days, essentially collapsing a year of work into one month with no additional resources or opportunity to prepare. Am. Compl. ¶¶ 127–59. There is no reason to believe the processes demanded by the Recertification Letter would uncover fraud; the massive diversion of resources would instead hamper Minnesota's ability to detect fraud. *Id.* ¶¶ 160–65.

## IV. DEFENDANTS "SUSPEND[] PAYMENTS ON ALL ACTIVE AWARDS AND ANY FUTURE AWARDS" TO MINNESOTA.

Shortly after receiving the Recertification Letter, Minnesota sued and sought a preliminary injunction motion. ECF 1, 5. On January 9, 2026, Secretary Rollins sent a second letter (the "Awards Termination Letter"), this one to Governor Walz and Minneapolis Mayor Jacob Frey. Ex. 2. That letter also vaguely alleges "widespread and systemic fraud." *Id.* It also notes "you asked the courts to block USDA's directive to recertify the State's SNAP recipients." *Id.* Secretary Rollins announced immediate action:

> [E]ffective immediately, I am suspending payments on all active awards and any future awards from USDA to the State of Minnesota and the City of Minneapolis, currently totaling over $129.18 million. Within 30 days, you shall provide USDA with payment justifications for all federal dollar expenditures from January 20, 2025, to the present.

*Id.* The letter cited no authority for these actions.

5

## V.   DEFENDANTS WITHHOLD SNAP ADMINISTRATIVE FUNDS WITHOUT FOL- LOWING MANDATORY PROCEDURES.

This Court set a motion hearing for January 14, 2026 (the day before the Recertification Letter's compliance deadline). In the courtroom that day, minutes before the hearing, Defendants' counsel handed Minnesota's counsel a third letter from Secretary Rollins to Governor Walz (the "Enforcement Letter," and with the other letters, the "USDA Letters"). *Id.* ¶ 98; Ex. 3.

The Enforcement Letter "preemptively took the very action that Minnesota's motion sought to enjoin." PI Order at 18 n.5. It states it creates a "new pilot project" pursuant to § 2026(b)(1)(A), under which "FNS immediately withholds the Federal government's portion of Minnesota's administrative costs for the first quarter of calendar year 2026 and concurrently seeks immediate corrective action." Ex. 3. The letter did not identify any such corrective action. *Id.* Loss of these funds would "effectively caus[e] a shutdown of SNAP in Minnesota." Am. Compl. ¶ 218; *see also* PI Order at 44–45.

The letter acknowledges it does not comply with the FNA's procedures for withholding administrative funds, including "formal notice," "opportunity for corrective action," or "an administrative process to contest a suspension of payments for administrative costs," stating "this pilot project modifies these administrative procedures to accelerate corrective action[.]" *Id.*

## VI.   DEFENDANTS IMPOSE THE SAME DEMANDS ON COLORADO.

On December 17, 2025, Defendants sent Colorado's governor a letter nearly identical to Minnesota's Recertification Letter. Am. Compl. ¶¶ 109, Ex. 4. That letter purported

to require Colorado to recertify all SNAP households in 5 counties within 30 days, also using in-person interviews. Ex. 4. A federal district court enjoined Defendants from enforcing that letter. *See Colorado*, 2026 WL 734048.

## VII. THE USDA LETTERS ARRIVED AS PRESIDENT TRUMP PLEDGED "RECKONING" AND "RETRIBUTION" UPON MINNESOTA.

For months, President Trump has made crude, derogatory comments toward Minnesota and its leaders. *Id.* ¶¶ 67–74, 81. The USDA Letters arrived amid a flurry of punitive actions taken by the federal government against Minnesota. Am. Compl. ¶¶ 67–82. Chief among these was Operation Metro Surge, which profoundly transformed daily life in Minnesota and culminated in the killing of two Minneapolis residents by federal officers. *Id.*

Other federal agencies also turned their attention to Minnesota. In seeming lockstep, they suspended funds, opened investigations, and used any available levers to inflict harm on Minnesota. *Id.* ¶ 82.

One need not wonder if the federal government was merely punishing Minnesota: federal leaders openly said it. *Id.* ¶¶ 67–74, 81. To remove all doubt, in the wake of the killing of Renee Good by an ICE officer, President Trump posted this:



*Id.* ¶ 78.

Similar events unfolded in Colorado. Colorado refused to recognize President Trump's "pardon" of a former elections clerk convicted of state crimes. *Colorado*, 2026 WL 734048, at \*6. "The following week, the Trump Administration launched a barrage of threats and actions designed, by all appearances, to punish Colorado[.]" *Id.*

Colorado's recertification letter "arrived amid this flurry." *Id.* The *Colorado* court found "the pilot project seems to be about punishment and nothing more." *Id.* at \*18.

## PROCEDURAL POSTURE

On January 14, 2026, this Court granted Minnesota's preliminary injunction motion from the bench, enjoining Defendants from acting against Minnesota based on the Recertification Letter or Enforcement Letter. PI Order at 18. Two days later, the Court issued a written opinion. *Id.* In March 2026, Minnesota filed an Amended Complaint including claims regarding the Awards Termination Letter and Enforcement Letter. ECF 60. Defendants now move to dismiss.

## LEGAL STANDARD

To survive a motion under Federal Rule of Civil Procedure 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court must "take as true the factual allegations and grant all reasonable inferences in favor of the nonmoving party." *Lustgraaf v. Behrens*, 619 F.3d 867, 872–73 (8th Cir. 2010). The Court need not accept "legal conclusions or formulaic recitation[s] of the elements of a cause of action." *Id.* at 873 (quotation omitted).

A Rule 12(b)(1) motion challenging subject matter jurisdiction may present "a facial attack" or a "factual attack." *Carlsen v. GameStop, Inc.*, 833 F.3d 903, 908 (8th Cir. 2016). In a factual attack, "the court considers matters outside the pleadings, and the non-moving

9

party does not have the benefit of 12(b)(6) safeguards." *Id.* As discussed below, Defendants' motion arises only under Rule 12(b)(6), not 12(b)(1).

Obtaining a preliminary injunction is a "heavier burden" than pleading a "plausible claim[.]" *New Hope Fam. Servs., Inc. v. Poole*, 966 F.3d 145, 165 (2d Cir. 2020). A motion to dismiss should rarely, if ever, be granted where a plaintiff has already shown it is likely to prevail. *Cf. Child Evangelism Fellowship v. Elk River Area Sch. Dist. #728*, 599 F. Supp. 2d 1136, 1142 (D. Minn. 2009) (summarily denying motion to dismiss after granting preliminary injunction).

## ARGUMENT

### I.    THE COURT SHOULD DISREGARD DEFENDANTS' EXTENSIVE DISCUSSION OF MATTERS OUTSIDE THE PLEADINGS.

Defendants ignore nearly all of Minnesota's allegations, including that it would be impossible to comply with the Recertification Letter, Am. Compl. ¶¶ 127–59, and that Defendants punished Minnesota for partisan purposes, *id.* ¶¶ 67–82, 191–96, 226, 234. Rather than accept the Rule 12(b)(6) standard, Defendants state they have ignored allegations they deem "irrelevant, impertinent, overtly political…or otherwise not germane[.]" ECF 67 at 18–19.

Defendants rely extensively on declarations, press releases, and news articles. These materials cannot be considered on a Rule 12(b)(6) motion. *See, e.g., Lee v. Seasons Hospice*, 696 F. Supp. 3d 572, 578 (D. Minn. 2023). Defendants' assertions are misleading or false. *See* ECF 25 at 2; ECF 27 ¶¶ 4–14.

Defendants claim to make a Rule 12(b)(1) "factual attack," permitting them to submit matters outside the pleadings. ECF 67 at 6. They claim to contest ripeness, an Article III requirement. *Id.* at 24. But Defendants actually contest "final agency action" and exhaustion, two prerequisites to review under the Administrative Procedure Act (APA). *See* 5 U.S.C. § 704; *Glisson v. U.S. Forest Serv.*, 55 F.3d 1325, 1326 (7th Cir. 1995) (APA's exhaustion requirement is "codified" in § 704).

"[T]he APA's requirements are part of a party's cause of action and are not jurisdictional." *Iowa League of Cities v. EPA*, 711 F.3d 844, 878 n.12 (8th Cir. 2013).[2] They are therefore reviewed under Rule 12(b)(6), making it inappropriate to consider any materials outside the pleadings.

Even under Rule 12(b)(1), extraneous matters can only be considered regarding subject matter jurisdiction. But Defendants rely on declarations to construct post hoc justifications for the Recertification Letter. *See, e.g.*, ECF 67 at 10–15, 40–42. This has nothing to do with "ripeness;" it attempts to respond to Minnesota's arbitrary and capricious claim but rejects the obligation to "accept as true all of the factual allegations in the complaint" and "refrain from considering matters 'outside the pleadings.'" *Lee*, 696 F. Supp. 3d at 578.

---

[2] Some opinions "have loosely referred to the final agency action requirement as 'jurisdictional.'" *Trudeau v. FTC*, 456 F.3d 178, 184 (D.C. Cir. 2006). But "where judicial review is sought under the APA rather than a particular statute prescribing judicial review, the requirement of final agency action is *not* jurisdictional." *Id.* (quotation omitted).

II.    **DEFENDANTS' ACTIONS ARE REVIEWABLE UNDER THE APA.**

### a.  The USDA Letters are final agency actions.

The APA allows review of "final agency action." 5 U.S.C. § 704. To be "final," the challenged action must: (1) "mark the consummation of the agency's decision-making process and not be merely tentative or interlocutory in nature," and (2) "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Union Pac. R.R. Co. v. U.S. R.R. Ret. Bd.*, 162 F.4th 908, 917 (8th Cir. 2025). "To satisfy this second condition, the agency action must inflict some legal injury upon the party seeking judicial review, either compelling affirmative action or prohibiting otherwise lawful action." *Id.* (quotation omitted).

### i.  This Court already determined the Recertification Letter is final agency action.

Defendants have already conceded that the Recertification Letter is final agency action. Jan. 14, 2026 Tr. at 36:17–22. The Court agreed, finding "[t]he challenged action not only is final but also determines Minnesota's obligations and the consequences flowing from a failure to comply therewith." PI Order at 22 n.6.

"Under the law-of-the-case doctrine, when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *In re Tri-State Fin., LLC*, 885 F.3d 528, 533 (2018) (quotation omitted).[3] This Court's determination should stand.

---

[3] Preliminary injunction orders constitute law of the case when they determine legal issues as opposed to preliminary fact determinations on a limited record. *See Minn. RFL Republican Farmer Lab. Caucus v. Moriarty*, 108 F.4th 1035, 1038 (8th Cir. 2024); *Howe v. Varity Corp.*, 36 F.3d 746, 752 (8th Cir. 1994).

### ii.  Each of the USDA Letters is final agency action.

Defendants claim "[n]either condition" of the final-agency-action test is met by any of the USDA Letters but fail to explain why. ECF 67 at 25. Instead, they focus on the availability of administrative review and whether Defendants have brought "noncompliance procedures" against Minnesota. ECF 67 at 26–27. But Defendants never actually contest either of the two conditions, both of which are easily met. *See Colorado*, 2026 WL 734048, at \*9 (Colorado letter "constitutes final agency action").

### 1.  The USDA Letters each mark the consummation of Defendants' decision-making process.

A final agency action "mark[s] the consummation of the agency's decision-making process[.]" *Union Pac.*, 162 F.4th at 917. The Awards Termination Letter and Enforcement Letter each announce withholding of funds. As to the Recertification Letter, "[t]here is nothing 'tentative or interlocutory'" about Defendants' position that Minnesota "must comply with these new obligations or face the legal consequences." *Colorado*, 2026 WL 734048, at \*9.

### 2.  The USDA Letters determine obligations or create legal consequences.

Each of the USDA Letters determines obligations or is an action "from which legal consequences will flow." *Union Pac.*, 162 F.4th at 917. The Awards Termination Letter and Enforcement Letter cut funding, a classic legal consequence. *See, e.g., Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 763 F. Supp. 3d 36, 54 (D.D.C. 2025) (freezing federal funds "immediately produced legal consequences"); *Woonasquatucket River*

*Watershed Council v. USDA*, 778 F. Supp. 3d 440, 467 (D.R.I. 2025) ("'legal consequences' surely flow" from funding freezes).

The Recertification Letter meets the second condition because it requires Minnesota to take certain actions. *See Sackett v. EPA*, 566 U.S. 120, 126 (2012) (condition met where agency action gave plaintiffs "the legal obligation to 'restore' their property"); *Union Pac.*, 162 F.4th at 917 (condition met where agency "compel[s] affirmative action"). It also fixes legal consequences for failing to comply. Another court found final agency action where Secretary Rollins warned noncompliance "<u>may</u> trigger noncompliance procedures[.]" *California v. USDA*, 2025 WL 2939227, at *5 (N.D. Cal. Oct. 15, 2025) (emphasis in original). The Recertification Letter states noncompliance "*will* trigger noncompliance procedures," and even result in termination of SNAP in Minnesota. Ex. 1 (emphasis added).

### 3. Whether Defendants have "initiated noncompliance proceedings" is irrelevant.

Defendants contend that the Recertification Letter and Enforcement Letter are not final agency actions because USDA has not "initiated noncompliance procedures against [Minnesota] under 7 U.S.C. § 2020(g)…as would be necessary to withhold funding from the State." ECF 67 at 27. This argument would be unavailing even if true. "[P]arties need not await enforcement proceedings before challenging final agency action where such proceedings carry the risk of 'serious…civil penalties.'" *U.S. Army Corps. of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 600 (2016); *see also Sackett*, 566 U.S. at 127 (APA plaintiff need not "wait for the Agency to drop the hammer"); *cf. Iowa League of Cities*, 711 F.3d at 868

14

(ripeness met where plaintiffs "must either immediately alter their behavior or play an expensive game of Russian roulette").

And Defendants proceed with remarkable chutzpah in arguing the lack of "noncompliance proceedings" makes their actions unreviewable when *they unlawfully bypassed those procedures* to immediately impose crippling penalties on Minnesota. *See* Ex. 3; PI Order at 31. An enforcement action is not a prerequisite to APA review, and the APA does not permit agencies to insulate their actions from review by eschewing mandatory procedures.

### 4. Availability of administrative review is irrelevant to final agency action.

Defendants also argue there is no final agency action because "[t]he FNA and its regulations outline a detailed administrative review process of USDA's decision to suspend or disallow funds." ECF 67 at 26. As discussed below, these procedures are inapplicable here and not mandatory even where they apply.

Regardless, Defendants conflate finality with exhaustion: "the judicial doctrine of exhaustion of administrative remedies is conceptually distinct from the doctrine of finality." *Darby v. Cisneros*, 509 U.S. 137, 144 (1993). The final agency action test does not consider the availability of administrative review. *See Union Pac.*, 162 F.4th at 917.

### 5. Whether Minnesota has been "sanctioned" or "harmed" is irrelevant.

Defendants argue Minnesota "has not been sanctioned and thus, has not been harmed." ECF 67 at 27. But a party need not "be sanctioned" or "harmed" for agency action to be "final." *Colorado*, 2026 WL 734048, at *9 ("USDA's argument that the matter is not

15

ripe because Colorado has not been sanctioned yet is unavailing."). Parties may bring pre-enforcement challenges to final agency actions. *See Hawkes Co.*, 578 U.S. at 600; *Sackett*, 566 U.S. at 127; *Iowa League of Cities*, 711 F.3d at 868.

And Defendants *have* sanctioned and harmed Minnesota.[4] The Recertification Letter and Enforcement Letter would have imposed irreparable harm on Minnesota had they not been enjoined. PI Order at 39–44. Defendants also cut $129 million in funding to Minnesota and Minneapolis, a harm that is ongoing. Ex. 2.

### 6. The Court should disregard Defendants' factual claims regarding the Awards Termination Letter.

Defendants argue, without evidence, that they did not cut funding pursuant to the Awards Termination Letter. ECF 67 at 27. But on a Rule 12(b)(6) motion the Court must accept the plaintiff's allegations. *See, e.g., Lee*, 696 F. Supp. 3d at 578.

The Awards Termination Letter is final agency action regardless. "An action is either final or not, and the mere fact that the agency could—or actually does—reverse course in the future does not change that fact." *Texas v. Biden*, 20 F.4th 928, 955 (5th Cir. 2021), *aff'd in relevant part, rev'd on other grounds*, 597 U.S. 785 (2022); *see also Sackett*, 566 U.S. at 127–28 ("The mere possibility that an agency might reconsider…does not suffice to make an otherwise final agency action nonfinal."); *Zhou v. Lyons*, 813 F. Supp. 3d

---

[4] Defendants teeter on bad faith in arguing otherwise. They quote this Court's discussion of how the costs of complying with the Recertification Letter are largely moot, ECF 67 at 27, but ignore that in the *very next paragraph* the Court stated "what remains are the costs of *not* complying," which the Court concluded were irreparable, PI Order at 42 (emphasis in original). Defendants also ignore that they suspended awards and withheld SNAP administrative funds.

1052, 1060 (C.D. Cal. 2025) ("The Government cannot 'un-finalize final agency action' by simply reversing its decision.").

And the Awards Termination Letter did more than suspend funds, it imposed new grant conditions. Defendants say nothing about these conditions. ECF 67 at 27.

### b.  Minnesota is not required to exhaust administrative remedies.

There is no administrative path to the relief Minnesota seeks here. Even if there were, the APA only requires plaintiffs to exhaust administrative processes if a statute or regulation requires that.

### i.  Defendants failed to comply with their own processes.

Defendants argue Minnesota "failed to exhaust all administrative remedies," stating:

> The State agency has 30 days from receipt of the warning to either submit evidence of compliance or submit a corrective action proposal. If the State agency is still deficient after that period, USDA must determine the "appropriate" funds to be suspended or withheld, and FNS must notify the State.

ECF 67 at 28 (citations omitted).

Another remarkable argument: Minnesota had no opportunity to "exhaust" this procedure because *Defendants* refused to follow it. *See* Ex. 3; *see also* PI Order at 31.

### ii.  There is no administrative review process for the actions challenged here.

7 C.F.R. § 276.4 provides procedures for "suspending" or "disallowing" SNAP administrative funds. FNS must first advise the state of the alleged deficiency in its SNAP administration, allow time for corrective action, issue a formal warning, and then allow more time for the state to submit evidence of compliance or a corrective action plan. § 276.4. Only after this may USDA suspend or disallow funds. *Id.* In the event of a

17

disallowance (but not a suspension), "the State agency may request an appeal in accordance with the procedures specified in § 276.7." § 276.4(f); *see also* 276.7(a)(1) ("FNS claims that may be appealed" include "disallowances of Federal funds" under § 276.4).

Minnesota sued to challenge a mandatory Section 2026 project that dramatically altered its recertification obligations. Defendants then suspended payments and imposed new conditions on USDA awards. The administrative processes Defendants cite do not provide for review of any of these actions. *See* 7 C.F.R. §§ 276.4 (suspension/disallowance of administrative funds), 276.7(a)(1) (providing for review of § 276.4 claims and others not relevant here).

Nor do those processes provide for review of the withholding of administrative funds in the Enforcement Letter. Defendants did not disallow funds under § 276.4. They "withheld" them under a "pilot project" that "modifies these administrative procedures[.]" Ex. 3. Because there has been no § 276.4 disallowance, § 276.7 does not provide for review. Defendants agree: the Enforcement Letter states there will be no "administrative process to contest a suspension of payments for administrative costs." Ex. 3.

Nor does any statute provide for review of the "withholding" of funds under a Section 2026 project. 7 U.S.C. § 2020(g) similarly requires the Secretary to provide notice of any deficiency followed by an opportunity to correct it. "If the State agency does not correct such failure," the Secretary

> shall proceed to withhold from the State such funds authorized under sections 2025(a), 2025(c), and 2025(g) of this title as the Secretary deems to be appropriate, subject to administrative and judicial review under section 2023 of this title.

§ 2020(g). None of that happened. Because § 2020(g)'s procedures were not followed, the right to review under § 2023 was not triggered.

Moreover, the Secretary withheld funds authorized by § 2025(a), while § 2023 only provides for review of claims against State agencies under §§ 2022 and 2025(c). *See* § 2023(a)(1), (6). Section 2023 does not provide for review of the withholding of funds authorized by § 2025(a) *even if* Defendants had followed the § 2020(g) procedures.[5]

### iii.   No exhaustion requirement applies to Minnesota's APA claims.

Even if there were an available review process, "only administrative appeals mandated by statute or by agency rule need be pursued before seeking judicial review of an agency action." *Coteau Props. Co. v. Dep't of Interior*, 52 F.3d 1466, 1471 (8th Cir. 1995); *see also Darby*, 509 U.S. at 146 (the APA prohibits "impos[ing] additional exhaustion requirements beyond those provided by Congress or the agency"); *Glisson*, 55 F.3d at 1327 (final agency action "is reviewable even if an administrative appeal is available unless either a statute or the agency's rules require exhaustion as a prerequisite to judicial review").

Defendants never contend that any statute or regulation requires Minnesota to pursue administrative remedies, and courts nationwide have held states need not pursue these processes before seeking APA relief. *See Colorado*, 2026 WL 734048, at *20 ("Administrative exhaustion is not statutorily required, and the Court perceives no reason to compel

---

[5] Section 2020(g) states that withholding of funds is "subject to administrative and judicial review under section 2023" because § 2020(g) permits withholding of funds authorized by § 2025(c), which is reviewable under § 2023(a)(6).

Colorado to submit to this process"); *California*, 2025 WL 2939227, at \*5–6 (states are not required to exhaust review procedures in 7 U.S.C. § 2023(a) or 7 C.F.R. § 276.7).

The single case Defendants cite, *McCarthy v. Madigan*, 503 U.S. 140 (1992), was a *Bivens* action, not an APA case. Because *Bivens* suits are judicially created, any exhaustion requirement is subject to "sound judicial discretion[.]" *McCarthy*, 503 U.S. at 144. But Congress prohibited exhaustion requirements for APA claims beyond those mandated by statute or regulation. *Coteau Properties*, 52 F.3d at 1471. Regardless, *McCarthy* held the plaintiff did *not* need to exhaust administrative remedies. *McCarthy*, 503 U.S. at 149.

### c.  Minnesota has no adequate alternative remedy.

The APA provides for review of "final agency action for which there is no other adequate remedy in a court[.]" 5 U.S.C. § 704. Courts "look for clear and convincing evidence of legislative intent to create a special, alternative remedy and thereby bar APA review." *Citizens for Resp. & Ethics in Wash. v. U.S. DOJ*, 846 F.3d 1235, 1244 (D.C. Cir. 2017) ("*CREW*") (quotation omitted). "Courts must…avoid lightly constru[ing] [section 704] to defeat the [APA's] central purpose of providing a broad spectrum of judicial review of agency action." *Id.* (quotation omitted).

In the vaguest terms, Defendants argue that "[t]he FNA regulatory framework" provides a "structured path" to challenge their actions without further explanation or citation, leaving Minnesota to guess where that trailhead may be.[6] Defendants have waived this

---

[6] The single case Defendants cite found no adequate alternative remedy barring APA review. *See Bowen v. Massachusetts*, 487 U.S. 879, 901–08 (1988).

"undeveloped argument." *United States v. Moua*, 145 F.4th 929, 935 (8th Cir. 2025); *Reynolds v. Harper*, 2026 WL 622283, at *14 (D. Minn. Mar. 5, 2026) (Provinzino, J.).

Minnesota's best guess is Defendants refer to 7 U.S.C. § 2023(a)(13). That provision provides for judicial review of administrative determinations made under § 2023. As discussed above, § 2023 provides review of some determinations made under § 2020, but not the withholding of § 2025(a) funds. It provides no review here: both because the Secretary withheld § 2025(a) funds and because she failed to follow § 2020(g)'s processes. Because Defendants' actions are not reviewable under § 2023, § 2023(a)(13) does not provide for judicial review.

Likewise, the FNA's regulations do not provide for administrative review of the actions challenged here, so the provision for judicial review in 7 C.F.R. § 276.7(j) is of no avail. Regardless, agency regulations cannot evince "legislative intent" to create an alternative remedy that bars APA review. *CREW*, 846 F.3d at 1244.

Defendants' undeveloped argument has not identified any alternative, adequate path to judicial review, let alone "clear and convincing evidence of legislative intent" to create one. *Id.*

### III. THE AMENDED COMPLAINT STATES AN APA CLAIM FOR PROCEDURAL VIOLATIONS (COUNT I).

"The APA empowers federal courts to 'hold unlawful and set aside agency action, findings, and conclusions if they fail to conform with any of six specified standards." *Iowa League of Cities*, 711 F.3d at 844 (quotation omitted). Among those is that "a reviewing

21

court may set aside agency action that has failed to observe those 'procedure[s] required by law.'" *Id.* (quoting 5 U.S.C. § 706(2)) (alteration in original).

The Amended Complaint plausibly alleges that Defendants violated procedural requirements.

### a. The Recertification Letter was subject to the APA's notice and comment procedures.

Agencies must promulgate "legislative rules" using the APA's notice and comment procedures. *Id.* (citing 5 U.S.C. § 553(b)–(c)). The Amended Complaint plausibly alleges that Defendants did not do so before issuing the Recertification Letter. Am. Compl. ¶¶ 190, 244.

Legislative rules "impose[] new rights or duties." *Iowa League of Cities*, 711 F.3d at 873. "Expanding the footprint of a regulation by imposing new requirements…is the hallmark of legislative rules." *Id.* "Whether or not a binding pronouncement is in effect a legislative rule that should have been subjected to notice and comment procedures thus depends on whether it substantively amends or adds to, versus simply interpreting the contours of, a preexisting rule." *Id.* Courts apply "a *de novo* standard of review when distinguishing between legislative rules and other types of agency action." *Id.*

*Colorado* determined the letter there "unquestionably constitutes a legislative rule" because

> [i]t is an agency statement of "particular applicability and future effect" intended to implement or prescribe a specific policy. 5 U.S.C. § 551(4). It imposes new duties on Colorado and SNAP recipients through a mandatory pilot project that—backed by the threat of sanctions—carries the force of law.

*Colorado*, 2026 WL 2026 WL 734048, at *14.

22

The Recertification Letter "substantively amends" at least the following regulations in Title 7 of the Code of Federal Regulations:

1. §§ 273.2(e), 273.14(b)(3) (permitting telephone interviews during recertification)

2. § 273.2(e)(1) (prohibiting requiring households to report for in-office interviews during their certification periods)

3. § 273.10(f)(3) (requiring assignment of the "longest certification period possible" and "at least 6 months" except in limited circumstances)

4. § 273.10(f)(4) (prohibiting "end[ing] a household's certification period earlier than its assigned termination date" except in limited circumstances)

5. § 273.10(g)(1)(i)(A) (requiring State agencies to notify households of their certification periods)

6. § 273.14(b)(1) (requiring State agencies to provide timely notices of expiration to households)

7. § 282.1(b) (requiring notice-and-comment for pilot projects that "will likely have a significant impact on the public")

This Court already described the Recertification Letter as an attempt to "rewrite its own regulations[.]" PI Order at 31. That is exactly what makes it a legislative rule.

Defendants argue the Recertification Letter is an "order."[7] ECF 67 at 33–34. Under the APA, an "order" is "the whole or a part of a final disposition…of an agency in a matter other than rule making but including licensing." 5 U.S.C. § 551(6). An "order" is the product of "adjudication." *Id.* § 551(7).

---

[7] This would not get Defendants very far. Orders result from adjudications, which are subject to their own procedures that Defendants did not follow. *See* 5 U.S.C. § 554.

"[R]ules generally have only 'future effect' while adjudications immediately bind parties by retroactively applying law to their past actions." *Safari Club Int'l v. Zinke*, 878 F.3d 316, 333 (D.C. Cir. 2017); *see also Colorado*, 2026 WL 734048, at *14 (an order "must have retroactive effect, or else it would be considered a rulemaking").

*Colorado* easily dismissed this argument:

> The Recertification Letter does not purport to bind Colorado "by retroactively applying law to [its] past actions." *Safari Club*, 878 F.3d at 333. It does not "adjudicate disputed facts" in an existing controversy. *United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224, 245 (1973). Instead, it is purely future-oriented, the hallmark of a legislative rule. *See Safari Club Intl.*, 878 F.3d at 333.

*Colorado*, 2026 WL 734048, at *14 (some citations modified or omitted).

Defendants offer no reason to reach a different conclusion, and some of the cases they cite don't even involve "orders" under the APA. *See* ECF 67 at 33–34. *Pub. Citizen, Inc. v. FERC*, 839 F.3d 1165, 1169 (D.C. Cir. 2016), discusses "order" as used in the Federal Power Act, not the APA.[8] *FTC v. Standard Oil Co. of California*, 449 U.S. 232, 249 n.7 (1980), determined that the FTC's issuance of a complaint was "agency action," not an "order." As the initial step in an adjudication alleging that the respondents had previously violated the law, that action bears little resemblance to the Recertification Letter.

---

[8] That definition, "any agency action capable of review on the basis of the administrative record," *Public Citizen*, 839 F.3d at 1169 (emphasis removed), would swallow all other forms of "agency action," *see* 5 U.S.C. § 551(13). *Public Citizen* cites *Investment Co. Institute v. Board of Governors of Federal Reserve System*, 551 F.2d 1270 (D.C. Cir. 1977), which acknowledges that "the word 'order' has several frequently used meanings which very in scope," noting the APA's definition differs from that in other statutes. 551 F.2d at 1278.

Defendants' remaining cases concern "orders," but Defendants make no attempt to show those orders are at all like the Recertification Letter. *Baltimore Gas & Electric Co. v. FERC*, 954 F.3d 279, 281–85 (D.C. Cir. 2020), discusses FERC decisions on rate proposals from power utilities. And *Sackett v. EPA*, 566 U.S. 120, 124–25 (2012), concerns an order determining Plaintiffs violated the Clean Water Act—a classic application of law to past actions. None of these impose future obligations contrary to existing regulations.

Defendants suggest that "rules" are generally applicable whereas "orders" affect only specific parties. ECF 67 at 32–34. But the APA defines "rule" to include "statement[s] of general *or particular applicability*[.]" 5 U.S.C. § 551(4) (emphasis added); *see also Colorado*, 2026 WL 734048, at *14 (Colorado letter is "statement of 'particular applicability and future effect'"). And adjudications can "have generally applicable effect." *ITServe All., Inc. v. DHS*, 590 F. Supp. 3d 27, 42 (D.D.C. 2022). This is not a basis for distinguishing one from the other.

The Recertification Letter is a legislative rule. *Colorado*, 2026 WL 734048, at *14. Because Defendants did not follow notice and comment procedures, it must be held unlawful. 5 U.S.C. § 706(2)(D).

**b. The Recertification Letter failed to comply with 7 C.F.R. § 282.1(b).**

If a Section 2026 project "will likely have a significant impact on the public," FNS must publish a notice of the project in the Federal Register at least 30 days in advance stating the project's "specific operational procedures" and explaining its "basis and purpose[.]" 7 C.F.R. § 282.1(b)."If significant comments are received," FNS must "take such

25

action as may be appropriate prior to implementing the project." *Id.* Defendants did not follow these procedures for the Recertification Letter. Am. Compl. ¶ 176.

This Court already found it "implausible that a Section 2026 project that requires Minnesota to recertify over 100,000 households within a month, requires Minnesota to violate USDA regulations to do so, and threatens to impede the SNAP benefits of all Minnesotans does not constitute a 'significant impact on the public.'" PI Order at 26–27. This is the law of the case. *See In re Tri-State Fin.*, 885 F.3d at 533.

*Colorado* agreed, finding "compressing more than six months of work into one[] indubitably meets this standard." *Colorado*, 2026 WL 734048, at *14. The court described recertification as "akin to completing a tax return form on steroids with an automatic audit on top of it." *Id.* (internal quotations removed). It also found Defendants' argument "that the project is unlikely to have a significant impact on the public is directly at odds with the agency's assertion that the project's purpose is to uncover substantial benefits fraud." *Id.* "If the project is significant enough to expose widespread fraud, and important enough to enforce with sanctions, it is necessarily significant enough to require notice to stakeholders and the public." *Id.*

Defendants respond that "USDA determined that the pilot project was not likely to have a significant impact on the public" and that "[t]hat determination satisfies the deferential arbitrary and capricious standard." ECF 67 at 25. First, nothing in the pleadings suggests Defendants made that determination. Even if this Court could consider extraneous matters, Defendants have not shown they were even aware of this regulation, let alone made any determination.

26

Second, the "arbitrary and capricious" standard plays no role here.[9] That language comes from a different APA review provision. *See* 5 U.S.C. § 706(2)(A). Nor does 7 C.F.R. § 282.1(b) use that language. Instead, "[a]gency attempts to avoid the notice and comment procedure under the APA are closely scrutinized." *Nat'l Women, Infants, & Child. Grocers Ass'n v. Food & Nutrition Serv.*, 416 F. Supp. 2d 92, 104 (D.D.C. 2006) (collecting cases). Exceptions to notice and comment procedures are "narrowly construed and only reluctantly countenanced." *Nw. Airlines, Inc. v. Goldschmidt*, 645 F.2d 1309, 1321 (8th Cir. 1981); *see also Petry v. Block*, 737 F.2d 1193, 1200 (D.C. Cir. 1984) (exceptions to notice and comment "are *not* 'escape clauses' that may be arbitrarily utilized at the agency's whim"). Courts conduct a "careful examination" of agencies' justifications for forgoing notice; they do not decide whether those determinations were "arbitrary and capricious." *Nat'l Women, Infants & Children*, 416 F. Supp. 2d at 104.

Third, even if that standard applied, Minnesota has stated a claim that Defendants' "determination" was arbitrary and capricious. *See* PI Order at 27 ("implausible" that Recertification Letter "does not constitute a 'significant impact on the public'"); *Colorado*, 2026 WL 734048, at *15 (claim is "simply not credible" and "reflects not a reasoned determination, but an attempt to evade its notice-and-comment obligations altogether"). Defendants did not even announce this "determination," let alone explain their reasoning. *Niobrara*

---

[9] Defendants' case concerns issuance of a Finding of No Significant Impact on the environment. *See Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 72 F.4th 1166, 1188 (11th Cir. 2023). The agency did so after publishing an environmental assessment and considering public comments. *Id.* at 1177–78. Agency action following notice and comment does not implicate the scrutiny courts give to attempts to evade those procedures and in fact underscores their importance.

*River Ranch, L.L.C. v. Huber*, 373 F.3d 881, 884 (8th Cir. 2004) ("[A]n agency must provide a satisfactory explanation for its actions based on relevant data.")

Finally, Defendants claim the Secretary may waive regulatory requirements, so "to the extent the regulation would have required such notice, the requirement was waived by the Secretary[.]" ECF 67 at 35. Defendants concede she never actually did this, claiming it was "implicit[]." *Id.*

This Court and *Colorado* have rejected the Secretary's sweeping "waiver" claims. PI Order at 30–32 & n.10; *Colorado*, 2026 WL 734048, at *11. Even if Defendants had the power they claim, their argument still falters: by their own account, the ability to "waive" the FNA arises only under a Section 2026 project. Notice and comment is a prerequisite to such a project. *See* 7 C.F.R. § 282.1(b) (requiring notice "[a]t least 30 days prior"). The Secretary cannot gain her waiver power—whatever its scope—until a Section 2026 project commences, which cannot happen until notice and comment is complete.

### c. The Enforcement Letter failed to comply with 7 C.F.R. § 282.1(b).

Defendants also did not use 7 C.F.R. § 282.1(b)'s procedures before implementing the Enforcement Letter. Am. Compl. ¶ 244. But that "project" also has a significant impact on the public. This Court determined it would "significantly impede [Minnesota's] ability to administer SNAP[.]" PI Order at 44. As the Court explained:

> Hundreds of thousands of Minnesotans rely on SNAP to sustain their most basic human need for adequate food and nutrition—just as Congress intended. Going without food has long been recognized as an irreparable harm in the American legal tradition, because the deprivation of nutrition, and the psychological and physical distress attending that deprivation, are quite likely to impose lingering, if not irreversible effects. The USDA's threat to

28

terminate all administrative and beneficiary SNAP funding to Minnesota risks such irreparable harm.

PI Order at 44–45 (internal citations and quotations omitted). Clearly that constitutes a "significant impact." Defendants' motion does not dispute that the Enforcement Letter was subject to § 282.1(b) and focuses solely on the Recertification Letter. ECF 67 at 34–35.

### d. The Enforcement Letter failed to comply with 7 U.S.C. § 2020(g) and 7 C.F.R. § 276.4.

Congress established procedures Defendants must follow before withholding SNAP administrative funds. 7 U.S.C. § 2020(g). USDA adopted regulations implementing these procedures. 7 C.F.R. § 276.4. Those procedures require USDA to "(1) inform a state that it believes the state to be out of compliance with USDA rules, and then (2) give the state a definite period of time to come back into compliance." PI Order at 31. The Enforcement Letter acknowledges Defendants did not follow those procedures before withholding Minnesota's administrative funds. This Court already rejected Defendants' argument they can simply waive these procedures for themselves. PI Order at 31.

### e. The Amended Complaint states a claim that the Awards Termination Letter was subject to notice and comment procedures.

The Awards Termination Letter suspends "payments on all active awards and any future awards from USDA to the State of Minnesota" and demands "justifications for all federal dollar expenditures from January 20, 2025, to the present." Ex. 2. The letter does not delineate what "awards" are affected. Defendants' counsel also seemed uncertain of what the Awards Termination Letter targets.[10]

---

[10] Jan. 14, 2026 Tr. at 23–24.

Some grant terminations or changes to grant terms must go through notice and comment. *See, e.g., Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, 770 F. Supp. 3d 822, 854–56 (D. Md. 2025) (certain grounds for grant terminations are subject to notice and comment); *Elev8 Balt., Inc. v. Corporation for Nat'l & Cmty. Serv.*, 804 F. Supp. 3d 524, 561–64 (D. Md. 2025) (mass termination of grants required notice and comment); *Maryland v. Corp. for Nat'l & Cmty. Serv.*, 785 F. Supp. 3d 68, 110–15 (D. Md. 2025) (same); *Massachusetts v. NIH*, 770 F. Supp. 3d 277, 312 (D. Mass. 2025) (change to grant terms was legislative rule requiring notice and comment).

Any uncertainty about what the affected awards are and the extent to which notice and comment rules apply is due to the letter's vagueness. Because many grant changes or terminations do require notice and comment, Minnesota has stated a plausible claim and is entitled to discovery on the scope of the affected awards.

## IV.   THE AMENDED COMPLAINT STATES AN APA CLAIM THAT THE USDA LETTERS ARE CONTRARY TO LAW AND IN EXCESS OF STATUTORY AUTHORITY (COUNT II).

Under the APA, Courts must set aside agency action that is "contrary to law," *Unity HealthCare v. Azar*, 918 F.3d 571, 577 (8th Cir. 2019), or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C).

### a.   This Court already determined the Recertification Letter and Enforcement Letter are contrary to law.

This Court already determined that "Minnesota is likely to succeed" on its claims that the Recertification Letter and Enforcement Letter are contrary to law and in excess of

Defendants' authority. PI Order at 23. That was a legal conclusion not dependent on disputed facts and should not be reconsidered. *See In re Tri-State Fin.*, 885 F.3d at 533.

### b. The Recertification Letter and Enforcement Letter are not valid Section 2026 projects.

This Court determined that "for at least four independent reasons" the Recertification Letter likely "violate[s] the statutory restrictions on Section 2026 projects." PI Order at 23. Those reasons and more are discussed below.

*First*, a Section 2026 project must "include[] an evaluation to determine the effects of the project." 7 U.S.C. § 2026(b)(1)(B)(i)(II). But neither the Recertification Letter nor the Enforcement Letter includes any proposal for an evaluation. PI Order at 24; Exs. 1, 3.

Defendants' response, that the Recertification Letter requires document preservation, "conflates the statutory evaluation requirement with the Recertification Letter's recordkeeping mandate. Although recordkeeping may facilitate evaluation, they are distinct activities." *Colorado*, 2026 WL 734048, at *13. Prior Section 2026 projects "detailed exactly how the project would be evaluated." *Id.* This Court should not "accept the agency's assurances that it will evaluate the pilot project when the sole document establishing the parameters of the program makes no provision for it." *Id.*

*Second*, a Section 2026 project may not be inconsistent with Minnesota's obligation to "provide timely, accurate, and fair service to applicants[.]" *See* 7 U.S.C. §§ 2026(b)(1)(B)(iv)(III)(ff), 2020(e)(2)(B)(i). "But the Recertification Letter's demands trample over the statutory and regulatory guardrails that ensure fair, accurate, and timely

31

service to SNAP recipients."[11] PI Order at 24; *see also Colorado*, 2026 WL 734048, at *13 (letter "runs roughshod" over statutes and regulations providing for fair process).

As in *Colorado*, Defendants "refuse[] to acknowledge this reality, clinging to [their] refrain that 'the pilot project does not impose new burdens or rules on beneficiaries.'" *Colorado*, 2026 WL 734048, at *13.[12] [R]equiring individuals and families to recertify on short notice outside of their recertification cycle is both new and burdensome….The pilot project promises to generate confusion, disruption, and erroneous terminations—the very 'antithesis' of the 'timely, accurate, and fair service' that the government must provide. *Id.*

The Enforcement Letter is also inconsistent with "timely, accurate, and fair service." Losing administrative funding "would significantly impede [Minnesota's] ability to administer SNAP." PI Order at 44; *see also* Am. Compl. ¶ 218 (loss of administrative funding would "effectively caus[e] a shutdown of SNAP in Minnesota").

*Third*, a Section 2026 project may not be inconsistent with USDA's obligation to pay half of a state's SNAP administrative costs. *See* 7 U.S.C. §§ 2026(b)(1)(B)(iv)(III)(hh), 2025(a). But the Recertification Letter's threat to withhold administrative funds was "inconsistent" with that requirement, and the Enforcement Letter, which did suspend administrative funding, "is an impermissible project for the same reason." PI Order at 26.

---

[11] The Court detailed the specific provisions at issue. PI Order at 24–26. In particular, "[t]erminating a SNAP recipient's guaranteed certification period, for reasons wholly unrelated to the recipient's eligibility or conduct, is fundamentally unfair because it defeats the recipient's reasonable reliance on the guarantee of uninterrupted benefits during that period." *Id.* at 25.

[12] Defendants use that exact language here. *See* ECF 67 at 38 ("the December 16 Pilot does not impose new burdens or rules on beneficiaries").

*Fourth*, a Section 2026 project may not contravene SNAP's objective of "providing food assistance to raise levels of nutrition among low-income individuals[.]" 7 U.S.C. § 2026(b)(1)(B)(i)(I). It also may not deny assistance to eligible households that have "not failed to comply with any work, behavioral, or other conduct requirement[.]" *Id.* § 2026(b)(1)(B)(iv)(III)(bb).

The Recertification Letter "will invariably cause eligible households to lose benefits, either due to administrative error or because applicants are unable to comply with these demands on a compressed timeframe." *Colorado*, 2026 WL 734048, at *13. The Enforcement Letter is inconsistent with these requirements because withholding administrative funding is tantamount to shutting down SNAP. PI Order at 44; Am. Compl. ¶ 218.

Defendants claim the Recertification Letter does not require unenrolling households who do not recertify.[13] ECF 67 at 37. *Colorado* rejected this argument because it "fundamentally misunderstands the relationship between eligibility and recertification. Except in limited circumstances, households that are not recertified within 30 days are ineligible to receive benefits." *Colorado*, 2026 WL 734048, at *13; *see also* PI Order at 25 (Recertification Letter "defeats the recipient's reasonable reliance on the guarantee of uninterrupted benefits during that period.").

_____

[13] Defendants also claim the Recertification Letter "does not require in-person interviews beyond those that are normally required during recertifications." ECF 67 at 37. This is a clear misrepresentation. *See* ECF 67 at 19 (the Recertification Letter "required that MDCYF, as part of the recertification process,…conduct[] in-person interviews"); PI Order at 28 ("[T]he Recertification Letter requires Minnesota to conduct 'in-person' interviews of each household."). *Colorado* rejected this "unnatural reading of [Defendants'] own letter" as an "attempt[] to rewrite the plain terms of the pilot project[.]" *Colorado*, 2026 WL 734048, at *8. It is unfortunate that Defendants repeat those claims here.

*Fifth*, as discussed above, Defendants were required to proceed through notice and comment for both "projects" but failed to do so. PI Order at 26–28.

*Sixth*, "[p]ermissible Section 2026 projects" are those that "improve program administration" or pursue other enumerated goals. 7 U.S.C. § 2026(b)(1)(B)(ii). The Recertification Letter and Enforcement Letter accomplish none of them. Am. Compl. ¶¶ 169, 233. Defendants repeat several times that Section 2026 projects may be conducted to "improve program administration" but never explain how these projects do that. ECF 67 at 2, 9, 22, 36. As the Court found, the Recertification Letter imposes a "crushing operational burden," and the Enforcement Letter would "significantly impede" SNAP administration. PI Order at 38, 44.

*Seventh*, the Recertification Letter and Enforcement Letter are invalid Section 2026 projects because "the FNA does not permit the Secretary to compel states to participate in a § 2026(b)(1)(A) pilot project[.]" *Colorado*, 2026 WL 734048, at *10; *see also* PI Order at 31 (neither party nor the Amici "could identify a circumstance where the USDA could unilaterally compel a state to participate in a Section 2026 project").

*Colorado* engaged in detailed statutory analysis to reach that conclusion, bolstered by the major questions doctrine. *Id.* at *10–11. Defendants take on none of that discussion. Instead, they argue nothing in § 2026 says the Secretary *can't* mandate participation. ECF 67 at 36. But agencies only have the authority Congress gives them. *See, e.g., FEC v. Cruz*, 596 U.S. 289, 301 (2022). Defendants need to point to a source of authority, not the absence of a restriction.

Defendants also argue the Secretary must be able to compel participation because she is "*required*" to carry out pilot projects. ECF 67 at 36. The FNA does require the Secretary to conduct other types of pilot projects, *see* 7 U.S.C. §§ 2021(i)(1)(A), 2025(h)(1)(F)(i)(I), 2017(f)(2)(A), but the FNA does *not* require her to carry out Section 2026 projects, *see* § 2026(b)(1)(A). And even when the Secretary must conduct pilot projects "she must nonetheless secure state cooperation." *Colorado*, 2026 WL 734048, at 10. "[I]t cannot be the case that in the one pilot project provision where the Secretary has no duty to act, she may simultaneously compel states to participate." *Id.*

### c. The Recertification Letter and Enforcement Letter are beyond Defendants' authority.

The Recertification Letter requires Minnesota "to comply with *new* recertification requirements not found in the FNA or its implementing regulations and to violate *existing* ones. *Colorado*, 2026 WL 734048, at *12. Likewise, the Enforcement Letter rewrites the FNA by depriving Minnesota of the procedures Congress required. PI Order at 31.

Defendants claim the power to impose this on Minnesota because Section 2026 gives the Secretary authority to "waive any requirement of this chapter to the extent necessary for the project to be conducted." 7 U.S.C. § 2026(b)(1)(A). In the Court's words, Defendants argue that section allows them to "amend willy-nilly any statute relating to SNAP—dashed off in a letter—in the name of instituting a 'pilot project.'" PI Order at 30; *see also Colorado*, 2026 WL 734048, at * 11 ("the agency claims the Secretary has the extraordinary power to effectively rewrite the whole of the FNA through the vehicle of compulsory § 2026(b)(1)(A) pilot projects").

35

Again, this Court and *Colorado* have rejected this. "[T]he USDA's authority to 'waive any requirement' explicitly refers to waivers *requested by* a state who is participating in a Section 2026 project. It does not, as the USDA purports to read it, allow the USDA to 'waive' all statutory provisions relating to SNAP when *creating* a Section 2026 project." PI Order at 29 (citations omitted); *see also Colorado*, 2026 WL 734048, at *10. Moreover, given the "breathtaking" scope of USDA's position, the major questions doctrine requires "much more in the way of Congressional approval…before the Court could adopt such an expansive reading [of § 2026(b)(1)(A)]." *Id.* at 30–32; *see also Colorado*, 2026 WL 734048, at *11. Defendants' argument also violates the canon against surplusage because it would render all of SNAP's substantive statutory provisions meaningless: "the USDA's interpretation of Section 2026(b)(1)(A) would swallow the [FNA], boiling that chapter down to a single command: the USDA can implement SNAP as it pleases." PI Order at 32 n.10.

Defendants' motion addresses none of these issues. Instead they claim the Secretary can impose new obligations on Minnesota because "Section 2026(b) does not contain any language suggesting that the *only* way the Secretary may conduct a pilot project is through a waiver of existing requirements." ECF 67 at 37. But again, Defendants need affirmative statutory authorization. "An agency, after all, literally has no power to act…unless and until Congress authorizes it to do so by statute." *Cruz*, 596 U.S. at 301 (quotation omitted). And in "extraordinary cases" like this one where an agency asserts a remarkable power, it "must point to 'clear congressional authorization' for the power it claims." *West Virginia v. EPA*,

36

597 U.S. 697, 721, 723 (2022). Defendants cannot claim the power to rewrite the FNA through the *absence* of statutory language.

Defendants also argue, unbelievably, that the Recertification Letter and Enforcement Letter "did not impose any new requirements" on Minnesota. ECF 67 at 37. This Court already chided Defendants for this. *See* PI Order at 37 ("The USDA, astoundingly, reiterates that the Recertification Letter does not demand any alterations to what Minnesota is already legally required to do.").) The argument is more brazen the second time around.

### d.  The Awards Termination Letter is contrary to law.

The USDA has adopted OMB's Uniform Guidance for federal grants, located at 2 C.F.R. pt. 200, subparts A–F. *See* 2 C.F.R. § 400.1. The Uniform Guidance contains procedures and standards for suspending or terminating grants. 2 C.F.R. §§ 200.339–343. An agency may "[t]emporarily withhold payments" or "[s]uspend or terminate" a grant if a recipient "fails to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the Federal Award" if the agency "determines that noncompliance cannot be remedied by imposing specific conditions[.]" *Id.* § 200.339. Upon taking one of these actions, "the Federal agency must provide the recipient with an opportunity to object and provide information challenging the action." *Id.* § 200.342.

The Awards Termination Letter violates these regulations. It suspended payments on but does not claim Minnesota violated the Constitution or any statute, regulation, or term and condition. Ex. 2. Nor did the letter claim that any noncompliance could not be remedied by imposing specific conditions. And the letter provided no opportunity to object or challenge the action. *See Porwancher v. Nat'l Endowment for the Humans.*,

37

792 F. Supp. 3d 107, 114–15 (D.D.C. 2025) (plaintiff likely to succeed where agency did not terminate grant in compliance with Uniform Guidance).

## V. THE AMENDED COMPLAINT STATES AN APA CLAIM THAT THE USDA LETTERS ARE ARBITRARY AND CAPRICIOUS (COUNT III).

An agency action is arbitrary and capricious if:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

PI Order at 33 (quoting *Mo. ex rel. Bailey v. U.S. Dep't of Interior, Bureau of Reclamation*, 73 F.4th 570, 576–77 (8th Cir. 2023)). "[A]n agency may not take 'action that is internally inconsistent or not reasonable and reasonably explained.'" *Id.* (quoting *Firearms Regul. Accountability Coal., Inc. v. Garland*, 112 F.4th 507, 520 (8th Cir. 2024)). "It is a foundational principle of administrative law that judicial review of agency action is limited to the grounds that the agency invoked when it took the action." *Mandan, Hidatsa & Arikara Nation v. U.S. Dep't of the Interior*, 95 F.4th 573, 581 (8th Cir. 2024) (quotation omitted)

### a. The Court already determined the Recertification Letter and Enforcement Letter are arbitrary and capricious.

This Court already determined Minnesota is "likely to prevail" on its claim that the Recertification Letter and Enforcement Letter are arbitrary and capricious. PI Order at 39. Defendants have offered no reason to believe that was wrong and it should not be reconsidered. *In re Tri-State Fin.*, 885 F.3d at 533.

### b. The USDA Letters did not offer satisfactory explanations for their actions.

The Amended Complaint plausibly alleges arbitrary and capricious agency action. "[A]n agency must provide a satisfactory explanation for its actions based on relevant data." *Huber*, 373 F.3d at 884. Both the Recertification Letter and the Awards Termination Letter cited the "Feeding Our Future" fraud, but the Court already determined there is "no rational connection between the Feeding Our Future fraud scheme and the potential of fraud within SNAP, an entirely different entitlement program." PI Order at 34; *see also* Am. Compl. ¶¶ 117–20. Nor is there any reason to believe there is any connection between Feeding Our Future and USDA awards. *Id.* ¶ 220.

All three USDA Letters cite unsubstantiated claims of "fraud" or even just "alleged fraud." But "the USDA offers no evidence to corroborate its claim of fraud in Minnesota's administration of SNAP." PI Order at 34 n.11. Nor does USDA provide evidence of fraud in connection with awards. Defendants cannot penalize Minnesota based on "sweeping, nonspecific, and unsupported accusations of 'fraud, waste, and abuse,'" particularly where, as here, "the evidence before this Court—*including from the USDA itself*—undermines those allegations." *Id.* at 35 n.11; *see also New York v. Admin. for Child. & Fams.*, 2026 WL 673848, at *18–19 (S.D.N.Y. Mar. 10, 2026) (agency acted arbitrarily and capriciously by suspending funding to Minnesota based on "vague concern" of fraud).

As before, USDA "largely abandon[s] its principal reliance on the Feeding Our Future Fraud scheme, and instead now asserts that its demands 'took into consideration MDCYF performance, public reporting, and concerns over the State's administration of

39

SNAP over the course of multiple years.'" PI Order at 34 (quoting ECF 22 at 26); *see* ECF 67 at 41.[14] The Court already rejected this because "the USDA provided none of those explanations in the Recertification Letter, so it may not rely on such 'post hoc rationalization' now." PI Order at 34; *see also id.* at 34 n.11 ("Nor does the USDA offer such explanation in its Enforcement Letter").

### c. Defendants failed to explain how the USDA Letters will fight fraud.

Agencies must "articulate…a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation omitted). None of the three letters explain how they will find or fight fraud.

As the Court explained, the Recertification Letter does not explain why recertification must be completed in just 30 days, why households must be interviewed in person, or why Defendants selected the four Recertification Counties. PI Order at 35–36. Minnesota has plausibly alleged these actions would *undermine* its ability to identify fraud. Am. Compl. ¶¶ 160–65. "If it is true that the USDA is concerned about SNAP fraud in Minnesota, it must proffer some rationale as to how its specific, heavy-handed demands would help uncover that fraud." PI Order at 37; *see also Colorado*, 2026 WL 734048, at *17 (USDA "does nothing to explain *why* the agency believes that conducting a mass recertification in five counties, on a compressed timeline and with no chance to prepare, will

---

[14] The phrase that the Court quoted from Defendants' previous memorandum reappears in their motion to dismiss. ECF 67 at 41.

uncover fraud more effectively than existing procedures and improve payment accuracy—a counterintuitive proposition, at best").

The Awards Termination Letter does not explain how "suspending payments on all active awards" relates to the "alleged fraud" supposedly underlying the action. Ex. 2. Nor does the Enforcement Letter connect termination of SNAP administrative funding to Minnesota's "alleged indifference to ongoing fraud[.]" Ex. 3. Another district court recently rejected a similar funding freeze to Minnesota based on the "specter of potential wrongdoing" as an arbitrary and capricious "'freeze first, ask questions later' approach." *New York*, 2026 WL 673848, at *20.

### d. Defendants failed to consider the weight of their demands.

"[C]omplying with the Recertification Letter would require Minnesota to violate a number of statutory guidelines and regulations[.]" PI Order at 37. It would also be impossible for Minnesota to comply with the letter's demands even if it devoted all available resources to the project. Am. Compl. ¶¶ 127–159; PI Order at 38 (Minnesota provided evidence that "comply[ing] with the Recertification Letter's demands would be close to impossible"); *id.* at 27 n.9 ("no state could likely perform the impossible task the USDA demanded of Minnesota"); *Colorado*, 2026 WL 734048, at *16. This impossibility also permeates the Awards Termination Letter and Enforcement Letter, both of which cited Minnesota's failure to comply with the Recertification Letter.

Defendants respond that Minnesota's "impossibility" argument relies on "State-elected options" it "is at liberty to alter" but gives no examples. ECF 67 at 41; *see also*

*Moua*, 145 F.4th at 935 (undeveloped arguments are waived). It also argues the Secretary may waive any statutory impediments, ECF 67 at 41, an argument this Court rejected.

Defendants continue to ignore Minnesota's allegations—backed by evidence at the preliminary injunction stage—that the Recertification Letter is impossible to comply with because Minnesota and the Recertification Counties lack the employees or even the physical space needed and because it would have been impossible for nearly 100,000 households to schedule in-person interviews in a 30-day period over the holidays and during Operation Metro Surge. Am. Compl. ¶¶ 127–59; PI Order at 38 (complying "would be close to impossible"); *Colorado*, 2026 WL 734048, at *16 ("Colorado simply does not have enough trained eligibility workers state-wide to complete the pilot on the mandated timeline.").

Defendants' continued failure to "acknowledge the weight of its demands" suggests its actions are arbitrary and capricious and "leaves the distinct impression that the USDA has set Minnesota and the Recertification Counties up to fail, a consequence that is about as arbitrary as they come." PI Order at 37–38.

### e. The USDA Letters ignore serious reliance interests.

It is arbitrary and capricious for agencies to "ignore" that "longstanding policies may have engendered serious reliance interests that must be taken into account." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (quotation omitted).

Minnesota, the Recertification Counties, and Minnesota's SNAP beneficiaries have serious reliance interests in SNAP being run as required by law. Am. Compl. ¶ 126.

Minnesota also has serious reliance interests in receiving grants it has been awarded without imposition of burdensome new requirements. *Id.* ¶ 224.

Defendants claim they considered these interests. ECF 67 at 41. But they were required to show their work. None of the USDA Letters acknowledge these interests, let alone provides the "more detailed justification" an agency must give when abandoning a policy that has "engendered serious reliance interests." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

### f.   The USDA Letters punish Minnesota for partisan purposes.

An agency action is arbitrary and capricious when the agency offers a "pretextual" reason "that is incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019). Agency decisions are arbitrary and capricious where they "feature[e] unjustifiable bias or partisanship[.]" *Level the Playing Field v. FEC*, 961 F.3d 462, 464 (D.C. Cir. 2020).

Minnesota has plausibly alleged the true reason for the USDA Letters was to exact the "RECKONING & RETRIBUTION" President Trump pledged to impose on Minnesota. Am. Compl. ¶ 78; *see also id.* ¶¶ 67–82, 191–96, 226, 234. Defendants' motion ignores these allegations entirely.

This is no crackpot claim: in November 2025 a court found it "clear that the administration is withholding full SNAP benefits for political purposes." *R.I. State Council of Churches v. Rollins*, 808 F. Supp. 3d 370, 385 (D.R.I. 2025). This Court has questioned Defendants' motivations. PI Order at 35 n.11 (noting USDA's "purported concerns" of fraud), 37 ("If it is true that USDA is concerned about SNAP fraud in Minnesota…"),

38 (USDA appears to have "set Minnesota and the Recertification Counties up to fail").

*Colorado* found the recertification demand "seems to be about punishment and nothing more." *Colorado*, 2026 WL 734048, at *18; *see also id.* at *6. And another court recently found another agency provided contrived, AI-generated explanations for funding cuts to Minnesota, Colorado, and two other states that may have been directed by an OMB policy to target those disfavored states. *See Illinois v. Vought*, --- F. Supp. 3d ---, 2026 WL 962287, at *2–5 (N.D. Ill. Mar. 12, 2026).

## VI.   THE APA'S REQUIREMENTS DO NOT APPLY TO MINNESOTA'S CONSTITUTIONAL AND ULTRA VIRES CLAIMS.

Defendants argue all of Minnesota's claims are subject to the APA's reviewability provisions in 5 U.S.C. § 704. ECF 67 at 29–30. Because the USDA Letters meet those requirements, this argument would be meaningless even if it were correct.

But "§ 704's 'final agency action' limitation applies only to APA claims[.]"[15] *Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1172 (9th Cir. 2017); *see also Red Lake Band of Chippewa Indians v. Barlow*, 846 F.2d 474, 476 (8th Cir. 1988) ("[T]he waiver of sovereign immunity contained in section 702 is not dependent on application of the procedures and review standards of the APA."); *Trudeau*, 456 F.3d at 187 (reversing dismissal of non-APA claims for lack of "final agency action"); *Woody v. U.S. Bureau of Prisons*, 2016 WL 7757523, at *2 (D. Minn. Nov. 22, 2016), *R&R adopted*, 2017 WL 150505

---

[15] Because the APA's exhaustion requirements are also contained in § 704 they also apply only to APA claims.

(D. Minn. Jan. 13, 2017) (plaintiff stating constitutional claim "need not also satisfy the requirements of § 704 of the APA").

Defendants rely on two cases, both involving 42 U.S.C. § 405(h), which strips district courts of federal question jurisdiction for suits arising under the Social Security Act or Medicare Act.[16] Section 405(h) bars suits raising constitutional challenges to the denial of Social Security or Medicare benefits because those suits "arise" under the Social Security or Medicare Act, which create the rights plaintiffs seek to vindicate, and therefore must be "channel[ed]" through the "special review system[s]" for Social Security or Medicare claims. *Shalala v. Ill. Council on Long Term Care*, 529 U.S. 1, 9, 11–13 (2000); *see also Weinberger v. Salfi*, 422 U.S. 749, 760–61 (1975).

Here there is no similar jurisdiction-stripping statute that "channels" constitutional claims through the APA. Even if there were, "the substantive basis" for Minnesota's claims arise solely from the Constitution, not the APA. Unlike the *Weinberger* and *Shalala* plaintiffs who alleged they had been unconstitutionally denied benefits created by statute, Minnesota's Spending Clause and ultra vires claims do not claim Minnesota has been denied rights bestowed by the APA.

## VII. THE AMENDED COMPLAINT STATES A SPENDING CLAUSE CLAIM (COUNT IV).

Conditions imposed on states' acceptance of federal funds "must be set out unambiguously[.]" *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (quotation omitted). States must accept those conditions "voluntarily and knowingly." *Id.*

---

[16] 42 U.S.C. § 1395ii incorporates the Medicare Act into § 405(h).

Defendants "violated the Spending Clause" because Minnesota "did not receive clear notice that compulsory participation in future pilot projects was a condition of accepting SNAP funds." *Colorado*, 2026 WL 734048, at *19. Minnesota also did not receive clear notice of the conditions the Awards Termination Letter places on the awards it affects.

Defendants argue the Spending Clause does not apply to agencies, who may retroactively impose new conditions. ECF 67 at 43. *Colorado* rejected this. 2026 WL 734048, at *18. The Spending Clause's restrictions "apply to agency-drawn conditions on grants to states" because all agency authority is delegated by Congress. *City of L.A. v. Barr*, 929 F.3d 1163, 1196 n.6 (9th Cir. 2019). The cases Defendants rely on have been rightly criticized. *See County of Santa Clara v. Noem*, 815 F. Supp. 3d 979, 1030 (N.D. Cal. 2025).

## VIII. THE AMENDED COMPLAINT STATES AN ULTRA VIRES CLAIM (COUNT V).

"Ultra vires" refers to "[u]nauthorized" actions "beyond the scope of power allowed or granted…by law[.]" *Adamski v. McHugh*, 304 F. Supp. 3d 227, 236 (D.D.C. 2015). "The ability to sue to enjoin unconstitutional actions by state and federal officers…reflects a long history of judicial review of illegal executive action[.]" *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015).

"The availability of nonstatutory review depends largely on whether the claimed violation is statutory or constitutional." *Sustainability Inst. v. Trump*, 165 F.4th 817, 829–30 (4th Cir. 2026); *see also AFL-CIO v. Dep't of Lab.*, 2026 WL 879518, at *23 (D.D.C. Mar. 31, 2026); *League of United Latin Am. Citizens v. Exec. Office of President*, 808 F. Supp. 3d 29, 69–70 (D.D.C.) (collecting cases). "Ultra vires claims that allege executive action in excess of statutory authority are statutory in nature, while ultra vires

46

claims that allege executive action in the 'absence' of statutory authority are constitutional." *AFL-CIO*, 2026 WL 879518, at \*24 (citing *Dalton v. Specter*, 511 U.S. 462, 473 (1994)). The limitations discussed in Defendants' memorandum apply only to statutory claims. *Sustainability Inst.*, 165 F.4th at 830; *AFL-CIO*, 2026 WL 879518, at \*23.

Minnesota alleges a constitutional violation: Defendants acted in the absence of statutory authority. No statute gives, or could give, Defendants authority to amend the FNA as they seek to do here. They have acted without authority, usurping Congress's exclusive power to legislate. *Cf. Colorado*, 2026 WL 734048, at \*10 ("[t]here is no express textual authority for this separate power that the agency asserts"). Minnesota has therefore stated a classic constitutional ultra vires claim.

Minnesota's complaint clears the statutory ultra vires bar too. Statutory ultra vires claims require a showing that "(i) there is no express statutory preclusion of all judicial review; (ii) there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory[.]" *Fed. Express Corp. v. U.S. Dep't of Comm.*, 39 F.4th 756, 763 (D.C. Cir. 2022) (quotation omitted). Defendants contest only point (ii), arguing Minnesota's claims properly fall under the APA. ECF 67 at 44–45. But they strenuously argue the APA does *not* provide for review. *Id.* at 24–30. If for any reason the Court agrees, then Minnesota clearly also states a statutory ultra vires claim as well as a constitutional one.

## CONCLUSION

Defendants refuse to accept the facts as pleaded, rely heavily on their own declarations, mischaracterize their own actions, falsely claim they have not "sanctioned" Minnesota, repeatedly point to the absence of "noncompliance proceedings" they unlawfully "waived," and retread arguments this Court and *Colorado* have already rejected. All of this reveals their motion for what it is: not a serious motion to dismiss, but an attempt to delay production of an administrative record and summary judgment. This Court should deny Defendants' motion and permit this case to proceed apace.

Dated:  May 20, 2026

Respectfully submitted,

KEITH ELLISON
Attorney General
State of Minnesota

**s/ Joseph Richie**
JOSEPH RICHIE
Special Counsel
Atty. Reg. No. 0400615

LIZ KRAMER
Solicitor General
Atty. Reg. No. 0325089

PETER J. FARRELL
Deputy Solicitor General
Atty. Reg. No. 0393071

KATHERINE BIES
Special Counsel
Atty. Reg. No. 0401675

BRIAN CARTER
Special Counsel
Atty. Reg. No. 0390613

48

LINDSEY MIDDLECAMP
Special Counsel
Atty. Reg. No. 0392589

445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2125
(651) 300-0921 (Voice)
(651) 282-5832 (Fax)
joseph.richie@ag.state.mn.us
liz.kramer@ag.state.mn.us
peter.farrell@ag.state.mn.us
katherine.bies@ag.state.mn.us
brian.carter@ag.state.mn.us
lindsey.middlecamp@ag.state.mn.us

*Attorneys For Plaintiff State of Minnesota*

|#6351643-v1